# UNITED STATES DISTRICT COURT
## DISTRICT OF DISTRICT OF COLUMBIA

| | |
|---|---|
| VINCENT VINCI, 2242 W. Pratt Blvd., Chicago, Illinois, 60645, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> FEDERAL NATIONAL MORTGAGE ASSOCIATION (operating as FANNIE MAE), 3900 Wisconsin Avenue, NW Washington, DC 20016, FRANKLIN RAINES, c/o Federal National Morgage Association, 3900 Wisconsin Avenue, NW Washington, DC 20016, J. TIMOTHY HOWARD, c/o Federal National Morgage Association, 3900 Wisconsin Avenue, NW Washington, DC 20016, and LEANNE G. SPENCER, c/o Federal National Morgage Association, 3900 Wisconsin Avenue, NW Washington, DC 20016, <br><br> Defendants. | **CIVIL ACTION NO.** <br><br> CLASS ACTION COMPLAINT <br><br> **JURY TRIAL DEMANDED** <br><br> CASE NUMBER  1:04CV01639 <br><br> JUDGE: Richard J. Leon <br><br> DECK TYPE: General Civil <br><br> DATE STAMP: 09/23/2004 |

Plaintiff, Vincent Vinci ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Federal National Mortgage Association (operating as Fannie Mae) ("Fannie Mae" or the "Company") securities analysts' reports and

advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes

that substantial evidentiary support will exist for the allegations set forth herein after a reasonable

opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal class action on behalf of purchasers of the securities of Fannie Mae

between October 11, 2000 and September 22, 2004, inclusive (the "Class Period"), seeking to pursue

remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17

C.F.R. §240.10b-5).

3.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of

the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15

U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including

the preparation and dissemination of materially false and misleading information, occurred in

substantial part in this Judicial District. Additionally, the Company maintains a principal executive

office in this Judicial District.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint,

defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the

facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, Vincent Vinci, as set forth in the accompanying certification, incorporated by reference herein, purchased Fannie Mae securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant Fannie Mae is a federally chartered corporation that maintains its principal place of business in this judicial district at 3900 Wisconsin Avenue, NW Washington, DC 20016.

8.      Defendant Franklin D. Raines ("Raines") is the Company's Chief Executive Officer.

9.      Defendant J. Timothy Howard ("Howard") is the Company's Executive Vice President and Chief Financial Officer.

10.     Defendant Leanne G. Spencer ("Spencer") is the Company's Senior Vice President and Controller.

11.     Defendants Raines, Howard, and Spencer are collectively referred to hereinafter as the "Individual Defendants." During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Fannie Mae were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects <u>via</u> access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

13.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Fannie Mae, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14.     As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the provisions of the federal securities laws, the

Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Fannie Mae, each of the Individual Defendants had access to the adverse undisclosed information about Fannie Mae financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Fannie Mae and its business issued or adopted by the Company materially false and misleading.

16.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is

responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

17.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Fannie Mae securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Fannie Mae business, operations, management and the intrinsic value of Fannie Mae securities; and (ii) caused Plaintiff and other members of the Class to purchase Fannie Mae securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Fannie Mae between October 11, 2000 and September 21, 2004, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fannie Mae's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Fannie Mae or its transfer agent and may be notified of the pendency

of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

22.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Fannie Mae; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

23.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     Fannie Mae is a source of financing for home mortgages in the United States. The Company was chartered by the United States Congress to provide liquidity in the secondary mortgage market to increase the availability and affordability of homeownership for low-, moderate- and middle-income Americans.

25.     Fannie Mae's charter limits its operations to activities related to housing, mortgages and related financial products. Its business activities are aligned with national policies that support the expansion of homeownership in America, and serve to increase the total amount of funds available to finance housing.   Though chartered by Congress, the Company's business is self-sustaining and funded exclusively with private capital. The United States government does not guarantee, directly or indirectly, Fannie Mae's securities or other obligations.

### Materially False And Misleading
### Statements Issued During The Class Period

26.     The Class Period commences on October 11, 2000.   At that time, Fannie Mae announced record Third Quarter 2000 earnings. The Company reported earnings for the third quarter of 2000 of $1.124 billion, or $1.09 per diluted common share.   This compared with earnings of $1.097 billion, or $1.05 per diluted common share, for the second quarter of 2000 and $991.0 million, or $0.94 per diluted common share, for the third quarter of 1999. For the first nine months of 2000, Fannie Mae's net income was $3.283 billion, or $3.16 per diluted common share, compared with $2.874 billion, or $2.73 per diluted common share, for the same period in 1999. Fannie Mae's earnings per share for the first nine months of 2000 were 15.8 percent above the first nine months of 1999.

27.    Commenting on these results, defendant Raines stated:

> Our third quarter financial report extends a record of earnings
> consistency few in any industry can match. . . . During a time when
> the financial outlook for many companies has become less certain,
> Fannie Mae stands out. Our sound business strategies, proven risk
> management capabilities, and the broad and deep support we have for
> our housing mission make our prospects for the future as bright as our
> record from the past."

> Raines noted that Fannie Mae's third-quarter financial performance
> continued to be paced by strong growth in revenues. At $1.98 billion,
> the company's taxable-equivalent revenues in the third quarter were
> 13.0 percent above the third quarter of 1999.

28.    Additionally, defendant Howard stated:

> [T]he growth in the company's taxable-equivalent revenues between
> the third quarter of 2000 and the third quarter of 1999 was due
> primarily to a $187.1 million increase in net interest income. Howard
> said this increase stemmed from a 15.2 percent rise in the company's
> average net mortgage balance, together with a net interest margin that
> averaged 100 basis points in both the third quarter of this year and the
> third quarter of 1999.

29.    On January 11, 2001, Fannie Mae reported record 2000 earnings. More specifically,

the Company reported earnings for 2000 of $4.448 billion, or $4.29 per diluted common share. This

compared with earnings of $3.912 billion, or $3.72 per diluted common share for 1999. Earnings

per diluted common share in 2000 were up 15.3 percent compared with 1999. Fannie Mae's net

income for the fourth quarter of 2000 was $1.164 billion, or $1.12 per diluted common share. This

compared with net income of $1.124 billion, or $1.09 per diluted common share, for the third quarter

of 2000 and $1.038 billion, or $0.99 per diluted common share, for the fourth quarter of 1999.

30.    Commenting on these results, defendant Raines stated:

> "The year 2000 was an exceptionally successful one for Fannie Mae
> in a variety of critical areas. We posted our 14th consecutive year of
> record earnings, increased our earnings per share by over 15 percent

-9-

for the second year in a row, achieved our $1 trillion affordable housing commitment ahead of schedule, and announced a set of voluntary liquidity, disclosure and capital enhancement initiatives that put us at the leading edge of financial institution practices." Raines added that Fannie Mae's financial results in 2000 kept the company ahead of the pace required for meeting its goal of doubling EPS over the five years ending in 2003.

Raines also said that the company's record 2000 earnings per share (EPS) performance was driven by top-line revenue growth, with taxable-equivalent revenue rising by 12.2 percent compared with 1999. Commenting on the outlook for 2001, Raines noted, "Fannie Mae's prospects for continued strong earnings growth are excellent. Our credit indicators are favorable, our 25 percent annualized portfolio growth last quarter gives us excellent momentum, and the current financial environment suggests that secondary market activity will remain at an elevated level well into this year."

31.    Additionally, defendant Howard stated:

[T]he company's 2000 financial results were paced by a $780.4 million increase in net interest income, a $69.1 million increase in guaranty fees, and a $32.9 million decline in credit-related expenses. Howard added that average fully diluted common shares declined by 21.5 million shares during the year to 1.009 billion shares in 2000.

Howard said that the increase in Fannie Mae's net interest income in 2000 was the result of a 16.4 percent increase in the average investment balance, coupled with an average net interest margin that remained stable at 101 basis points compared with 1999. Howard said that average net mortgage-backed securities (MBS) outstanding rose by 4.4 percent in 2000, while the average effective guaranty fee during the year increased slightly to 19.5 basis points.

Howard noted that credit-related losses in 2000 declined by $35.2 million compared with 1999, the result of a $32.9 million reduction in foreclosed property expenses to $214.0 million. Fannie Mae's loss provision was a negative $120.0 million in 2000, unchanged from 1999. Charge-off recoveries were $124.9 million in 2000, $2.3 million higher than recoveries in 1999. The company's credit loss rate - credit losses as a percentage of total mortgages and MBS - declined to 0.7 basis points in 2000 from 1.1 basis points in 1999, while the allowance for losses stood at $809 million at the end of 2000 compared with $804 million at the end of 1999.

Howard said that fee and other income totaled $43.5 million of expense in 2000 compared with $191.2 million of income in 1999. Fee and other income was negative in 2000 as a result of a $134.4 million increase in net operating losses generated by higher tax-advantaged investment balances along with a decline in other miscellaneous income. Howard noted that the increase in net operating losses was more than offset by tax credits recognized on low-income housing and other investments. The decline in other miscellaneous income included the recognition of a hedge loss on a Benchmark Note® issue recorded in the second quarter.

Finally, Howard said that the company's EPS growth in 2000 was aided by the repurchase of 25.2 million shares of common stock during the first three quarters of the year, when the share price was unusually low. Howard said that Fannie Mae issued $978 million in preferred stock during the year to finance the repurchases, and that the company did no further share repurchases during the fourth quarter.

32.    On April 17, 2001, Fannie Mae issued a press release with the headline: "Fannie Mae Reports Record First Quarter 2001 Financial Results; Operating Net Income of $1.238 Billion Up 16.6 Percent Over First Quarter 2000; Operating Earnings Per Diluted Common Share of $1.20 Up 17.6 Percent." Therein, the Company reported operating net income for the first quarter of 2001 of $1.238 billion, a 16.6 percent increase compared with the first quarter of 2000. Operating earnings per diluted common share of $1.20 were 17.6 percent above the same period in 2000. Operating net income and earnings per share exclude the one-time cumulative change in accounting principle and the quarter-to-quarter variability in the market value of purchased options which Financial Accounting Standard 133 ("FAS 133") now required to be included in the income statement. Net income and earnings per diluted common share for the first quarter of 2001 including these FAS 133 items were $1.293 billion and $1.25, respectively.

33.    Commenting on these results, defendant Raines stated:

"At a time when many companies are reporting disappointing results, Fannie Mae continues to meet or exceed performance expectations." He said that Fannie Mae's access to the international capital markets enabled the company to commit to purchase record amounts of mortgages during the first quarter.

"Fannie Mae's critical role in providing liquidity during the current period of mortgage refinancings has been extremely beneficial to homeowners and lenders, and also to our shareholders," said Raines. Raines added that Fannie Mae's revenues grew by over 20 percent compared with the first quarter of 2000, nearly double the growth rate of the company's operating costs over the same period.

34.    Additionally, defendant Howard stated:

[G]rowth in Fannie Mae's business and the increase in its net interest margin in the first quarter of 2001 had given the company excellent earnings momentum. Howard noted that the company had not changed its expectation that portfolio growth would be in the high teens during 2001. Commenting on the outlook for operating earnings per share, Howard said, "With our first quarter results we now expect growth in operating EPS for 2001 to be above the 14.9 percent growth rate required to double our EPS in the five years ending 2003." Howard added that the first quarter's results also had improved the company's earnings outlook for 2002 and 2003.

Howard noted that Fannie Mae's net interest margin increased by nine basis points between December 2000 and March 2001 due to a difference in timing between debt calls and expected mortgage liquidations. Howard said that the company expected the margin to move back down as liquidations increase over the spring and summer and the company replaces the option-based debt that was retired during the first quarter. Howard said that for 2001 as a whole management expects the net interest margin not to be significantly different from the 101 basis point average for 2000.

35.    On July 17, 2001, Fannie Mae reported operating net income for the second quarter of 2001 of $1.314 billion, or $1.27 per diluted common share. Operating net income was 19.8 percent above the second quarter of 2000, while operating earnings per diluted common share (operating EPS) rose 21.0 percent over the same period. For the first six months of 2001 Fannie

Mae's operating net income was $2.553 billion, or $2.47 per diluted common share, compared with $2.159 billion, or $2.08 per diluted common share, for the same period in 2000. Fannie Mae's operating EPS for the first six months of 2001 were 18.8 percent above the first six months of 2000. Operating net income and earnings per common share excluded the variability in the market value of purchased options and the one-time cumulative change in accounting principle which resulted from the implementation of FAS 133 on January 1, 2001. Net income and EPS for the second quarter of 2001, including FAS 133 market value changes, were $1.402 billion and $1.36, respectively. Net income and EPS for the six months ended June 30, 2001 including FAS 133 items were $2.696 billion and $2.61, respectively.

36.    Commenting on these results, defendant Raines stated:

"Slower economic growth, lower interest rates and contained inflation have combined to produce very favorable conditions for home buying and mortgage refinancing. In this environment Fannie Mae has been called upon to provide a greater volume of support to housing finance than at any time in the company's history."

Raines said that Fannie Mae's combined book of business - its net mortgage portfolio and outstanding mortgage-backed securities - grew at a 22.3 percent annual rate during the second quarter. At the same time, Raines noted, a rising net interest margin contributed to taxable-equivalent revenue growth of over 29 percent compared with the second quarter of 2000. Finally, Raines added, in spite of the slowing economy the company's credit losses fell to a 17-year quarterly low of $16.2 million. . . . With very strong business and revenue growth and well contained credit losses, Fannie Mae is extremely well-positioned to continue to play a critical role in providing mortgage credit to the economy, while extending our enviable record of superior financial performance."

37.    With respect to FAS 133, Fannie Mae stated:

Fannie Mae adopted Financial Accounting Standard No. 133 (FAS 133), Accounting for Derivative Instruments and Hedging Activities, on January 1, 2001. FAS 133 requires that Fannie Mae mark to

-13-

market only its purchased options and none of its option-based debt or the mortgage investments it hedges with purchased options. At adoption, the mark-to-market of the time value of the purchased options that the company uses as a substitute for callable debt resulted in a cumulative gain of $258.3 million, or $167.9 million after tax. The change in the market value of Fannie Mae's purchased options during the second quarter of 2001 was a net gain of $35.4 million. This amount includes $100.1 million in option cost amortization that formerly was included in net interest income.

FAS 133 also requires that the company record certain derivatives, primarily interest rate swaps it uses as substitutes for non-callable debt, on the balance sheet at their fair values, with an offsetting entry recorded in a separate component of stockholders' equity called other comprehensive income, or OCI. At June 30, 2001, the OCI component of stockholders' equity included a $3.7 billion reduction, or 0.6 percent of the net mortgage balance. The comparable reduction to OCI was $5.7 billion at March 31, 2001. Other comprehensive income is not a component of core capital.

38.    Additionally, defendant Howard stated:

[T]he company's very strong start to the year had improved its financial prospects for both the near term and beyond.

Howard said the company was comfortable with the current security analyst consensus for Fannie Mae's earnings per share for both 2001 and 2002. Howard added, "Our expectation for operating earnings per share growth for the full year 2001 is that it should be in the range of the EPS growth rates we have reported for the quarter and for the year-to-date. For 2002, we expect operating EPS growth to be consistent with the mid-teens growth rates that have characterized the past several years."

On specific items, Howard: reaffirmed the company's previous guidance that it expects high-teens growth in its mortgage portfolio in 2001; said that credit-related losses might be at or near their low point. He added, however, that any near-term increases in credit-related losses would likely be small, and have little perceptible effect on Fannie Mae's net income growth; noted that after the sharp and unexpected increases earlier in the year, the company's net interest margin should move lower over the next several quarters, due to the impact of increased liquidations and as debt with lower-than-average costs runs off. Howard said, however, that it was

-14-

likely that the company's interest margin would remain above its 99 basis point average of the fourth quarter of 2000 throughout much of 2002.

39.    On October 15, 2001, Fannie Mae issued a press release with the headline: "Fannie Mae Reports Record Third Quarter 2001 Financial Results; Operating Net Income of $1.377 Billion up 22.5 Percent over Third Quarter 2000; Operating Earnings Per Diluted Common Share of $1.33 up 22.0 Percent." Therein, the Company stated:

> Fannie Mae (FNM/NYSE), the nation's largest source of financing for home mortgages, today reported operating net income for the third quarter of 2001 of $1.377 billion, or $1.33 per diluted common share. Operating net income was 22.5 percent above the third quarter of 2000, while operating earnings per diluted common share rose 22.0 percent over the same period.
>
> For the first nine months of 2001 Fannie Mae's operating net income was $3.929 billion, or $3.80 per diluted common share, compared with $3.283 billion, or $3.16 per diluted common share, for the same period in 2000. Fannie Mae's operating EPS for the first nine months of 2001 were 20.3 percent above the first nine months of 2000.
>
> ***
>
> Operating net income and operating earnings per common share exclude the variability in the market value of purchased options and the one-time cumulative change in accounting principle which resulted from the implementation of Financial Accounting Standard 133 (FAS 133) on January 1, 2001. Net income and EPS for the third quarter of 2001, including FAS 133 market value changes, were $1.230 billion and $1.19, respectively. Net income and EPS for the nine months ended September 30, 2001 including FAS 133 items were $3.925 billion and $3.80, respectively.
>
> Highlights of Fannie Mae's third quarter 2001 performance include:
>
> Taxable-equivalent revenue growth of 30.6 percent versus the third quarter of 2000.
> Annualized book of business growth of 19.9 percent for the quarter and 19.7 percent year-to-date.

A net interest margin of 1.10 percent versus 1.00 percent in the third quarter of 2000.

Credit-related losses of $18.7 million compared with $19.5 million in the third quarter of 2000.

Losses on debt repurchases and calls of $134.5 million after tax.

Franklin D. Raines, Fannie Mae's Chairman and Chief Executive Officer, said, "Fannie Mae and the residential housing sector have provided an unprecedented amount of support to the economy during this exceptionally challenging time." Raines said that Fannie Mae's combined business volume of $430 billion in portfolio purchases and mortgage-backed security issues during the first three quarters of 2001 already have exceeded the annual total for any previous year. Raines added, "Fannie Mae's record provision of liquidity to the nation's mortgage markets has helped the housing sector inject $40 billion in economic stimulus so far this year. With interest rates again declining, mortgage refinancings should give a further boost to the sagging economy in the months ahead."

Raines noted that the strong growth in Fannie Mae's business volume during the third quarter had combined with a rising net interest margin to produce growth in taxable-equivalent revenue of over 30 percent compared with the third quarter of 2000. Raines also said that in spite of the slowing economy the company's credit losses, at $18.7 million, were lower in the third quarter of 2001 than in the third quarter of 2000.

Timothy Howard, Fannie Mae's Executive Vice President and Chief Financial Officer, said that the company's net interest margin averaged 110 basis points in the third quarter, and rose to 113 basis points in September. Howard said that this year's sharp declines in short-term interest rates in response to aggressive policy accommodation by the Federal Reserve had allowed the company to quickly call debt in amounts that substantially exceeded the timing and volume of mortgage liquidations. Howard said that much of this debt was reissued with short-term maturities in anticipation of a subsequent rise in mortgage repayments, and that with short-term rates declining markedly throughout the year, Fannie Mae's interest margin had experienced a temporary benefit as a result.

Howard said that the additional Federal Reserve easings in response to the events of September 11 would cause the company's short-term debt costs to continue to fall in the fourth quarter, leading to further increases in the interest margin through the end of the year. Howard noted, however, that as the volume of mortgage liquidations grows

over the next several months, much of the company's low-cost short-term debt that had been added since the first quarter of 2001 would be paid off. As this occurred, Howard said, the margin would move back toward more normal levels.

Howard added that the surge in net interest income that resulted from the temporary increase in the net interest margin this year had given the company a valuable opportunity to repurchase certain debt issues that were trading at historically wide spreads to other fixed-income securities. Howard said that Fannie Mae repurchased $5.7 billion in high-coupon debt during the third quarter, resulting in an after-tax loss of $122.3 million. Howard noted that the company had repurchased $9.0 billion of high-coupon debt since the beginning of the year, at an after-tax loss of $217.8 million.

40.    On January 14, 2002, Fannie issued a press release with the headline: "Fannie Mae Reports Record 2001 Financial Results; Operating Net Income of $5.367 Billion up 20.7 Percent over 2000; Operating Earnings Per Diluted Common Share of $5.20 up 21.2 Percent. Results Include Contribution of $300 Million in Common Stock to Fannie Mae Foundation." More specifically, the Company stated:

Fannie Mae (FNM/NYSE), the nation's largest source of financing for home mortgages, today reported operating net income for 2001 of $5.367 billion, or $5.20 per diluted common share. Operating net income was 20.7 percent above 2000, while operating earnings per diluted common share rose 21.2 percent over the same period. For the fourth quarter of 2001 Fannie Mae's operating net income was $1.438 billion, or $1.40 per diluted common share, compared with $1.164 billion, or $1.12 per diluted common share, for the fourth quarter of 2000. The company's fourth quarter and full-year 2001 results include a commitment to contribute $300 million of Fannie Mae common stock to the Fannie Mae Foundation.

*** 

Operating net income and operating earnings per common share exclude the variability in the market value of purchased options and the one-time cumulative change in accounting principle which resulted from the implementation of Financial Accounting Standard 133 (FAS 133) on January 1, 2001. Net income and earnings per

share (EPS) for 2001 including FAS 133 items were $5.894 billion and $5.72, respectively. Net income and EPS for the fourth quarter of 2001, including FAS 133 market value changes, were $1.969 billion and $1.92, respectively. Page one of the attachments to this release provides a reconciliation of operating net income and net income.

***

Franklin D. Raines, Fannie Mae's Chairman and Chief Executive Officer, said, "This was an extraordinary year for Fannie Mae in every respect. The company achieved 21 percent growth in operating earnings per share, greatly exceeding consensus expectations of 14 percent earnings growth at the beginning of the year. Very high levels of mortgage activity enabled us to increase our book of business by 19 percent, the fastest in nine years. Our net interest margin rose 10 basis points, and our credit losses continued to fall in spite of the onset of recession last March. With growth in our taxable-equivalent revenues exceeding 30 percent, we were able to make a $300 million stock contribution to the Fannie Mae Foundation, conduct repurchases of high-cost debt, and launch a significant upgrading of our technology infrastructure - all of which will enhance our financial performance in the future."

Raines noted that the contribution to the Fannie Mae Foundation in the fourth quarter of 2001 would reduce the Foundation's need for company contributions over the next several years. In addition, Raines said, by making the contribution in Fannie Mae shares at a time the company believes the shares to be substantially undervalued, any future Foundation contributions should be reduced even further as the shares appreciate. Raines said the company expects to acquire the shares it will contribute to the Foundation through open market purchases by the end of the first quarter of 2002.

Outlook
Raines said that the company's exceptional financial performance was likely to continue in 2002. "We expect growth in Fannie Mae's operating earnings per share in 2002 to again be significantly above the very positive long-term EPS trend we anticipate for the company," said Raines. Raines noted that the long-term trend for Fannie Mae's earnings would be built upon growth in the residential mortgage market. Raines said the company anticipates that growth in residential mortgage debt outstanding - which averaged 7 percent per year during the decade of the 1990s - will average between 8 and 10 percent per year during the current decade. Raines added that over

-18-

this period Fannie Mae expects to continue to grow both its book of business and its earnings at rates that exceed the growth in mortgage debt.

Raines said that Fannie Mae's financial performance in 2001 and prospects for 2002 make it very likely that the company would achieve the goal it set in May 1999 of doubling its earnings per share between 1998 and 2003. "At the time we set this goal," said Raines, "few expected us to attain it. Not only are we very likely to, we will do so without increasing our risk profile, and with unwavering focus on our housing mission."

Fannie Mae's Executive Vice President and Chief Financial Officer, Timothy Howard, said that Fannie Mae's above-trend earnings prospects for 2002 stem from a variety of factors. Howard said that the recent sharp rebound in long-term interest rates was likely to significantly lower the volume of mortgage liquidations over the course of the first half of the year. This would mean, said Howard, that the company's net interest margin - which had benefited from the call and refunding of a large volume of debt during 2001 - would likely be at elevated levels for a longer period of time than previously anticipated.

Howard added that Fannie Mae's very high levels of business activity during the second half of 2001 would have beneficial carryover effects in the current year. Howard noted that the company ended 2001 with $55 billion in outstanding commitments to purchase mortgages, compared with $16 billion in outstanding commitments at December 31, 2000. As this $39 billion in additional commitments settle, Howard said, it will add over five percentage points to portfolio growth in 2002. Howard also said that Fannie Mae's MBS outstandings on January 1, 2002 were 10 percent above the average MBS balance for 2001. Said Howard, "If average guaranty fee rates simply remain stable this year, the company will not need to add any additional MBS balances to produce double-digit growth in guaranty fee income in 2002."

Howard said that while credit losses may rise somewhat in the aftermath of the recession, they are likely to remain low in 2002. Howard noted that the company's book of business is backed by homes with average equity exceeding 40 percent of market value. In addition, Howard said, 35 percent of the mortgages the company owns or guarantees benefit from some form of third-party credit enhancement. Howard added that Fannie Mae's taxable equivalent

revenues of $10.2 billion during 2001 were well over one hundred times the $81.3 million in credit-related losses the company recorded during the same period. "Even if Fannie Mae's credit losses were to double this year - which is highly unlikely - it would take less than one percentage point off the company's 2002 EPS growth," said Howard.

Finally, Howard said that Fannie Mae's administrative expenses in 2002 were likely to grow at a mid- to high-teens rate due to an initiative begun last year to upgrade the company's operating infrastructure. "This important technology initiative will significantly enhance Fannie Mae's transaction processing, product development and risk management efficiencies, and increase the company's ability to meet the needs of its customers," said Howard. Howard added that the company's guidance for 2002 EPS growth fully reflected the impact of higher-than-normal administrative costs related to this technology project.

"Fannie Mae had an exceptional year in 2001, and we are poised for another exceptional year in 2002," said Howard.

41.    On July 15, 2002, Fannie Mae issued a press release with the headline: "Fannie Mae Reports Record Second Quarter 2002 Financial Results; Operating Net Income of $1.573 Billion up 19.7 Percent over Second Quarter 2001; Operating Earnings Per Diluted Common Share of $1.55 up 22.0 Percent." Therein, the Company stated:

Fannie Mae (FNM/NYSE), the nation's largest source of financing for home mortgages, today reported operating net income for the second quarter of 2002 of $1.573 billion, a 19.7 percent increase compared with the second quarter of 2001. Operating earnings per diluted common share (operating EPS) of $1.55 rose 22.0 percent above the same period in 2001.

For the first six months of 2002, Fannie Mae's operating net income was $3.091 billion, compared with $2.553 billion for the same period in 2001. Operating EPS for the first six months of 2002 was $3.03, or 22.7 percent above the first six months of 2001.

***

Operating net income and operating EPS exclude the variability in earnings that results from including unrealized gains and losses from the change in the market value of purchased options under Financial Accounting Standard No. 133 (FAS 133). Also excluded is the one-time cumulative change in accounting principle from the adoption of FAS 133 on January 1, 2001. Operating net income and operating EPS provide consistent accounting treatment for purchased options and the options embedded in callable debt, and are the performance measures used by company management.

Net income for the second quarter of 2002 including FAS 133 items was $1.464 billion, an increase of 4.4 percent over the second quarter of 2001. EPS including FAS 133 items was $1.44, 5.9 percent above the same period last year. Net income and EPS for the six months ended June 30, 2002, including FAS 133 items, were $2.672 billion and $2.61, respectively. Page one of the attachments to this release provides a reconciliation of net income and operating net income.

*\*\**

Franklin D. Raines, Fannie Mae's Chairman and Chief Executive Officer, said, "Strong business volumes, a rising net interest margin, and a continued low level of credit losses enabled Fannie Mae to report its 58th consecutive quarterly increase in operating earnings per share during the second quarter of 2002." Raines said that taxable-equivalent revenues in the second quarter of 2002 were 21.4 percent higher than the same period one year ago. Raines added that in part because of a higher-than-expected net interest margin, the second quarter slowdown in portfolio growth due to narrow mortgage-to-debt spreads would have little discernable effect on the company's financial performance.

Raines said that the first application of the risk-based capital stress test by the company's financial regulator, the Office of Federal Housing Enterprise Oversight (OFHEO), showed that Fannie Mae's total capital was $6.1 billion in excess of the risk-based requirement as of March 31, 2002. The company had previously reported that its equity capital as of the same date was $0.9 billion above the statutory minimum. Said Raines, "This initial application of the OFHEO risk-based standard confirms that Fannie Mae is managing its business risks with exceptional discipline and prudence." Raines noted that OFHEO would not be using the risk-based standard to classify the company for regulatory capital purposes until the end of

the third quarter 2002. The higher of the risk-based or the minimum capital standard will be binding, Raines said.

Outlook

Fannie Mae's Executive Vice President and Chief Financial Officer, Timothy Howard, reiterated the company's positive outlook for its financial performance, saying, "We continue to expect that growth in operating EPS in 2002 will be above the company's very positive long-term EPS trend." He added, "Although growth in operating EPS next year should be below the exceptional rates recorded in 2001 and anticipated for 2002, we expect another strong financial performance in 2003."

Howard said that Fannie Mae's portfolio growth slowed to 4.9 percent during the second quarter, as mortgage-to-debt spreads remained narrow. Howard said, "We will continue to be disciplined in our approach to portfolio growth -- growing quickly when spreads are wide and more slowly or not at all when spreads are less favorable." Howard noted that with the reduced pace of mortgage commitments during the first half he now expected portfolio growth for the full year to be in the low-to-mid teens range.

Howard also said that the company's net interest margin was higher than expected in the second quarter. He said the company still expects the margin to move lower over the remainder of this year and into next year, although by a lesser degree and at a somewhat slower pace than previously projected.

Howard commented that Fannie Mae's credit performance was continuing to exceed expectations. "For the first half of 2002 credit losses are running at a pace that is below the first six months of 2001," he said. Howard noted that the single-family delinquency rate had fallen by 7 basis points between January and May 2002, which was a positive indicator for future credit losses. Said Howard, "We keep anticipating that our credit losses will rise from their extremely low levels, but so far they have not."

42.     On October 15, 2002, Fannie Mae issued a press release with the headline: "Fannie Mae Reports Record Third Quarter 2002 Operating Results; Operating Net Income of $1.631 Billion

up 18.4 Percent over Third Quarter 2001; Operating Earnings Per Diluted Common Share of $1.62

up 21.8 Percent; Net Interest Margin Stable at 116 Basis Points." Therein, the Company stated:

Fannie Mae (FNM/NYSE), the nation's largest source of financing for home mortgages, today reported operating net income for the third quarter of 2002 of $1.631 billion, an 18.4 percent increase compared with the third quarter of 2001. Operating earnings per diluted common share (operating EPS) of $1.62 rose 21.8 percent above the same period in 2001.

For the first nine months of 2002 Fannie Mae's operating net income was $4.722 billion, compared with $3.929 billion for the same period in 2001. Operating EPS for the first nine months of 2002 was $4.65, or 22.4 percent above the first nine months of 2001.

\*\*\*

Operating net income and operating EPS exclude the variability in earnings that results from including unrealized gains and losses from the change in the time value of purchased options as required under Financial Accounting Standard No. 133 (FAS 133). Also excluded is the one-time cumulative change in accounting principle from the adoption of FAS 133 on January 1, 2001. Operating net income and operating EPS provide consistent accounting treatment for purchased options and the options embedded in callable debt, and are the performance measures used by company management.

Net income on a Generally Accepted Accounting Principles (GAAP) basis for the third quarter of 2002 including the above FAS 133 items was $994.3 million, a decrease of 19.1 percent compared with the third quarter of 2001. GAAP EPS was $0.98, 17.6 percent below the same period last year. The decline in GAAP net income and EPS in the third quarter was due to a $965.2 million increase in unrealized losses in the time value of purchased options. This increase was driven by a change in interest rates that caused a shift in the value under FAS 133 between the time value and the intrinsic value of purchased options that is unrelated to portfolio rebalancing actions during the quarter. Moreover, because Fannie Mae holds options to maturity or exercise, mark-to-market losses in time value are never realized. The effects of FAS 133 are discussed more fully in the FAS 133 section later in this release. GAAP net income and EPS were $3.667 billion and $3.59 for the nine months ended September 30, 2002, and $3.925 billion and $3.80 for the nine months ended

-23-

September 30, 2001. Page one of the attachments to this release provides a reconciliation of net income and operating net income.

\*\*\*

Franklin D. Raines, Fannie Mae's Chairman and Chief Executive Officer, said, "Very strong volumes and stable-to-increasing business margins enabled Fannie Mae to produce another record quarter of operating earnings per share." Raines said that the current environment of heavy mortgage refinancing had resulted in a number of positive developments for the company. Said Raines, "With mortgage rates at 40-year lows and activity in the primary market at unprecedented levels, Fannie Mae is seeing record volumes of commitments to purchase mortgages, continued rapid growth in mortgage-backed security (MBS) guarantees, and record technology and transaction fees." Raines also noted that in spite of concerns about the economy, Fannie's Mae's third-quarter credit losses fell to an 18-year low.

Timothy Howard, Fannie Mae's Executive Vice President and Chief Financial Officer, said that commitments to purchase mortgages for the company's portfolio were $57 billion for September and $128 billion for the quarter, both record amounts. Howard noted that because actual mortgage purchases had lagged well behind commitments -- at $34 billion for September and $74 billion for the quarter -- portfolio growth in the third quarter slowed to a 5.9 percent annual rate. Howard said that it was not unusual in a refinance period for portfolio commitments to outpace purchases, and added that the balance of outstanding commitments had risen to a record $84 billion at the end of September. Said Howard, "Given the large amount of commitments currently outstanding and the likelihood of a continued strong pace of commitments for at least another few months, the outlook for portfolio growth through the first part of 2003 seems very promising."

Howard said that guaranty fee income had continued to increase at an exceptionally rapid pace. Fueled by very strong growth in outstanding MBS and a relatively stable average guaranty fee rate, the company's third quarter guaranty fee income was 20.5 percent above the third quarter of 2001.

Howard noted that as typically occurs in a period of very low interest rates, the duration gap on Fannie Mae's mortgage portfolio widened somewhat during the quarter. Howard said that the portfolio's

duration gap fell from minus four months in June to minus fourteen months at the end of August, before narrowing to minus ten months at the end of September. Said Howard, "The movement in our duration gap last quarter is within the range of what we have experienced historically. As the refinance wave plays out, we expect it to return to a more normal level." Howard emphasized that the company's duration gap, which is not a reliable predictor of the company's net income, had no negative effects on Fannie Mae's financial results in the third quarter. Howard noted that Fannie Mae's primary portfolio risk management measure, four-year net interest income at risk, moved by considerably less than the duration gap -- from 2.4 percent in June to 6.7 percent in August, then back to 3.9 percent in September. Howard added that during the quarter Fannie Mae's percentage of option-based debt rose from 58 percent to 68 percent, reflecting increased portfolio rebalancing.

43.     On October 21, 2002, Fannie Mae announced an offering of $300 million, or 6 million shares at $50 stated value, of fixed-rate non-cumulative preferred stock, designated Series I. Proceeds from the issue would be used for general corporate purposes, including the replacement of Fannie Mae preferred stock issues redeemed earlier this year.

44.     On November 20, 2002, Fannie Mae announced an offering of $300 million, or 6 million shares at $50 stated value, of variable rate non-cumulative preferred stock, designated Series J. The Proceeds from the issue would have helped to capitalize growing portfolio purchases, provide an additional cushion of capital, and be used for general corporate purposes, including the replacement of Fannie Mae preferred stock issues previously redeemed this year. Preferred stock was a component of Fannie Mae's core capital and counts as capital toward meeting the Company's regulatory minimum and risk-based capital requirements. Preferred stock comprised less than 10 percent of Fannie Mae's core capital. The dividend rate on Series J Preferred Stock would have reset based on the two-year swap-rate, every two years beginning on December 31, 2004. Fannie

Mae would have the right to redeem the issue beginning December 31, 2002 and every two years thereafter.

45.   Commenting on this defendant Howard stated:

"Mortgage originations are projected to exceed $2.5 trillion this year, and Fannie Mae's outstanding purchase commitments were a record $119.3 billion levels at the end of October[.] . . . Currently, market conditions make it very attractive for us to issue preferred stock at favorable rates to match our capital levels with portfolio growth as these commitments settle."

46.   On November 21, 2002, Fannie Mae announced the pricing of $625 million, or 12.5 million shares at $50 stated value, of variable rate non-cumulative preferred stock, designated Series J. The issue will have an initial dividend rate of 3.78 percent per year.  Proceeds from the issue would have helped to capitalize growing portfolio purchases, provide an additional cushion of capital, and be used for general corporate purposes, including the replacement of Fannie Mae preferred stock issues previously redeemed this year.

47.   On January 15, 2003, Fannie Mae reported financial results for the year ended December 31, 2002.  Fannie Mae's net income was $4,619 million in 2002 compared with $5,894 million in 2001, and earnings per diluted common share were $4.53 in 2002 compared with $5.72. For 2002 strong growth in net interest income of 30.6 percent and guaranty fee income of 22.5 percent were more than offset by a $4,507 million increase in mark-to-market losses in the time value of purchased options used to hedge the company's interest rate risk.

48.   Commenting on these results, defendant Raines stated:

"In an extremely difficult business environment that affected virtually every company in America, Fannie Mae's operating results in 2002 were among the best in the company's history." Raines noted that in 2002 Fannie Mae reported a second consecutive year of growth in operating earnings per share in excess of 20 percent, and posted its

-26-

16th consecutive year of double-digit growth in operating earnings per share. Raines said credit-related losses remained at historically low levels in 2002, and that in spite of volatile interest rates the duration gap on the company's mortgage portfolio remained within its preferred range for all but three months of the year. Said Raines, "Fannie Mae's disciplined risk management in the fast-growing market of residential mortgage finance has enabled us to achieve a record of growth and consistency of earnings over the past decade and a half that is without equal in financial services."

49.    Also commenting on the Company's success was defendant Howard, who stated:

[T]he company's 21.3 percent growth in operating earnings per share in 2002 was paced by 16.8 percent growth in taxable equivalent revenues. Adjusted net interest income -- net interest income less purchased options amortization expense -- grew by 16.7 percent during the year, while guaranty fees grew by 22.5 percent. Paced by record transactions and technology fees, Fannie Mae's fee and other income rose by $81 million during the year.

50.    On March 31, 2003, Fannie Mae filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results and incorporated its financial results for 2001. Therein, the Company's auditor's KPMG LLP issued the following clean audit opinion:

We have audited the accompanying balance sheets of Fannie Mae as of December 31, 2002 and 2001, and the related statements of income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2002. These financial statements are the responsibility of Fannie Mae's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the

-27-

overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Fannie Mae as of December 31, 2002 and 2001, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2002, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 13 to the financial statements, Fannie Mae changed its method of accounting for derivative instruments and hedging activities in 2001 in accordance with the adoption of Financial Accounting Standard No. 133, Accounting for Derivative Instruments and Hedging Activities.

We also have audited in accordance with auditing standards generally accepted in the United States of America the supplemental fair value balance sheets of Fannie Mae as of December 31, 2002 and 2001, included in Note 16 to the financial statements. As described in Note 16, the supplemental fair value balance sheets have been prepared by management to present relevant financial information that is not provided by the financial statements and is not intended to be a presentation in conformity with accounting principles generally accepted in the United States of America. In addition, the supplemental fair value balance sheets do not purport to present the net realizable, liquidation, or market value of Fannie Mae as a whole. Furthermore, amounts ultimately realized by Fannie Mae from the disposal of assets may vary significantly from the fair values presented. In our opinion, the supplemental fair value balance sheets included in Note 16 present fairly, in all material respects, the information set forth therein.

51.    On April 14, 2003, Fannie Mae reported financial results for the first quarter of 2003.

Fannie Mae's reported net income for the first quarter of 2003 was $1,941 million, a 60.5 percent

increase compared with $1,209 million in the first quarter of 2002. Diluted earnings per share were

$1.93 in the first quarter of 2003, up 65.0 percent from $1.17 in the first quarter of 2002.  Strong

growth in net interest income contributed significantly to the Company's reported results.  Net

interest income for the first quarter of 2003 was $3,368 million, up 38.6 percent from the first quarter

of 2002. This increase was driven by an 11.7 percent rise in the average net investment balance and

a 29 basis point increase in the net interest yield. The Company's net interest yield averaged 160

basis points in the first quarter of 2003 compared with 131 basis points in the first quarter of 2002.

Fannie Mae's net interest yield benefited from an increase in the amount of purchased options used

as a substitute for callable debt, since the cost of these options is not included in our net interest

income or net interest yield. Prior to the adoption of FAS 133 the Company included the

amortization of purchased option premiums as a component of interest expense. This amortization

expense was now included as a component of purchased options expense on the income statement

and excluded from interest expense.

  52. Commenting on these results, defendant Raines stated:

> "Fannie Mae recorded extremely strong and balanced growth during
> the first quarter of 2003, continuing a record of financial performance
> that few other companies have matched." Raines noted that compared
> with the first quarter of 2002 the company experienced double-digit
> growth in both its mortgage portfolio and outstanding MBS, and also
> posted increases in its net interest margin and average guaranty fee
> rate. Raines added that Fannie Mae's first quarter credit-related losses
> were $14 million below the previous quarter and $1 million below the
> first quarter of 2002. Said Raines, "For the last few years housing has
> been one of the notable bright spots of the U.S. economy. Fannie
> Mae's disciplined response to the demands for credit from this sector
> has benefited both home buyers and our shareholders."

  53. Also commenting on the Company's financial results was defendant Howard, who

stated:

> [T]he company's 24.3 percent growth in core business diluted
> earnings per share compared with the first quarter of 2002 was paced
> by a 26.9 percent increase in core taxable-equivalent revenue over the
> same period. Strong growth in core net interest income, MBS
> guaranty fees and fee and other income all contributed to this
> increase, Howard said.

Howard said that during the three months ended March 31, 2003 the company's total book of business grew at an annual rate of 24.7 percent. Howard said that Fannie Mae's outstanding MBS grew at a 34.0 percent annual rate during this period, while the company's mortgage portfolio grew at a 13.3 percent annual rate. Howard noted that the company's mortgage portfolio had grown at a slower rate than its outstanding MBS during seven out of the last eight quarters. Said Howard, "Fannie Mae takes a disciplined approach to portfolio growth. Recently, commercial banks and other investors have been strong bidders for fixed-rate mortgages. We have been able to accommodate these demands by stepping up our issuance of MBS, and doing relatively less purchasing of mortgages and MBS ourselves."

Howard added that Fannie Mae reported improvements in all measures of capital adequacy during the quarter, and at the same time took advantage of market opportunities to repurchase 8.6 million shares of common stock. Between December 31, 2002 and March 31, 2003 the company's core capital rose from $28.1 billion to $29.5 billion, while its excess of core capital relative to the statutory minimum rose from $877 million to $1.291 billion. Fannie Mae's total capital exceeded its risk-based capital requirement by $11.4 billion at December 31, 2002 -- the latest date for which a risk-based capital requirement has been determined -- compared with a $5.8 billion surplus at September 30, 2002. Fannie Mae's total capital plus subordinated debt was 3.7 percent of total assets at March 31, 2003, approaching the 4.0 percent target for this measure set by the company in October 2000 as part of its voluntary initiatives.

54.     On May 15, 2003, Fannie Mae filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Howard and Spencer. Therein, the Company reaffirmed its previously announced financial results. Additionally, the Company represented the following: "The interim financial information provided in this report reflects all adjustments that, in the opinion of management, are necessary for a fair presentation of the results for such periods."

55.     On July 15, 2003, Fannie Mae reported financial results for the second quarter of 2003. According to the Company, its financial highlights were as follows:

Highlights

-30-

Highlights of Fannie Mae's financial performance in the second
quarter of 2003 compared with the second quarter of 2002 include:

Reported net interest income of $3,500.3 million, up 38.2 percent;

Core net interest income of $2,784.5 million, up 26.5 percent;

Guaranty fee income of $632.3 million, up 49.3 percent;

Fee and other income of $231.5 million compared with $41.6 million;
Credit-related expenses of $22.6 million compared with $24.2
million; and,

Losses of $739.8 million from the call and repurchase of debt
compared with $224.7 million.

Fannie Mae's combined book of business grew at an annualized rate
of 29.0 percent during the quarter, including a 55.9 percent
annualized increase in outstanding mortgage-backed securities (MBS)
and a 1.7 percent annualized decrease in the mortgage portfolio.

56.    Commenting on these results, defendant Raines stated:

"Fannie Mae delivered an extremely strong financial performance in
the second quarter, again demonstrating the success of our balanced
and disciplined strategies for growth. With interest rates at their
lowest levels in 45 years, the efficiency of our business model
enabled us to finance a truly extraordinary volume of mortgage
product." Said Raines, "The quality and liquidity of our
mortgage-backed securities have proven to be invaluable in this
environment. Our outstanding mortgage-backed securities increased
at a 56 percent rate during the quarter, and over the past four quarters
they have grown by more than 30 percent, to over $1.2 trillion. We
anticipate that these loans will generate profitable revenues for us for
many years to come." Raines added that the company strengthened its
capital base by $1.2 billion during the quarter, while at the same time
taking advantage of market opportunities to repurchase 5.3 million
shares of common stock.

57.    Also commenting on the Company's results was defendant Howard, who stated:

Each of our primary businesses delivered exceptional financial
performance in the second quarter, including substantial increases in
both core net interest income and guaranty fee income." Howard

added that the company's performance benefited significantly from very low mortgage rates and high levels of refinancing, which resulted in a further temporary increase in the company's net interest margin during the second quarter, to an average of 130 basis points. As a consequence, core net interest income during the second quarter of 2003 was 26.5 percent above the second quarter of 2002.

Howard said that the record amounts of refinancing volumes during the quarter had a number of other positive effects on the company's top-line revenues. In the credit guaranty business, rapid refinancings not only fueled extremely strong MBS growth, but also led to a rise in the effective guaranty fee rate, to an average of 21.2 basis points, as rapid prepayments caused deferred guaranty fee revenues to be recognized more quickly. Record business volumes also resulted in very high levels of transaction and technology fee income during the quarter. In addition, said Howard, credit-related expenses remained at very low levels, totaling just $22.6 million in the second quarter which was $1.6 million lower than the same quarter a year ago.

Howard said that the 1.7 percent annualized decline in the company's mortgage portfolio during the second quarter reflected its disciplined approach to purchasing. Howard noted that Fannie Mae took advantage of favorable pricing in the forward market to make many of its mortgage purchase commitments during the quarter for delayed settlement. Howard said that during the second quarter retained commitments exceeded purchases by $63 billion. Accordingly, unsettled commitments rose to a record $135 billion at June 30. Said Howard, "As these commitments settle during the second half of the year, Fannie Mae's portfolio growth should accelerate noticeably." Howard added that assuming mortgage-to-debt spreads are relatively favorable for the balance of the year the company continues to anticipate recording mid-teens portfolio growth for the year as a whole.

Howard noted that the duration gap on Fannie Mae's mortgage portfolio averaged a negative one month in June. For the first six months of the year the company's duration gap averaged a negative three months, in spite of the extremely low and volatile mortgage rates that prevailed during this period.

Finally, Howard said that the company had several opportunities to call and repurchase relatively high cost debt during the second quarter, resulting in losses on the early extinguishment of debt of

$740 million. These debt repurchases will benefit the company's financial performance in coming years.

58.    On July 30, 2003, defendant Raines held a two-hour conference call where he stated:

> FRANKLIN RAINES, CHAIRMAN AND CEO, FANNIE MAE: -- for the company. And finally, but in many ways, (technical difficulty) extraordinary events at Freddie Mac have had a significant impact on the housing markets and on Fannie Mae. These events have shaken the industry, in that a well-respected company was found not to have had the kinds of internal accounting controls that would have been expected. And by their own account, undertook trading activities to influence the impact of a new accounting standard in ways that distorted there real economic results. The impact of the Freddie Mac situation (technical difficulty) being felt in many quarters, and is now leading to the possibility of Congress looking at whether or not there are any actions that they need to take. And that has had a big impact as well.
>
> It is in the context of this extraordinary year that I thought it might be useful to sit down with you and give you a chance to ask me any questions you might have on any of these topics and how these topics interrelate. Because I think when we try to talk about them discretely we always find that it bleeds over into other things. So rather than trying to do something compartmentalized by topic, better to just open up the entire topic, and we can share with you what our views are. So with that, let me just invite questions that you might have.
>
> AUDIENCE MEMBER: Mr. Raines, talk a little, if you will, about the OFHEO review of the accounting. Is it underway, in depth, and then looking at it, and where do you expect that to go?
>
> FRANKLIN RAINES: The director of OFHEO indicated that, not only had they undertaken a special investigation of Freddie Mac, but they were also going to be reviewing the accounting policies of Fannie Mae, even though he said that he did not have reason to believe that there were any issues. We've had some preliminary discussions with them with regard to the kinds of information that they would like us to provide. But at the moment I believe that they have, appropriately, they are focused on their investigation with Freddie Mac.

We welcome the review by OFHEO, because we have a great deal of confidence in our application of appropriate accounting principles. And having just gone through the process of registering with the SEC, we have the benefit of having third parties look at our accounting policies and ask us detailed questions about them. Our external auditor, KPMG, has always treated us as though we were an SEC registrant, and has applied those standards throughout history. So we feel quite comfortable with our accounting policies.

(technical difficulty) Further, and say that we have looked at each of the issues that Freddie Mac has publicly identified, and looked to see whether we have similar issues, whether we engaged in similar transactions. And I can say that of the issues that they have identified, that we do not have any of the same issues and we have not had the same transactions. So in terms of a direct relationship to Freddie Mac, we are quite comfortable that we have none of those issues. But beyond that we believe that we have applied quite conservative accounting principles that are clearly outlined in our (technical difficulty) K, which we are required to identify our critical accounting policies. And we do outline each of those and explain why it is a critical accounting policy, and ensure that our internal controls and our external auditors are focused on these most important accounting policies.

AUDIENCE MEMBER: Mr. Raines, two questions; one a follow up. When you say that OFHEO is now focusing on Freddie Mac, is that to say that OFHEO (inaudible) cover two courts at the same time?

FRANKLIN RAINES: No, I don't mean to say that at all. OFHEO has many parts. The OFHEO examiners who examine Fannie Mae on a daily basis continue to do their work unabated, unchanged by anything that has gone on at Freddie Mac. As well, the people to manage their risk-based capital calculations continue to do that work. They have set up a special task force, however, looking at the issue of accounting. And that special task force is, of course, giving its primary attention to Freddie Mac. But we expect that they will be engaged with us, in carrying out the director's desire to take a look at our policies. Indeed I think the more they learn about Freddie Mac the more it will help them to hone their own questions about us; it will simply make it more efficient, rather than doing two parallel activities without the benefit of learning from the others.

AUDIENCE MEMBER: Another follow up. You said that Fannie Mae didn't engage in any of the transactions that you saw at Freddie

Mac. But you have got to say that beginning at the end of 19 (technical difficulty) the introduction of FAS and quarters thereafter that Fannie Mae never did any smoothing. That they never did (technical difficulty) transaction (technical difficulty)

FRANKLIN RAINES: This was one of the extraordinary statements that came out in the report issued by the independent counsel who looked at Freddie Mac. And that was the decision that Freddie Mac made to not simply adopt FAS 133, but then to try to influence the impact of FAS 133 on their earnings. I can tell you that at Fannie Mae we took no steps whatsoever to try to ameliorate the impact of FAS 133. In fact we did just the opposite.

We spent (technical difficulty) preparing to implement FAS 133. We spent millions of dollars on new systems, hired new people, made sure our people were up on this very complicated accounting standard, so that they could apply it appropriately. We went through and made sure that we had, for every type of derivative transaction that we engaged in, that we had prior approval before the transactions were engaged in, not only by Fannie Mae's internal accounting team (technical difficulty) by our external auditors. Before any transactions could be carried out, they had to be in a book as an approved transaction (technical difficulty) had been approved as well.

Then when we got to the first announcements of our results under FAS 133, we made a very conscious choice of saying is there -- here is what the GAAP is now with FAS 133. We differ as to whether or not this gives an accurate portrayal of our (technical difficulty) We are going to give you another measure, which we called originally operating earnings, which we now call core business earnings, that takes out the effect of FAS 133. So we gave people the complete results 133; and we gave them the results without FAS 133. (technical difficulty) effort to try to smooth FAS 133 earnings or to in any way distort what the actual impact of FAS 133 was on Fannie Mae.

This is a good point, I think, to make a clarification that sometimes these things get confused; and we ought to make sure we are all on the same basis. You basically have two schools of thought about accounting, particularly for financial institutions. One of them is thought of as historical cost accounting. What anybody who went to (technical difficulty) took any accounting course, any time in your past, you know about historical cost accounting. You put things on your books at its acquisition cost; and then you (technical difficulty) amortized or bring it into earnings as you use up the entity. Whether

-35-

it is a building or it is a derivative contract. And you start historical costs and then you move things into earnings over the period of time you use them. That is the traditional accounting. That is what accounting was for Fannie Mae and everyone before FAS 133.

There is another view of accounting which you call fair value accounting. Which is not historical cost. It is not bringing things in as you use them up. It is a mark to market. On a daily basis, monthly basis, quarterly basis, yearly basis, you mark things (technical difficulty) on an instantaneous basis. (technical difficulty)

What happened with FAS 133 is they took historical accounting and they brought in a piece of fair value, so you had a hybrid. What we operate under now is a hybrid; some historical costs, and some is fair value. We have been very clear both in the U.S. accounting discussion (technical difficulty) international accounting discussions, we think this is a mistake. We think you are far better off to have historical cost accounting or fair value; putting the two together is very confusing, even for the experts.

With FAS 133 they took a piece of fair value. They said, value some of your derivatives using fair value; but none of your assets. Which is a direct contradiction of what fair value is about, which is to mark to market both your assets and your liabilities. That is why it was so confusing. Our answer to that wasn't, well, let's go in and see if we can change the FAS 133 results. It was, report those; but also report them the way we reported them prior to FAS 133. And that is what we do. And we leave it up to the investors to determine which of these they would like to rely on, and what meaning they get from them.

AUDIENCE MEMBER: Mr. Raines, (technical difficulty) Congress looking into what should be done about regulating you and Freddie Mac. What do you (technical difficulty) regulator? Should it be moved to the Treasury Department as having (technical difficulty) about this.

FRANKLIN RAINES: We have said for quite some time that we (technical difficulty) believers that we need to have a strong and well-respected regulator. It is in Fannie Mae's interest. We are a very large company. We have a very important role in the economy. We are a big player in the international capital markets. And it is very important that we, and I would add, and all other large financial companies, should have a safety and soundness regulator that is

-36-

respected. That is in our interest. It is in the public interest, and we strongly support it.

With regard to the question of our own regulator and the placement, we have taken the position thus far that it would be more appropriate for the administration to express its views on that location and not for the regulatees to be leading that discussion. So we have been reticent to come forward with our solution. I can say that the Treasury Department has been generous enough to talk to us on this subject. As you know Secretary Snow said they have a study going on about it. And we have a gratified that our views have been solicited.

But we will wait (technical difficulty) Secretary Snow has to say on September 4 on this topic. I'm hopeful that his leadership will lead to a speedy resolution of this issue, so that it is not lingering, and that we can then move back to putting our focus and the industry's focus on meeting the extraordinary housing demand that we anticipate during this decade.

AUDIENCE MEMBER: Mr. Raines, you have said Fannie Mae has not done the specific things that Freddie Mac did. But more broadly, has Fannie Mae used any accounting practices or any accounting-driven (technical difficulty) that have either distorted your financial presentations or that might appear questionable if known to the public?

**FRANKLIN RAINES: Let me be specific about why I answered the first question the way I did, and then I'll deal with your question. We don't have any insight as to what happened in Freddie Mac that is different than yours. So all we know is what they, special counsel, has told us. So when I answer that question I'm trying to answer it directly based on what we know, without speculating about anything that happened at Freddie Mac that we don't know.**

With regard to Fannie Mae, the question of the appropriateness of our accounting is something I'm quite focused on. Because as an SEC registrant, I am required every quarter to personally certify that I believe that the financial statements that we provided and the information we provide with those financial statements fairly represents our financial condition. So I, every quarter, put my name on the line saying that these statements represent our financial results. So I can say to you that (technical difficulty) undertaken any transactions to distort our true financial condition.

As to the question of the light of day question (technical difficulty) us know what the question of the day will be when any of these things come in. So I don't want to be speculating as to whether or not something will be vitally important to people that they have never heard of two days before and didn't care about at all when they first heard about it. That I think would get me in the realm of rank speculation.

But we have tried to be very fastidious in our accounting to reflect the economics of our business. That is why we care so much about reporting our (technical difficulty) earnings. Because that is what management uses to run the company. And the SEC has very specific rules now about what kind of accounting statements you can put out, what kind of non-GAAP measures you can put out. And their test is that management has to demonstrate why they are using this non-GAAP measure. And (technical difficulty) process, I personally went to the SEC to discuss with them, how do we put out core business earnings?

And the reason was, this is what we believe is the best representation of how our business operates. And this is what we use day to day in running the COMPANY. We wanted to be sure that the SEC agreed with us that that met at their standard; and they did agree with it. I personally went to make that case at the SEC, because I felt so strongly that if I was going to be giving a certification, that it had to be clear what I was certifying to and the importance that we placed on ensuring that investors knew how we think about the business.

That is why we report our GAAP earnings and we report our core business earnings; and we (technical difficulty). So that every accounting period, you can go from one to the other and you can see that the only real difference between the two is how you calculate the cost of our options. One of them says, figure how much you paid for it, bring that cost in over the time you used that option; and the other one says mark it to market, period by period. That is the only difference between our two accounting statements that we put out.

AUDIENCE MEMBER: Just to (technical difficulty) statements that you can possibly make on this subject, has Fannie Mae done anything to circumvent accounting (technical difficulty) Has Fannie Mae used any accounting judgment that either its employees or its auditors considered debatable?

FRANKLIN RAINES: The answer to that is clearly, no. We have not. If we had, I would have violated the law in certifying our financial results. If we had, our auditors would be obligated to publicly do something about that. So I do not think that there is any question on that, of our taking any steps to subvert accounting. And I think that is an important thing to get across.

It is one of the things that I think is indicative of the fact that we became an SEC registrant, is that the process of becoming an SEC registrant -- we are the largest financial registrant the SEC has ever had. But that process was multi-month process, where we went back and forth with the SEC about our accounting principles and policies; and gave them the opportunity to ask lots of questions and to clarify our presentations. Such that when we filed our Form 10-K we had all of their comments. We didn't have to wait to get their comments after the fact. We had all of their comments before we filed, and we did that in order to be able to present the most clear presentation of our accounting.

But let me -- just in -- I have seen a number of these sort of scandal fests before, where the issues become of vital importance that were not of any importance previously. Some people seem to be of the belief that if you manage your company (technical difficulty) the accounting results, that that is somehow a suspicious activity. I don't (technical difficulty) that is not managed with an eye to what the accounting is going to say at the end of the period. So let's be very clear, every company undertakes business decisions with a view to, is this going to be recorded as a profit or a loss? That is a normal part of business.

I hope we don't get to the position where someone says, have you ever thought about two alternatives, one of which would have a more favorable impact on you and the other would have a less favorable; that somehow that is suspicious. It is not suspicious. It is the normal course of conducting a business, any business, not just a business like Fannie Mae. But keep in mind that the actions that Freddie Mac has now admitted to were very discrete actions that, as they said, were results oriented. And the result that they were trying to seek was to defeat the impact of FAS 133 on their accounting; which is something that we simply said, we lost the debate; we just simply now have to live with the difference.

And your publications, many of them have taken strong positions on this. Some of them have insisted that you will only report GAAP

earnings. Some have said you'll report (technical difficulty) will report our core business earnings. So there have been positions taken by a lot of people around FAS 133. Ours has been very clear from the beginning. And that is, we will give our accounting on two bases; one GAAP, and the other on core business earnings.

AUDIENCE MEMBER: (technical difficulty) (inaudible)

FRANKLIN RAINES: Okay, let's do a couple things. One, the accounting in our presentation is dictated by GAAP. So we don't have a choice as to how we present GAAP accounting. Let's just be very clear about that. There is an implication that we had a choice to be made there. That is all dictated by GAAP, and we believe it to be appropriate.

Second, what you are referring to, the other comprehensive income section of the capital account, is heavily affected by mark to market accounting, and can move depending on the direction of interest rates. And so the movement down in that number could equally move up going forward. And therefore (technical difficulty) to say that there is some portion of that is irretrievably a loss. That is why it is in that account. If it were irretrievably a loss it would have run through the income statement. And (technical difficulty) included in the equity itself.

AUDIENCE MEMBER: You are saying that (inaudible)

FRANKLIN RAINES: No, that is not what I said. What I said is that --

AUDIENCE MEMBER: Well how much was it?

FRANKLIN RAINES: What I said was that the accounting there is a function of the -- predominantly a function of mark to market. That mark to market can swamp any of the other components. And therefore you cannot come to the conclusion that there is an irretrievable loss included there. If it were irretrievable is would have moved through the income statement and would be a part of the equity that is not included in that component. So to be very clear, this is the GAAP requirement. Now what you are suggesting is that there should be an adjustment to GAAP in some way, that would take the GAAP requirement and present the same information in a different way. Now we do not believe that that is an appropriate thing to do. (Emphasis added.)

-40-

59.    On August 14, 2003, Fannie Mae filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Howard and Spencer. Therein, the Company reaffirmed its previously announced financial results. Additionally, the Company represented the following: "The interim financial information provided in this report reflects all adjustments that, in the opinion of management, are necessary for a fair presentation of the results for such periods."

60.    On October 16, 2003, Fannie Mae reported financial results for the third quarter of 2003. According to the Company, its financial highlights were as follows:

Highlights

Highlights of Fannie Mae's financial performance in the third quarter of 2003 compared with the third quarter of 2002 include:

Reported net interest income of $3,489.3 million, up 34.7 percent;

Core net interest income of $2,668.8 million, up 21.7 percent;

Guaranty fee income of $613.2 million, up 32.6 percent;

Credit-related expenses of $28.6 million compared with $13.2 million;

Losses of $902.0 million from the call and repurchase of debt compared with $138.0 million; and

A $185.1 million after-tax gain resulting from the adoption of FASB Statement No. 149, Amendment of Statement 133 on Derivative Instruments and Hedging Activities ("FAS 149").

61.    Commenting on these results, defendant Raines stated:

"Fannie Mae delivered outstanding financial results in the third quarter, driven by record business volume and portfolio growth. In a quarter marked by historic levels of volatility in the fixed income

markets, our company continued to benefit from the disciplined strategies for growth that have resulted in consistently strong financial performance through a wide range of economic and financial environments. The 21.9 percent year-to-date growth rate in our mortgage portfolio was achieved even as refinancing activity slowed and portfolio liquidations reached an all-time high. The strength of our performance also enabled us to repurchase nearly $6.8 billion in higher cost outstanding debt, which will benefit our shareholders in the future."

Raines added, "We are particularly pleased by the demonstrated effectiveness of our corporate risk disciplines in a period of sustained volatility and stress in the financial markets. Our duration gap remained within our preferred range in each month of the third quarter, and while our credit loss ratio increased slightly compared with the second quarter of 2003, this measure remains at extremely low historical levels."

62.    Also commenting on the Company's results was defendant Howard, who stated:

"The consistency and strength of our financial performance was not compromised by an extremely challenging and volatile market. Our core business earnings per share increased by 13.0 percent compared with the third quarter of 2002. This growth rate was substantially reduced by the impact of over $900 million in costs associated with the repurchase of outstanding debt, partially offset by a one-time after-tax gain of $185 million associated with the adoption of FAS 149, an amendment to FAS 133 that will result in the majority of Fannie Mae's mortgage purchase commitments being accounted for as derivatives. Our portfolio business recorded exceptional financial performance in the third quarter, with core net interest income up 22 percent over the third quarter of 2002. Guaranty fee income increased by 33 percent compared with the prior year quarter."

Howard said that the 62.4 percent annualized increase in the company's mortgage portfolio during the third quarter was driven by record purchases of $254 billion. These purchases reflected a combination of the settlement of outstanding commitments, which totaled $135 billion at June 30, 2003, and new commitments made during the quarter. Said Howard, "In addition to seeing the very positive impact of the settlement of outstanding commitments, we were able to take advantage of attractive mortgage-to-debt spreads at different points during the quarter, and also benefited from intermittent selling of MBS by banks and other investors." Howard

added that outstanding portfolio mortgage commitments were $30 billion at September 30, 2003.

Howard noted that the duration gap on Fannie Mae's mortgage portfolio averaged a positive one month in September. Howard said, "Our duration gap stayed within our preferred range during each month of a quarter in which yields on 10-year treasuries surged 105 basis points and then declined by 66 basis points in September. That is a very positive testament to the effectiveness of our stringent, publicly-disclosed financial and risk disciplines."

Howard added, "During the quarter we capitalized on particularly attractive opportunities to repurchase shares of Fannie Mae common stock, while at the same time significantly strengthening our capital position to support the extraordinary growth of our mortgage portfolio." Specifically, Howard said, Fannie Mae repurchased 5.5 million shares of common stock during the quarter, while the company's core capital rose to $32.8 billion compared with $30.7 billion at June 30, 2003.

63.     On November 14, 2003, Fannie Mae filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Howard and Spencer. Therein, the Company reaffirmed its previously announced financial results. Additionally, the Company represented the following: "The interim financial information provided in this report reflects all adjustments that, in the opinion of management, are necessary for a fair presentation of the results for such periods."

64.     On January 21, 2004, Fannie Mae reported financial results for the year ended December 31, 2003. According to the Company, its financial highlights were as follows:

Highlights

Highlights of Fannie Mae's 2003 financial performance include:

Record business volume of $1,423 billion, 67.6 percent higher than 2002;

Growth of 20.6 percent in the total book of business;

Reported taxable equivalent revenues of $17.9 billion, up 30.4 percent;

Core taxable equivalent revenues of $14.8 billion, up 24.4 percent;

Record reported net interest income of $13.6 billion, up 28.4 percent;

Record core net interest income of $10.5 billion, up 19.7 percent;

Record guaranty fee income of $2.4 billion, up 32.7 percent;

Record fee and other income of $437.0 million, up 88.2 percent;

Credit-related expenses of $111.6 million compared with $91.7 million;

The call and repurchase of $265.9 billion of outstanding debt, resulting in losses of $2,261.0 million compared with $710.5 million in 2002.

65.    Commenting on these results, defendant Raines stated:

"Fannie Mae delivered outstanding business results in 2003, capitalizing on opportunities and meeting the significant challenges posed by a year of historic refinance and purchase volumes and volatility in our market. Our financial performance was balanced and strong by virtually every measure, as we recorded our 17th consecutive year of double-digit growth in core business earnings per share (EPS). We also met our goal -- established in 1999 -- to double our core business earnings in five years. Equally important, we achieved our mission objectives, building on our demonstrated record of lowering costs, removing barriers, and increasing homeownership opportunities for American families."

Raines added, "Our business volumes in 2003 reached extraordinary levels -- over 67 percent above those recorded in 2002 -- and our capacity to handle these enormous demands for housing finance benefited home buyers and our shareholders alike. Even as liquidations reached record levels, our total book grew by 21 percent, and we delivered solid growth in each of our businesses. Strong year-over-year increases in core net interest and guaranty fee income, and the maintenance of credit losses within a historically low range, contributed to a 15.7 percent increase in core business EPS. This exceptional financial performance in an extremely challenging

-44-

environment is a testament to the balance of our business model, and our strict adherence to the financial and risk disciplines that govern it."

Raines continued, "These business and mission successes were at times obscured during the year by regulatory and legislative concerns growing out of the situation at Freddie Mac." Raines said, "We believe that Congress will not enact any changes to our regulatory status that would harm our ability to perform our mission and produce returns for our shareholders."

66.    Also commenting on the Company's results was defendant Howard, who stated:

"The strength of our full year financial results is especially gratifying given the extreme financial market volatility over the past year, with interest rates declining to 45-year lows in mid-June before rebounding sharply over the balance of the summer. As a consequence of this volatility, the growth rates of Fannie Mae's two businesses diverged substantially, and showed significant variability on a quarterly basis."

Howard added, "While low interest rates during the first half of the year spurred record mortgage originations, aggressive purchasing of mortgages by banks and other investors resulted in relatively narrow mortgage to debt spreads and lower than expected sales into the secondary market. Our portfolio business maintained investment discipline throughout the year, purchasing mortgages when spreads exceeded our hurdle rates and when supply was available in the market. Opportunistic purchasing resulted in a sporadic pattern of portfolio growth during the year, including two quarters of declines that were more than offset by annualized growth of over 60 percent in the third quarter. For the full year our portfolio grew close to our expectation, by 13 percent."

Howard noted that the growth of Fannie Mae's outstanding mortgage-backed securities (MBS) benefited substantially from the record amount of refinancing during the year. Although outstanding MBS declined by 8.3 percent in the third quarter, balances grew at an annual rate of 32.8 percent to a record $1.3 trillion in the fourth quarter, and by 26.3 percent during all 12 months of 2003.

Howard said that the margins on both the portfolio and credit guaranty business rose in 2003 compared with 2002. Said Howard, "Our core net interest margin averaged a higher than anticipated 120

-45-

basis points for the year, compared with 115 basis points in 2002. And partly because of the effect of an accelerated recognition of deferred guaranty fees, our effective guaranty fee rate also rose, averaging 20.2 basis points in 2003 compared with 19.1 basis points in 2002."

Howard added that Fannie Mae's credit costs rose moderately in 2003. Said Howard, "A continued rise in the number of foreclosed properties, coupled with a gradual increase in our loss per case on foreclosure from historic lows, led to a modest increase in credit-related expenses in 2003, to $112 million compared with $92 million in 2002." Howard said that Fannie Mae's credit loss ratio -- the company's credit-related losses as a percent of average net mortgage portfolio and outstanding mortgage-backed securities -- remained extremely low at 0.6 basis points in 2003.

Howard concluded, "The strength of our financial performance in 2003 was accompanied by significant steps taken during the year to further strengthen our risk disciplines and capital position. The stringent financial and risk tolerances to which we publicly committed in July were tested and proven effective by the extreme volatility of the fixed income markets during the past year. Our portfolio's duration gap -- our most closely followed measure of interest rate risk -- remained within our preferred range in each month of 2003, and averaged minus one month for the year. We also met our voluntary initiative -- announced in October of 2000 -- to issue subordinated debt in an amount sufficient to bring the sum of total capital and subordinated debt to 4 percent of on-balance sheet assets, after providing for capitalization of off-balance sheet MBS. At year-end, our combined total capital and subordinated debt was over $41.7 billion, or 4.1 percent of on-balance sheet assets. In effect, the issuance of subordinated debt has allowed our company to add an additional cushion to our capital base of over 40 percent, substantially strengthening our capital position."

67.   On March 15, 2004, Fannie Mae filed its annual report with the SEC on Form 10-K.

The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's

previously announced financial results.  Additionally, the Company's Form 10-K contained the

following clean audit opinion by Fannie Mae's accountants, KPMG LLP:

We have audited the accompanying balance sheets of Fannie Mae as of December 31, 2003 and 2002, and the related statements of income, changes in stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2003. These financial statements are the responsibility of Fannie Mae's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Fannie Mae as of December 31, 2003 and 2002, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the financial statements, Fannie Mae changed its method of accounting for financial guarantees, stock-based compensation and commitments related to mortgages and mortgage-related securities in 2003 and derivative instruments in 2001.

We also have audited in accordance with auditing standards generally accepted in the United States of America the supplemental fair value balance sheets of Fannie Mae as of December 31, 2003 and 2002, included in Note 17 to the financial statements. As described in Note 17, the supplemental fair value balance sheets have been prepared by management to present relevant financial information that is not provided by the financial statements and is not intended to be a presentation in conformity with accounting principles generally accepted in the United States of America. In addition, the supplemental fair value balance sheets do not purport to present the net realizable, liquidation, or market value of Fannie Mae as a whole. Furthermore, amounts ultimately realized by Fannie Mae from the

disposal of assets may vary significantly from the fair values presented. In our opinion, the supplemental fair value balance sheets included in Note 17 present fairly, in all material respects, the information set forth therein.

68.     The statements contained in ¶¶ 26-67 were materially false and misleading when made because failed to disclose or indicate the following: (1) that the Company applied accounting methods and practices that do not comply with GAAP in accounting for the enterprise's derivatives transactions and hedging activities; (2) that the Company had materially understated its accrued cost-of-access liability by $50-$80 million; (3) that the Company used "cookie jar" accounting wherein Fannie Mae arbitrarily distributed current gains to subsequent quarters in a bid to keep its revenue and earning growth steady; (4) that the Company deferred expenses to achieve bonus compensation targets; (5) that the Company had insufficient and inadequate internal controls; and (6) that as a result, the value of the Company's net income and financial results was materially understated at all relevant times.

## The Truth Begins to Emerge

69.     On March 6, 2004, Federal regulators, the Office of Federal Housing Enterprise Oversight ("OFHEO"), ordered Fannie Mae to promptly revamp its accounting to more closely reflect losses on some investments, saying the mortgage giant's accounting has violated standard principles in some instances. The sharp action by OFHEO may force the government-sponsored company to restate its earnings. It capped a period of intensifying scrutiny by regulators of Fannie Mae, following an accounting scandal that erupted at smaller rival Freddie Mac last spring. "Fannie Mae improperly accounted for these assets in a way that fails to reflect losses," OFHEO Director Armando Falcon wrote in a letter to Franklin Raines, Fannie Mae's chairman and chief executive. "... We will take the necessary steps to correct this."

-48-

70.    On April 19, 2004, Fannie Mae issued a press release with the headline: "Fannie Mae Reports First Quarter 2004 Financial Results." Therein, the Company stated:

> Highlights of Fannie Mae's financial performance in the first quarter of 2004 included:
>
> Outstanding MBS growth of 14.8 percent on an annualized basis;
>
> A 7.6 percent decline in the mortgage portfolio on an annualized basis;
>
> Guaranty fee income of $736.9 million, a 34.8 percent increase over the first quarter of 2003;
>
> Credit losses of $9.7 million, down $10.7 million compared with the first quarter of 2003;
>
> Core capital of $35.7 billion, a 21.0 percent increase over the first quarter of 2003; and
>
> A 33.3 percent increase in cash dividends per common share compared with the first quarter of 2003.
>
> Franklin D. Raines, Fannie Mae's Chairman and Chief Executive Officer, said, "Fannie Mae's financial performance -- exemplified by a 10.3 percent increase in core business EPS -- continued to benefit from the balance and flexibility of our business model. Growth in outstanding MBS during the first quarter served as an offset to the decline in our mortgage portfolio, which we had anticipated given the intensity of competition for mortgage product among investors. Credit guaranty income was very strong, while our first quarter credit losses were remarkably low." Looking forward, Raines noted, "With our strong capital base, the demonstrated effectiveness of our risk disciplines, and the sustained high level of purchase originations flowing into our market, we are well positioned to continue to support our mission and to capitalize on opportunities for profitable growth in the coming quarters."

71.    On May 10, 2004, Fannie Mae filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Howard and Spencer. Therein, the Company reaffirmed its previously announced financial results. Additionally, the Company represented the

following: "The interim financial information provided in this report reflects all adjustments that, in the opinion of management, are necessary for a fair presentation of the results for such periods."

72.     On July 21, 2004, Fannie Mae reported financial results for the second quarter of 2004 and updated its performance outlook for the full year.  More specifically, the Company,

> Highlights of Fannie Mae's financial performance in the second quarter of 2004 included:
>
> Business volume of $226 billion compared with $163 billion in the previous quarter;
> Annualized growth of 4.8 percent in the mortgage portfolio;
> Net interest margin of 104 basis points compared with 107 basis points in the previous quarter;
> Guaranty fee income of $656.7 million, a 3.9 percent increase over the second quarter of 2003;
> Credit-related losses of $16.6 million, down $6.3 million from the second quarter of 2003; and,
> Core capital of $36.1 billion, a 17.7 percent increase over the second quarter of 2003.
>
> Franklin D. Raines, Fannie Mae's Chairman and Chief Executive Officer, said, "Fannie Mae delivered a solid second quarter performance in a challenging market characterized by significant volatility, continued strong investor competition for mortgages, and a marked shift among consumers to alternative mortgage products." Raines continued, "Business volumes increased notably over the first quarter of 2004, and our mortgage portfolio returned to positive growth for both June and the second quarter as a whole. Equally important, our results reflected Fannie Mae's continued focus on disciplined risk management, as credit losses remained at exceptionally low levels by historical standards and our portfolio's duration gap remained well within our preferred range even as interest rates moved significantly during the quarter. In addition, we are pleased that Standard & Poor's reaffirmed our company's corporate governance score of 9 on a 10 point scale, citing 'governance practices that are consistently strong or very strong.'" Raines concluded, "Given the balance and flexibility of Fannie Mae's business model and the demonstrated effectiveness of our risk disciplines, we believe we are well positioned to address the continued challenges presented by a transitioning market through the remainder of the year and beyond."

73.     On August 9, 2004, Fannie Mae filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Howard and Spencer. Therein, the Company reaffirmed its previously announced financial results. Additionally, the Company represented the following: "The interim financial information provided in this report reflects all adjustments that, in the opinion of management, are necessary for a fair presentation of the results for such periods."

74.     The statements contained in ¶¶ 69-73 were materially false and misleading when made because failed to disclose or indicate the following: (1) that the Company applied accounting methods and practices that do not comply with GAAP in accounting for the enterprise's derivatives transactions and hedging activities; (2) that the Company had materially understated its accrued cost-of-access liability by $50-$80 million; (3) that the Company used "cookie jar" accounting wherein Fannie Mae arbitrarily distributed current gains to subsequent quarters in a bid to keep its revenue and earning growth steady; (4) that the Company deferred expenses to achieve bonus compensation targets; (5) that the Company had insufficient and inadequate internal controls; and (6) that as a result, the value of the Company's net income and financial results was materially understated at all relevant times.

## The Truth Emerges

75.     On September 22, 2004, Fannie Mae, prior to the opening of the market, issued the following statement:

> Statement by Ann McLaughlin Korologos Presiding Director, Fannie Mae Board of Directors September 22, 2004
>
> Over a year ago, the Office of Federal Housing Enterprise Oversight (OFHEO) announced a special examination of Fannie Mae's accounting policies and practices. From the outset, Fannie Mae's Board of Directors has taken this examination seriously. The Board's Audit Committee was charged with overseeing the company's

response to the examination. In connection with its oversight, the Audit Committee engaged outside counsel, which in turn engaged the accounting firm Ernst & Young.

On September 20, Fannie Mae's Board of Directors received OFHEO's report of the findings to date of the agency's special examination. In a letter to the Board that summarizes the report, OFHEO describes its findings that "Fannie Mae (1) applied accounting methods and practices that do not comply with GAAP in accounting for the enterprise's derivatives transactions and hedging activities, (2) employed an improper 'cookie jar' reserve in accounting for amortization of deferred price adjustments under GAAP, (3) tolerated related internal control deficiencies, (4) in at least one instance deferred expenses apparently to achieve bonus compensation targets, and (5) maintained a corporate culture that emphasized stable earnings at the expense of accurate financial disclosures." OFHEO's report to the Board states that "the matters detailed in this report are serious and raise doubts concerning the validity of previously reported financial results, the adequacy of regulatory capital, the quality of management supervision, and the overall safety and soundness of the Enterprise."

The Board takes the report seriously and is working with OFHEO to resolve these matters.

In addition, the Securities and Exchange Commission (SEC) has been conducting an informal inquiry that includes issues raised in the OFHEO report. The Board has pledged its full cooperation with the regulators.

In order to work with OFHEO and the SEC, the Board has designated a committee composed entirely of independent directors to take the lead on both the OFHEO report and the SEC inquiry. The Board has retained independent counsel, former Senator Warren Rudman of Paul, Weiss, Rifkind, Wharton & Garrison LLP, to serve as counsel to the committee. The firm will in turn retain an independent accounting firm to assist in the review of these matters so that the committee and the Board may report back to OFHEO and the SEC expeditiously.

Fannie Mae's Board of Directors is committed to working with our regulators to resolve these matters consistent with our commitment to the highest standards of corporate governance, financial reporting and transparency to the marketplace.

76.    News of this shocked the market. Shares of Fannie Mae fell $4.96 per share, or 6.56

percent, to close at $70.69 per share on unusually high trading volume.

77.    After the market closed on September 22, 2004, OFHEO Director Armando Falcon,

Jr. issued the following statement regarding Fannie Mae's accounting review:

> "OFHEO has met with the Board of Directors of Fannie Mae and
> presented them with the findings to date of our accounting review.
>
> "Now that the Board has had an opportunity to review these findings,
> I am today releasing the report to the public. We are working with the
> Board to resolve the issues raised in the examination."

78.    OFHEO in its report stated the following:

> We are currently conducting a Special Examination of Fannie Mae's
> accounting policies, internal controls, and financial reporting
> processes. Although the examination is still in process, our findings
> to-date are serious and warrant a report at this juncture. This report
> details the Special Examination's concerns on the framework and
> conditions of Fannie Mae's accounting policies and internal controls,
> with a particular focus on two critical accounting areas: deferred price
> adjustments, and derivatives and hedging activities.
>
> We have determined that Fannie Mae, in developing policies and
> practices in these critical areas, has misapplied Generally Accepted
> Accounting Procedures ("GAAP"), specifically Accounting for
> Nonrefundable Fees and Cos s Associated with Originating or
> Acquiring Loans and Initial Direct Costs of Leases ("SFAS 91") and
> Accoun ing for Derivative Instruments and Hedging Activities
> ("SFAS 133"). The misapplications of GAAP are not limited
> occurrences, but are pervasive and are reinforced by management.
> The matters detailed in this report are serious and raise concerns
> regarding the validity of previously reported financial results, the
> adequacy of regulatory capital, the quality of management
> supervision, and the overall safety and soundness of the Enterprise.
>
> The problems relating to these accounting areas differ in their
> specifics, but they have emerged from a culture and environment that
> made these problems possible. Characteristics of this culture include:

• management's desire to portray Fannie Mae as a consistent generator of stable and growing earnings;
• a dysfunctional and ineffective process for developing accounting policies;
• an operating environment that tolerated weak or non-existent internal controls;
• key person dependencies and poor segregation of duties; •
incomplete and ineffective reviews by the Office of Auditing;
• an inordinate concentration of responsibility vested with the Chief Financial Officer; and
• an executive compensation structure that rewarded management for meeting goals tied to earnings-per-share, a metric subject to manipulation by management.

The tenor of earnings management is deeply ingrained at Fannie Mae and has given rise to accounting policies and practices that emphasize effects on earnings volatility, rather than faithfulness to GAAP. A key message by Fannie Mae to the investor community is management's ability to generate stable and growing earnings. This is evidenced by Fannie Mae's annual financial reports, with their recurring graphs of steadily increasing earnings against a backdrop of volatile interest rates. Less well known, but detailed in this report, is the fact that the desire by management to minimize earnings volatility was a central organizing principle in the development of key accounting policies.

Management also emphasized the stable earnings imperative in its communications to the Fannie Mae Board of Directors. In July 2003, even as the accounting problems of Freddie Mac were publicly emerging, Fannie Mae's Chief Financial Officer, Tim Howard, made a presentation to the Board that emphasized a "stable pattern of earnings" as a requirement for Fannie Mae if it were to be perceived as a low-risk Enterprise. Mr. Howard included in this presentation a graph showing that the earnings of Fannie Mae were smoother than those of Freddie Mac and almost all other companies in the S&P 500.

Sound risk management practices can reduce the economic effects of volatile cash flows. However, management should not reduce earnings volatility through accounting policies and practices that do not comport with GAAP.

79.    The market reacted swiftly. The next trading day shares of Fannie Mae fell an

additionally $3.24 per share, or 4.58 percent, by noon on September 23, 2004.

## FANNIE MAE'S VIOLATION OF GAAP RULES

80.    Given thee accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)    The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated  (FASB Statement of Concepts No. 2, ¶¶58-59); and

(g)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated.  (FASB Statement of Concepts No. 2, ¶95).

81.     The adverse information concealed by defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. 229.303).

## UNDISCLOSED ADVERSE FACTS

82.     The market for Fannie Mae's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Fannie Mae's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Fannie Mae securities relying upon the integrity of the market price of Fannie Mae's securities and market information relating to Fannie Mae, and have been damaged thereby.

83.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Fannie Mae's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

84.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Fannie Mae's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Fannie Mae and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

85.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Fannie Mae, their control over, and/or receipt and/or modification of Fannie Mae allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Fannie Mae, participated in the fraudulent scheme alleged herein.

-57-

86.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

87.    Defendants were motivated to commit the fraud described herein because an executive compensation structure was in place that rewarded management for meeting goals tied to earnings-per-share, a metric subject to manipulation by management.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

88.    At all relevant times, the market for Fannie Mae securities was an efficient market for the following reasons, among others:

(a) Fannie Mae stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Fannie Mae filed periodic public reports with the SEC and the NYSE;

(c) Fannie Mae regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Fannie Mae was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

-58-

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

89.    As a result of the foregoing, the market for Fannie Mae securities promptly digested current information regarding Fannie Mae from all publicly-available sources and reflected such information in Fannie Mae stock price. Under these circumstances, all purchasers of Fannie Mae securities during the Class Period suffered similar injury through their purchase of Fannie Mae securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

90.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Fannie Mae who knew that those statements were false when made.

**FIRST CLAIM**
## Violation Of Section 10(b) Of
## The Exchange Act Against And Rule 10b-5
## Promulgated Thereunder Against All Defendants

91.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Fannie Mae securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

93.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Fannie Mae securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

94.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Fannie Mae as specified herein.

-60-

95.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Fannie Mae value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Fannie Mae and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Fannie Mae securities during the Class Period.

96.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

97.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Fannie Mae operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

98.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Fannie Mae securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Fannie Mae publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Fannie Mae securities during the Class Period at artificially high prices and were damaged thereby.

99.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the

-62-

other members of the Class and the marketplace known the truth regarding the problems that

Fannie Mae was experiencing, which were not disclosed by defendants, Plaintiff and other

members of the Class would not have purchased or otherwise acquired their Fannie Mae

securities, or, if they had acquired such securities during the Class Period, they would not have

done so at the artificially inflated prices which they paid.

100.    By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

101.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their respective purchases and

sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation Of Section 20(a) Of**
**The Exchange Act Against the Individual Defendants**

102.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

103.    The Individual Defendants acted as controlling persons of Fannie Mae within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various

statements which Plaintiff contend are false and misleading.  The Individual Defendants were

provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

105.    As set forth above, Fannie Mae and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 23, 2004

**COHEN, MILSTEIN, HAUSFELD, & TOLL, P.L.L.C.**

By: _____

Steven J. Toll (DC Bar# 225623)
Daniel S. Sommers (DC Bar # 416549)
Matthew Handley
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas (481690)
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
(610) 667-7706

**Attorneys for Plaintiff**

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Vincent Vinci, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the Complaint and authorizes its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in the following: Fannie Mae (NYSE: FNM) that are the subject of this action are as follows[1]:

| Fund/Symbol | Buy/Sell | # of Shares | Date | Price |
|---|---|---|---|---|
| Fannie Mae | Bought | 71 | 9/30/2003 | $70.52 |
| Fannie Mae | Bought | 23 | 12/1/2003 | $69.53 |
| FANNIE MAE | bought | 8 | 8/03/04 | $70.98 |

[1]List additional transactions on a separate sheet of paper, if necessary.

5.      During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party or a class in the following actions filed under the federal securities laws: St. Paul Travelers Companies, Inc.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of September, 2004.

VINCENT VINCI