# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation | )<br>)<br>)<br>)<br>)     **MDL No. 1688** |
| In Re Fannie Mae Securities Litigation | )<br>)<br>)<br>)<br>)     **Consolidated Civil Action No.: 1:04-CV-01639**<br><br>**Judge Richard J. Leon** |

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

## JURY TRIAL DEMANDED

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ............................................................... 1

II.    JURISDICTION AND VENUE .......................................................... 5

III.   PARTIES .......................................................................................... 6

      A.  Lead Plaintiffs ..................................................................... 6

      B.  Fannie Mae Defendants ...................................................... 7

      C.  Defendant KPMG ............................................................... 16

      D.  Defendant Goldman Sachs .................................................. 17

IV.   GENERAL BACKGROUND OF FANNIE MAE ............................ 17

V.    THE GOVERNMENT AND INTERNAL INVESTIGATIONS FINDING GAAP VIOLATIONS AND EGREGIOUS MISCONDUCT BY DEFENDANTS. ............. 22

      A.  OFHEO's Interim 2004 Report Partially Uncovered the Fraud ............ 22

      B.  The Internal Rudman Investigation Confirmed and Further Elaborated on the Fraud ........................................... 39

      C.  The 2006 OFHEO Report Disclosed Even More Accounting Manipulations by Defendants .......................... 45

      D.  The SEC Complaint Alleging Fraud and the OFHEO and SEC Settlements ........................................................ 51

VI.   THE FANNIE MAE DEFENDANTS' KNOWING OR RECKLESS DISREGARD OF GAAP ............................................ 55

      A.  General GAAP Violations ................................................... 55

      B.  The Fannie Mae Defendants' Violations of SFAS 91 ................ 60

C.   The Fannie Mae Defendants' Violations of SFAS 133 ............................. 65

D.   The Fannie Mae Defendants' Additional Accounting Manipulations and
     Violations of Other Accounting Rules ........................................................ 72

VII.   ADDITIONAL   SCIENTER   ALLEGATIONS   AS   TO   THE   FANNIE   MAE
       DEFENDANTS ...................................................................................................... 79

       A.   Admissions and Congressional Testimony Concerning The Fannie Mae
            Defendants' Fraudulent Accounting ........................................................... 79

       B.   Inadequate Controls and Accounting Oversight Support a Strong
            Inference of Scienter .................................................................................... 86

       C.   Individual Defendants' Compensation Was Tied to Their Ability to
            Manage Fannie Mae's Earnings ................................................................... 90

       D.   Individual Defendants' Insider Trading ....................................................... 96

VIII.   FANNIE MAE DEFENDANTS' FALSE AND MISLEADEADING STATEMENTS
        DURING THE CLASS PERIOD ......................................................................... 112

        A.   Statements Concerning Fiscal Year 2001 ................................................. 112

        B.   Statements Concerning Fiscal Year 2002 ................................................. 140

        C.   Statements Concerning Fiscal Year 2003 ................................................. 189

        D.   Statements Concerning First Two Quarters of 2004 ............................... 250

IX.   KPMG KNEW OR RECKLESSLY DISREGARDED THAT ITS 2001, 2002 AND
      2003 AUDIT OPINIONS WERE MATERIALLY FALSE AND MISLEADING. 269

      A.   KPMG Knew or Recklessly Disregarded That Fannie Mae's Accounting
           Violated GAAP ........................................................................................... 271

           1.   SFAS 91 Violations ........................................................................... 271

      2.   SFAS 133 Violations ............................................................. **281**

      3.   Additional Accounting Violations ....................................... **293**

  B.  KPMG'S Knowing Violations of GAAS ...................................... **294**

  C.  Additional Evidence of KPMG's Scienter .................................. **299**

  D.  KPMG Lacked The Requisite Auditor Independence ........................... **300**

  E.  KPMG'S False and Misleading Statements ............................... **302**

X.    GOLDMAN SACHS' DIRECT PARTICIPATION IN THE FRAUDULENT SCHEME ................................................................. **307**

  A.  "Project Libra":  Goldman Sachs' Sham Transactions to Shift Fannie Mae Income to Future Periods ...................................... **308**

  B.  The "Cover-up" by Goldman Sachs and the Fannie Mae Defendants:  Hiding the Improper Income-Shifting Purpose of the REMICS from Investors ............................................................... **312**

  C.  Non-Compliance with SFAS 140 Requirements for Qualifying Special Purpose Entities ....................................................... **315**

  D.  Benefit to Goldman Sachs ...................................... **316**

XI.   CLASS ACTION ALLEGATIONS ................................................ **317**

XII.  INAPPLICABILITY OF STATUTORY SAFE-HARBOR ..................................... **319**

XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET ...................................................................... **320**

XIV. LOSS CAUSATION ........................................................ **321**

XV.  CAUSES OF ACTION ...................................................... **323**

XVI. PRAYER FOR RELIEF ..................................................... **332**

## I.      NATURE OF THE ACTION

1.      This is a shareholder class action on behalf of the purchasers of the publicly traded common stock and call options, and the sellers of publicly traded put options, of Fannie Mae a/k/a Federal National Mortgage Association ("Fannie Mae" or the "Company") during the period from April 17, 2001 through September 27, 2005 (the "Class Period").

2.      Throughout the Class Period, Defendant Fannie Mae and Defendants Franklin Raines, the former Chairman of the Board and Chief Executive Officer, Timothy Howard, the former Vice Chairman of the Board and Chief Financial Officer, and Leanne Spencer, the former Controller (collectively, the "Individual Defendants") (Defendant Fannie Mae and the Individual Defendants are collectively referred to herein as the "Fannie Mae Defendants"), issued to the public materially false and misleading financial reports and other statements that artificially inflated the price of Fannie Mae's securities, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

3.      The Fannie Mae Defendants engaged in a massive financial fraud involving multiple violations of Generally Accepted Accounting Principles ("GAAP") and other accounting manipulations to falsely portray that the Company had stable earnings growth and reduced income statement volatility and to maximize the Individual Defendants' compensation.

4.      Fannie Mae has engaged in one of the largest financial frauds in U.S. corporate history.  Its financial restatement is expected to wipe out almost $12 billion of profits Fannie Mae reported to the public it earned from 2001 to 2004.  The majority of the restatement involves Statement of Financial Accounting Standards ("SFAS") 91, *Accounting for Nonrefundable Fees and Costs Associated With Originating or Acquiring Loans and Initial*

*Direct Costs of Leases* ("SFAS 91") and SFAS 133, *Accounting for Derivative Instruments and Hedging Activities* ("SFAS 133").  With regard to SFAS 133, Fannie Mae violated the most basic provisions of the hedge accounting rules and continued to apply its own accounting treatment for its hedges despite that the Financial Accounting Standards Board had expressly rejected Fannie Mae's lobby for its treatment of hedge accounting.  The violations of SFAS 133 were simple and involved intentional manipulations of Fannie Mae's financial results.

5.     Fannie Mae's intentional violations of SFAS 91 were brought to the attention of Defendants Raines, Howard and Spencer during the Class Period, but they ignored the warnings of an internal whistleblower because they were the perpetrators of the fraud.  Roger Barnes, a former Manager of Financial Accounting, Deferred Assets in Fannie Mae's Controller Division, submitted written testimony to an October 2004 Congressional hearing, detailing his efforts to alert management, including Defendants Raines, Howard and Spencer, to the accounting fraud at Fannie Mae.  Barnes directly questioned Defendant Spencer about a number of accounting transactions and specifically told Spencer that he believed Fannie Mae's actions violated GAAP. On August 5, 2003, Barnes gave Spencer a detailed memorandum outlining the ways in which Fannie Mae was violating GAAP and provided her with 60 examples of such misconduct. Spencer simply ignored Barnes and his warnings.

6.     In September 2002, Mr. Barnes sent a written memorandum **directly to Defendants Raines and Howard**, detailing part of the accounting fraud that was occurring at Fannie Mae.  After describing the accounting fraud in detail in the memorandum, Barnes concluded, "the possible impact reaches hundreds of millions of dollars and possibly affects the integrity of the current financial statements and those we will issue after beginning compliance with SEC reporting in 2003."  Raines and Howard took no action to investigate Barnes' warnings

or to stop the intentional manipulation of earnings because, in fact, they were integral participants in, and substantially profited from, the fraud.

7.      Indeed, the compensation of Defendants Raines, Howard and Spencer, among other top Fannie Mae executives, was directly tied to Fannie Mae hitting certain earnings' targets, so they each had a strong motive to manipulate Fannie Mae's earnings to meet the established targets and disregard Barnes' warnings.  Even before the start of the Class Period, the Individual Defendants manipulated Fannie Mae's financial results so they could achieve additional compensation.  The Office of Federal Housing Enterprise Oversight ("OFHEO"), the regulator of Fannie Mae and Freddie Mac, found, and the Securities and Exchange Commission ("SEC") has charged, that in 1998, Defendant Howard, with the knowledge and consent of Defendants Raines and Spencer, deliberately caused Fannie Mae to defer $200 million of amortization expense to permit Fannie Mae to reach its earnings target, so that an additional $27 million in bonus payments to executives would be paid.  From 2001 to 2003, Raines received more than $35 million as a result of Fannie Mae "achieving" its targeted earnings and Howard received an almost additional $10 million.  In addition, Raines sold almost $7 million worth of Fannie Mae stock during the Class Period and Howard sold $13.7 million worth of stock.  If fact, Howard sold a large number of shares and locked in a $400,000 profit just days before the release of the 2004 OFHEO Report.

8.      Defendant KPMG LLP ("KPMG"), Fannie Mae's outside auditor for 35 years, made false and/or misleading statements and participated in the fraudulent scheme by the Fannie Mae Defendants in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  As detailed herein, during the Class Period, KPMG knowingly or recklessly issued false and misleading audit reports certifying Fannie Mae's financial results for

fiscal years 2001, 2002 and 2003, even though KPMG knew, or recklessly disregarded, that Fannie Mae's financial statements did not conform with GAAP and that KPMG's audits were not conducted in accordance with Generally Accepted Auditing Standards ("GAAS").  Had KPMG conducted its audits of Fannie Mae's financial statements in accordance with GAAS, it would have either been unable to complete its audits, and would have been required to issue qualified opinions, or would have been required to withdraw from the engagement altogether.

9.      Defendant Goldman, Sachs & Co. ("Goldman Sachs") participated in and furthered the fraudulent scheme by engineering with the Fannie Mae Defendants two Real Estate Mortgage Investment Conduit (REMIC) transactions in December 2001 and March 2002, for the sole economic and improper purpose of shifting $107 million of Fannie Mae's earnings into future periods.  Entering into transactions that have no economic purpose other than shifting income is a violation of GAAP.  The Fannie Mae Defendants did not make appropriate disclosures about these transactions in Fannie Mae's financial statements and other public statements.  Goldman Sachs directly participated in this fraudulent scheme as both the architect of the improper transactions and as the underwriter for them.  Goldman Sachs also agreed with the Fannie Mae Defendants to conceal the purpose and nature of the transactions from the public. Goldman Sachs, by engaging in transactions and other conduct with the Fannie Mae Defendants for the express purpose of deceiving investors, participated in and furthered the fraud in violation of Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and 10b-5(c) promulgated thereunder.

10.      As a result of the massive accounting fraud at Fannie Mae, the SEC directed Fannie Mae to restate it financial statements from 2001 through mid-2004.  The current reported impact of that restatement is at least a $12 billion reduction in the Company's previously

reported earnings – almost half of the Company's previously reported earnings.  By sheer numbers, this is one of the largest financial restatements in U.S. corporate history, second only to the massive restatement by WorldCom.

11.     As a result of Defendants' violations of federal securities laws, Lead Plaintiffs and the other members of the Class have been damaged by purchasing Fannie Mae securities at artificially inflated prices during the Class Period and by suffering losses when the price of Fannie Mae securities declined after the revelations of the accounting machinations at the Company.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. 240.10b-5).

13.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Many of the acts in furtherance of the alleged fraud and/or the effects of the fraud occurred within this District and Defendant Fannie Mae's principal place of business is located in this District.  Defendant KPMG maintains an office and performed its audits of Fannie Mae in this District.  Defendant Goldman Sachs maintains an office in this District.

15.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiffs

16.    Plaintiff Ohio Public Employees Retirement System ("OPERS"), formed in 1935, provides retirement, disability and survivor benefit programs for thousands of public employees throughout the State of Ohio who are not covered by another state or local retirement system. OPERS serves more than 620,000 members and over 130,000 retirees and surviving beneficiaries, and had assets exceeding $54 billion under management as of December 31, 2003. As set forth in the certification previously filed with the Court in this case [Doc. # 4], incorporated by reference herein, OPERS purchased shares of Fannie Mae common stock during the Class Period at artificially inflated prices and has thereby been damaged by the wrongful acts of Defendants alleged herein.  OPERS suffered losses on its investment in Fannie Mae each time information concerning the improper accounting at Fannie Mae was revealed and Fannie Mae's stock price declined.

17.    Plaintiff State Teachers Retirement System of Ohio ("STRS") is one of the nation's premier retirement systems, serving more than 400,000 active, inactive and retired Ohio public educators.  With assets of approximately $54 billion, STRS is one of the largest public pension funds in the country.  As set forth in the certification previously filed with the Court in this case [Doc. # 31], incorporated by reference herein, STRS purchased shares of Fannie Mae common stock during the Class Period at artificially inflated prices and has thereby been damaged by the wrongful acts of Defendants alleged herein.  STRS suffered losses on its

investment in Fannie Mae each time information concerning the improper accounting at Fannie Mae was revealed and Fannie Mae's stock price declined.

**B.     Fannie Mae Defendants**

18.     Defendant Fannie Mae was established as a U.S. government entity in 1938, and became a federally chartered, shareholder-owned corporation in 1968.  Its principal place of business is located at 3900 Wisconsin Avenue, NW, Washington, DC.  Fannie Mae's common stock is traded on the NYSE.  Fannie Mae is subject to regulation by OFHEO, which was established as an independent entity within the Department of Housing and Urban Development by the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (12 U.S.C. §§4501 et. seq.).  OFHEO's primary mission is ensuring the capital adequacy and financial safety and soundness of Fannie Mae and its smaller rival, Freddie Mac.

19.     Defendant Franklin D. Raines ("Raines") was both the Chairman of the Board and Chief Executive Officer of Fannie Mae from January 1999 until December 2004, and was Chairman of the Board and Chief Executive Officer—Designate of Fannie Mae from May 1998 to December 1998.  Raines was a Fannie Mae Director from September 1991 through September 1996, and from December 1998 through December 2004.  Prior to becoming Chairman and CEO of Fannie Mae, Raines was the Director of the U.S. Office of Management and Budget ("OMB") from 1996 to 1998 under President Clinton, was the Associate Director of the OMB under President Carter from 1978 to 1991, and was a Vice President and then a partner at the Wall Street investment banking firm Lazard Freres & Co., L.L.C.  As detailed herein, Raines made frequent false and/or misleading public statements about the Company, including its earnings, operations, financial statements, condition and results, and disclosures and controls, in press

releases, during conference calls with investors and security analysts and in other public financial reports and other public statements during the Class Period.

(a)     As Chairman of the Board and Chief Executive Officer, Raines' primary responsibilities included overseeing the overall success or failure of the Company; providing leadership for the formulation and achievement of the Company's vision, mission, strategy, financial objectives and goals; ensuring that effective and qualified management were retained by the Company; ensuring that the Company established and maintained appropriate internal and disclosure controls, policies and procedures that were adequate to protect corporate assets; and directing the conduct and affairs of the Company in furtherance of its safe and sound operation.

(b)     Raines, along with Defendants Timothy Howard and Leanne G. Spencer, was responsible for ensuring the accuracy of Fannie Mae's public financial reports and other public statements. Raines commented on the Company's financial performance in each of its quarterly and annual earnings press releases issued during the Class Period. Raines also signed letters to shareholders commenting upon the Company's performance and disclosure policies in Fannie Mae's Annual Reports issued during the Class Period and signed the Company's Forms 10-K for the fiscal years ending December 31, 2002 and 2003.

(c)     Raines also personally attested to and certified the accuracy of Fannie Mae's reported financial results on numerous occasions throughout the Class Period. Raines signed certifications filed with Fannie Mae's Forms 10-K for the fiscal years ended December 31, 2002 and 2003, and the Forms 10-Q filed in 2003 and 2004. In these Certifications, he personally certified, among other things, that:

(i)      the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in

light of the circumstances under which such statements were made, not
misleading,

(ii)   the financial statements and other financial information included in the
reports fairly presented in all material respects the financial condition,
results of operation and cash flow of the Company as of and for the
periods presented, and

(iii)   that he and Defendant Timothy Howard were responsible for
establishing and maintaining disclosure controls and procedures as
defined in the Exchange Act and that they (1) had designed such
disclosure controls and procedures, or caused such disclosure controls
and procedures to be designed under their supervision, to ensure that
material information relating to the Company was made known to them
by others within the entity, particularly during the period in which the
report was being prepared; and (2) having evaluated the effectiveness
of the Company's disclosure controls and procedures, both concluded
that the disclosure controls and procedures were effective as of the
applicable period.

As set forth herein, these Certifications were false and/or misleading.

(d)   Raines, along with the other Individual Defendants, was also principally
responsible for the Company's communications with investors and securities analysts.   As
described herein, Raines communicated directly with investors and investment analysts
concerning the Company's financial results and operations in numerous conferences calls and
securities conferences held during the Class Period.

(e)     During the Class Period, Raines received substantial compensation based in whole or in part on the Company's financial condition and performance, including its earnings per share.  The compensation included the following:

|  | Salary | Bonus | Securities Underlying Stock Options | Value of Performance Shares |
|---|---|---|---|---|
| 2003 | $992,250 | $4,180,365 | 135,020 | $11,621,280 |
| 2002 | 992,250 | 3,300,000 | 311,731 | 7,233,679 |
| 2001 | 992,250 | 3,125,000 | 277,335 | 6,803,068 |

(f)     On December 21, 2004, after the SEC ordered Fannie Mae to restate its 2001-2004 financial reports, Fannie Mae announced that Raines had "retired" from his positions as Chairman of the Board and Chief Executive Officer of Fannie Mae and that his service on the Board of Directors had terminated effective immediately.  In a public statement, Raines said, "I previously stated that I would hold myself accountable if the SEC determined that significant mistakes were made in the Company's accounting. . . .  By my early retirement, I have held myself accountable."  Raines has not, however, returned any of the substantial compensation that he received, but was paid to him based upon Fannie Mae's overstated earnings.

(g)     Raines claims that he is due a pension from Fannie Mae of more than $1.3 million a year for life under his employment agreement with the Company.  This benefit is payable to Raines' spouse upon his death.  OFHEO is investigating whether the Company acted appropriately by letting Raines retire instead of firing him for cause.

20.     Defendant Timothy Howard ("Howard") became a member of the Office of the Chairman in November 2000 and was the Vice Chairman of the Board of Directors of Fannie Mae from May 2003 until December 2004.  He was also Executive Vice President and Chief Financial Officer of Fannie Mae from February 1990 until December 2004.  Howard initially

joined Fannie Mae in 1982.  As detailed herein, Howard made frequent false and/or misleading public statements about the Company, including its earnings, operations, financial statements, condition and results, disclosures and controls, in press releases, during conference calls with investors and security analysts and in other public financial reports and statements during the Class Period.

(a)  As Chief Financial Officer, Howard was responsible for the preparation and accuracy of the Company's financial statements and reports.  Howard has also admitted to OFHEO that he controlled nearly all of the financial operations, accounting and reporting activities and risk management of Fannie Mae.  For example, he told OFHEO that, (i) he served informally as Fannie Mae's chief risk officer, (ii) his responsibilities at Fannie Mae included risk management, the retained portfolio, the accounting function, investor relations, treasury and financial reporting; and (iii) Defendant Leanne G. Spencer, who was responsible for financial reporting, business planning, tax and accounting reporting, reported directly to him, as did the chief operating officer, the investor relations department and the corporate financial strategies department.

(b)  While stating to the public in each annual "Report of Management" signed by Howard and Defendant Spencer during the period, that "[o]rganizationally, the internal Office of Auditing is **independent of the activities it reviews**," Howard admitted to OFHEO that, while the internal auditor supposedly reported directly to the Audit Committee Chairman, starting in 2002 the internal auditor had reported on a dotted line basis to him.  (Emphasis added.)

(c)  Howard, along with Defendants Raines and Spencer, was responsible for ensuring the accuracy of Fannie Mae's public financial reports and other public statements. Howard commented on the Company's financial performance in quarterly and annual earnings

press releases issued during the Class Period.  Howard also published statements about Fannie Mae's performance, growth prospects and safety and soundness in Fannie Mae's Annual Reports issued during the Class Period and signed the Company's 2002 and 2003 Forms 10-K and the Forms 10-Q filed by Fannie Mae in 2003 and 2004.

 (d)  Howard also personally attested to and certified the accuracy of Fannie Mae's reported financial results on numerous occasions throughout the Class Period.  Howard signed certifications filed with Fannie Mae's Forms 10-K for the fiscal years ended December 31, 2002 and 2003 and the Forms 10-Q filed in 2003 and 2004.  In these Certifications, he personally certified, among other things, that:

 (i) the reports did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading,

 (ii) the financial statements and other financial information included in the reports fairly presented in all material respects the financial condition, results of operation and cash flows of the Company as of and for the periods presented, and

 (iii) that he and Defendant Raines were responsible for establishing and maintaining disclosure controls and procedures as defined in the Exchange Act and that they (1) had designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision, to ensure that material information relating to the Company was made known to them by others within the

entity, particularly during the period in which the report was being prepared; and (2) having evaluated the effectiveness of the Company's disclosure controls and procedures, they both concluded that the disclosure controls and procedures were effective as of the applicable period.

As set forth herein, these Certifications were false and/or misleading.

(e) Howard, along with the other Individual Defendants, was also principally responsible for the Company's communications with securities analysts and investors.  As described herein, Howard communicated directly with investors and investment analysts concerning the Company's financial results and operations in numerous conferences calls and securities conferences held during the Class Period.

(f) According to the 2004 OFHEO Report, in July 2003, even as the accounting problems at Freddie Mac were publicly emerging, Howard "made a presentation to the Board that emphasized a **stable pattern of earnings** as a requirement for Fannie Mae if it were to be perceived as a low-risk enterprise.  Mr. Howard included in [that] presentation a graph showing that the earnings of Fannie Mae were **smoother** than those of Freddie Mac and almost all other companies in the S&P 500."  (Emphasis added.)

(g) During the Class Period, Howard received substantial compensation based in whole or in part on the Company's financial condition and performance, including the Company's earnings per share.  The compensation included the following:

|  | Salary | Bonus | Securities Underlying Stock Options | Value of Performance Shares |
|---|---|---|---|---|
| 2003 | $645,865 | $1,176,145 | 112,968 | $3,470,578 |
| 2002 | 498,614 | 781,250 | 81,661 | 1,947,368 |
| 2001 | 463,315 | 694,983 | 75,617 | 1,987,119 |

13

(h)  On December 20, 2004, Howard "resigned" from his position as Vice Chairman of the Board and Chief Financial Officer of Fannie Mae.  However, Howard has not returned any of the substantial compensation that he received, but was paid to him based upon Fannie Mae's overstated earnings.

(i)  On December 30, 2004, Howard "resigned" from the Board of Directors of Fannie Mae.

(j)  Howard claims that he is due a pension in the annual amount of $432,852 for life under his employment agreement with the Company.  OFHEO is investigating whether the Company acted appropriately by letting Howard resign instead of firing him for cause.

21.    Defendant Leanne G. Spencer ("Spencer") was the Vice President and Controller of Fannie Mae during the Class Period.  As detailed herein, Spencer made numerous false and/or misleading public statements about the Company, including its earnings, operations, financial statements, condition and results in public financial reports and other statements during the Class Period.

(a)  Spencer, along with Raines and Howard, was responsible for ensuring the accuracy of Fannie Mae's public financial reports and other public statements.  Spencer reported directly to Defendant Howard.  Spencer signed the Company's Forms 10-K for the fiscal years ending December 31, 2002 and 2003 and the Forms 10-Q filed by Fannie Mae in 2003 and 2004.

(b)  Spencer, along with the other Individual Defendants, was also principally responsible for the Company's communications with investors and security analysts and communicated directly with these investors and analysts during conference calls held during the Class Period.

(c) Upon information and belief, Spencer received substantial bonuses, shares of Fannie Mae common stock and stock options during the Class Period that were based, in whole or in part, on the Company's financial condition and performance, including its earnings per share.  The only publicly available compensation information for Spencer is that in 2002, she received total compensation of $1,383,714, which included a salary of $260,000, a bonus of $330,000, stock options for 18,479 shares and long-term incentive payments valued at $396,017.

(d) On January 17, 2005, Spencer "stepped down" from her positions with Fannie Mae.  She continued in a non-officer capacity as a Special Advisor for a period thereafter.

22.    The Individual Defendants were the Company's senior executive officers during the Class Period and were responsible for and controlled Fannie Mae and its public financial statements and disclosures and other public statements, including the content of the Company's Annual Reports, various SEC filings, annual and quarterly earnings releases, financial statements, press releases and other public statements pertaining to the Company during the Class Period.  Each of the Individual Defendants directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, was responsible for the preparation and/or accuracy of the Company's financial statements and reports and was privy to confidential information concerning the Company and its earnings, accounting, policies and practices, reserves, business, operations, investments, growth, financial statements, financial reporting, and financial condition, and actively engaged in or permitted the misconduct alleged herein.  The Individual Defendants manipulated the Company's earnings and financial results by intentionally or recklessly making or approving various accounting policies and practices that did not comply with GAAP, they made, drafted and/or approved the false and misleading statements and information alleged herein, were aware

15

or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and/or approved, certified or ratified these statements, all in violation of the federal securities laws.

23.     As senior officers and controlling persons of a publicly held company whose common stock is traded on the NYSE and governed by certain provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's earnings, financial results, financial condition, performance, growth, operations, financial statements, business, investments, markets, management, and compliance with GAAP, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

### C.     Defendant KPMG

24.     Defendant KPMG is an international certified public accounting firm that served as Fannie Mae's outside auditor from 1969, until its termination by Fannie Mae on December 21, 2004.  KPMG purported to audit Fannie Mae's financial statements in accordance with GAAS for, *inter alia*, the fiscal years ended 2001, 2002 and 2003.  KPMG issued materially false and misleading unqualified audit opinions as to Fannie Mae's 2001, 2002 and 2003 financial statements, stating that they were fairly presented in accordance with GAAP, when in fact KPMG knew or recklessly disregarded that they were not.  KPMG knew that investors relied upon its audit reports during the Class Period, yet failed to comply with GAAS in conducting its audits of Fannie Mae.  As a result of KPMG's knowing conduct, participation in, and/or reckless

disregard of the Fannie Mae Defendants' fraudulent scheme and lack of adequate internal controls during the Class Period, KPMG is jointly and severally liable with the Fannie Mae Defendants.  KPMG maintains offices in this District at 2001 M Street N.W., Washington, D.C. 20036-3310.

        **D.**     **Defendant Goldman Sachs**

25.     Defendant Goldman Sachs is a New York based broker-dealer and investment bank and securities firm that, among other things, offers underwriting services to companies seeking to sell securities to the public.  Goldman Sachs devised and implemented with the Fannie Mae Defendants two REMIC transactions during the Class Period for the sole purpose of shifting $107 million of Fannie Mae's earnings into future periods.  As a result of Goldman Sachs' knowing conduct, participation in, and/or reckless disregard of the Fannie Mae Defendants' fraudulent scheme during the Class Period, Goldman Sachs is jointly and severally liable with the Fannie Mae Defendants.  Goldman Sachs maintains an office in this District at 101 Constitution Avenue, N.W., Suite 1000 East, Washington, D.C. 20005.

**IV.**     **GENERAL BACKGROUND OF FANNIE MAE**

26.     Fannie Mae is the nation's largest source of financing for home mortgages.  The U.S. Congress chartered Fannie Mae in 1968 for the purpose of providing liquidity in the secondary mortgage market in order to increase the availability and affordability of homeownership for low-, moderate-, and middle-income Americans.  Although created by Congress, the U.S. government does not guarantee, directly or indirectly, Fannie Mae's securities or other obligations.  Fannie Mae is a private, shareholder-owned company and its common stock is publicly traded on the New York Stock Exchange ("NYSE") under the symbol "FNM."

27.     Congress' central idea behind creating Fannie Mae and Freddie Mac was that they would encourage home-ownership by buying mortgages from banks – freeing up banks' limited capital and therefore allowing the banks to make more loans.  The purchase also relieved the banks of both the credit risk (the risk the holder of the loan might default) and the interest rate risk (the risk that the interest rates might rise during the life of a loan).  Fannie Mae and Freddie Mac have several advantages over other banks, including that they are exempt from state and local taxes, they have less stringent capital requirements than banks, and the U.S. Treasury is permitted to buy $2.25 billion of each company's debt.  Also, their cost of capital is kept low by the market's belief that the U.S. government would never let them default, even though the U.S. government does not formally guarantee their debt.

28.     Fannie Mae operates exclusively in the secondary mortgage market and does not loan money directly to consumers.  Fannie Mae makes its money in two major ways. The first and more conservative way is its credit guaranty business.  In this part of its business, Fannie Mae gets a fee for guaranteeing the payments on the mortgages its buys, which it then re-sells to investors usually in the form of mortgaged-backed securities ("MBS"), *i.e.*, beneficial interests in pools of mortgage loans or in other mortgage-related securities issued by Fannie Mae.  Fannie Mae receives fees for its guaranty of timely payment of principal and interest payments due to certificate holders on the MBS it issues.  Fannie Mae typically shares the credit risk on the underlying mortgages with third parties such as the lenders that originated the mortgages and private mortgage insurance companies.

29.      The second and more aggressive way that Fannie Mae makes money is its portfolio investment business.  In this part of its business, Fannie Mae holds the mortgage loans and mortgage-related securities and other investments that it purchases from commercial banks,

savings and loan associations, mortgage companies, securities dealers and other investors and it also purchases short-term, non-mortgage assets for liquidity and investment purposes. Fannie Mae funds these portfolio purchases by issuing short and long term debt and by selling debt securities to domestic and international capital markets investors. Fannie Mae profits to the extent that the yield on the mortgage assets and other investments in its portfolio exceed its low cost of capital (the cost of the debt securities it issued to fund those portfolio investments). Since 1995, Fannie Mae's portfolio has grown an average of 20% a year.

30.     Fannie Mae's business is subject to several areas of risk, including prepayment risk, interest rate risk, credit risk and operations risk. Most borrowers in the United States can prepay their mortgage at any time without penalty. Thus, when interest rates decline sharply, which happened during the Class Period, borrowers rush to refinance their mortgage at lower rates, causing the mortgages to have a shorter life than originally projected. As a consequence, when interest rates drop, the investment yield on Fannie Mae's mortgage-related investments is reduced. When this occurs, Fannie Mae receives large amounts of cash as the older, higher-rate mortgages are paid off, but faces the risk that it will not be able to reinvest this cash at rates that are above the rates that it is required to pay on its outstanding debt securities. This form of risk is called "prepayment risk."

31.     Another risk is linked to the short-term and long-term debt Fannie Mae issues to fund its mortgage purchases. When interest rates decline, Fannie Mae's cost of issuing new short-term debt also declines, but it is required to pay the original and higher interest rate on its longer-term debt until that previously issued debt matures or can be called. This is called the "interest rate risk."

32.     Interest rate fluctuations and prepayment risks exposed Fannie Mae to radical earnings volatility from quarter to quarter.  To offset or "hedge" against these risks, Fannie Mae typically engaged in a variety of derivatives transactions and related hedges.  Indeed, Fannie Mae was noted by the SEC's Chief Accountant as "one of the largest users of derivatives in the world."  These risk-mitigating transactions included issuing callable debt, interest rate swaps, options to enter into interest rate swaps (called "swaptions"), interest rate caps and floors, foreign currency swaps, forward starting swaps, asset swaps, and other derivatives.

33.     In May 1999, five months after becoming Chairman of the Board and Chief Executive Officer of the Company, Defendant Franklin Raines publicly announced that "[t]he future is so bright that I am willing to set as a goal that our EPS [earnings per share] will double over the next five years."  During his tenure, this promise and the Individual Defendants' personal greed were the motivating force behind everything the Fannie Mae Defendants did.  Indeed, a substantial portion of the Individual Defendants' compensation, averaging from 80-90% during the Class Period, was tied to Fannie Mae meeting earnings per share growth goals.  And, although Fannie Mae ultimately met the earnings per share target – announcing profits of $7.3 billion in 2003 – it has now been revealed that the Fannie Mae Defendants were only able to achieve that earnings growth by their knowingly or recklessly disregarding the proper application of GAAP.

34.     As detailed herein, throughout the Class Period, the Fannie Mae Defendants issued numerous false and/or misleading public financial reports and other statements and/or engaged in improper transactions to mislead investors into believing, among other things, that Fannie Mae (i) presented its financial statements in accordance with GAAP, (ii) was a conservative, stable investment with little or no earnings volatility, (iii) had a properly computed

capital structure that was adequate to meet regulatory requirements and its business needs, (iv) had steady quarter-over-quarter earnings growth even in times of market and interest rate volatility through the use of properly reported, tested and documented financial transactions, and/or (v) had "effective" internal controls and "transparent" disclosure policies and procedures that were the "vanguard" of financial institutions.  The Fannie Mae Defendants publicly said on numerous occasions throughout the Class Period that by their safe and sound business practices and exceptional risk management policies, Fannie Mae was largely immune to the financial impact of interest rate fluctuations and other factors that, in comparable institutions, resulted in earnings volatility and capital impairment.  At all times during the Class Period, however, the Fannie Mae Defendants knew, or were reckless in not knowing, that Fannie Mae's reported operating and financial results, including its earnings, earnings per share and core capital, were false and/or misleading and that the Fannie Mae Defendants had engaged in accounting schemes, violations of GAAP, and/or improper transactions and tolerated weak or non-existent internal controls in order to achieve the purported "record earnings growth" and steady "increased earnings per share."   As a direct result of their misconduct described herein, Fannie Mae's securities traded at artificially inflated prices during the Class Period and the price declined upon the subsequent revelations of the Fannie Mae Defendants' fraudulent conduct and the resulting impact on Fannie Mae and its business operations, causing a substantial loss to Lead Plaintiffs and the other members of the Class.

35.    A January 24, 2005 *Fortune* article perfectly sums up what brought about this case, stating as follows:

> The Fannie story is not like other accounting scandals . . .  Yes, the company broke the rules to produce a smooth stream of earnings, just as Enron, Tyco, WorldCom, and all the others did.  But that's only one of a half-dozen other story lines.  The Fannie Mae saga is also about a company that lost sight of its original mission.  It's

about power politics run amok, and the combustible blend of politics and business. It's about a company whose huge debt terrified top government officials, and whose very existence drew ideological opposition.   It's about an orchestrated, behind-the-scenes campaign to rein in a financial powerhouse.   It's about a regulator who learned to fight back against a much more formidable foe.

It's about all of these things and one more.  Fannie Mae thought itself so different, so special, and so powerful that it should never have to answer to anybody.  And in this, it turned out to be very wrong.

## V.     THE GOVERNMENT AND INTERNAL INVESTIGATIONS FINDING GAAP VIOLATIONS AND EGREGIOUS MISCONDUCT BY DEFENDANTS.

### A.     OFHEO's Interim 2004 Report Partially Uncovered the Fraud

36.     After an accounting scandal emerged at Fannie Mae's small rival, Freddie Mac, in 2003, OFHEO undertook an investigation into Fannie Mae's accounting practices and disclosures.   OFHEO hired the accounting firm of Deloitte & Touche LLP to assist with its investigation.   OFHEO's investigation involved the review and analysis of 600,000 pages of documents, 1.5 million emails and 29 days of interviews with Fannie Mae employees.   On September 22, 2004, Fannie Mae issued a press release containing a statement from Ann McLaughlin Korologos, the Presiding Director of the Board of Directors of Fannie Mae.   In the statement, Ms. Korologos reported that Fannie Mae's Board of Directors had received, on September 20, 2004, OFHEO's Report of its special examination and that the report had indicated, among other things, that:

> Fannie Mae (1) applied accounting methods and practices that do not comply with GAAP in accounting for the enterprise's derivatives transactions and hedging activities, (2) employed an improper "cookie jar" reserve in accounting for amortization of deferred price adjustments under GAAP, (3) tolerated related internal control deficiencies, (4) in at least one instance deferred expenses apparently to achieve bonus compensation targets, and (5) maintained a corporate culture that emphasized stable earnings at the expense of accurate financial disclosures.  OFHEO's report to the Board states that "the matters detailed in this report are serious and raise doubts concerning the validity of previously reported financial results, the adequacy of regulatory capital, the quality of management supervision, and the overall safety and soundness of the Enterprise.

Ms. Korologos also reported in her statement that the SEC had been conducting an informal inquiry that included issues raised in the 2004 OFHEO Report.

37.     On this news, Fannie Mae common stock, which had closed at $75.65 on September 21, 2004 and had opened at $74.18 on the NYSE that day, fell $4.18 to $70.00, and closed out the day at $70.69, on trading volume of over 17.7 million shares.  This represented a one-day market capitalization loss of approximately $3.9 billion.  During the following weeks, Fannie Mae's stock price fell to a low of $63.40 per share, with a resulting market capitalization loss exceeding $9.6 billion.

38.     After the close of the market on September 22, 2004, OFHEO publicly released its letter to the Fannie Mae Board of Directors enclosing its report and the full 198-page Report of Findings to Date, Special Investigation of Fannie Mae dated September 17, 2004 (the "2004 OFHEO Report").  In the OFHEO letter to the Board, OFHEO told the Board that its:

> findings cannot be explained as mere differences in interpretation of accounting principles, but clear instances in which **management sought to misapply and ignore accounting principles** for the purposes of meeting investment analyst expectations; reducing volatility in reported earnings; and enabling fragmented processes and systems, and an ineffective controls environment to exist. (Emphasis added.)

Also in the letter, OFHEO stated that the "findings warrant immediate remedial action," and OFHEO submitted an agreement that included the minimum steps that need to be taken to address the safety and soundness problems identified in the 2004 OFHEO Report.  OFHEO further stated:

> In addition, we must consider the accountability of management and whether we have sufficient confidence in management to fully implement these corrective measures and bring about broad cultural and operational changes in the areas of concern.  The analysis and findings of this report make it difficult to assert such confidence.

A copy of the letter to the Fannie Mae Board and the complete 2004 OFHEO Report were attached as Exhibit A to the Consolidated Class Action Complaint filed on March 4, 2005 and are incorporated herein by reference.

39.    OFHEO also said that Fannie Mae's accounting problems were more serious, complex and larger than the problems found the year before at its smaller rival, Freddie Mac, which had to restate its financial statements for 2000, 2001 and 2002.

40.    The 2004 OFHEO Report further provided:

We have determined that Fannie Mae, in developing policies and practices in these critical areas, has **misapplied Generally Accepted Accounting Principles ("GAAP"),** specifically *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases* ("FAS 91") and *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133"). The misapplications of GAAP are not limited occurrences, **but are pervasive and are reinforced by management.** (Emphasis added.)  **The matters detailed in this report are serious and raise concerns regarding the validity of previously reported financial results, the adequacy of regulatory capital, the quality of management supervision, and the overall safety and soundness of the Enterprise.**  (Emphasis in original.)

The problems relating to these accounting areas differ in their specifics, but they have emerged from a culture and environment that made these problems possible. Characteristics of this culture include:

- **management's desire** to portray Fannie Mae as a consistent generator of stable and growing earnings**;**
- a **dysfunctional and ineffective** process for developing accounting policies;
- an operating environment that **tolerated weak or non-existent internal controls;**
- key person dependencies and poor segregation of duties;
- incomplete and ineffective reviews by the Office of Auditing;
- an inordinate concentration of responsibility vested with the Chief Financial Officer; and
- an **executive compensation structure that rewarded management for meeting goals tied to earnings-per-share**, a metric subject to **manipulation by management**.  (Emphasis added.)

The tenor of earnings management is deeply ingrained at Fannie Mae and has given rise to accounting policies and practices that **emphasize effects on earnings volatility, rather than faithfulness to GAAP.** A key message by

Fannie Mae to the investor community is management's ability to generate stable and growing earnings. This is evidenced by Fannie Mae's annual financial reports, with their recurring graphs of steadily increasing earnings against a backdrop of volatile interest rates. Less well known, but detailed in this report, is the fact that the **desire by management to minimize earnings volatility** was a **central organizing principle in the development of key accounting policies.** (Emphasis added.)

Management also emphasized the stable earnings imperative in its communications to the Fannie Mae Board of Directors. In July 2003, even as the accounting problems of Freddie Mac were publicly emerging, Fannie Mae's Chief Financial Officer, Tim Howard, made a presentation to the Board that emphasized a "stable pattern of earnings" as a requirement for Fannie Mae if it were to be perceived as a low-risk Enterprise. Mr. Howard included in this presentation a graph showing that the earnings of Fannie Mae were smoother than those of Freddie Mac and almost all other companies in the S&P 500.

Sound risk management practices can reduce the economic effects of volatile cash flows. However, **management should not reduce earnings volatility through accounting policies and practices that do not comport with GAAP**. (Emphasis added.)

41.     The GAAP violations by the Fannie Mae Defendants identified in the 2004 OFHEO Report primarily involve Statement of Financial Accounting Standards ("SFAS") 91, *Accounting for Nonrefundable Fees and Costs Associated With Originating or Acquiring Loans and Initial Direct Costs of Leases* ("SFAS 91") and SFAS 133, *Accounting for Derivative Instruments and Hedging Activities* ("SFAS 133").

42.     With respect to SFAS 91, the 2004 OFHEO Report found that:

**OFHEO has concluded that the accounting used by Fannie Mae for amortizing purchase premiums and discounts on securities and loans as well as amortizing other deferred charges is not in accordance with GAAP.** This is particularly significant, in that management, in the MD&A section of their Form 10-K, details their underlying application of amortization as it relates to SFAS 91, and also explains that the accounting estimates associated with deferred price adjustments are "critical accounting estimates." (Emphasis in original.)

However, despite the importance of premium and discount amortization to the financial statements of Fannie Mae, and despite the requirement of SFAS 91 to formulate best estimates in good faith, **management intentionally developed accounting policies** and **selected and applied accounting methods** to

**inappropriately reduce earnings volatility** and to **provide themselves** with inordinate flexibility in determining the amount of income and expense recognized in any accounting period.  In this regard, the amortization policies that management developed and the methods they applied created a "cookie jar" reserve.  In addition, OFHEO found that management:

  i. **deliberately developed and adopted** accounting policies to spread estimated income or expense that exceeded predetermined thresholds over multiple reporting periods;

 ii. established a materiality threshold for estimated income and expense, within which management could avoid making adjustments that would otherwise be required under SFAS 91;

iii. made **discretionary adjustments** to the financial statements, for the sole purpose of minimizing volatility and achieving desired financial results;

 iv. forecasted and managed the future unrecognized income associated with **misapplied GAAP**;

  v. capitalized reconciliation differences as 'phantom' assets or liabilities and amortized them at the same speeds as 30-year fixed-rate mortgages;

 vi. developed estimation methods that were inconsistently applied to retrospective and prospective amortization required by SFAS 91 for current and future periods;

vii. developed and implemented processes to generate multiple estimates of amortization with varying assumptions in order to **select estimates that provided optimal accounting results**;

viii. failed to properly investigate an employee's concerns regarding illogical or anomalous amortization results, along with that employee's further allegation of an intent to misstate reported income;

 ix. **tolerated significant weaknesses in internal controls** surrounding the amortization process; and

  x. inappropriately deferred $200 million of estimated amortization expense in 1998, which had significant effects on executive compensation.  (Emphasis added.)

\* \* \*

In various memoranda, management openly expressed as an objective of its amortization policies and practices a desire to minimize earnings volatility.  For example, a March 1999 memorandum from an employee in the Controller's Department described the benefits of a particular brand of software for modeling amortization, noting that the software allowed a user to "**manipulate factors to produce an array of recognition streams**", which "**strengthens the earnings management that is necessary when dealing with a volatile book of business**."

\* \* \*

**The consequences of the misapplications of GAAP and control breakdowns surrounding accounting for amortization are potentially large.**   The management of Fannie Mae, by recording incorrect and incomplete amounts of premium and discount amortization, has misstated interest income over many reporting periods, as well as balance sheet accounts for unamortized premiums and discounts.  Also, because amortization estimates ultimately flow to individual securities, **gains or losses recorded on the sale or transfer of securities in previous periods are also questionable**.   Fannie Mae will need to devote considerable resources to determine the full magnitude of these errors.  (Emphasis in original.)

43.    With respect to Fannie Mae's violations of SFAS 133, the 2004 OFHEO Report stated *inter alia* that "**Fannie Mae implemented SFAS 133 in a manner that placed minimizing earnings volatility and maintaining simplicity of operations above compliance with GAAP**," and "**OFHEO has found that in many cases Fannie Mae does not assess and record hedge ineffectiveness as required by SFAS 133, and applies hedge accounting to hedging relationships that do not qualify.**"   The 2004 OFHEO Report further stated that Fannie Mae had failed to properly document hedging activity and that "**[t]his lack of documentation and the ability to create such documentation retroactively is not only a SFAS 133 violation, but is evidence of a poor control framework and is a significant safety and soundness problem.**"  (Emphasis in original.)  The Report also noted this complete lack of documentation was in contrast to prior statements by Raines that, "The hedge accounting treatment for each individual transaction is determined -- and documented in writing -- before we enter into the transaction and it cannot subsequently be changed."[1]

44.    With respect to Defendant Howard, the 2004 OFHEO Report stated:

**[T]he Chief Financial Officer, Tim Howard, failed to provide adequate oversight to key control and reporting functions within Fannie Mae.** (Emphasis in original.)   Mr. Howard oversees the Controller's Department, which **does not possess the skills required** to ensure that Fannie Mae has appropriate accounting policies, the resources to appropriately implement such policies, nor an effective system of internal controls.   In addition, the Chief

---

[1] From Fannie Mae's website Answers from the CEO, cited in the 2004 OFHEO Report at 136.

Financial Officer significantly influences the evaluation of the head of the Office of Auditing, and makes compensation recommendations for him.  This **decreases the independence and effectiveness of the internal audit function and is inappropriate**.  (Emphasis added.)

With respect to key person dependencies, we found that the Chief Financial Officer also serves as the Chief Risk Officer of Fannie Mae, and is directly responsible for overseeing the Enterprise's Treasury and Portfolio Management functions, in addition to the Controller's Department.  **The combination of these responsibilities does not provide the independence necessary for an effective Chief Risk Officer function.**  (Emphasis in original.)  We further found that Mr. Howard was **instrumental in setting financial targets** as Vice Chairman, and **had the authority to meet these targets** as Chief Financial Officer.  (Emphasis added.)

45.     After release of the OFHEO letter to the Board and the full 2004 OFHEO Report, Fannie Mae shares fell to a low of $66.50, closing at $67.15 on September 23, 2004.  Fannie Mae's stock price further declined to a close of $65.51 on September 24, 2004, as the market digested the news.

46.     On September 23, 2004, Fannie Mae announced that it had amended its employment agreements with Defendants Raines and Howard to expand the definition of "cause" for termination of employment to include when the employee has "materially harmed Fannie Mae by, in connection with his service under his employment agreement, engaging in dishonest or fraudulent actions or willful misconduct, or performing his duties in a grossly negligent manner."  The employment agreements were also modified to allow more compensation payable to Defendants Raines and Howard if they were terminated for cause.

47.     On September 27, 2004, OFHEO announced that it had entered into an agreement with the Fannie Mae Board of Directors (the "Agreement") requiring immediate action to address the improper accounting and inadequate controls detailed in OFHEO's findings to date of its special examination.  The Agreement required Fannie Mae to take a series of steps with respect to its internal controls, organization and staffing, governance, accounting and capital.

Fannie Mae, by signing the Agreement, admitted that it had engaged in improper accounting and had inadequate internal controls, as the Agreement requires Fannie Mae to, among other things:

- Implement correct accounting treatments that will bring the Enterprise into compliance with SFAS 91 and SFAS 133 accounting standards.

- To address SFAS 91, recalculate amortization for each quarterly period from 1998 to 2004 using parameters provided by OFHEO and report and assess differences from previously reported financial statements.

- Beginning with the first quarter of 2005, cease hedge accounting for any derivatives, including terminated hedges, that do not or did not qualify under SFAS 133 for such treatment.

- Protect the existing capital surplus and move to a targeted capital surplus equal to 30% of their required minimum capital; develop capital plan to protect existing capital and achieve surplus requirements.

- Undertake a top-to-bottom review of staff structure, responsibilities, independence of functions, compensation and incentives.

- Appoint an independent chief risk officer and separate other key business functions currently performed jointly by certain individuals or departments.

- Separate the function of business planning and forecasting from the controller's (Defendant Spencer's) function.

- Separate modeling and accounting functions.

- Take steps to assure the independence of the internal auditor, including the ability of the auditor to report directly to the Audit Committee or Board.

- Put in place policies to assure adherence to accounting rules and new internal controls.

- Board must review accounting policies and other corporate policies to ensure they reflect Board's objections in complying with law and regulation and in overseeing operations of Fannie Mae.

- Board must hire within 45 days independent counsel and an independent accounting firm, reporting directly to the Board or Board committee, to conduct certain reviews called for by the Agreement.

48.     On September 30, 2004, the *Wall Street Journal* reported that the United States Department of Justice had begun a criminal investigation into Fannie Mae's accounting practices and that the SEC had commenced a formal investigation into whether the Fannie Mae Defendants had violated the federal securities laws.  Fannie Mae's stock price closed at $63.40 on September 30, 2004.

49.     On October 12, 2004, Fannie Mae publicly disclosed that the U.S. Attorney's Office for the District of Columbia was conducting a criminal investigation and requested that Fannie Mae preserve certain documents, including documents relating to the matters discussed in the 2004 OFHEO Report.

50.     Seven days later, on October 19, 2004, Fannie Mae publicly disclosed that the SEC had initiated a formal investigation of Fannie Mae.

51.     In a November 15, 2004 Form 8-K, Fannie Mae publicly announced that if it were required to restate its financial results, it would eliminate an estimated $9 billion of its earnings during 2001 through mid-2004, almost **40%** of its previously reported earnings for that period.

52.     Also in the November 15, 2004 Form NT 10-Q filed with the SEC, which was signed by Defendant Howard, Fannie Mae reported that:

   (a)    It was unable to file its quarterly financial results for the third quarter of 2004 on Form 10-Q because its auditors could not complete their review of the Company's financial statements until the SEC determined whether or not the Company had previously complied with GAAP.

   (b)    It had submitted its views to the SEC's Office of the Chief Accountant and would modify its accounting, if necessary, to comply with the SEC's views.

   (c)    It estimated that it would have to record in earnings a net cumulative after-tax loss on its derivative transactions of approximately $9 billion as of September 30, 2004, if the SEC determined that it has been accounting improperly for derivatives under SFAS 133.  There would be a corresponding decrease to retained earnings and, accordingly, regulatory capital.  The cumulative after-tax loss would consist of losses of approximately $13.5 billion on cash flow hedge relationships that had been deferred

and were currently recorded in equity as a component of accumulated other comprehensive income (AOCI) and gains of approximately $4.5 billion on fair value hedges that were currently recorded on Fannie Mae's balance sheet as an adjustment to the hedged item.

(d)   It estimated that it would be required to record in earnings a net cumulative after-tax loss of approximately $26 million as of September 30, 2004, if the SEC determined that its current accounting under SFAS 91 was not in compliance with GAAP.

(e)   It admitted that its methodology for performing calculations to measure the catch-up adjustment required by SFAS 91 for balance sheet dates in the periods 2001 through 2002 was not consistent with GAAP and that the Company would make adjustments to prior periods "if and to the extent material." Fannie Mae admitted that to be compliant with SFAS 91, it should have been calculating its catch-up adjustment during those periods with reference to its quarter-end position rather than its projected year-end position and recording amounts solely on the basis of those quarterly calculations. The Company said it was assessing the impact and estimated that the effect would be an increase in 2001 and 2002 earnings and a decrease in 2003 earnings.

53.     Fannie Mae, in particular Defendant Raines, publicly disputed OFHEO's findings and stridently defended Fannie Mae's accounting practices. In testimony before Congress on October 6, 2004, Raines said that Fannie Mae made "no accounting errors." Although Fannie Mae agreed to take a number of remedial actions in response to the 2004 OFHEO Report, including an increase in its capital base and changing how it defers expenses and calculates for hedging transactions, Raines said that "people have mistakenly concluded that the company's agreement with OFHEO constituted an admission by the company to the findings and conclusions of the report. Let me clarify that is not the case. This is a serious allegation, and we strongly disagree with it."

54.     Fannie Mae requested that the SEC, the final arbiter of whether a public company has properly applied GAAP, review the Company's accounting to determine if the Fannie Mae Defendants had misapplied GAAP, as charged by OFHEO. On December 15, 2004, the SEC issued its conclusion that Fannie Mae's financial statements did not materially comply with

GAAP and it ordered the Company to restate its financial statements from 2001 through mid-2004.  The Office of the Chief Accountant ("OCA") of the SEC found that "Fannie Mae's accounting practices did not comply in material respects with the accounting requirements in Statement Nos. 91 and 133."  Among other things, the SEC determined that:

- Regarding SFAS 91, Fannie Mae had failed to record timely adjustments to the recorded amount of its loans based on changes in the estimated speed with which those loans would be prepaid.

- Contrary to SFAS 91, Fannie Mae recognized adjustments to the carrying amount of its loans only if they exceeded a self-defined materiality limit, referred to as a "precision threshold".

- "Fannie Mae internally developed its own unique methodology to assess whether hedge accounting was appropriate.  Fannie Mae's methodology, however, did not qualify for hedge accounting because of deficiencies in its application of [SFAS] 133.  Among other things, Fannie Mae's methodology of assessing, measuring, and documenting hedge ineffectiveness was inadequate and not supported by [SFAS 133]."

55.     The SEC advised Fannie Mae that, to be consistent with SFAS 91 and SFAS 133, it had to:

- Restate its financial statements filed with the SEC to eliminate the use of hedge accounting.

- Evaluate its accounting under SFAS 91 and restate its financial statements filed with the SEC if the amounts required for correction are material.

- Re-evaluate the information purportedly prepared under GAAP and non-GAAP information Fannie Mae previously provided to investors, particularly in view of the decision that hedge accounting was not appropriate.

56.     On December 15, 2004, the SEC announced its findings to Defendant Raines, outside directors Stephen B. Ashley, Joe K. Pickett and Thomas P. Gerrity, OFHEO Director Armando Falcon, Jr., KPMG (Fannie Mae's auditor) and criminal prosecutors from the Justice Department.  Reportedly at the meeting, when Defendant Raines asked what they did wrong, Nicolaisen held up a sheet of paper and responded that if the paper represented the four corners

of SFAS 133 and the center was perfect compliance, "you weren't even on the page."  When Raines tried the defense that hedge accounting under SFAS 133 was just too complex, Nicolaisen responded that hedge accounting was voluntary and that, "[m]any companies out there get it right."  Nicolaisen also reportedly said, "Sir, hedge accounting is a privilege, not a right," and "[i]t applies under strict circumstances, and you did not comply."

57.     In his testimony to Congress on February 9, 2005, Mr. Nicolaisen made clear that, while long in text, it is not difficult for companies to comply with SFAS 133.  In response to a question from Congressman Baker, Mr. Nicolaisen testified that Fannie Mae's failure to comply with SFAS 133 was "outside professional accounting standards" and was not "just a matter of interpretive judgment where two people could've come to varying conclusions." Mr. Nicolaisen also testified that he "believes that other companies are complying with Statements 91 and 133.  I have reason to believe that the standards are workable and are being followed."

58.     Mr. Nicolaisen further stated, in response to a question from Congressman Kanjorski, concerning SFAS 133, that, "[t]hose rules are not overly complex.  I think those rules are clear.  They're laid out.  They're laid out because the FASB thought it was important to maintain the financial integrity of reporting by – when exceptions to basic rules are followed, that you had to comply with these essential elements.  And they exist, and I do believe that those large financial institutions who engage in derivative transactions are familiar with those rules."

59.     On December 21, 2004, following the determination by the SEC, Fannie Mae announced that Defendant Raines had "retired" and Defendant Howard had "resigned" from their positions with Fannie Mae.

60.     Also on December 21, 2004, OFHEO classified Fannie Mae as "significantly undercapitalized" as of September 30, 2004, finding that Fannie Mae had a $3 billion capital

shortfall in its minimum capital for the quarter.  OFHEO ordered Fannie Mae to submit a capital

restoration plan to OFHEO for its review and approval.  The "significantly undercapitalized"

classification meant that Fannie Mae has to obtain OFHEO's approval before the payment of any

dividend on Fannie Mae's common stock.  Fannie Mae was forced to take prompt and extreme

measures to attempt to restore its capital shortfall, including private offerings of $5 billion in

preferred stock to select investors and cutting the dividend on its common stock by 50%.

     61.     On December 22, 2004, Fannie Mae filed a Form 8-K with the SEC in which it

reported that it would fully comply with the SEC's determination and restate its financial

statements from 2001 to mid-2004.  Fannie Mae also reported that a loss of hedge accounting

under SFAS 133 for all derivatives could result in its recording into earnings a net cumulative

loss on derivative transactions of approximately $9.0 billion, with a corresponding decrease to

retained earnings and, accordingly, regulatory capital.  Fannie Mae further stated:

> Fannie Mae is working to determine the effect of the restatement, including the
> effect on each prior reporting period.  The company expects that the impact will
> be material to Fannie Mae's reported GAAP and core business results for many,
> if not all, periods and will vary substantially from period to period based on the
> amount and types of derivatives held and fluctuations in interests rates and
> volatility.  Fannie Mae's restated financial statements will also reflect corrections
> as a result of its misapplication of FAS 91 for each prior reporting period
> described above.  Fannie Mae also will consider the impact, if any, of the OCA's
> decision on FAS 91 for periods prior to those described above.

> Accordingly, on December 17, 2004, the Audit Committee of the Board of
> Directors of Fannie Mae concluded that Fannie Mae's previously filed interim
> and audited financial statements and the independent auditors' reports thereon
> for the periods from **January 2001 through the second quarter of 2004 should
> no longer be relied upon because such financial statements were prepared
> applying accounting practices that did not comply with generally accepted
> accounting principles, or GAAP.**  (Emphasis added.)

     62.     The continuing, new disclosures about the nature, scope and impact of the

accounting fraud at Fannie Mae continued to be reflected in the price of Fannie Mae securities.

On December 23, 2004, OFHEO announced that it was reviewing Raines' and Howard's termination packages to determine whether "they were unjustly enriched." That same day Fannie Mae announced that its financial statements from 2001 to the present, including the third quarter 2004, "should no longer be relied upon" as they did not comply with GAAP. In response to the announcements by OFHEO and Fannie Mae, the Company's stock price decreased $7.12 per share to close at $69.62 per share on December 23, 2004.

63.    On December 28, 2004, Fannie Mae filed a Form 8-K with the SEC in which it announced that on December 21, 2004, the Audit Committee of the Fannie Mae Board had discharged KPMG LLP, who had served as its public accountants since 1969 and who had reviewed and commented upon and/or reported on the Company's various financial statements issued from 2001 through mid-2004.

64.    Fannie Mae also disclosed in this filing that, notwithstanding the prior public statements of the Fannie Mae Defendants that the Company's controls were effective, KPMG had notified the Company that there existed strong indicators of material weaknesses in internal control over financial reporting, which included OFHEO's determination of weaknesses in such controls, OCA's determination that Fannie Mae's application of SFAS 91 and SFAS 133 did not comply in material respects with the accounting requirements of those standards, and observed deficiencies in Fannie Mae's process of closing its accounting records for the quarter ended September 30, 2004 that resulted in post-closing entries to the interim financial information.

65.    As a result of the accounting irregularities found at Fannie Mae, OFHEO instituted a new requirement that Fannie Mae maintain a 30% capital surplus. On December 29, 2004, Fannie Mae announced that to address its capital inadequacy, it was forced to raise $5 billion in preferred stock sales to select institutional investors – the largest capital placement ever

undertaken by Fannie Mae – to offset a $3 billion capital shortfall for its third quarter ended September 30, 2004.  The amount received by Fannie Mae was far below what it should have received - a direct result of Fannie Mae not being able to conduct a public stock offering because it did not have current financial statements on file with the SEC.  Some analysts characterized the placement as a "panic-button fire sale." The placement may further damage members of the Class by significantly diluting their ownership of the Company.

66.     On January 18, 2005, Fannie Mae announced that it would cut its first quarter common stock dividend in half in order to "expeditiously increase its capital," to meet the OFHEO requirement.  Fannie Mae's stock price declined in reaction to this news, falling from its close price of $69.70 per share on January 18, 2005, to a close of $67.43 per share on January 19, 2005 and $64.85 on January 21, 2005, after the market digested this news.

67.     On January 21, 2005, Fannie Mae filed a Form 8-K with the SEC in which it reported that the Compensation Committee of the Fannie Mae Board had determined (i) that for 2004 no cash bonuses would be paid to the company's executive officers or senior vice presidents under the Company's Annual Incentive Plan or otherwise, and (ii) to deter certain actions under the Company's performance share program until the Company had reliable financial data for prior fiscal years.

68.     In the same 8-K, Fannie Mae also reported that, on January 17, 2005, Defendant Spencer had "stepped down" from her positions with Fannie Mae, but would continue her employment for a certain period in the non-officer capacity as Special Advisor.  The Company also announced that the Board had amended Fannie Mae's By-Laws on January 19, 2005, to eliminate the requirement that its Chairman of the Board also be its Chief Executive Officer and to modify the Chairman's duties.

69.     On January 24, 2005, the Company announced that three additional senior officers who had responsibilities relating to accounting were also stepping down from their positions.   These officers were Jonathan Boyles, Senior Vice President for Accounting and Tax Policy, Janet Pennewell, Senior Vice President for Financial Reporting, and Sam Rajappa, Senior Vice President for Operations Risk.

70.     On February 23, 2005, before the opening of the stock market, Fannie Mae announced that its deadline to meet its 30% surplus capital requirement was extended by OFHEO and Fannie Mae reported that it would achieve the increase in surplus capital through reducing the size of its mortgage portfolio and through an increase in retained earnings.  In a new announcement further disclosing the scope and impact of the fraud, Fannie Mae also announced that, during its on-going investigation, OFHEO had found evidence of **additional violations of GAAP** by the Fannie Mae Defendants as well as **internal control deficiencies that it believes raise safety and soundness concerns**.   Among others, the new accounting problems identified by OFHEO involved:

- SFAS 115, *Accounting for Certain Investments in Debt and Equity Securities.*

- SFAS 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities.*

- SFAS 65, *Accounting for Certain Mortgage Banking Activities*.

- OFHEO also questioned:  (i) whether Fannie Mae's policies and certain transfers with respect to the Qualified Special Purpose Entities it uses to issue mortgage-backed securities complies with Financial Interpretation No. 46 (Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin 51) and whether certain transfers have a valid business purpose; (ii) Fannie Mae's practice of recognizing interest expense on short-term debt instruments and interest income on certain liquid investments in a monthly ratable manner rather than pursuant to the contractual accrual convention, which had the effect of smoothing certain income and expense amounts, (iii) whether Fannie Mae appropriately deferred recognizing the financial impact of implementing new systems or correcting estimation methodologies; (iv) Fannie Mae's internal

controls and systems, including questions relating to Fannie Mae's procedures for preparing, reviewing, validating, authorizing and recording journal entries relating to amortization adjustments; (v) Fannie Mae's reliance on software applications and systems relating to portfolio accounting that may be ill-suited or ill-equipped for their intended purposes; and (vi) controls surrounding database modifications.

71.     On March 3, 2005, *The Wall Street Journal* reported that Fannie Mae's violation of SFAS 149 alone, for just one year, could cause Fannie Mae to decrease its earnings by nearly $2.76 billion as a result of the losses incurred in mortgage commitments in that period. As a result, Fannie Mae's regulatory capital would be similarly decreased.  This now meant investors were facing up to a $12 billion restatement, instead of the previously reported $9 billion.  Fannie Mae's stock price declined $1.10 per share on March 3, 2005.

72.     The scope and impact of the fraud continued to be revealed, as even more accounting violations and manipulations were subsequently identified by OFHEO.  First, on March 17, 2005, OFHEO disclosed it uncovered instances of Fannie Mae employees falsifying signatures on accounting ledgers and making changes in database records related to earnings without authorization.  That same day, Fannie Mae disclosed that it would not be filing its Form 10-K for the fiscal year ended December 31, 2004.  Reacting to this news, Fannie Mae's stock declined $2.45 per share to close at $54.40 per share on March 17, 2005.

73.     Then, on April 4, 2005, *The Wall Street Journal* reported that OFHEO was investigating whether Fannie Mae improperly accounted for trusts it set up to issue mortgage-backed securities.  In response to this news, shares of Fannie Mae common stock fell $1.78 per share from $53.24 per share on April 1, 2005, to close at $51.46 per share on April 4, 2005.

74.     After the close of trading on April 9, 2005, Fannie Mae disclosed that the Company's restatement was taking longer than predicted and that it would not be completed until the second half of 2006.  The Company also disclosed that it was in violation of New York Stock

Exchange rules requiring the filing of an annual financial report with the SEC, and thus was facing the possibility of delisting.  Reacting to this news, Fannie Mae shares declined $2.19 per share from $54.83 per share on August 9, 2005, to close at $52.64 per share on August 10, 2005.

75.    Investors were shocked to learn that the breadth and scope of the fraud went even further when "[n]ew and pervasive accounting violations" at Fannie Mae were reported on September 28, 2005.  According to *Dow Jones*, Fannie Mae used so-called finite insurance policies to hide earnings losses after they were incurred, and embellished earnings by overvaluing assets, underreporting credit losses and misusing tax credits.  In response to this news, Fannie Mae's stock price plummeted $4.99 per share, or 11%, from $46.70 per share on September 27, 2005 to close at $41.71 per share on September 28, 2005. This one-day drop wiped out approximately $4.82 billion in market value and constituted Fannie Mae's lowest per share price since July 1997.  Analysts, including JP Morgan Securities and Morgan Stanley, stated that these additional accounting violations may cause a change in the amount of Fannie Mae's restatement and capital requirements.

76.    On August 9, 2006, Fannie Mae filed a Form 12b-25 with the SEC indicating that it believes that its new auditors, Deloitte & Touche, will conclude that Fannie Mae's internal control over financial reporting was still ineffective as of December 31, 2005.

### B.    The Internal Rudman Investigation Confirmed and Further Elaborated on the Fraud

77.    In September 2004, the Special Review Committee of the Board of Directors of Fannie Mae engaged former Senator Warren B. Rudman ("Rudman") and the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") to conduct an independent investigation of the issues raised in the 2004 OFHEO Report (the "Rudman Investigation"). During the course of the investigation, Paul Weiss and their forensic accountants, Huron

Consulting Group Inc. ("Huron") reviewed more than four million pages of documents and conducted more than 240 interviews, including interviews of the Company's current employees, counsel and auditors.

78.     On February 23, 2006, Fannie Mae publicly released the 616-page Report to the Special Review Committee of the Board of Directors of Fannie Mae by Paul Weiss (the "Rudman Report"), which attached an additional 2,052 pages of exhibits.  The Rudman Report confirmed OFHEO's prior findings that fraud at Fannie Mae was rampant, concluded that Fannie Mae's accounting practices "in virtually all of the areas [it] reviewed **were not consistent with GAAP, and, in many instances, management was aware of the departures from GAAP**" (emphasis added), confirmed that violations of GAAP were made intentionally to "smooth earnings," and confirmed that in many instances, KPMG knew of and approved of the improper accounting.

79.     The 30-page Executive Summary to the Rudman Report concluded, with respect to Fannie Mae's historical accounting practices, internal controls, corporate governance and structure, as follows:

> First, management's accounting practices in virtually all of the areas that we reviewed were not consistent with GAAP, and, in many instances, management was aware of the departures from GAAP.  Management often justified departures from GAAP based upon materiality assessments that were not comprehensive, the need to accommodate systems inadequacies, the unique nature of Fannie Mae's business, or 'substance over form' arguments.   For example, management unjustifiably departed from GAAP with respect to: (1) its implementation of [SFAS] 133 in order to minimize earnings volatility and to avoid having to make investments in new systems to accommodate the standard; (2) its application of FAS 91, because compliance with FAS 91 would have resulted in greater earnings volatility than management had wanted; and (3) its approach to accounting for interest-only securities in combination with other securities to avoid impairment write-downs that would have been required under GAAP for the interest-only securities.

Second . . . [we found] evidence supporting the conclusion that management's adoption of certain accounting policies and financial reporting procedures was motivated by a desire to show stable earnings growth, achieve forecasted earnings, and avoid income statement volatility.

* * *

Third, employees who occupied critical accounting, financial reporting and audit functions at the Company were either unqualified for their positions, did not understand their roles, or failed to carry out their roles properly. This deficiency was most clearly manifested by employees who occupied senior positions in the Office of the Controller and the Office of Auditing.  In addition, the resources devoted to accounting, financial reporting, and audit functions were not sufficient to address the needs of an institution as large and complex as Fannie Mae.

* * *

Fourth, the information that management provided to the Board of Directors with respect to accounting, financial reporting, and internal audit issues generally was incomplete and, at times, misleading.

* * *

Fifth, the Company's accounting systems were grossly inadequate.  This fact became apparent in our review of several areas – most notably our review of the Company's accounting for premium and discount amortization under FAS 91, but also in connection with the Company's accounting under FAS 133 and FAS 149.

* * *

Finally, we concluded that Howard, the former CFO, and Leanne Spencer, the former Controller, were primarily responsible for adopting or implementing accounting practices that departed from GAAP, and that they put undue emphasis on avoiding earnings volatility and meeting EPS targets and growth expectations . . . [the Company's CEO] Raines contributed to a culture that improperly stressed stable earnings growth and that, as the Chairman and CEO of the Company from 1999 through 2004, [Raines] was ultimately responsible for the failures that occurred on his watch.

80.    As previously found by OFHEO, the Rudman Report also concluded in no uncertain terms that Fannie Mae intentionally violated SFAS 133 in order to "smooth" earnings:

[I]n our view, Fannie Mae did not engage in innocuous practical interpretations or modest deviations from a strict reading of [FAS 133]. The Company's implementation of FAS 133 was motivated, not only by a desire to avoid earnings volatility, but also by a desire to avoid the substantial changes to the Company's business methods, and/or the development of new and complex accounting systems, that would have been required to satisfy FAS 133's special accounting requirements. These considerations led the Company, with the knowledge of senior managers in the Controller's Office, to adopt an approach to hedge

accounting that relied too heavily on the assumption that its hedges were 'perfectly effective.'

The Company's approach deviated from FAS 133 requirements in numerous and important respects. Indeed, the record of our review shows that the Company's method of hedge accounting conflicted with clear and specific provisions of FAS 133. As one example, the Company disregarded amendments to FAS 133 that the FASB had adopted over a year before the standard took effect. The FASB's amendments were directed specifically to limit the application of hedge accounting with respect to a type of transaction that Fannie Mae had raised with the FASB, and which was referred to within the Company as the 'Fannie Mae carve-out.' Notwithstanding the amendment, the Company did not change its approach to hedge accounting for these transactions.

81.   With regard to SFAS 91, the Rudman Report also confirmed that management inappropriately deferred $200 million of estimated expense in 1998, and established and executed a plan to record this expense in subsequent fiscal years, in order to obtain EPS-based thresholds for triggering management bonus payments.

82.   The Rudman Report found violations of other accounting rules.  With regard to SFAS 115, *Accounting for Certain Investments in Debt and Equity Securities*, the Rudman Report concluded that "Fannie Mae's accounting under FAS 115 violated an unambiguous accounting rule regarding the classification of securities as held to maturity (HTM), available for sale (AFS), or trading. Moreover, the Company's procedure for determining a security's classification involved the consideration of factors that would affect the security's fair value." The Rudman Report concluded:

Fannie Mae's policies regarding the application of FAS 115 were incorrect. Separate and apart from the question of whether (and when) the Company's portfolio was tainted, its policy resulted in its accounting for securities as AFS when they had been designated "at acquisition" as HTM. The record we have compiled supports the conclusion that Fannie Mae used the flexibility inherent in its approach to FAS 115 in a fashion that had tangible benefits for the Company. The record does not, however, support the conclusion that Fannie Mae used this approach to manage earnings directly. Ultimately, the characterization of the securities as HTM or AFS had an effect on Fannie Mae's financial statements when the securities in the AFS portfolio were sold.

83.     With respect to the Individual Defendants' knowledge of and/or participation in the fraudulent scheme, the Rudman Report found that:

- With regard to SFAS 91 and the 1998 adjustment, the Individual Defendants all agreed that instead of recording the total catch-up figure of $439 million, which was the proper GAAP practice, they would only record $240 million and defer recording the remaining $199 million to maximize their compensation.  Further, the Individual Defendants withheld this information from the Board and also withheld from the Board the fact that KPMG had noted an audit difference for the remaining $199 million.

- That with respect to the Amortization Policy ("Policy") developed in response to the $199 million audit difference noted by KPMG, Defendant Timothy Howard played a critical role in developing the policy that he knew was developed for the purpose of avoiding audit differences with the outside auditor and that he, along with Defendant Leanne Spencer, misled Fannie Mae's Board of Directors about the purpose of the Policy and the fact that it was not implemented consistent with the Policy's terms.

- That with respect to Fannie Mae's implementation of SFAS 133 hedge accounting, Paul Weiss found evidence that Defendant Timothy Howard set the tone for the SFAS 133 implementation effort such that from the outset and throughout the process, he focused the implementation team's efforts on avoiding the volatility associated with SFAS 133 and not changing the Company's business practices to a significant degree.  During a meeting where Defendant Spencer briefed Defendant Howard on the progress of implementation of the SFAS 133 standard, one of the talking points noted by Spencer was as follows: "The key tenet we are working towards is that we want to fit all of our transactions into the FASB's 'perfect hedge' exception."   Also, in an email dated July 21, 2000, Mehmood Nathani, who participated in the SFAS 133 efforts from the Treasurer's Office, reported that he an others had met with Defendant Howard to discuss the implementation of SFAS 133 and noted that "…reduction of earnings volatility is still our numero uno objective."

- Fannie Mae's accounting for the allowance of loan losses was based on a provision for losses equal to charge-offs that was not consistent with GAAP, and in June 2002, Jonathan Boyles, then head of Financial Standards, wrote to Defendant Spencer, and others, describing the issue as follows:

   > We do not believe our current method of accounting [for the Allowance] is the preferable method…Under our current methodology we are increasing the [Allowance] by recording gains from the disposition of properties and reducing it through negative provisions…With the current public debate regarding whether or not we should register with the SEC we believe it has become imperative that we begin to put into place the analysis and support for the balance in our allowance for loan losses.

Paul Weiss also concluded that despite this knowledge, Defendant Howard failed to act on the recommendation until late 2002.

- Fannie Mae's accounting for dollar rolls failed to follow GAAP, and Paul Weiss found that Defendant Spencer bore the responsibility, among others in senior management, for failure to communicate clearly the responsibilities of each group with respect to the transactions.

- Paul Weiss concluded that senior accountants in the Controller's Office, including Defendant Spencer, "*knew* at some point that the Company was not reporting interest expense and income accurately."(Emphasis added.)  Paul Weiss stated that Howard may have been aware as well, finding that in an e-mail dated May 22, 2003, Defendant Spencer told Howard that "smoothing" was being officially stopped and that he "was fine with the decision."

84.   The Rudman Report also confirmed that Fannie Mae's outside auditor, KPMG, was intimately involved in the development and implementation of Fannie Mae's improper accounting policies and *knew* that Fannie Mae's financial statements were in violation of GAAP at the time KPMG issued its unqualified audit opinions on Fannie Mae's 2001, 2002 and 2003 financial statements.  Specifically, with regard to KPMG, the Rudman Report found that:

- KPMG *knew* that Fannie Mae improperly deferred a $200 million catch-up expense in 1998, and merely proposed an audit difference for the unrecorded catch-up amount, but failed to qualify its opinion on the Company's financial statements;

- KPMG was actively involved in and signed off on Fannie Mae's Amortization Policy, which the Rudman Report concluded "was not consistent with GAAP" since it allowed management significant discretion to manage earnings volatility;

- KPMG *knew* about concerns raised by an employee in Fannie Mae's Controller Division that Fannie Mae was engaging in violations of GAAP;

- KPMG "had a comprehensive view of the most significant features of the Company's FAS 133 policies" and acknowledged that the policy was "not in strict compliance with GAAP;"

- KPMG *knew* that Fannie Mae was improperly using the "short cut" method to account for its derivatives and *knew* that Fannie Mae's policy for assuming non-effectiveness for its derivatives was not in compliance with GAAP.  KPMG justified such deviations as "immaterial," even though SFAS 133 does not allow for a materiality standard to be applied when assessing deviations;

- KPMG "was aware" of the Company's violation of SFAS 115 but "raised no objection;" and

- KPMG *knew* Fannie Mae smoothed the monthly interest expense and income on certain investments and borrowings.

85.     Further, during Congressional testimony given by Senator Rudman on March 14, 2006, the Senator confirmed that the Company's SFAS 133 polices "were known to, and accepted by" KPMG and that based on the Rudman Investigators' review of KPMG's workpapers and interviews conducted with KPMG, Senator Rudman concluded "**I don't know how [KPMG] reached the conclusion that they reached, particularly in the area of FAS 133 . . And frankly, I don't know how they approved it, because it was fairly obvious to us and to the SEC that it was incorrect**."  (Emphasis added).

### C.     The 2006 OFHEO Report Disclosed Even More Accounting Manipulations by Defendants

86.     On May 23, 2006, OFHEO released its final Report of the Special Examination of Fannie Mae (the "2006 OFHEO Report") that provided a scathing review of Fannie Mae's financial accounting and corporate environment from 2001 through 2004.  The press release accompanying the 2006 OFHEO Report indicated the severity of OFHEO's recent findings, noting that the report "**details an arrogant and unethical corporate culture where Fannie Mae employees manipulated accounting and earnings to trigger bonuses for senior executives from 1998 to 2004**."  (Emphasis added).  James B. Lockhart, Acting Director of OFHEO, stated in the press release that the "image of Fannie Mae as one of the lowest-risk and 'best in class' institutions **was just a façade** . . . [the OFHEO] examination found an environment where the ends justified the means.  Senior management manipulated accounting; reaped maximum undeserved bonuses; and prevented the rest of the world from knowing."

(Emphasis added).  Lockhart further elaborated on the manipulation of earnings by management

to reap their bonuses:

> Fannie Mae's executives were precisely managing earnings to the one-hundredth of a penny to maximize their bonuses while neglecting investments in systems internal controls and risk management . . . The combination of earnings manipulation, mismanagement and unconstrained growth resulted in an estimated $10.6 billion of losses, well over a billion dollars in expenses to fix the problems, and ill-gotten bonuses in the hundreds of millions of dollars.

87.    The 2006 OFHEO Report also includes the following findings:

- "Fannie Mae senior management promoted an image of the Enterprise as one of the lowest-risk financial institutions in the world and as 'best in class' in terms of risk management, financial reporting, internal control, and corporate governance. The findings in this report show that risks at Fannie Mae were greatly understated and that the image was false."

- A large number of Fannie Mae's accounting policies and practices did not comply with GAAP.  Fannie Mae also had "serious problems of internal control, financial reporting, and corporate governance" resulting in overstating reported income and capital by approximately $10.6 billion.

- From 1998 to mid-2004, Fannie Mae's reporting of "smooth profit growth" and meeting earnings per share targets "were illusions deliberately and systematically created by the Enterprise's senior management with the aid of inappropriate accounting and improper earnings management."

- "By deliberately and intentionally manipulating accounting to hit earnings targets, senior management maximized the bonuses and other executive compensation they received, at the expense of shareholders. Earnings management made a significant contribution to the compensation of Fannie Mae Chairman and CEO Franklin Raines, which totaled over $90 million from 1998 through 2003. Of that total, over $52 million was directly tied to achieving earnings per share targets."

- Fannie Mae management "did not make investments in accounting systems, computer systems, other infrastructure, and staffing needed to support a sound internal control system, proper accounting, and GAAP-consistent financial reporting."

88.    With respect to the Individual Defendants' knowledge of and/or participation in

the fraudulent scheme, the 2006 OFHEO Report found that:

- Defendant Timothy Howard, when faced with pressure from his staff that accounting standards required adjustments, such as lowering the allowance for loan losses, used his position of power in personnel evaluations to set everyone straight that the lack of earnings volatility trumped compliance with GAAP.

- That Senior Management was actively managing earnings with an eye to achieving maximum bonus payout numbers.   In a November 4, 2001 memorandum from Defendant Spencer to Defendant Raines entitled "Update on Earnings," Spencer discussed earnings management and "smoothing ideas." Spencer told Raines that the $5.20 earnings target would require debt repurchases combined with a special contribution to the Fannie Mae Foundation, actions that would have the effect of reducing reported earnings for that year.   Defendant Spencer also described plans to "pull earnings down" to $6.30 EPS in 2002, with an indication that Defendant Howard had asked Peter Niculescu, Senior Vice President for Portfolio Strategy, for ideas on how to accomplish that.   As Spencer described it to Raines: "For 2002, I plugged in [sic] an amount into the gain/loss line item just to pull the earnings down to $6.30.   It is purely a plug with no actions identified as yet.   Tim has Peter working on ideas."   In a July 26, 2002 "Q2 Earnings Forecast" from Janet Pennewell, Vice President for Financial Reporting and Planning, and Shaun Ross, Director for Business Planning, it was noted that Fannie Mae was on track that year to achieve planned EPS of $6.30 or EPS growth of 21.2%.   The EPS number reported at year-end 2002 was $6.3137, and the maximum EPS AIP bonus payout number was $6.288.

- According to notes taken from a May 9, 2002 Quarterly Business Review discussion, Defendant Howard confirmed the strategy to push income from 2002 into future years by buying up portfolios of mature loans or by pushing up the construction schedule.   According to the notes, Howard stated: "Why are we working to increase income in 2002 when the corporation is trying to push income out of 2002 to 2003 and 2004?   We need to talk about this as a follow-up."

- Defendant Spencer engaged in discussions with Jonathan Boyles, Vice President for Financial Accounting, demonstrating knowledge that Fannie Mae was intentionally misapplying GAAP related to buy-ups under SFAS 125 and their focus on concealing the information rather than correctly applying GAAP.   For example, Defendant Spencer told Mr. Boyles to brief Karen Pallotta, Director of Single Family Business, in person rather than by e-mail, about the fact that KPMG had not questioned Fannie Mae's accounting treatment for buyups even though Fannie Mae had not been faithful to interest-only (IO) instruments accounting and that one of the reasons KPMG had not questioned Fannie Mae's treatment was that the cash flows were part of a guarantee fee payment and did not sound like an IO.

47

- Defendant Howard was also made aware by Jonathan Boyles of his concern with the questionable IO security accounting in a briefing given to Howard in 1998. Boyles' briefing materials stated the following:

  > "KPMG has apparently forgotten about these transactions, and we have not brought these issues to their attention. They [KPMG] have experienced significant turnover since we adopted the "package" accounting and, as a result, there is currently only one member of the audit team remaining from the fall of 1995. The accounting team they currently have on the audit is more technically proficient, and if they stumble across these packages, may not be as easily convinced of the current accounting treatment.

- With respect to debt repurchases, OFHEO found that in 2003 senior management and Defendants Howard and Spencer orchestrated the large-scale repurchase activity of 2001-2003 to manage earnings. For example, in an email dated September 23, 2004 entitled "EPS and Buyback Losses for Third Quarter," Defendants Howard and Spencer discussed achieving earnings growth target of $1.79 and a $400 million debt buyback that would be necessary to achieve that target, further noting that a cap of $350 million to $375 million would create a cushion of a penny ($1.80 versus "our $1.79 target"). In that same email, Defendant Spencer was asked how much cushion she preferred, noting that her view of the right cushion would influence the number to be provided to Dave Benson. OFHEO found no evidence that management documented any other reasons to proceed with the large-scale debt repurchases, and that the analysis to support buy-backs to promote liquidity was at times performed in reverse.

- With respect to internal controls weaknesses at Fannie Mae, OFHEO found that the deficiencies resulted from actions and inactions of senior management that contravened OFHEO standards and were in and of themselves unsafe and unsound practices. This conduct included a failure to ensure appropriate segregation of duties. For example, in contravention to safety and soundness guidelines that provided that an Enterprise should separate risk managements oversight from oversight of accounting and financial reporting, Defendant Raines expanded Defendant Howard's responsibilities making him both the Chief Risk Officer (CRO) and the Chief Financial Officer (CFO) "despite being advised that research by Fannie Mae had found that no companies had CROs and CFOs who were the same person." Similarly, the centralization of duties in Defendant Spencer undermined Fannie Mae's internal control system and the integrity of the Enterprise's financial reporting because Defendant Spencer played a key role in the development of the SFAS 91 policy, effectively substituting for the Financial Standards Group that reported to her and was responsible for developing accounting policies; Defendant Spencer also approved financial forecasts and participated in the communication of financial results both internally and externally.

- OFHEO also found that senior management failed to provide adequate resources to accounting and financial reporting. OFHEO found that "Spencer failed to reveal to the Board of Directors resource problems and system implementation challenges relative to the implementation of new accounting standards. For example in February 2004 she attempted to play down the $1 billion computation error related to FAS 149 to the Audit Committee of the Board."

- OFHEO found that Fannie Mae's senior management knew of and actively participated in Fannie Mae's failure to maintain the independence and objectivity of the internal auditor. OFHEO found that in 2002, Defendant Raines changed Sampath Rajappa's (Senior Vice President for Operations Risk and head of Fannie Mae's Office of Auditing) "dotted line" reporting relationship from Chief Operating Officer Daniel Mudd to Chief Financial Officer Tim Howard. Defendant Howard subsequently exerted considerable control over Mr. Rajappa's actions by participating in Mr. Rajappa's annual performance evaluation and making compensation recommendations. Howard's definitive influence over Mr. Rajappa was revealed in 2004 when Howard *ordered* Mr. Rajappa not to communicate with the Audit Committee about accounting related issues without first talking to Defendant Spencer or him. Defendant Spencer was also made aware of the limits imposed on Mr. Rajappa's ability to communicate openly about accounting issues through an email sent to her by Howard in which he revealed his conversation with Mr. Rajappa stating "I made it 'blisteringly clear' to him [Rajappa] that on any future calls he gets from the Chairman of our Audit Committee on accounting-related issues he must run the question or issue by you [Spencer] before he or anyone else gets back to Gerrity [Audit Committee Chairman]"

89.    Based on its findings set out in the 2006 OFHEO Report, OFHEO recommended

that the following actions be taken at Fannie Mae:

1. Fannie Mae should be subject to penalties and fines consistent with the findings of this report.

2. Fannie Mae must meet all of its commitments for remediation and do so with an emphasis on implementation-with dates certain-of plans already presented to OFHEO.

3. Fannie Mae must maintain a capital surplus until the Director determines a change in the surplus amount is warranted.

4. Fannie Mae must continue to use independent consultants acceptable to the Director to validate and assure compliance with requirements. Cyclical targeted exams by independent consultants, at least every two years, are needed to assure systems and practices are being implemented properly.

5.  Fannie Mae must develop new structures and operational plans for its Board of Directors related to Board reporting, maintenance of minutes, and other changes that will enhance Board oversight of the Enterprise's management.

6.  Fannie Mae must review OFHEO's report to determine additional steps to take to improve its controls, accounting systems, risk management practices and systems, external relations program, data quality, and corporate culture. Once OFHEO has approved the Enterprise's plans, an emphasis must be placed on implementation of those plans.

7.  Fannie Mae must undertake a review of individuals currently with the Enterprise that are mentioned in OFHEO's report and provide OFHEO a report as to conclusions regarding terminations, transfers, or other remedial steps (such as disgorgement, restitution, or alteration of benefits) in cases of misconduct.

8.  Fannie Mae must assure that departments are fully and appropriately staffed with skilled professionals who have available regular training opportunities in financial services industry standards.

9.  Due to Fannie Mae's current operational and internal control deficiencies and other risks, the Enterprise's growth should be limited.

90.     The 2006 OFHEO Report also confirmed the allegations in the Rudman Report that KPMG *knew and identified* Fannie Mae's accounting violations and noncompliance with GAAP during the course of its audits, but continued to issue "clean" audit opinions, which reassured investors that everything at Fannie Mae was fine.  In addition to supporting the prior allegations, the 2006 OFHEO Report also contained new allegations concerning KPMG that, *inter alia*: (1) KPMG identified instances during its audit where Fannie Mae violated its own internal SFAS 91 policy relating to amortization of premiums; and (2) KPMG's workpapers acknowledge that Fannie Mae's practices under SFAS 133 resulted in a "practical application" of GAAP, and therefore were not GAAP compliant.

91.     The 2006 OFHEO Report also disclosed for the first time that Goldman Sachs had knowingly engaged in a fraudulent scheme to falsely portray Fannie Mae's financial results by

devising and implementing two REMIC transactions to improperly shift $107 million of Fannie Mae's income to future periods.

**D.    The SEC Complaint Alleging Fraud and the OFHEO and SEC Settlements**

92.    On May 23, 2006, the SEC filed a Complaint against Fannie Mae in this Court. The Complaint charges Fannie Mae with engaging in a financial fraud and filing materially false and misleading financial statements with the SEC, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As part of the allegations, the SEC charged that: "In many instances, the Company's non-GAAP policies, procedures, and practices were reviewed by its independent auditor" KPMG.

93.    In the Complaint, the SEC alleged that Fannie Mae's accounting under SFAS sections 91, 133, 115, 149, 140 and FIN 46R were all non-GAAP compliant.  Under SFAS 91, the SEC alleged that Fannie Mae's policy of booking a catch-up adjustment tempered by a "threshold" violated SFAS 91.  The SEC stated:  "There is no support for the use of a threshold in SFAS 91 or in the Financial Accounting Standards Board ("FASB") implementation guide for SFAS 91 developed to assist companies in complying with the standard.  Not only did Fannie Mae's use of a "threshold" violate GAAP, but so did its use of a full year time horizon rather than a quarterly basis as provided in SFAS 91.  Implementation of [Fannie Mae's SFAS 91] Policy led to misstatements of SFAS 91 amortization in all periods from the fourth quarter 2000 through the second quarter 2004."  SEC Complaint, ¶¶ 29, 30, 31.

94.    In its complaint, the SEC made the following allegations with respect to the Fannie Mae Defendants and KPMG:

- "From at least 1998 through the second quarter of 2004, Fannie Mae issued financial reports that were materially false and misleading, primarily due to its failure to comply with Statement of Financial Accounting Standards ("SFAS") 133.  These

violations had the result of achieving management's desire: (a) to show predictable and steady earnings growth; and (b) avoid income statement volatility."

- "Fannie Mae's senior management fostered a corporate culture that placed significant emphasis on stable earnings growth and avoidance of income statement volatility, and insufficient emphasis on ensuring compliance with applicable accounting regulations and federal securities law." This resulted in Fannie Mae implementing a series of non-GAAP policies, procedures, and practices that falsely portrayed the Company's earnings. The non-GAAP policies, procedures, and practices included, but were not limited to: (1) improper accounting for loan fees, premiums, and discounts; and (2) improper hedge accounting.

- The SEC alleged that these non-GAAP transactions, acts, practices, or courses of business were directed and/or implemented with the knowledge or approval of Fannie Mae's senior management acting within their scope of authority.

- The SEC also alleged that in many instances Fannie Mae's non-GAAP policies, procedures, and practices were reviewed by its independent auditor, KPMG.

- With respect to Fannie Mae's improper hedge accounting pursuant to SFAS 133, the SEC alleged that minimizing or eliminating earning volatility became a focus of members of senior management when faced with the significant challenge posed by SFAS 133 to Fannie Mae's goal of avoiding volatility in its financial statements.

- The SEC stated, that, given the size of its portfolio, Fannie Mae did not have the systems or personnel necessary to perform "long-haul" accounting method prescribed under SFAS 133 that provides for measuring and recording of ineffectiveness of a company's debt hedge instruments. As a result, Fannie Mae disregarded the requirements of SFAS 133 and qualified transactions for the "short-cut" method based on erroneous interpretations and an unjustified reliance on materiality.

- The SEC further alleged that Fannie Mae violated SFAS 149, the amendment to SFAS 133, by failing to timely or adequately determine whether its mortgage commitments qualified for hedge accounting in accordance with the GAAP requirements prescribed by SFAS 149. The SEC stated that inadequate resources in the departments most affected by SFAS 149, resulted in Fannie Mae not adopting a final accounting policy until several months after SFAS 149 became effective.

- With respect to Fannie Mae's accounting for loan loss reserves, the SEC alleged that in violation of GAAP, which requires that the estimate of loss reserves be based on losses currently inherent in the loan portfolio, Fannie Mae performed no quantitative assessment between 1997 and 2003, choosing instead to rely on management's qualitative judgment in determining the appropriate loan loss reserve. As a result, Fannie Mae maintained an unjustifiably high level of loan loss reserve that at the year-end 2002 was overstated by at least $100 million, which resulted in a $100 million understatement of earnings before tax, which represented 1.6% of the 2002

earnings before takes, and 8 cents of additional EPS on the year-end 2002 EPS figure of $4.52.

- The SEC further alleged, with respect to system realignment adjustments, also called accounting errors, that Fannie Mae, rather than consistently follow the appropriate accounting guidance, used three different methods to account for the realignment adjustments, two of which were improper under GAAP, and resulted in reported results that improperly spread the impact of these adjustments over time. Specifically, the SEC alleged that in order to allow it to avoid volatility in its financial statements that would result from recording the accounting errors, Fannie Mae chose to record immediately any small realignments in the income statement and defer larger adjustments and recognized those as income statement items over future periods.  This methodology was contrary to GAAP, specifically Accounting Principles Board (APB) Opinion No. 20 that governs the treatment of accounting errors and requires that any material impacts must be reported as a prior period adjustment and then disclosed in the current period's financial statements.

- The SEC further alleged that Fannie Mae improperly treated a $40 million premium for a finite insurance contract as an expense in order to lower Fannie Mae's earnings by $13.5 million in each of 2002 and 2003, and approximately $8 million in 2004. The SEC alleged that the improper recordation of the premium was a result of the initiative by the Company to shift current income into future periods and Fannie Mae's disregard for the fact that the insurance contract did not have sufficient risk transfer to qualify the premium to be recorded as an expense.

- With respect to the classification of the securities held in portfolio, the SEC alleged, that rather than adhere to the clear guidance under GAAP, specifically SFAS 115, which requires that the accounting classification be made at the time of acquisition of a security, Fannie Mae initially classified the securities it acquired as held-to-maturity, and then at the end of the month of acquisition, decided on the ultimate accounting classification.  In addition the SEC stated in its complaint that this GAAP violation illustrated a significant internal control deficiency.

- With respect to Fannie Mae's recognition of interest income and expense, the SEC found that by using a standard figure, i.e. programming its accounting systems to calculate interest expense and income on its investments as if there were 30.4 days in each month, regardless of whether the terms of the instruments specified interest payments on a different basis, Fannie Mae avoided fluctuations in interest income and expense that would otherwise have resulted due to the fact that not every month has the same number of days and neither do the four quarters of the year.

- The SEC alleged that Fannie Mae's discretionary approach to amortization of its debt issuance cost did not comply with the GAAP requirement that financial statements be prepared on a consistent basis.  The SEC cited as an example that Fannie Mae was able to offset a $43 million income item in the third quarter of 2002 by revising the estimated life of its callable debt in that same period.

- In connection with its adoption in 2003 of FASB Interpretation No. 46, Fannie Mae failed to consolidate certain trusts used in connection with securitization transactions that were required to be consolidated on the balance sheet of the Company. This failure resulted in an understatement in the assets and liabilities recorded on the Company's balance sheet for any portion of the trusts owned by third parties and, according to the Company's own estimate, as a result of the correction, approximately $28.5 billion of both incremental assets and liabilities will be recognized in the financial statements.

- With respect to accounting for dollar rolls pursuant to SFAS 140, the SEC alleged that Fannie Mae had no procedures in place to meet the requirements set forth by SFAS 140 and that there was a failure to coordinate among the Company's various departments, resulting in a failure to contemporaneously apply the tests necessary to determine whether the transactions met the "substantially the same" test.

- Finally, with respect to Fannie Mae's valuation of aircraft asset backed securities, the SEC alleged that in the second quarter of 2003 Fannie Mae recorded an expense of $83.5 million, an amount that was understated by $45 million due to Fannie Mae's misapplication of SFAS 115. The SEC alleged that the write-down was erroneously based on values obtained from an internal discounted cash flow model instead of available market prices as required by SFAS 115 when determining the amount of asset impairment. The $45 million understatement represented 3.2% of Fannie Mae's quarterly earnings before tax, and 3 cents of the 2003 EPS of $7.91.

95.    On May 23, 2006, Fannie Mae agreed to pay $400 million in fines to settle matters with OFHEO and the SEC. Fannie Mae also consented to the entry of a final Judgment in the SEC's civil action. As part of the Consent Decree with the SEC, Fannie agreed, among other things, "not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the Complaint or creating the impression the Complaint is without factual basis." However, nothing in the Consent Decree affects Fannie Mae's "right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party."

96.    During the joint press conference announcing the OFHEO/SEC settlement and the issuance of the 2006 OFHEO Report, Wanda DiLeo, OFHEO's Chief Accountant, confirmed that KPMG certified that Fannie Mae's financial statements complied with GAAP, though they

contained "significant departures from GAAP," and that KPMG "was aware of the non-GAAP provisions of [Fannie Mae's] FAS 91 policy" as well as the "non-GAAP practices" Fannie Mae used in its application of SFAS 133.

## VI.   THE FANNIE MAE DEFENDANTS' KNOWING OR RECKLESS DISREGARD OF GAAP

97.    As has now been revealed, the Fannie Mae Defendants were only able to satisfy Wall Street expectations and make it appear as if the Company's earnings were characterized by steady growth and low volatility by engaging in the earnings manipulations and numerous accounting improprieties that violated fundamental GAAP precepts complained of herein.  When these earnings manipulations and GAAP violations were finally exposed, billions of dollars of shareholder value was wiped out.  Now, the Company has admitted that its previously issued 2001 through the second quarter of 2004 financial statements are unreliable because they were not prepared in accordance with GAAP, and it has ousted the Individual Defendants and its public accountants.

### A.    General GAAP Violations

98.    As set forth in SEC Rule 4-01(a) of Regulation S-X, "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform to GAAP, as set forth in § AU110.03 of the American Institute of Certified Public Accountants ("AICPA") Professional Standards:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's

transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management . . . Thus, the fair presentation of financial statements in conformity with [GAAP] is an implicit and integral part of management's responsibility….

99.     The Individual Defendants, as senior management, were also responsible for implementing and maintaining sound accounting policies and appropriate internal controls and assuring that staffing levels and experience in financial accounting were sufficient to ensure that significant errors were prevented or detected at an early stage.  AICPA, Statement on Auditing Standards No. 1, Section 110.02 provides as follows:

Management has the responsibility for adopting sound accounting policies, for maintaining an adequate and effective system of accounts, for the safeguarding of assets, and for devising a system of internal control that will, among other things, help assure the production of proper financial statements.  The transactions which should be reflected in the accounts and in the financial statements are matters within the direct knowledge and control of management.  The auditor's knowledge of such transactions is limited to that acquired through his examination.  Accordingly, the fairness of the representations made through financial statements is an implicit and integral part of management's responsibility.  The independent auditor may make suggestions as to the form or content of financial statements or he may draft them in whole or in part, based on management's accounts and records.  However, his responsibility for the statements he has examined is confined to the expression of his opinion on them. The financial statements remain the representations of management.

100.     The Fannie Mae Defendants were well aware of these responsibilities.  In fact, Fannie Mae's Annual Report for 2001 and Forms 10-K for fiscal years ended December 31, 2002 and 2003, contained the following acknowledgement and assurance in a "Report of Management" signed by Defendants Howard and Spencer:

The management of Fannie Mae is responsible for the preparation, integrity and fair presentation of the accompanying financial statements and other information appearing elsewhere in this report.  In our opinion, the financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America as appropriate in the circumstances, and the other financial information in this report is consistent with such statements.  In preparing the financial statements and in developing the other financial information, it has been necessary to make informed judgments and estimates of

the effects of business events and transactions.  We believe that these judgments and estimates are reasonable, that the financial information contained in this report reflects in all material respects the substance of all business events and transactions to which the corporation was a party, and that all material uncertainties have been appropriately accounted for or disclosed.

The management of Fannie Mae is also responsible for maintaining internal control over financial reporting that provides reasonable assurance that transactions are executed in accordance with appropriate authorization, permits preparation of financial statements in conformity with accounting principles generally accepted in the United States of America, and establishes accountability for the assets of the corporation.

Internal control over financial reporting includes controls for the execution, documentation, and recording of transactions, and an organizational structure that provides an effective segregation of duties and responsibilities.  Fannie Mae has an internal Office of Auditing whose responsibilities include monitoring compliance with established controls and evaluating the corporation's internal controls over financial reporting.   Organizationally, the internal Office of Auditing is independent of the activities it reviews.

\* \* \*

Management recognizes that there are inherent limitations in the effectiveness of any internal control environment.  However, management believes that, as of December 31, [applicable year], Fannie Mae's internal control environment, as described herein, provided reasonable assurance as to the integrity and reliability of the financial statements and related financial information.

101.    In footnote 1 to the Notes to Financial Statements in Fannie Mae's 2001 Annual Report, Fannie Mae represented that "[t]he accounting and reporting policies of Fannie Mae conform with accounting principles generally accepted in the United States of America."

102.    Likewise, Defendants Raines and Howard signed certifications attached to the Forms 10-K for the fiscal years ended December 31, 2002 and 2003 and the Forms 10-Q filed in 2003 and 2004, in which they certified that (i) the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading, (ii) the financial statements and other financial information included in the reports fairly presented in all material

respects the financial condition, results of operation and cash flow of the Company as of and for the periods presented, and (iii) that Raines and Howard were responsible for establishing and maintaining disclosure controls and procedures as defined in the Exchange Act and that they (a) had designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under their supervision, to ensure that material information relating to the Company was made known to them by others within the entity, particularly during the period in which the report was being prepared; and (b) having evaluated the effectiveness of the Company's disclosure controls and procedures, both concluded that the disclosure controls and procedures were effective as of the applicable period.

103.    Additionally, in preparing financial statements, senior management was required to take into consideration the fundamental objectives and concepts upon which GAAP are based, which include:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment  decisions   and that information should be comprehensible to those who have a reasonable understanding of business and economic activities.  (FASB Statement of Concepts No. 1 ¶34);

(b)    The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.  (FASB Statement of Concepts No. 2, ¶132);

(c)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners

(stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general. (FASB Statement of Concepts No. 1, ¶50);

(d)    The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (FASB Statement of Concepts No. 1, ¶42);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting.  (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.  (FASB Statement of Concepts No. 2, ¶80); and

(g)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.  (FASB Statement of Concepts No. 2, ¶¶95, 97).

104.    In agreeing to restate its financial results for 2001 through mid-2004, the Company has admitted that material errors existed at the time the financial statements were

prepared and thus it failed to provide a fair presentation of its financial results during the Class

Period.  *See* SFAS 16 and APB Opinion No. 20 (restatements of prior periods are required for

material accounting errors that existed at the time financial statements were originally issued).

105.    Finally, Fannie Mae has itself admitted that the Fannie Mae Defendants violated

GAAP.  In its Form 8-K filed on December 22, 2004, Fannie Mae reported that:

> The Audit Committee of the Board of Directors of Fannie Mae concluded that
> Fannie Mae's previously filed interim and audited financial statements and the
> independent auditors' reports thereon for the periods from **January 2001
> through the second quarter of 2004 should no longer be relied upon because
> such financial statements were prepared applying accounting practices that
> did not comply with generally accepted accounting principles, or GAAP.**
> (Emphasis added.)

**B.      The Fannie Mae Defendants' Violations of SFAS 91**

106.    In December 1988, Statement of Financial Accounting Standards No. 91,

*Accounting for Nonrefundable Fees and Costs Associated with Organization or Acquiring Loans

and Initial Direct Costs of Leases* ("SFAS 91") was issued to establish consistent accounting for

nonrefundable fees and costs associated with lending activities.  SFAS 91 required the Company

to recognize loan fees, premiums, discounts and other deferred purchase and guarantee fee price

adjustments to income using the effective yield method.  This method required that the Company

estimate a constant effective yield for its loans and mortgage-backed securities each time it

reported its financial results.  The accounting standard requires that purchases of loans and

mortgage-based securities be recorded at the net purchase price, taking into account premiums,

discounts and other deferred purchase and guarantee fee price adjustments.

107.    OFHEO found that, with respect to SFAS 91, the Fannie Mae Defendants

"intentionally developed accounting policies and selected and applied accounting methods to

inappropriately reduce earnings volatility and to provide themselves with inordinate flexibility in

determining the amount of income and expense recognized in any accounting period.  In this regard, the amortization policies that management developed and the methods they applied created a 'cookie jar' reserve," which is not permitted under SFAS 91 or GAAP.

108.    Fannie Mae anticipated that a certain portion of its loans would be prepaid, and therefore, as permitted by SFAS 91, incorporated an estimate for prepayments when amortizing fees, premiums and discounts.  If a difference arose between the prepayments anticipated by the Company and the actual prepayments received, SFAS 91 required the Company to make a "catch-up" adjustment and immediately book the difference between the revised estimate of amortization and the actual recorded amortization as an adjustment to interest income.  The guidance on this process provided by SFAS 91 is as follows:

> If the enterprise holds a large number of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated, the enterprise may consider estimates of future principal prepayments in the calculation of the constant effective yield necessary to apply the interest method.  If the enterprise anticipates prepayments in applying the interest method and a difference arises between the prepayments anticipated and actual prepayments received, the enterprise shall recalculate the effective yield to reflect actual payments to date and anticipated future payments.  ***The net investment in the loans shall be adjusted to the amount that would have existed had the new effective yield been applied since the acquisition of the loans.  The investment in the loans shall be adjusted to the new balance with a corresponding charge or credit to interest income.***  Enterprises that anticipate prepayments shall disclose that policy and the significant assumptions underlying the prepayment estimates.

(SFAS 91, ¶19)  (Emphasis added).

109.    Properly estimating and accounting for the differences between estimated and actual prepayments, however, would have caused large swings in the amount of the catch-up adjustments and significant income volatility.  To circumvent this periodic charge or credit to interest income and the resulting earnings volatility, the Fannie Mae Defendants developed an amortization policy and selected and applied accounting methods that would allow the Company

to avoid current period volatility and would further provide management with the flexibility to shift income and minimize the potential for prospective volatility.

110.    Both OFHEO and the SEC found that the Fannie Mae Defendants, in violation of SFAS 91, failed to record timely adjustments to the recorded amounts of its loans based on changes in the estimated speed with which those loans would be prepaid.  Indeed, the Fannie Mae Defendants have now admitted that their methodology for performing calculations to measure the catch-up adjustment required for balance sheet dates in the periods 2001 through 2002 was not consistent with GAAP.  As detailed above, in the Company's Form NT-10-Q filed November 15, 2004, which was signed by Defendant Howard, the Company admitted that during those periods, "Fannie Mae should have been calculating its catch-up adjustment with reference to its quarter-end position rather than its projected year-end position and recording amounts solely on the basis of those quarterly calculations."

111.    OFHEO found that there was a concerted effort to formulate a SFAS 91 policy to manage the amortization of deferred price adjustments and therefore provide earnings flexibility and minimize earnings volatility and that the effort "was directed and overseen by Chief Financial Officer Mr. Tim Howard," and "[p]olicy analysis was performed for the most part by personnel within the controllers group, including active involvement by the Controller, Ms. Leanne Spencer."

112.    One such policy that was found by both OFHEO and the SEC to violate SFAS 91, was Fannie Mae's policy to recognize adjustments to the carrying amount of its loans only if they exceeded a self-defined materiality limit, referred to as a "precision threshold," which allowed the Company to avoid making adjustments that otherwise would be required under SFAS 91.  The SEC has reported that Fannie Mae has represented to it that the Company has

initiated changes to eliminate the "precision threshold" and is working with OFHEO to further amend its accounting practices under SFAS 91.

113.    Other specific violations of SFAS 91 noted by OFHEO in the 2004 OFHEO Report include that management had:

- Failed to apply the accounting treatment required by SFAS 91 to Real Estate Mortgage Investment Conduit (REMIC) securities held in its portfolio until 1998, even though SFAS 91 became effective in 1988.

- Inappropriately deferred $200 million of estimated expense in 1998, and established and executed a plan to record this expense in subsequent fiscal years, to receive 100% of their annual bonus compensation – "[w]ithout such deferral, no bonus would have been paid out."

- Undertook a concerted effort to develop and adopt accounting policies that would enable the Company to "spread income or expense over multiple reporting periods."

- Made discretionary adjustments to the financial statements "for the sole purpose of minimizing volatility and achieving desired financial results."

- Forecasted and managed unrecognized income and expense to measure and maintain a "cookie jar" reserve.

- Recorded reconciliation differences and other errors as "phantom assets and liabilities."  These phantom assets and liabilities were then amortized in accordance with a 30-year conventional mortgage proxy life.

- Applied discretion to the selection of market rate assumptions in order to achieve desired accounting results.

- Developed and effected capabilities to iteratively generate and evaluate estimates under varying assumptions, in order to obtain desired outcomes.

- Incorrectly and inconsistently applied adjustments to the estimate of amortization.

- Failed to properly investigate Mr. Barnes' concerns regarding illogical or anomalous amortization results, and allegations of an intent to misstate reported income.

- Tolerated significant weaknesses in internal controls "that undermined control objectives, maintained inadequate segregation of duties, and impeded the review and oversight of accounting processes and results."

114.    Fannie Mae's use and establishment of the amortization policy also violated SFAS No. 5, *Accounting for Contingencies* ("SFAS 5") which provides that:

> An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if both of the following conditions are met:
>
> - Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> - The amount of loss can be reasonably estimated. (¶8)

115.    Moreover, SFAS No. 5 prohibits the establishment of a reserve for general or unspecified business risks, which by their nature cannot meet the requirement of ¶8. Fannie Mae's establishment of a "cookie jar" reserve under SFAS 91 was not based on a probable or estimable contingency and thus represented a general reserve prohibited by SFAS 5.

116.    The total scope and affect on Fannie Mae as a result of the Fannie Mae Defendants' violations of SFAS 91 is unknown at this time, however OFHEO has said that:

> **The consequences of the misapplications of GAAP and control breakdowns surrounding [Fannie Mae's] accounting for amortization are potentially large.** The management of Fannie Mae, by recording incorrect and incomplete amounts of premium and discount amortization, has misstated interest income over many reporting periods, as well as balance sheet accounts for unamortized premiums and discounts. Also, because amortization estimates ultimately flow to individual securities, **gains or losses recorded on the sale or transfer of securities in previous periods are also questionable**. Fannie Mae will need to devote considerable resources to determine the full magnitude of these errors. (Emphasis in original.)

117.    During his testimony at an October 6, 2004 hearing before the United States House of Representative Subcommittee on Capital Markets, Insurance and Government

Sponsored Enterprises, Defendant Howard did not dispute OFHEO's description of the SFAS 91 cookie jar reserve as a direct violation of GAAP and how it worked.  In fact, Defendant Howard did not even try to minimize the impact this undisclosed reserve had on managing Fannie Mae's earnings.  Instead, he admitted that he "made the judgment" that smoothing out some of the volatility SFAS 91 caused in quarterly earnings was necessary because "it preserves the integrity and the quality of our published financial statements," despite his public certifications and statements that Fannie Mae's financials were accurate and prepared in accordance with GAAP.  In short, Howard conceded that he intentionally caused Fannie Mae to misapply SFAS 91 so the Fannie Mae Defendants could achieve their desired goal of smooth and steady earnings growth.

**C.      The Fannie Mae Defendants' Violations of SFAS 133**

118.    In June 1998, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards No. 133, *Accounting for Derivative Instruments and Hedging Activities* (SFAS 133).  In May 1999, FASB voted to delay the implementation date of SFAS 133 for one year, until January 1, 2001.  Thus, Fannie Mae was not required to give effect to SFAS 133 until the beginning the first quarter of 2001, and therefore had a significant amount of time to get ready for the implementation.

119.    Indeed, in a presentation at a FAS133.com seminar in November 1999, Kimberly Rawls, then senior project manager with the Company's Financial Standards Department, reported that senior management had been very involved even before the first SFAS 133 exposure draft was issued, its CFO and President had met with FASB on several occasions to discuss SFAS 133 issues, and therefore when the final statement was issued in June 1998, Fannie Mae was in the "unusual position of being intimately familiar with many of its concepts."  Ms. Rawls further said Fannie Mae's success with respect to the implementation of SFAS 133 was

the ongoing involvement of senior management.  She said, "[a]t the beginning of 1999, our CFO mandated that a team of senior officers be assembled to provide the leadership for this project," and to make sure senior managers kept focused on the project, the CFO tied the manager's performance goals and bonus for the year to its successes.

120.    SFAS 133 established accounting and reporting standards for certain derivative instruments.   Prior to SFAS 133, the rules were inconsistent and lacked transparency and companies could hide the effects of ineffective, imprecise and simply bad hedges "off balance-sheet."  SFAS 133 simply requires an entity to record all derivatives as either assets or liabilities on its balance sheet at their fair value.  Changes in a derivative's fair value are included in earnings, unless the derivative **is designated and qualifies** for hedge accounting.   Hedge accounting provides a means for a matching of the earnings effect of a derivative and the related designated hedged transaction, thereby mitigating the impact on income of marking-to-market the derivative under SFAS 133.  Hedge accounting is **elective**.

121.    There are three categories of hedges under SFAS 133: (i) fair value hedge, (ii) cash flow hedge, and (iii) foreign currency hedge.   For a fair value hedge - a derivative designated as hedging the exposure to changes in the fair value of a recognized asset or liability or a firm commitment (*i.e.,* interest rate swaps or swaptions as a hedge against changes in the fair value of fixed rate assets or obligations caused by changing interest rates) - the gain or loss in the derivative is recorded in earnings in the period of change together with the loss or gain in the fair value of the hedged item.

122.    For a cash flow hedge - derivatives properly designated as hedges of changes in future cash flows, such as those associated with variable or floating rate assets or obligations - the effective portion of the change in the fair value of the derivative is recorded on the balance

sheet under "Accumulated Other Comprehensive Income" (a component of equity) and amortized through the income statement over the periods in which the hedged item impacts the income statement.

123.    In terms of Fannie Mae, the applicable foreign currency hedge accounting rules merely require the application of the fair value and cash flow hedging accounting model to Fannie Mae's foreign currency exposures.

124.    One objective of hedge accounting is to immediately reflect in earnings the extent to which the hedging instrument (normally a derivative) is not effective in achieving offsetting changes in fair value or cash flows of the hedged item.   Derivatives not properly designated in (or qualifying for) hedging relationships (and the ineffective portion of all hedges) are marked to fair value through the income statement.

125.    SFAS 133 gave investors and analysts much greater clarity about the use of derivatives and effectiveness (and ineffectiveness) of a company's hedging activities.   Volatility in earnings per share increased under SFAS 133 to the extent that a company's hedges were ineffective in offsetting the specific risk being hedged.   In other words, if there is a low correlation between changes in the value of a derivative and changes in the value of the hedged item, investors will generally observe this ineffectiveness through increased volatility of earnings.   SFAS 133 creates a strong incentive for managers of publicly traded companies to use hedges that are highly effective, as defined by the accounting standard, and meet the requirements for hedge accounting.

126.    During the Class Period, Fannie Mae was one of the world's largest users of derivatives.   Fannie Mae issues over $800 billion of debt securities each year.   Kimberly Rawls, senior project manager in the Company's financial standards department, said: "The use of

derivatives products in our business is crucial.  We use derivatives to hedge our debt issuance program."  The majority of Fannie Mae's derivative instruments were classified as cash flow hedges or fair value hedges.

127.    To qualify for hedge accounting under SFAS 133, certain stringent criteria must be satisfied.  To meet the criteria, an entity must, at the inception of a hedge, create formal documentation of the hedge relationship and the entity's risk management objective and strategy for undertaking the hedge, including:  a) the identification of the hedging instrument, the hedged item (in the case of a fair value hedge) or the hedged transaction (in the case of a cash flow hedge); b) the nature of risk being hedged; c) the basis upon which effectiveness will be measured; and d) there must be a reasonable basis to expect that the hedge will be highly effective.  (SFAS 133, ¶¶20, 21, 28, 29).  Furthermore, SFAS 133 requires a company to assess the effectiveness of each hedge transaction on an ***ongoing basis.***  An assessment of effectiveness is required whenever financial statements or earnings are reported, and at least every three months.

128.    OFHEO and the SEC both found numerous violations of SFAS 133 by Fannie Mae.  The SEC has ordered Fannie Mae to restate its 2001 to mid-2004 financial statements to totally **eliminate the use of hedge accounting.**  After its review, the SEC determined that:

> Fannie Mae internally developed its own unique methodology to assess whether hedge accounting was appropriate.  Fannie Mae's methodology, however, did not qualify for hedge accounting because of deficiencies in its application of Statement No. 133.  Among other things, Fannie Mae's methodology of assessing, measuring, and documenting hedge ineffectiveness was inadequate and was not supported by the Statement.

129.    OFHEO found that Fannie Mae implemented SFAS 133 in a manner that placed minimizing earnings volatility and maintaining simplicity of operations above compliance with

GAAP.  OFHEO said that in a March 2003 memorandum that took a retrospective look at Fannie

Mae's SFAS 133 implementation:

> Jonathan Boyles, Senior Vice President for Financial Standards, wrote that the
> implementation of this standard was driven by management's desire to minimize
> earnings volatility, leverage off existing systems, and make the non-GAAP
> measure of "operating earnings" simple and easy to understand.  Mr. Boyles
> wrote that these goals 'were intertwined in many of the decisions we made during
> the implementation process.'  He went on to write that these decisions "were
> often the joint decisions of management including the CFO."  He further noted
> that "in hindsight these decisions may not have been the best decisions given
> what we know now."

130.    OFHEO found that in many cases throughout the Class Period, Fannie Mae did

not assess and record hedge ineffectiveness as required by SFAS 133, and applied hedge

accounting to hedging relationships that do not qualify.  Specifically, Fannie Mae's hedge

accounting regime assumed that the vast majority of its hedging relationships were "perfectly

effective"; which simplified operations because SFAS 133 did not require effectiveness

assessment or measurement of ineffectiveness for such relationships.  However, SFAS 133

prescribes specific rules for assuming perfect effectiveness and hedges that do not meet the

criteria require an assessment of effectiveness to qualify for hedge accounting and a measure of

ineffectiveness for qualifying hedge relationships.  OFHEO found that the Company had many

hedging relationships that did not qualify as perfectly effective, but the Company nevertheless

treated them as such.  Because Fannie Mae did not perform a proper assessment of hedge

effectiveness for these hedges, those hedge relationships did not qualify for hedge accounting.

Thus, only the fair value changes for derivatives in those relationships **should have been**

**recorded immediately in earnings** without being offset by changes in the fair value or cash

flows of any hedged item.

131.    Further, even if a hedge relationship qualified for hedge accounting, "ineffectiveness" (the extent to which changes in the fair value of a derivative are not perfectly matched with the changes in fair value or cash flows of the hedged item) may exist.  Pursuant to SFAS 133, the ineffective portion of changes in the derivative's fair value must be recorded in earnings.  OFHEO identified numerous instances in which Fannie Mae improperly ignored the ineffectiveness in hedges relationships or failed to perform the required assessment tests.  For example, Fannie Mae often re-designated derivatives to different hedged items during the life of the derivative.  OFHEO found that Fannie Mae incorrectly assumed that such derivatives were perfectly effective upon re-designation, even though the derivatives do not have a fair value of zero at the time of re-designation, which is required in order to assume perfect effectiveness or to received matched terms accounting.

132.    When seeking to effectively terminate interest rate swaps, management often entered into offsetting swaps instead of buying back the existing swap.  According to OFHEO, however, the accounting for offsetting derivatives was inappropriate through the end of 2003, because Fannie Mae incorrectly treated the original swap and the offsetting swap as perfect cash flow hedges and recorded changes in their fair value in accumulated other comprehensive income (AOCI) instead of earnings.  In the first quarter of 2004, Fannie Mae modified its accounting for the offsetting swaps prospectively.  However, OFHEO believes the offsetting swaps were not valid hedging relationships under SFAS 133 in past periods and should not have received hedge accounting after execution of the second swap.

133.    Further, OFHEO found that Fannie Mae applied the "short-cut" method, or the "matched terms" method, for a broad range of hedge relationships where these methods are

inappropriate and had also applied its own definitions of "matched terms" in certain instances.

Specific examples include:

- receive fixed swaptions hedging the fair value of non-callable debt;

- callable swaps hedging discount notes, which are incorrectly treated as perfectly effective without regard to the option value existing in the derivative but not the hedged item;

- swaps arising from the exercise of a swaption, which are treated as perfectly effective despite their non-zero fair value at inception;

- the modification of the requirement for matching of reset dates (in order to assume perfect effectiveness) between the hedged item and the swap in cash flow hedges to permit up to a seven day reset date mismatch;

- the modification of the requirement for matching of maturity dates (in order to assume perfect effectiveness) between the hedged item and the swap in fair value hedges to permit up to a 90 day mismatch; and

- the use of a "duration method" to assume perfect effectiveness in hedges of anticipated debt issuances.  In March 2004, Fannie Mae discontinued the use of duration matching as a method to assess the effectiveness of hedging anticipated debt issuances and admitted that this methodology was a known departure from GAAP.

134.    OFHEO also identified a number of problems with Fannie Mae's hedge documentation.  In several examples, the documentation was ambiguous as to the nature of the hedging relationship or did not clearly identify the hedged risk, hedged item, or its probability of occurrence.  In addition, OFHEO found instances where there was no contemporaneous hedge documentation, as well as instances where staff created hedge designations retroactively.  Under SFAS 133, the lack of contemporaneous hedge designation documentation precludes a company from qualifying for hedge accounting.  OFHEO found that "this lack of documentation and the ability to create such documentation retroactively is not only a SFAS 133 violation, but is evidence of a poor control framework and is a significant safety and soundness problem."

135.    Finally, OFHEO determined that Fannie Mae had made an error in accounting for changes in the time value and the intrinsic value components of purchased interest rate caps. Fannie Mae found the error and corrected its methodology only prospectively to new interest rate caps.  OFHEO found that Fannie Mae incorrectly accounted for and reported this error in its financial statements.

136.    Fannie Mae previously announced that if the SEC determined it had been accounting improperly for derivatives under SFAS 133, which it has, that the Company would have to record in earnings a net cumulative after-tax loss on its derivative transactions of approximately $9 billion, with a corresponding decrease to retained earnings and, accordingly, regulatory capital.  Fannie Mae stated that this cumulative after-tax loss would consist of losses of approximately $13.5 billion on cash flow hedge relationships that had been deferred and were currently recorded in equity as a component of AOCI and gains of approximately $4.5 billion on fair value hedges that were currently recorded on Fannie Mae's balance sheet as an adjustment to the hedged item.  As a result, after the SEC ordered Fannie Mae to restate its financial for 2001 through mid-2004 to eliminate all hedge accounting, OFHEO declared the Company "significantly undercapitalized," finding that it had a $3 billion capital shortfall in its minimum capital.

D.    **The Fannie Mae Defendants' Additional Accounting Manipulations and Violations of Other Accounting Rules**

137.    Fannie Mae announced on February 23, 2005, that during its on-going investigation, OFHEO had found evidence of **possible further violations of GAAP** by the Fannie Mae Defendants as well as **internal control deficiencies that it believes raise safety and soundness concerns**.  Specifically, OFHEO has raised the following concerns:

- With respect to SFAS 115, *Accounting for Certain Investments in Debt and Equity Securities*, OFHEO has questioned the Company's compliance with the requirements for designating when mortgage-backed securities purchased for Fannie Mae's investment portfolio are designated as "held-to-maturity" or "available-for-sale."  Specifically, OFHEO raised concerns about the timing of the Company's designation and about whether certain designations or redesignations subsequent to the acquisition should be accounted for as transfers of securities from one such class to another.

- With respect to SFAS 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, OFHEO raised questions about, among other things, (i) Fannie Mae's policies and procedures for determining whether securities qualify as "substantially similar" to those sold under FAS 140, (ii) Fannie Mae's monitoring of these transactions for compliance with the requirements and FAS 140, (iii) Fannie Mae's policies and procedures regarding when it must be determined that a dollar-roll repurchase transaction has failed to occur as anticipated, and therefore has failed to qualify under FAS 140 for treatment as secured financing instead of as a sale, (iv) whether Fannie Mae adequately monitors the collateral in these transactions, (v) Fannie Mae's compliance with its policies with regard to ensuring the return of substantially similar securities, and (vi) Fannie Mae's practice for recognizing failed deliveries under the contracts.

- With regard to SFAS 65, *Accounting for Certain Mortgage Banking Activities*, OFHEO identified issues relating to Fannie Mae's classification of loans purchased for its portfolio as either held-for-investment or held-for-sale. Specifically, a systems upgrade in 2004 identified a long-standing practice of improperly designating all loans intended to be securitized as held-for-investment. OFHEO has directed Fannie Mae to identify and properly record these loans, and has questioned whether Fannie Mae may treat loans acquired in the future as held-for-investment given the past systems errors.

- OFHEO has questioned whether Fannie Mae's policies and certain transfers with respect to the Qualified Special Purpose Entities it uses to issue mortgage-backed securities complies with Financial Interpretation No. 46 (Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin 51) and whether certain transfers have a valid business purpose.

- With respect to SFAS 149, Amendments of Statement 133 on Derivative Instruments and Hedging Activities, OFHEO has questioned (i) the adequacy of Fannie Mae's methodology, assumptions and documentation for applying cash flow hedge accounting to certain transactions, and (ii) whether certain transactions have been accounted for inconsistently since the inception of FAS 149 on July 1, 2003.

- OFHEO has raised questions about Fannie Mae's practice of recognizing interest expense on short-term debt instruments and interest income on certain liquid investments in a monthly ratable manner rather than pursuant to the contractual accrual convention, which had the effect of smoothing certain income and expense amounts.   In addition, OFHEO questioned whether Fannie Mae appropriately deferred recognizing the financial impact of implementing new systems or correcting estimation methodologies.

- OFHEO has raised a number of questions about Fannie Mae's internal controls and systems, including questions relating to Fannie Mae's procedures for preparing, reviewing, validating, authorizing and recording journal entries relating to amortization adjustments; reliance on software applications and systems relating to portfolio accounting that may be ill-suited or ill-equipped for their intended purposes; and controls surrounding database modifications.

- Finally, OFHEO raised additional questions about Fannie Mae's procedures relating to adjusting amortization factors for premiums, discounts, and other deferred purchase and guaranty fee price adjustments under SFAS 91.

138.   On March 17, 2005, OFHEO reported that it had discovered instances of Fannie Mae employees falsifying signatures on accounting ledgers and making changes in database records related to earnings without authorization.  OFHEO later said on April 4, 2005, that it was investigating whether Fannie Mae also improperly accounted for trusts it set up to issue mortgage-backed securities.

139.   In the 2006 OFHEO Report, OFHEO reported that the Fannie Mae Defendants had engaged in intentional earnings management and had improper accounting policies and weak internal controls with respect to derivative and hedge accounting, investment accounting, securitization accounting, dollar roll accounting, and foreclosed property accounting.  OFHEO further found that the Fannie Mae Defendants had misapplied GAAP to avoid impairment losses in connection with investment securities, interest-only securities, and Buy-ups.  Finally, OFHEO found that the Fannie Mae Defendants engaged in improper transactions and accounting to fine-tune financial results, including short-term investment securities, income-shifting REMICS, strategic debt repurchases, and insurance transactions.

140.    On September 28, 2005, *Dow Jones* reported that Fannie Mae also used so-called finite insurance policies to hide earnings losses after they were incurred, and embellished earnings by overvaluing assets, underreporting credit losses and misusing tax credits.

141.    In additions to violations of SFAS 91 and SFAS 133, the SEC in its Complaint alleged that Fannie Mae violated SFAS sections 2, 5, 115, 149, 140, APB 20 and FIN 46R.

142.    With regard to *Statement of Financial Accounting Standards No. 5, Accounting for Contingencies*, the SEC alleges that contrary to GAAP, which requires that management perform a "quantitative judgment" in determining the appropriate loan loss reserve to book, between 1997 and 2003, Fannie Mae performed "no quantitative judgment in determining the appropriate loss reserve.   The failure to establish and implement an appropriate model for determining the size of the [loan loss reserve] was a violation of GAAP."   According to the SEC, at year-end 2002, this resulted in an overstated loan loss reserve of at least $100 million.   This overstatement resulted in a $100 million understatement of earnings before tax, which represented 1.6% of 2002 earnings before tax, and 8 cents of additional EPS at year-end 2002.

143.    The SEC Complaint also alleges that Fannie Mae violated *Accounting Principles Board Opinion APB 20, Accounting Changes* by manually making "realignments" to its premium and discount amortization system to match its loan and securities databases.   According to the SEC, these realignments produced a difference in accumulated amortization, which, under APB 20, should have been adjusted by Fannie Mae in the period in which they were incurred. APB 20, parag. 36 provides that: "correction of an error in the financial statements of a prior period discovered subsequent to their issuances should be reported as a prior period adjustment." Rather than following GAAP and immediately recording all of the realignments, Fannie Mae "recorded smaller realignments in the income statement but deferred large adjustments and

recognized those as income statement items over future periods."  Indeed, Fannie Mae used this method in order to avoid the earnings volatility in its financial statements that would have occurred from the required system realignment adjustments.

144.    Fannie Mae also utilized finite insurance transactions in order to "shift current income to future periods."  In January 2002, Fannie Mae's credit policy group entered into a finite insurance contract that allowed Fannie Mae to recognize a $40 million premium as an expense and record as income the loss recoveries from the insured in subsequent periods.  According to the SEC, this transaction did not constitute a valid insurance contract since it "did not have sufficient risk transfer to qualify."  Rather, Fannie Mae utilized this transaction in order to manage volatility by reducing earnings in 2002, 2003 and 2004 by $13.5 million, $13.5 million and $8 million, respectively.

145.    Fannie Mae's finite insurance transaction violated SFAS 5, *Accounting for Contingencies* which states that "[t]o the extent that an insurance contract or reinsurance contract does not, despite its form, provide for indemnification of the insured or the ceding company by the insurer or reinsurer against loss or liability, the premium paid less the amount of the premium to be retained by the insurer or reinsurer shall be accounted for as a deposit by the insured or the ceding company.  Those contracts may be structured in various ways, but if, regardless of form, their substance is that all or part of the premium paid by the insured or the ceding company is a deposit, it shall be accounted for as such."

146.    The SEC also concluded that Fannie Mae violated *SFAS 115, Accounting for Certain Investments in Debt and Equity Securities* by classifying its securities as held-to-maturity ("HTM") or available-for-sale ("AFS") at the end of the month instead of at the time of acquisition.  SFAS 115 states "At acquisition, an enterprise shall classify debt and equity

securities into one of three categories: held-to-maturity, available for sale, or trading." As noted by the SEC, "[r]ather than adhere to the **clear guidance under GAAP**, Fannie Mae initially classified the securities it acquired as HTM, and then at the end of the month of acquisition, decided on the ultimate classification." (Emphasis added). The SEC also pointed out that this GAAP violation "also illustrates a significant internal control deficiency."

147.    Fannie Mae also improperly made changes to its estimated life of callable debt; therefore violating the consistency principle of accounting under *Statement of Financial Accounting Concept* No. 2 Qualitative Characteristics of Accounting Information, which states:

> Information about a particular enterprise gains greatly in usefulness if it can be compared with similar information about other enterprises and with similar information about the same enterprise for some other period or some other point in time. Comparability between enterprises and consistency in the application of methods over time increases the informational value of comparisons of relative economic opportunities or performance. The significance of information, especially quantitative information, depends to a great extent on the user's ability to relate it to some benchmark.

148.    Moreover, the SEC also found that Fannie Mae violated SFAS 149, *Accounting for Forward Commitments*, which became effective on July 1, 2003 and amended SFAS 133 by requiring entities to treat certain firm commitments to purchase or sell mortgage loans or mortgage backed securities as derivatives. SFAS 149 requires that any changes in the value of these commitments be recorded in the financial statements unless they qualify for hedge accounting. The SEC Complaint alleges that Fannie Mae violated SFAS 149 by "failing to timely or adequately determine whether its mortgage commitments qualified for hedge accounting in accordance with SFAS 149."

149.    Fannie Mae also failed to comply with *FASB Interpretation Fin46 and FIN46R*. FASB Interpretation 46 of FIN46 was issued in January 2003, and amended by FIN 46R issued in December 2003. The interpretation provides guidance as to whether a business enterprise

should consolidate with a variable interest entity ("VIE"), also commonly referred to as special purpose entity ("SPE").  According to GAAP, companies should consolidate a VIE if one or more of the following characteristics exist:

1. The equity investment at risk is not sufficient to permit the entity to finance its activities without additional subordinated financial support provided by another party, including the equity holders.

2. The equity investors lack one or more of the following essential characteristics of a controlling financial interest:
   a. The direct or indirect ability to make decisions about the entity's activities through voting rights or similar rights
   b. The obligation to absorb the expected losses of the entity
   c. The right to receive the expected residual returns of the entity.

3. The equity investors have voting rights that are not proportionate to their economic interests, and the activities of the entity involve or are conducted on behalf of an investor with a disproportionately small voting interest.

The SEC found that "Fannie Mae failed to consolidate certain trusts used in connection with securitization transactions that were required to be consolidated on the balance sheet of the Company . . . Based on the Company's initial evaluation approximately $28.5 billion of both incremental assets and liabilities will be recognized in the financial statements".

150.    Fannie Mae also entered into short term financing arrangements in which the Company used its assets as collateral and agreed to repurchase the security at a later date.  Under SFAS 140, *Accounting for Transfers of Servicing and Financial Assets and Extinguishments of Liabilities*, these types of transactions, known as "dollar rolls," may be accounted for as a financing transaction so long as certain conditions are met.  If the requirements are not met, then security sale and purchase accounting must be used.

151.    Specifically, under SFAS 140, the Company must determine whether or not the returned security on the dollar roll transaction would be considered "substantially the same" security.  SFAS 140 also requires the Company to monitor whether or not the cash received is

adequate to repurchase the security sold.  The SEC concluded that Fannie Mae "failed to appropriately apply SFAS 140 in several respects."  This included a "lack of oversight" which led the Company to fail to apply the necessary tests to determine whether the dollar roll transactions met the requirements to be considered "substantially the same" security.  Fannie Mae also "had no procedures in place" to meet the requirement to monitor whether or not the cash received is adequate to repurchase the security sold or whether additional assets or cash are required.

152.    Finally, the SEC alleged that in the second quarter of 2003, Fannie Mae recorded an "other than temporary impairment" using values obtained from an internal discount model rather than the market value of the impaired asset.  This calculation resulted in an expense of $83.5 million, which was understated by $45 million.  In using an internal valuation model rather than market value, the Company violated SFAS 115 *Accounting for Certain Investments in Debt and Equity Securities* which states: "For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary".

## VII.    ADDITIONAL SCIENTER ALLEGATIONS AS TO THE FANNIE MAE DEFENDANTS

### A.    Admissions and Congressional Testimony Concerning The Fannie Mae Defendants' Fraudulent Accounting

153.    Fannie Mae admitted in its December 22, 2004 Form 8-K, that its "previously filed interim and audited financial statements and the independent auditors' reports thereon for the periods from January 2001 through the second quarter of 2004 should no longer be relied upon because such financial statements were prepared applying accounting practices that did not

comply with generally accepted accounting principles, or GAAP," and that it will restate its financial statements for 2001 through mid-2004.

154.    Specifically, the Fannie Mae Defendants have admitted that their methodology for performing calculations to measure the catch-up adjustment required by SFAS 91 for balance sheet dates in the periods 2001 through 2002 was not consistent with GAAP and that they should have calculated the catch-up adjustment during those periods with reference to the Company's quarter-end position rather than its projected year-end position and recorded amounts solely based on those quarterly calculations.  The Fannie Mae Defendants also represented to the SEC that they would initiate changes to eliminate the "precision threshold" in recognizing adjustments to the carrying amount of its loans that the SEC determined violated SFAS 91.

155.    Roger Barnes, former Manager of Financial Accounting, Deferred Assets in Fannie Mae's Controller Division, submitted written testimony to the United States House of Representative Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises for their October 6, 2004 hearing on the 2004 OFHEO Report.  In this testimony, he described in detail the Fannie Mae Defendants' knowledge of, and active participation in or approval of, the accounting improprieties and violations of GAAP described herein.  Barnes was one of the few employees in the Controller's Division at Fannie Mae that was both a certified public accountant and had an MBA.   In his written testimony, Barnes said that: "[t]he atmosphere and culture, particularly within the Controller's Division, is one of intimidation, restraint of dissenting opinions, and pressure to be part of the 'Team,' giving Chairman Franklin Raines and Vice Chairman Tim Howard the numbers the Office of the Chairman desired to please the markets.  Employees like myself who refused to go along with this agenda were ostracized and subjected to retaliation."

156.    Barnes testified that the Individual Defendants implemented an Amortization Integrated Modeling System ("AIMS") that was meant to serve as a modeling program to determine the cash flows and income generated by deferrals on mortgages and Fannie Mae's MBS products.  Barnes stated that he "repeatedly advised management that it appeared that AIMS had been designed and employed to manipulate the level of income reported by Fannie Mae in its earnings statement and/or other public filings, which would constitute fraudulent conduct that violates federal law."  Barnes testified that he directly brought his concerns about the AIMS design and use to Raines and Howard in an intra-office memorandum in September 2002.

157.    Barnes testified that he was among a group of Fannie Mae employees who designed AIMS.  According to Barnes, Jeffrey Juliane, another manager in the Controller's division, said that the purpose of AIMS was to "manage the recognition of income and expenses" more effectively than the programs in use at the time.  Barnes said that in a meeting he told Juliane, and Janet Pennewell, the Senior Vice President for the Controller's division, that AIMS "would be used to manipulate the reporting of income and expenses, rather than for legitimate accounting purposes, in violation of GAAP, in particular FAS 92."  Barnes also expressed concern that "use of the system in that manner could cause Fannie Mae to issue materially inaccurate financial statements."

158.    Fannie Mae nonetheless implemented the AIMS system in 2000.  When Barnes continued to raise concerns about the legitimacy of the AIMS system, Pennewell, Juliane and Mary Lewers (director of Financial Accounting at Fannie Mae) told Barnes that AIMS was established "to accomplish the objective set by Spencer…and Howard, which was to reduce the Company's earnings volatility."

159.    Barnes further testified that:

On January 4, 2001, I participated in a meeting with Ms. Lewers, Richard
Stawarz, Director of Financial Reporting, and Mr. Juliane, to discuss the effects
of a recent cut in interest rates by the Federal Reserve.  During this discussion,
Mr. Juliane indicated that the rapid fall of rates had led senior management to
consider adjusting the "on-tops" – a term the Controller's division used to refer
to manual journal entries that could be used to adjust arbitrarily the Company's
income as the books were closed each month.  Senior management had stated
that "on-tops" could be used to reflect a desired amount of income for December
2000, which would maintain margin and net interest income levels.  Mr. Juliane
added that if the Company decided not to make "on tops" adjustments, he would
produce modeling runs to support the desired income results.  Mr. Juliane
indicated that he was prepared to generate any results desired by Ms. Spencer and
Mr. Howard through the modeling process.  I was extremely troubled by what
was clearly improper income management and asked Mr. Juliane if management
agreed with this approach, which seemed to violate GAAP.  Mr. Juliane told me
that the Company's management embraced this approach.

160.    On February 1, 2002, Juliane sent an email in which he stated that he adjusted net

interest income factors "to evenly recognize $75 million of additional income in 2001, which

[was] $50 million less than was originally forecasted in the plan."  According to Barnes, Juliane

said that he "adjusted the guaranty fee factors to make the Company's actual reported income

comport with "the plan" – i.e., management's statement of income goals for amortization

purposes."  Barnes complained to Lewers that Fannie Mae was "improperly engaging in income

management."  Lewers ignored Barnes concerns.

161.    Barnes also informed Congress that on June 12, 2001, he discovered that during

the closing of Fannie Mae's books for May 2001, management had posted a $10 million "on

tops" entry in order to increase Fannie Mae's reported income.  Barnes questioned Stawarz about

the entry and Stawarz admitted that "senior management made the "on tops" adjustments so that

it could report more than Fannie Mae's actual income for the month, in order to support what

management had previously set as earnings goals and margins."

162.    Barnes testified that he repeatedly attended meetings with Spencer, Lewers and Pennewell where he raised concerns about Fannie Mae's apparent income management through the use of modeling and last minute entries to the Company's books, as well as retroactive factor changes that were applied to previously closed accounting periods.  The result was that Barnes was excluded from attending meetings with Spencer, Lewers and Pennewell.

163.    On August 10, 2001 Barnes discussed his concerns with Stawarz.  Barnes told Stawarz of his concerns about the "on top adjustments and use of factor changes to manipulate the amount of income which Barnes stated he believed violated GAAP.  Stawarz responded that "management often decided how much income they wanted to reflect before ensuring that such results could be achieved properly."

164.    Barnes discovered, on November 6, 2001, an amortization factor change requested by management that resulted in a $100 million increase to the Company's interest income.  Barnes complained to Lewers that this increase demonstrated that the AIMS system produced flawed financial results.   Barnes said that the AIMS system "was designed not to retain audit trials, making it impossible to accurately review the basis used to support the factors generated."  Lewers again dismissed Barnes' concerns and said that Juliane was on top of the situation.

165.    During 2002, Barnes became aware that Fannie Mae was routinely using negative factors for discounts and premiums in order to revise current period net income.  The use of negative factors allowed management to incorrectly report income by incorporating it into the balance sheet through accumulated amortization, thereby removing or adding income or expenses from the Company's income statement, even if those amounts had already been amortized.  Barnes reported his concerns to Lewers who again dismissed his concerns

166.    Barnes then discovered that Fannie Mae's use of negative factors had caused some of the Company's mortgage and MBS related assets to appreciate rather than to depreciate – a result completely inconsistent with GAAP and economic realities.  He then raised further concerns to Lewers who referred him to Juliane who disagreed with Barnes.

167.    Since his managers would take no action, in September 2002, Barnes formally raised his concerns in a written memorandum to Defendants Raines and Howard.   Barnes testified that he told Defendants Raines and Howard in this memorandum about the "serious financial improprieties" that he had repeatedly brought to the attention of his managers.  Barnes said he specifically highlighted the following improprieties in the memorandum:

> that reconciliation differences from systems were being input as future deferrals instead of current period's income and expenses; that the Controller's division was intentionally limiting the AIMS [amortization] system capabilities so that it would not provide audit trails for modeling; that the division had a practice of using negative factors in amortization and allowed amortization to exceed 100%; that the division routinely understated and overstated income; that the division managed income to meet the Company's desired objectives; that the division used On Top entries in order to manage income and margin calculations; and that the Company was using a miscellaneous balance sheet account in order to manage reporting of some income in periods other than when it was received.

He also stated that there "were serious problems with the amortization of purchased discount and premium, and that, 'the possible impact reaches hundreds of millions of dollars and possibly affects the integrity of the current financial statements and those we will issue after beginning compliance with SEC reporting in 2003.'"  Neither Raines nor Howard undertook any action to investigate Barnes' concerns or take any corrective action.  Accordingly, Barnes reported the accounting improprieties to the Company's internal Audit Division in July 2003, and submitted to them a substantial amount of materials documenting the pervasive and systematic nature of the accounting abuses.   The response from the Audit Division, as detailed in the 2004 OFHEO Report, was incomplete, perfunctory, and ineffective.

168.    Barnes also testified as follows with respect to an accounting manipulation by

Defendant Spencer:

> On January 2, 2003, Ms. Lewers informed me that Ms. Spencer and Ms.
> Pennewell had decided that a more than $20 million correction to Fannie Mae's
> income would not be posted because of a concern that the correction would be
> noticed and questioned by the Company's Internal Audit division.  Ms. Lewers
> indicated that the Internal Audit division might disagree with the Controller's
> division's use of "on-top" adjustments, but that the division would wait to see if
> Internal Audit raised questions before modifying this practice.  In an effort to
> control the information conveyed to the internal auditors about the Company's
> use of "on-top" accounts, Ms. Lewers instructed me not to volunteer any
> information about these adjustments, and not to discuss the "on-top" account
> unless specifically asked.  Ms. Lewers also reminded me of Ms. Spencer's
> standing instruction that lower-level staff were not to speak with the Internal
> Audit division under any circumstances.

169.    After sending the detailed September 2002 memorandum to Raines and Howard

who took no action, Barnes again met with Stawarz in April 2003 and again raised his concerns

about Fannie Mae's accounting practices.  Barnes told Stawarz that it was "necessary to make

the Company's management aware that several of the amortization accounting policies and

procedures were not in compliance with GAAP, and affected the accuracy of Fannie Mae's

financial reporting."  Stawarz agreed with Barnes that Fannie Mae had significant accounting

problems but that Fannie Mae's climate was one in which "employees actually joked about

improper income management because it was such a regular occurrence, and a climate in which

employees' morale suffered because management offered promotions, bonuses and perks only to

employees who support management's improper goals" so that Barnes should drop his

complaining with regard to Fannie Mae's accounting practices.

170.    Thereafter, Barnes began an exhaustive analysis of Fannie Mae's amortization

balances.  He documented a large number of irregular unamortized balances and found numerous

amortization factor errors produced by the AIMS system.  Barnes then prepared a memorandum

titled "Unamortized Balances and Factor Analysis" that summarized his findings.   The
memorandum raised several concerns regarding Fannie Mae's accounting practices including:
the inadequacy of controls and reviews of accounting process; the AIMS system's failure to
retain audit trails; the lack of correlation between factors and loan prepayments; the inaccuracy
of Fannie Mae's financial statements as a result of the arbitrary selection factors; the lack of
adequate check and balances for the AIMS system; the problem of on top adjustments; the
problem of deferred assets being amortized in excess of 100% or in reverse; and the fact that
improper amortization speeds were being used.   Barnes provided 60 examples of factor errors to
support his conclusions.   The conclusion was that Fannie Mae's accounting was not in
compliance with GAAP.

171.   On August 5, 2003 Barnes gave a copy of his "Unamortized Balances and Factor
Analysis" memorandum to Spencer, Pennewell, Lewers, Stawarz and Juliane.   Barnes testified
that a meeting was convened that day with all the people to whom he gave the report and they
berated him for providing this information to Fannie Mae's internal audit division.   No one
raised the idea that Barnes' claims should be investigated.

## B.   Inadequate Controls and Accounting Oversight Support a Strong Inference of Scienter

172.   Throughout the Class Period, the Fannie Mae Defendants knew, or were reckless
in not knowing, that the Company's internal controls suffered from material weaknesses.   These
"weak" controls enabled the Fannie Mae Defendants to engage in the accounting manipulations
and practices that violated GAAP and to provide investors with false financial statements and a
false portrayal of the Company as stable and immune to earnings volatility.

173.   As described herein, the Fannie Mae Defendants knew of their responsibilities to
ensure adequate internal controls and staffing.   Indeed, Defendants Raines and Howard falsely

certified to the public on numerous occasions that they had evaluated the Company's internal controls and disclosure policies and procedures and that they were effective.

174.    An example of the Fannie Mae Defendants' knowledge that their statements were false when made are the representations by Defendants Howard and Spencer in the "Report of Management" in each of Fannie Mae's Annual Reports issued during the Class Period, that the internal Office of Auditing was independent of the activities it reviews." Defendant Howard admitted to OFHEO, however, that in fact the internal auditor (Sam Rajappa) had been reporting directly to Howard, who is in charge of all financial accounting and reporting, on a dotted line basis from 2002 through 2004.   Howard also admitted that he had participated in the annual performance evaluation of and made compensation recommendations for Mr. Rajappa.  Further, prior to that, according to the 2004 OFHEO Report, the internal auditor had reported to the Chief Operating Officer.  This reporting structure and compensation/performance evaluation structure clearly impaired the independence of the internal Office of Auditing and the Office of Auditing was not independent from the activities it reviews.

175.    Mr. Barnes testified before Congress that Fannie Mae is "plagued by a corporate culture that uses threats, intimidation, and reprisal, to create an atmosphere where even those employees with great integrity . . . who rightfully feel duty-bound to report improprieties and irregularities . . . cannot risk doing so, fearing the retaliation that they know will follow."

176.    Further, OFHEO found (i) "a lack of proper segregation of duties exists within the Controller's Department which has created an environment that is not conducive for developing safe and sound financial reporting practices," (ii) based on evidence reviewed during the examination, the accounting policy development process within the Controller's Department lends itself to the formation of accounting policies that are aggressive in nature and which do not

comport with a strict interpretation of GAAP" and (iii) it "identified critical resource shortages and lack of technical accounting expertise within the Controller's Department which resulted in key person dependencies."

177.   With respect to development and approval of accounting policy, for example, Defendant Howard told OFHEO that Defendant Spencer, as Controller, had the responsibility and authority for approving accounting policy and that he, as Chief Financial Officer, had responsibility for the adopted accounting policies.  Defendant Spencer relied upon Fannie Mae's Financial Standards Group to provide guidance on whether or not accounting policies conformed to regulatory standards.  However, Defendants Howard and Spencer admitted to OFHEO that the amortization policy that both OFHEO and the SEC have found violated SFAS 91, was directed by Defendant Howard with significant involvement by Defendant Spencer and other members of the Controller's Department, but without **any** input from the Financial Standards Group.  Indeed, Jonathan Boyles, Senior Vice President – Financial Standards and Tax, told OFHEO that his department was not involved in the development or approval of the amortization policy and he agreed that aspects of the policy on its face do not comport with GAAP.

178.   With respect to accounting policies on which the Financial Standards Group was involved, Defendant Howard told OFHEO that whenever Defendant Spencer and the Financial Standards Group had a difference of opinion with respect to an accounting policy recommendation, Defendant Howard made the final decision.

179.   Further, OFHEO found no evidence of any formal written procedures that govern the development of accounting policy at Fannie Mae and, in fact, Fannie Mae did not even have all of its critical accounting policies together in one place to be accessed by Fannie Mae personnel.

180.    OFHEO found that a wide range of functions fell within Defendant Howard's purview of responsibility, several of which potentially impaired his independence.   For example, as admitted by Defendant Howard, he had the authority to approve transactions related to mortgage acquisitions and derivatives – the authority to set risk management strategies used to develop the financial forecast – and the authority to determine how the financial transactions are reported in the financial statements.  Howard had the ability to set financial targets through his duties as Vice Chairman, and the ability to meet the financial targets through his duties as Chief Financial Officer.  This inherent conflict of interest contradicts the public statement made by Defendant Raines that "[t]hose entering into business transactions and accountable for business results do not determine the accounting of those transactions."

181.    Janet Pennewell, Senior Vice President – Financial Reporting and Planning, had responsibility for forecasting income under her business planning function, and the responsibility for reporting income under her financial reporting function.  This conflict of interest is a major control weakness that undermines the integrity of the financial reporting process.

182.    Jeffrey Juliane, Director of Financial Reporting, testified to OFHEO that he was responsible for both modeling the purchase premium and discount amortization with respect to SFAS 91, and recording that amortization amount to the financial statements.  This dual role is another conflict of interest that undermines the integrity of the modeling process and the reporting process.

183.    By entering into the September 27, 2004 Agreement with OFHEO, Fannie Mae admitted that it had engaged in improper accounting and had inadequate internal controls.  There would be no need to fix anything if it were not broken.  However, the OFHEO Agreement

requires the Fannie Mae Board to make a massive overhaul of its accounting policies, internal controls and staffing.  The Agreement requires Fannie Mae to, among other things:

- Implement correct accounting treatments that will bring the Enterprise into compliance with SFAS 91 and SFAS 133 accounting standards.

- Undertake a top-to-bottom review of staff structure, responsibilities, independence of functions, compensation and incentives.

- Appoint an independent chief risk officer and separate other key business functions currently performed jointly by certain individuals or departments.

- Separate the function of business planning and forecasting from the controller's (Defendant Spencer's) function.

- Separate modeling and accounting functions.

- Take steps to assure the independence of the internal auditor, including the ability of the auditor to report directly to the Audit Committee or Board.

- Put in place policies to assure adherence to accounting rules and new internal controls.

- The Board must review accounting policies and other corporate policies to ensure they reflect the Board's objections in complying with law and regulation and in overseeing operations of Fannie Mae.

184.    Further, on December 28, 2004, the Company admitted that KPMG, the Company's former independent auditors, had notified the Company that there "existed strong indicators of material weaknesses in internal control over financial reporting" at the Company.

185.    The failure to establish and implement proper internal controls, which could have detected and prevented the improper activities and accounting, gives rise to a strong inference that the Fannie Mae Defendants acted with scienter.

### C.    Individual Defendants' Compensation Was Tied to Their Ability to Manage Fannie Mae's Earnings

186.    In addition to their desire to meet earnings per share targets to stay in favor with analysts and investors, Fannie Mae's compensation structure strongly emphasized and rewarded

employees for hitting earnings per share targets, giving the Individual Defendants an additional motive for improperly managing earnings in order to reach those targets.

187.    In particular, other than base salary, all major elements of Fannie Mae's compensation program for the most senior executive officer group was tied to annual and long-term performance goals.   As explained in the Company's Proxy Statements, the executive compensation program included three key components:   base salary, an annual bonus award under the Annual Incentive Plan, and variable long-term incentive awards.   Fannie Mae's "pay for performance" approach provided a cash payment for achieving annual financial goals and stock-based awards for medium and long-term performance.

188.    Under the Annual Incentive Plan bonus program, the Board established financial goals measured by earnings per share growth at the beginning of each year during the Class Period and achievement against those goals determined the funding of the bonus pool from which the actual bonuses were paid.

189.    The variable long-term incentive awards were delivered in the form of stock options and performance shares or restricted stock.   Officers at the Senior Vice-President level and above received half of the value of their annual variable long-term incentive award in the form of performance shares and half in the form of stock options.   Performance shares were paid based upon financial goals tied to the growth in earnings per share and non-financial goals tied to Fannie Mae's strategic plan.   The earnings per share goals and strategic goals were given equal rating (*i.e.* 50% each) in determining award payout.   Incentive awards were determined on a three-year cycle.   In its 2002 Proxy Statement, Fannie Mae reported that for the three-year cycle from January 1999 through December 2001, maximum payouts of the award opportunity range were achieved based on targets for growth in earnings per share and the Compensation

Committee's rating of corporate performance in strategic areas, *i.e.* risk management, housing impact, delivery of value through technology and customer relationships, preserving Fannie Mae's franchise and work force development.  In addition, because of the Company's purported extraordinary performance during 2001, the Board approved a special award to each of the Company's employees in the form of shares of common stock of the Company.

190.    According to the Company's Proxy Statements and other public sources, the salary, Annual Incentive Plan bonuses, performance shares, options and other compensation and benefits paid by Fannie Mae to the Individual Defendants for 2000 – 2003 is as follows:

| | | Annual Compensation | | | | Long Term Compensation | | |
|---|---|---|---|---|---|---|---|---|
| Name | Year | Cash Base Salary | Annual Incentive Plan Bonus | Other Comp. | Total Annual Comp. | Total Comp. % of Cash Base Salary | Stock Option Awards | LTIP Payouts (Value of Performance Shares) |
| Franklin Raines | 2003 | $992,250 | $4,180,365 | $237,246 | $5,409,861 | 18.34% | 135,200 | $11,621,280 |
| | 2002 | $992,250 | $3,300,000 | $163,923 | $4,456,173 | 22.27% | 311,731 | $7,233,679 |
| | 2001 | $992,250 | $3,125,650 | $3,085 | $4,120,985 | 24.08% | 277,335 | $6,803,068 |
| | 2000 | $992,250 | $2,480,625 | $2,907 | $3,475,782 | 28.55% | 421,358 | $4,588,616 |
| | | | | | | | | |
| Timothy Howard | 2003 | $645,865 | $1,176,145 | $858 | $1,822,868 | 35.43% | 112,968 | $3,470,578 |
| | 2002 | $498,614 | $781,250 | $1,169 | $1,281,033 | 38.92% | 81,661 | $1,947,368 |
| | 2001 | $463,315 | $694,983 | $1,103 | $1,159,401 | 39.96% | 75,617 | $1,987,119 |
| | 2000 | $435,540 | $544,425 | $1,126 | $981,091 | 44.39% | 129,142 | $2,088,542 |
| | | | | | | | | |
| Leanne Spencer | 2003 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | 2002 | $260,000 | $330,000 | | $1,383,714 | | 18,479 | $396,017 |
| | 2001 | N/A | N/A | N/A | N/A | | N/A | N/A |

191.    According to a report in the October 8, 2004 edition of *Inside Mortgage Finance*, the following total compensation packages were paid by Fannie Mae for the year ending December 31, 2002, for the top five executives:

| Executive Officer | Total Compensation | % of Compensation Based Upon EPS and Stock Performance |
|---|---|---|
| | | |
| Frank Raines | $17,732,657 | 91% |
| Daniel Mudd | $ 5,156,717 | 87% |
| Timothy Howard | $ 4,499,621 | 67% |
| Robert Levin | $ 4,162,106 | 89% |
| Thomas Donilon | $ 4,270,352 | 90% |

On average, 85% of the total compensation package of the top five executives was related to earnings per share and the performance of the common stock of Fannie Mae.

192.    In addition to the five executives noted above, four other executives had total compensation packages in 2002 in excess of $3 million, with an average of 80% of that compensation tied to earnings per share or stock performance.   In addition, eleven other executives had compensation in 2002 in excess of $1 million, with 75% tied to earnings per share or common stock performance.

193.    Base salaries averaging approximately $400,000 were paid to these 20 executives, but the **total compensation** paid to these executives was **$69,555,933**.

194.    In its 2000 Proxy Statement, dated April 2, 2001, the Company touted that the "corporation's earnings per share (EPS) increased by over 15 percent for the second year in a row….   These results kept Fannie Mae ahead of schedule to achieve its aggressive goal set in 1999 to double EPS by the end of 2003."[2]  Moreover, it stated that "Fannie Mae achieved its fourteenth consecutive year of record earnings and established new records of financial performance by once again achieving the ***double-digit operating earnings per share growth*** that the corporation has posted for over a decade, a record only four other companies in the S&P have the possibility of matching."

195.    The Company's 2000 Proxy Statement further revealed that because the Company attained these EPS goals in 2000, the Individual Defendants benefited as follows:

- Because the EPS goal was achieved, the maximum payouts of the award opportunity range were reached under the Annual Incentive Plan.[3]

---

[2] Fannie Mae 2000 Proxy statement, at p.10-11.
[3] Fannie Mae 2000 Proxy statement, at p.11; 2001 Proxy statement, at p.11.

- Approximately 75% of each executive vice president's annual bonus was based on corporate performance and 25% was based on the individual contributions to the year's results.[4]

- The Board approved a special grant called the "Earnings Per Share Challenge Option Grants."[5]  The purpose of this special grant was to "serve as an incentive to all employees to double the corporation's *earnings per share*."  The EPS Challenge Options become exercisable in January 2004 if EPS equals or exceeds $6.46 per share by December 31, 2003.  Even if the EPS goal is not met, the options will become exercisable in 25% annual increments beginning in January of each of the next four years.[6]

196.    The Company's 2001 Proxy Statement, dated April 2, 2002, revealed that, because the Company attained these EPS goals in 2001, the Individual Defendants benefited as follows:

- Because the EPS goal was achieved, the maximum payouts of the award opportunity range were achieved under the Annual Incentive Plan.[7]

- Maximum payouts of the award opportunity range were achieved for the three-year Performance Share cycle that concluded in 2001 *based on targets for growth in EPS* and the Compensation Committee's rating of corporate performance in strategic areas.

- Under the 2000 Earnings Per Share Challenge Option Grants, Raines received 213,548 shares and Howard received 56,572 shares.[8]

- The Board approved the "**2001 Special Award**" under the Annual Incentive Plan.  "During 2001, the corporation's performance exceeded the highest corporate goal established by the Compensation Committee under the Annual Incentive Plan.  In light of this extraordinary performance, the Board of Directors approved a 2001 Special Award for all regular full-time and part-time employees of the corporation.  All officers received their special award in the form of shares of Fannie Mae common stock, while the others received their special award in cash."[9]

---

[4] Fannie Mae 2000 Proxy statement, at p.10.
[5] Fannie Mae 2000 Proxy statement, at p.17.
[6] Fannie Mae 2000 Proxy statement, at p.17.
[7] Fannie Mae 2001 Proxy statement, at p.11.
[8] Fannie Mae 2001 Proxy statement, at p.17.
[9] Fannie Mae 2001 Proxy statement, at p.11.

- Under the 2001 Special Award program, Raines received $520,994 in shares and Howard received $115,839.[10]

197.  According to the Company's 2002 Proxy Statement, "[f]or 2002, the corporate financial goal was an aggressive earnings per share ("EPS") growth measure that Fannie Mae exceeded."[11]

198.  The Company's 2003 Proxy Statement touted, under the CEO's 2003 achievements section, that "core business *earnings per share* grew more than 15 percent, producing Fannie Mae's *17th consecutive year of double-digit growth.*"  (Emphasis added.)

199.  The manipulation of Fannie Mae's financial results enabled the Individual Defendants to receive some of the largest compensation packages offered to executive officers anywhere.  For instance, the August 23, 2004 *GSE Report* noted that Raines was "one of the most highly compensated chief executives in America" and that, in 2003, his total compensation was over $20 million, in contrast to median compensation of $6.2 million for CEOs in America's largest companies.[12]  The *GSE Report* further stated that Raines was the fifth highest paid executive in the Washington D.C. area in 2003, receiving $5.3 million in cash compensation in 2003.[13]

200.  OFHEO has already found that the Individual Defendants took accounting actions for the purpose of increasing their compensation.  For example, in the 2004 OFHEO Report, OFHEO concluded that the Individual Defendants inappropriately deferred $200 million of estimated amortization expense in 1998.  This deferral allowed the payment of about $27 million in bonuses when no bonuses would have been paid without the deferral.

---

[10] Fannie Mae 2001 Proxy statement, at p.14.
[11] Fannie Mae 2002 Proxy, dated April 14, 2003,  at p.17.
[12] GSE Report May 24, 2004, at p.20.
[13] GSE Report August 23, 2004, at p.16.

201.    Given that a substantial portion of their compensation depended upon the Company meeting established earnings per share targets during the Class Period, the Individual Defendants had a strong motive to manipulate the earnings per share numbers each quarter to meet those targets.

**D.    Individual Defendants' Insider Trading**

202.    In addition to the substantial compensation that the Individual Defendants received during the Class Period from Fannie Mae as a result of their fraud, they also benefited significantly from their sales of Fannie Mae common stock at artificially inflated prices during the Class Period.  The Individual Defendants made these sales while they were in possession of the undisclosed material adverse information about Fannie Mae as described herein.

203.    The Individual Defendants began publicly reporting their sales of Fannie Mae common stock in April 2002.  Without taking into account any sales the Individual Defendants may have made during the first year of the Class Period, from April 2002 until the end of the Class Period, the Individual Defendants sold Fannie Mae common stock for proceeds totaling over $23 million.

204.    Defendant Raines garnered proceeds of over $6.88 million from his sales of Fannie Mae stock during this year and a half period, as follows:

**FRANKLIN D. RAINES**
**SALES OF FANNIE MAE COMMON STOCK**

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 1/8/03 | 18,624 | $68.685 | $1,279,189.44 |
| 1/21/03 | 20,908 | $69.43 | $1,451,642.44 |
| 1/5/04 | 29,664 | $74.495 | $2,209,819.68 |
| 1/23/04 | 24,874 | $78.315 | $1,948,007.31 |
|  |  |  |  |
| **Totals:** | **94,070** |  | **$6,888,658.87** |

205.    Defendant Howard sold thousands of shares that he owned directly or indirectly

during the Class Period for proceeds totaling over $13.7 million, as follows:

**TIMOTHY HOWARD**
**SALES OF FANNIE MAE COMMON STOCK**

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 5/16/02 | 20,000 | $80.51 | $1,610,200 |
| 1/8/03 | 4,624 | $68.685 | $317,599.44 |
| 1/15/03 | 470 | $69.285 | $32,563.95 |
| 1/21/03 | 5,019 | $69.43 | $348,469.17 |
| 5/13/03 | 10,000 | $73.00 | $730,000 |
| 5/15/03 | 13,000 | $73.40 | $954,200 |
| 5/15/03 | 2,000 | $73.42 | $146,840 |
| 11/13/03 | 300 | $69.57 | $20,871 |
| 11/13/03 | 4,400 | $69.55 | $306,020 |
| 11/13/03 | 200 | $69.54 | $13,908 |
| 11/13/03 | 500 | $69.46 | $34,730 |
| 11/13/03 | 7,700 | $69.45 | $534,765 |
| 11/13/03 | 1,000 | $69.43 | $69,430 |
| 11/13/03 | 500 | $69.42 | $34,710 |
| 11/13/03 | 2,400 | $69.41 | $166,584 |
| 11/13/30 | 4,900 | $69.40 | $340,060 |
| 11/13/03 | 700 | $69.39 | $48,573 |
| 11/13/03 | 400 | $69.38 | $27,752 |
| 11/13/03 | 3,200 | $69.37 | $221,984 |
| 1/5/04 | 6,829 | $74.495 | $508,726.35 |
| 1/23/04 | 7,825 | $78.315 | $612,814.87 |
| 3/17/04 | 500* | $75.73 | $37,865 |
| 3/17/04 | 3,000* | $75.75 | $227,250 |
| 3/18/04 | 200* | $74.63 | $14,926 |
| 3/18/04 | 100* | $74.62 | $7,462 |
| 3/18/04 | 100* | $74.68 | $7,468 |
| 3/18/04 | 100* | $74.67 | $7,467 |
| 3/18/04 | 100* | $74.65 | $7,465 |
| 3/18/04 | 100* | $74.70 | $7,470 |
| 3/18/04 | 100* | $74.75 | $7,475 |
| 3/18/04 | 100* | $74.55 | $7,455 |
| 3/18/04 | 100* | $74.57 | $7,457 |
| 3/18/04 | 300* | $74.59 | $22,377 |
| 3/18/04 | 200* | $74.54 | $14,908 |
| 3/18/04 | 100* | $75.20 | $7,520 |
| 3/18/04 | 100* | $75.26 | $7,526 |
| 3/18/04 | 100* | $75.25 | $7,525 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 3/18/04 | 100* | $75.21 | $7,521 |
| 3/18/04 | 100* | $75.22 | $7,522 |
| 3/18/04 | 100* | $75.32 | $7,532 |
| 3/18/04 | 100* | $75.34 | $7,534 |
| 3/18/04 | 200* | $75.35 | $15,070 |
| 3/18/04 | 200* | $75.30 | $15,060 |
| 3/18/04 | 100* | $74.88 | $7,488 |
| 3/18/04 | 100* | $75.05 | $7,505 |
| 3/18/04 | 100* | $75.00 | $7,500 |
| 3/18/04 | 100* | $75.19 | $7,519 |
| 3/18/04 | 100* | $75.13 | $7,513 |
| 3/18/04 | 100* | $75.14 | $7,514 |
| 3/18/04 | 100* | $74.61 | $7,461 |
| 3/18/04 | 100* | $74.79 | $7,479 |
| 3/18/04 | 100* | $74.66 | $7,466 |
| 3/31/04 | 100* | $74.64 | $7,464 |
| 3/31/04 | 100* | $74.60 | $7,460 |
| 3/31/04 | 100* | $74.66 | $7,466 |
| 3/31/04 | 100* | $74.70 | $7,470 |
| 3/31/04 | 100* | $74.77 | $7,477 |
| 3/31/04 | 200* | $74.48 | $14,896 |
| 3/31/04 | 200* | $74.49 | $14,898 |
| 3/31/04 | 300* | $74.40 | $22,320 |
| 3/31/04 | 100* | $74.46 | $7,446 |
| 3/31/04 | 100* | $74.47 | $7,447 |
| 3/31/04 | 100* | $74.56 | $7,456 |
| 3/31/04 | 200* | $74.50 | $14,900 |
| 3/31/04 | 200* | $74.53 | $14,906 |
| 3/31/04 | 100* | $74.55 | $7,455 |
| 3/31/04 | 100* | $75.23 | $7,523 |
| 3/31/04 | 200* | $74.36 | $14,872 |
| 3/31/04 | 400* | $74.39 | $29,756 |
| 3/31/04 | 200* | $74.34 | $14,868 |
| 3/31/04 | 100* | $74.33 | $7,433 |
| 3/31/04 | 100* | $74.31 | $7,431 |
| 3/31/04 | 100* | $75.33 | $7,533 |
| 3/31/04 | 100* | $74.85 | $7,485 |
| 3/31/04 | 100* | $75.14 | $7,514 |
| 3/31/04 | 100* | $75.10 | $7,510 |
| 4/01/04 | 200* | $74.68 | $14,936 |
| 4/01/04 | 100* | $74.64 | $7,464 |
| 4/01/04 | 100* | $74.62 | $7,462 |
| 4/01/04 | 100* | $74.47 | $7,447 |
| 4/01/04 | 200* | $74.49 | $14,898 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 4/01/04 | 100* | $74.45 | $7,445 |
| 4/01/04 | 100* | $74.42 | $7,442 |
| 4/01/04 | 100* | $74.43 | $7,443 |
| 4/01/04 | 100* | $74.40 | $7,440 |
| 4/01/04 | 100* | $74.57 | $7,457 |
| 4/01/04 | 200* | $74.20 | $14,840 |
| 4/01/04 | 100* | $74.39 | $7,439 |
| 4/01/04 | 200* | $74.34 | $14,868 |
| 4/01/04 | 100* | $74.30 | $7,430 |
| 4/01/04 | 100* | $74.07 | $7,407 |
| 4/01/04 | 300* | $74.17 | $22,251 |
| 4/01/04 | 300* | $74.14 | $22,242 |
| 4/01/04 | 100* | $74.12 | $7,412 |
| 4/01/04 | 600* | $74.15 | $44,490 |
| 4/01/04 | 300* | $74.10 | $22,230 |
| 4/28/04 | 100* | $68.62 | $6,862 |
| 4/28/04 | 100* | $68.42 | $6,842 |
| 4/28/04 | 100* | $68.48 | $6,848 |
| 4/28/04 | 100* | $68.47 | $6,847 |
| 4/28/04 | 100* | $68.49 | $6,849 |
| 4/28/04 | 100* | $68.50 | $6,850 |
| 4/28/04 | 100* | $68.55 | $6,855 |
| 4/28/04 | 100* | $68.58 | $6,858 |
| 4/28/04 | 100* | $68.59 | $6,859 |
| 4/28/04 | 100* | $68.57 | $6,857 |
| 4/28/04 | 200* | $68.20 | $13,640 |
| 4/28/04 | 100* | $68.29 | $6,829 |
| 4/28/04 | 200* | $68.31 | $13,662 |
| 4/28/04 | 100* | $68.33 | $6,833 |
| 4/28/04 | 300* | $68.30 | $20,490 |
| 4/28/04 | 100* | $68.35 | $6,835 |
| 4/28/04 | 200* | $69.35 | $13,870 |
| 4/28/04 | 200* | $68.08 | $13,616 |
| 4/28/04 | 100* | $68.05 | $6,805 |
| 4/28/04 | 100* | $68.88 | $6,888 |
| 4/28/04 | 100* | $67.95 | $6,795 |
| 4/28/04 | 200* | $68.15 | $13,630 |
| 4/28/04 | 100* | $68.18 | $6,818 |
| 4/28/04 | 100* | $68.17 | $6,817 |
| 4/28/04 | 100* | $68.12 | $6,812 |
| 4/28/04 | 100* | $68.14 | $6,814 |
| 4/28/04 | 100* | $68.10 | $6,810 |
| 4/28/04 | 100* | $68.90 | $6,890 |
| 4/29/04 | 200* | $68.76 | $13,752 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 4/29/04 | 100* | $68.75 | $6,875 |
| 4/29/04 | 200* | $68.70 | $13,740 |
| 4/29/04 | 100* | $68.46 | $6,846 |
| 4/29/04 | 100* | $68.45 | $6,845 |
| 4/29/04 | 100* | $68.40 | $6,840 |
| 4/29/04 | 100* | $68.54 | $6,854 |
| 4/29/04 | 100* | $69.22 | $6,922 |
| 4/29/04 | 100* | $68.20 | $6,820 |
| 4/29/04 | 100* | $68.23 | $6,823 |
| 4/29/04 | 100* | $68.32 | $6,832 |
| 4/29/04 | 200* | $68.35 | $13,670 |
| 4/29/04 | 100* | $69.00 | $6,900 |
| 4/29/04 | 100* | $69.08 | $6,908 |
| 4/29/04 | 100* | $69.02 | $6,902 |
| 4/29/04 | 100* | $68.88 | $6,888 |
| 4/29/04 | 100* | $68.86 | $6,886 |
| 4/29/04 | 200* | $68.80 | $13,760 |
| 4/29/04 | 100* | $68.83 | $6,883 |
| 4/29/04 | 100* | $68.07 | $6,807 |
| 4/29/04 | 100* | $68.06 | $6,806 |
| 4/29/04 | 200* | $68.96 | $13,792 |
| 4/29/04 | 100* | $69.19 | $6,919 |
| 4/29/04 | 100* | $68.94 | $6,894 |
| 4/29/04 | 200* | $68.90 | $13,780 |
| 4/29/04 | 200* | $68.10 | $13,620 |
| 4/29/04 | 200* | $68.15 | $13,630 |
| 5/12/04 | 100* | $68.68 | $6,868 |
| 5/12/04 | 100* | $68.65 | $6,865 |
| 5/12/04 | 200* | $68.64 | $13,728 |
| 5/12/04 | 300* | $68.61 | $20,583 |
| 5/12/04 | 100* | $68.71 | $6,871 |
| 5/12/04 | 200* | $68.75 | $13,750 |
| 5/12/04 | 100* | $68.76 | $6,876 |
| 5/12/04 | 200* | $68.56 | $13,712 |
| 5/12/04 | 100* | $68.51 | $6,851 |
| 5/12/04 | 100* | $68.58 | $6,858 |
| 5/12/04 | 100* | $68.52 | $6,852 |
| 5/12/04 | 100* | $69.28 | $6,928 |
| 5/12/04 | 100* | $69.36 | $6,936 |
| 5/12/04 | 200* | $68.88 | $13,776 |
| 5/12/04 | 100* | $68.83 | $6,883 |
| 5/12/04 | 100* | $69.02 | $6,902 |
| 5/12/04 | 100* | $69.04 | $6,904 |
| 5/12/04 | 200* | $69.06 | $13,812 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 5/12/04 | 100* | $69.01 | $6,901 |
| 5/12/04 | 100* | $69.00 | $6,900 |
| 5/12/04 | 200* | $68.92 | $13,784 |
| 5/12/04 | 100* | $68.93 | $6,893 |
| 5/12/04 | 100* | $68.98 | $6,898 |
| 5/12/04 | 100* | $69.01 | $6,901 |
| 5/12/04 | 300* | $69.15 | $20,745 |
| 5/13/04 | 100* | $69.77 | $6,977 |
| 5/13/04 | 100* | $69.71 | $6,971 |
| 5/13/04 | 100* | $70.45 | $7,045 |
| 5/13/04 | 100* | $70.42 | $7,042 |
| 5/13/04 | 200* | $69.48 | $13,896 |
| 5/13/04 | 100* | $70.50 | $7,050 |
| 5/13/04 | 100* | $69.52 | $6,952 |
| 5/13/04 | 100* | $70.28 | $7,028 |
| 5/13/04 | 400* | $70.20 | $28,080 |
| 5/13/04 | 100* | $70.33 | $7,033 |
| 5/13/04 | 100* | $70.30 | $7,030 |
| 5/13/04 | 100* | $70.35 | $7,035 |
| 5/13/04 | 100* | $70.01 | $7,001 |
| 5/13/04 | 200* | $70.00 | $14,000 |
| 5/13/04 | 100* | $70.09 | $7,009 |
| 5/13/04 | 300* | $69.80 | $20,940 |
| 5/13/04 | 200* | $70.10 | $14,020 |
| 5/13/04 | 200* | $69.99 | $13,998 |
| 5/13/04 | 100* | $70.17 | $7,017 |
| 5/13/04 | 100* | $69.91 | $6,991 |
| 5/13/04 | 200* | $69.90 | $13,980 |
| 5/13/04 | 300* | $69.95 | $20,985 |
| 5/13/04 | 100* | $69.96 | $6,996 |
| 5/26/04 | 100* | $67.79 | $6,779 |
| 5/26/04 | 100* | $67.73 | $6,773 |
| 5/26/04 | 100* | $68.21 | $6,821 |
| 5/26/04 | 100* | $68.30 | $6,830 |
| 5/26/04 | 200* | $68.02 | $13,604 |
| 5/26/04 | 400* | $68.07 | $27,228 |
| 5/26/04 | 300* | $68.05 | $20,415 |
| 5/26/04 | 500* | $68.01 | $34,005 |
| 5/26/04 | 200* | $68.08 | $13,616 |
| 5/26/04 | 300* | $68.06 | $20,418 |
| 5/26/04 | 100* | $67.85 | $6,785 |
| 5/26/04 | 100* | $68.00 | $6,800 |
| 5/26/04 | 100* | $68.03 | $6,803 |
| 5/26/04 | 200* | $67.99 | $13,598 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 5/26/04 | 100* | $68.11 | $6,811 |
| 5/26/04 | 300* | $68.10 | $20,430 |
| 5/26/04 | 200* | $67.97 | $13,594 |
| 5/26/04 | 100* | $67.94 | $6,794 |
| 5/27/04 | 100* | $68.75 | $6,875 |
| 5/27/04 | 300* | $69.23 | $20,769 |
| 5/27/04 | 100* | $68.83 | $6,883 |
| 5/27/04 | 100* | $68.84 | $6,884 |
| 5/27/04 | 200* | $69.05 | $13,810 |
| 5/27/04 | 300* | $69.06 | $20,718 |
| 5/27/04 | 200* | $69.07 | $13,814 |
| 5/27/04 | 100* | $69.04 | $6,904 |
| 5/27/04 | 100* | $69.02 | $6,902 |
| 5/27/04 | 100* | $69.03 | $6,903 |
| 5/27/04 | 100* | $69.08 | $6,908 |
| 5/27/04 | 600* | $69.00 | $41,400 |
| 5/27/04 | 200* | $69.01 | $13,802 |
| 5/27/04 | 100* | $68.87 | $6,887 |
| 5/27/04 | 200* | $68.94 | $13,788 |
| 5/27/04 | 200* | $69.18 | $13,836 |
| 5/27/04 | 100* | $68.98 | $6,898 |
| 5/27/04 | 100* | $69.13 | $6,913 |
| 5/27/04 | 100* | $68.93 | $6,893 |
| 5/27/04 | 100* | $69.11 | $6,911 |
| 5/27/04 | 100* | $68.95 | $6,895 |
| 6/09/04 | 200* | $69.60 | $13,920 |
| 6/09/04 | 100* | $69.61 | $6,961 |
| 6/09/04 | 100* | $69.64 | $6,964 |
| 6/09/04 | 200* | $69.63 | $13,926 |
| 6/09/04 | 100* | $69.65 | $6,965 |
| 6/09/04 | 100* | $69.62 | $6,962 |
| 6/09/04 | 100* | $69.48 | $6,948 |
| 6/09/04 | 100* | $69.45 | $6,945 |
| 6/09/04 | 100* | $69.57 | $6,957 |
| 6/09/04 | 300* | $69.55 | $20,865 |
| 6/09/04 | 200* | $69.52 | $13,904 |
| 6/09/04 | 100* | $69.54 | $6,954 |
| 6/09/04 | 500* | $69.50 | $34,750 |
| 6/09/04 | 300* | $69.51 | $20,853 |
| 6/09/04 | 100* | $69.53 | $6,953 |
| 6/09/04 | 100* | $69.58 | $6,958 |
| 6/09/04 | 100* | $69.25 | $6,925 |
| 6/09/04 | 100* | $69.29 | $6,929 |
| 6/09/04 | 100* | $69.28 | $6,928 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 6/09/04 | 100* | $69.20 | $6,920 |
| 6/09/04 | 200* | $69.38 | $13,876 |
| 6/09/04 | 100* | $69.18 | $6,918 |
| 6/09/04 | 100* | $69.10 | $6,910 |
| 6/10/04 | 200* | $69.65 | $13,930 |
| 6/10/04 | 100* | $69.61 | $6,961 |
| 6/10/04 | 200* | $69.62 | $13,924 |
| 6/10/04 | 100* | $69.63 | $6,963 |
| 6/10/04 | 200* | $69.78 | $13,956 |
| 6/10/04 | 100* | $69.77 | $6,977 |
| 6/10/04 | 100* | $69.74 | $6,974 |
| 6/10/04 | 300* | $69.75 | $20,925 |
| 6/10/04 | 100* | $69.72 | $6,972 |
| 6/10/04 | 100* | $69.71 | $6,971 |
| 6/10/04 | 100* | $69.79 | $6,979 |
| 6/10/04 | 200* | $69.76 | $13,952 |
| 6/10/04 | 100* | $69.47 | $6,947 |
| 6/10/04 | 100* | $69.50 | $6,950 |
| 6/10/04 | 100* | $69.55 | $6,955 |
| 6/10/04 | 100* | $69.52 | $6,952 |
| 6/10/04 | 300* | $69.88 | $20,964 |
| 6/10/04 | 100* | $69.87 | $6,987 |
| 6/10/04 | 100* | $69.86 | $6,986 |
| 6/10/04 | 100* | $69.83 | $6,983 |
| 6/10/04 | 100* | $69.80 | $6,980 |
| 6/10/04 | 100* | $69.84 | $6,984 |
| 6/10/04 | 100* | $69.81 | $6,981 |
| 6/10/04 | 100* | $69.98 | $6,998 |
| 6/10/04 | 100* | $69.94 | $6,994 |
| 6/10/04 | 100* | $69.90 | $6,990 |
| 6/10/04 | 100* | $69.91 | $6,991 |
| 6/23/04 | 100* | $70.62 | $7,062 |
| 6/23/04 | 300* | $70.61 | $21,183 |
| 6/23/04 | 400* | $70.67 | $28,268 |
| 6/23/04 | 200* | $70.60 | $14,120 |
| 6/23/04 | 300* | $70.75 | $21,225 |
| 6/23/04 | 200* | $70.76 | $14,152 |
| 6/23/04 | 200* | $70.74 | $14,148 |
| 6/23/04 | 100* | $70.73 | $7,073 |
| 6/23/04 | 100* | $70.77 | $7,077 |
| 6/23/04 | 100* | $70.78 | $7,078 |
| 6/23/04 | 200* | $71.30 | $14,260 |
| 6/23/04 | 100* | $70.80 | $7,080 |
| 6/23/04 | 100* | $71.05 | $7,105 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 6/23/04 | 100* | $71.00 | $7,100 |
| 6/23/04 | 100* | $70.83 | $7,083 |
| 6/23/04 | 200* | $70.90 | $14,180 |
| 6/23/04 | 200* | $70.94 | $14,188 |
| 6/23/04 | 200* | $70.97 | $14,194 |
| 6/23/04 | 100* | $71.17 | $7,117 |
| 6/23/04 | 100* | $71.15 | $7,115 |
| 6/23/04 | 100* | $71.16 | $7,116 |
| 6/24/04 | 300* | $71.02 | $21,306 |
| 6/24/04 | 300* | $71.06 | $21,318 |
| 6/24/04 | 500* | $71.03 | $35,515 |
| 6/24/04 | 300* | $71.00 | $21,300 |
| 6/24/04 | 100* | $71.05 | $7,105 |
| 6/24/04 | 300* | $71.07 | $21,321 |
| 6/24/04 | 100* | $71.08 | $7,108 |
| 6/24/04 | 100* | $71.04 | $7,104 |
| 6/24/04 | 100* | $71.17 | $7,117 |
| 6/24/04 | 100* | $71.14 | $7,114 |
| 6/24/04 | 400* | $70.98 | $28,392 |
| 6/24/04 | 100* | $71.10 | $7,110 |
| 6/24/04 | 100* | $70.97 | $7,097 |
| 6/24/04 | 300* | $70.95 | $21,285 |
| 6/24/04 | 100* | $71.01 | $7,101 |
| 6/24/04 | 300* | $71.12 | $21,336 |
| 7/07/04 | 100* | $71.65 | $7,165 |
| 7/07/04 | 100* | $71.69 | $7,169 |
| 7/07/04 | 100* | $71.64 | $7,164 |
| 7/07/04 | 400* | $71.61 | $28,644 |
| 7/07/04 | 100* | $71.62 | $7,162 |
| 7/07/04 | 100* | $71.73 | $7,173 |
| 7/07/04 | 200* | $71.72 | $14,344 |
| 7/07/04 | 200* | $71.70 | $14,340 |
| 7/07/04 | 100* | $71.43 | $7,143 |
| 7/07/04 | 100* | $71.40 | $7,140 |
| 7/07/04 | 100* | $71.41 | $7,141 |
| 7/07/04 | 100* | $71.47 | $7,147 |
| 7/07/04 | 100* | $70.45 | $7,045 |
| 7/07/04 | 200* | $71.57 | $14,314 |
| 7/07/04 | 100* | $71.50 | $7,150 |
| 7/07/04 | 200* | $71.58 | $14,316 |
| 7/07/04 | 200* | $71.55 | $14,310 |
| 7/07/04 | 100* | $71.59 | $7,159 |
| 7/07/04 | 100* | $70.56 | $7,056 |
| 7/07/04 | 100* | $70.54 | $7,054 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 7/07/04 | 100* | $71.20 | $7,120 |
| 7/07/04 | 100* | $71.06 | $7,106 |
| 7/07/04 | 100* | $71.09 | $7,109 |
| 7/07/04 | 200* | $71.05 | $14,210 |
| 7/07/04 | 100* | $71.01 | $7,101 |
| 7/07/04 | 100* | $71.10 | $7,110 |
| 7/08/04 | 100* | $71.65 | $7,165 |
| 7/08/04 | 200* | $71.45 | $14,290 |
| 7/08/04 | 200* | $71.46 | $14,292 |
| 7/08/04 | 100* | $71.48 | $7,148 |
| 7/08/04 | 100* | $71.44 | $7,144 |
| 7/08/04 | 100* | $71.49 | $7,149 |
| 7/08/04 | 100* | $71.47 | $7,147 |
| 7/08/04 | 100* | $71.42 | $7,142 |
| 7/08/04 | 100* | $71.50 | $7,150 |
| 7/08/04 | 200* | $71.52 | $14,304 |
| 7/08/04 | 100* | $71.56 | $7,156 |
| 7/08/04 | 200* | $71.53 | $14,306 |
| 7/08/04 | 400* | $71.29 | $28,516 |
| 7/08/04 | 100* | $71.27 | $7,127 |
| 7/08/04 | 100* | $71.25 | $7,125 |
| 7/08/04 | 200* | $71.23 | $14,246 |
| 7/08/04 | 100* | $71.35 | $7,135 |
| 7/08/04 | 300* | $71.34 | $21,402 |
| 7/08/04 | 100* | $71.31 | $7,131 |
| 7/08/04 | 100* | $71.36 | $7,136 |
| 7/08/04 | 100* | $71.32 | $7,132 |
| 7/08/04 | 100* | $71.30 | $7,130 |
| 7/08/04 | 100* | $71.38 | $7,138 |
| 7/08/04 | 100* | $71.16 | $7,116 |
| 7/08/04 | 100* | $71.12 | $7,112 |
| 8/04/04 | 100* | $70.63 | $7,063 |
| 8/04/04 | 100* | $70.62 | $7,062 |
| 8/04/04 | 200* | $70.61 | $14,122 |
| 8/04/04 | 100* | $70.64 | $7,064 |
| 8/04/04 | 200* | $70.48 | $14,096 |
| 8/04/04 | 100* | $70.49 | $7,049 |
| 8/04/04 | 200* | $70.54 | $14,108 |
| 8/04/04 | 100* | $70.56 | $7,056 |
| 8/04/04 | 100* | $71.30 | $7,130 |
| 8/04/04 | 200* | $71.33 | $14,266 |
| 8/04/04 | 100* | $70.58 | $7,058 |
| 8/04/04 | 100* | $70.38 | $7,038 |
| 8/04/04 | 200* | $70.34 | $14,068 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 8/04/04 | 100* | $70.39 | $7,039 |
| 8/04/04 | 100* | $70.35 | $7,035 |
| 8/04/04 | 100* | $70.32 | $7,032 |
| 8/04/04 | 100* | $70.37 | $7,037 |
| 8/04/04 | 100* | $70.31 | $7,031 |
| 8/04/04 | 200* | $71.05 | $14,210 |
| 8/04/04 | 100* | $71.07 | $7,107 |
| 8/04/04 | 100* | $71.08 | $7,108 |
| 8/04/04 | 100* | $71.02 | $7,102 |
| 8/04/04 | 100* | $70.85 | $7,085 |
| 8/04/04 | 100* | $70.84 | $7,084 |
| 8/04/04 | 100* | $71.18 | $7,118 |
| 8/04/04 | 200* | $71.16 | $14,232 |
| 8/04/04 | 100* | $71.11 | $7,111 |
| 8/04/04 | 100* | $70.97 | $7,097 |
| 8/05/04 | 100* | $70.60 | $7,060 |
| 8/05/04 | 200* | $70.68 | $14,136 |
| 8/05/04 | 100* | $70.65 | $7,065 |
| 8/05/04 | 200* | $70.77 | $14,154 |
| 8/05/04 | 100* | $70.75 | $7,075 |
| 8/05/04 | 200* | $70.73 | $14,146 |
| 8/05/04 | 200* | $70.72 | $14,144 |
| 8/05/04 | 200* | $70.70 | $14,140 |
| 8/05/04 | 100* | $70.76 | $7,076 |
| 8/05/04 | 100* | $70.74 | $7,074 |
| 8/05/04 | 100* | $70.79 | $7,079 |
| 8/05/04 | 300* | $70.51 | $21,153 |
| 8/05/04 | 100* | $70.56 | $7,056 |
| 8/05/04 | 100* | $71.23 | $7,123 |
| 8/05/04 | 100* | $70.87 | $7,087 |
| 8/05/04 | 200* | $70.86 | $14,172 |
| 8/05/04 | 100* | $70.85 | $7,085 |
| 8/05/04 | 200* | $70.89 | $14,178 |
| 8/05/04 | 100* | $71.05 | $7,105 |
| 8/05/04 | 100* | $71.01 | $7,101 |
| 8/05/04 | 200* | $70.84 | $14,168 |
| 8/05/04 | 100* | $70.81 | $7,081 |
| 8/05/04 | 100* | $70.94 | $7,094 |
| 8/05/04 | 200* | $70.90 | $14,180 |
| 8/18/04 | 100* | $73.69 | $7,369 |
| 8/18/04 | 100* | $73.76 | $7,376 |
| 8/18/04 | 200* | $73.74 | $14,748 |
| 8/18/04 | 100* | $73.71 | $7,371 |
| 8/18/04 | 100* | $73.73 | $7,373 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 8/18/04 | 100* | $73.70 | $7,370 |
| 8/18/04 | 100* | $73.49 | $7,349 |
| 8/18/04 | 100* | $73.48 | $7,348 |
| 8/18/04 | 100* | $73.45 | $7,345 |
| 8/18/04 | 200* | $73.54 | $14,708 |
| 8/18/04 | 100* | $73.50 | $7,350 |
| 8/18/04 | 100* | $73.57 | $7,357 |
| 8/18/04 | 100* | $73.55 | $7,355 |
| 8/18/04 | 100* | $73.39 | $7,339 |
| 8/18/04 | 200* | $73.80 | $14,760 |
| 8/18/04 | 200* | $73.89 | $14,778 |
| 8/18/04 | 200* | $73.85 | $14,770 |
| 8/18/04 | 200* | $73.88 | $14,776 |
| 8/18/04 | 200* | $73.81 | $14,762 |
| 8/18/04 | 100* | $73.83 | $7,383 |
| 8/18/04 | 100* | $73.82 | $7,382 |
| 8/18/04 | 100* | $73.04 | $7,304 |
| 8/18/04 | 200* | $73.95 | $14,790 |
| 8/18/04 | 200* | $73.12 | $14,624 |
| 8/18/04 | 100* | $73.11 | $7,311 |
| 8/18/04 | 100* | $73.68 | $7,368 |
| 8/19/04 | 100* | $74.45 | $7,445 |
| 8/19/04 | 100* | $74.40 | $7,440 |
| 8/19/04 | 200* | $74.23 | $14,846 |
| 8/19/04 | 100* | $74.21 | $7,421 |
| 8/19/04 | 100* | $74.29 | $7,429 |
| 8/19/04 | 100* | $74.20 | $7,420 |
| 8/19/04 | 100* | $74.36 | $7,436 |
| 8/19/04 | 100* | $74.35 | $7,435 |
| 8/19/04 | 100* | $74.30 | $7,430 |
| 8/19/04 | 300* | $74.09 | $22,227 |
| 8/19/04 | 100* | $74.05 | $7,405 |
| 8/19/04 | 100* | $74.02 | $7,402 |
| 8/19/04 | 200* | $74.00 | $14,800 |
| 8/19/04 | 300* | $74.07 | $22,221 |
| 8/19/04 | 200* | $73.80 | $14,760 |
| 8/19/04 | 100* | $74.14 | $7,414 |
| 8/19/04 | 100* | $74.10 | $7,410 |
| 8/19/04 | 200* | $74.11 | $14,822 |
| 8/19/04 | 200* | $74.15 | $14,830 |
| 8/19/04 | 100* | $73.92 | $7,392 |
| 8/19/04 | 100* | $73.90 | $7,390 |
| 8/19/04 | 500* | $74.13 | $37,065 |
| 9/01/04 | 200* | $74.63 | $14,926 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 9/01/04 | 200* | $74.60 | $14,920 |
| 9/01/04 | 100* | $74.61 | $7,461 |
| 9/01/04 | 100* | $74.43 | $7,443 |
| 9/01/04 | 100* | $74.46 | $7,446 |
| 9/01/04 | 100* | $74.45 | $7,445 |
| 9/01/04 | 100* | $74.44 | $7,444 |
| 9/01/04 | 100* | $74.40 | $7,440 |
| 9/01/04 | 100* | $74.57 | $7,457 |
| 9/01/04 | 100* | $74.55 | $7,455 |
| 9/01/04 | 100* | $74.52 | $7,452 |
| 9/01/04 | 100* | $74.50 | $7,450 |
| 9/01/04 | 100* | $74.54 | $7,454 |
| 9/01/04 | 300* | $74.25 | $22,275 |
| 9/01/04 | 200* | $74.21 | $14,842 |
| 9/01/04 | 100* | $74.20 | $7,420 |
| 9/01/04 | 100* | $74.26 | $7,426 |
| 9/01/04 | 200* | $74.22 | $14,844 |
| 9/01/04 | 100* | $74.29 | $7,429 |
| 9/01/04 | 100* | $74.27 | $7,427 |
| 9/01/04 | 200* | $74.32 | $14,864 |
| 9/01/04 | 100* | $74.34 | $7,434 |
| 9/01/04 | 100* | $74.30 | $7,430 |
| 9/01/04 | 200* | $74.31 | $14,862 |
| 9/01/04 | 300* | $74.12 | $22,236 |
| 9/02/04 | 200* | $73.69 | $14,738 |
| 9/02/04 | 300* | $73.66 | $22,098 |
| 9/02/04 | 100* | $73.63 | $7,363 |
| 9/02/04 | 100* | $73.67 | $7,367 |
| 9/02/04 | 100* | $73.64 | $7,364 |
| 9/02/04 | 100* | $73.61 | $7,361 |
| 9/02/04 | 300* | $73.70 | $22,110 |
| 9/02/04 | 100* | $73.78 | $7,378 |
| 9/02/04 | 100* | $73.75 | $7,375 |
| 9/02/04 | 500* | $73.72 | $36,860 |
| 9/02/04 | 100* | $73.77 | $7,377 |
| 9/02/04 | 200* | $73.49 | $14,698 |
| 9/02/04 | 100* | $73.59 | $7,359 |
| 9/02/04 | 100* | $73.54 | $7,354 |
| 9/02/04 | 100* | $73.53 | $7,353 |
| 9/02/04 | 200* | $73.55 | $14,710 |
| 9/02/04 | 100* | $73.83 | $7,383 |
| 9/02/04 | 200* | $73.80 | $14,760 |
| 9/02/04 | 100* | $73.89 | $7,389 |
| 9/02/04 | 200* | $73.86 | $14,772 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 9/02/04 | 100* | $73.91 | $7,391 |
| 9/02/04 | 100* | $73.73 | $7,373 |
| 9/15/04 | 100* | $76.45 | $7,645 |
| 9/15/04 | 100* | $76.42 | $7,642 |
| 9/15/04 | 200* | $76.41 | $15,282 |
| 9/15/04 | 100* | $76.43 | $7,643 |
| 9/15/04 | 100* | $76.40 | $7,640 |
| 9/15/04 | 100* | $76.23 | $7,623 |
| 9/15/04 | 100* | $76.21 | $7,621 |
| 9/15/04 | 200* | $76.27 | $15,254 |
| 9/15/04 | 100* | $76.28 | $7,628 |
| 9/15/04 | 200* | $76.38 | $15,276 |
| 9/15/04 | 100* | $76.31 | $7,631 |
| 9/15/04 | 100* | $76.33 | $7,633 |
| 9/15/04 | 400* | $76.03 | $30,412 |
| 9/15/04 | 300* | $76.00 | $22,800 |
| 9/15/04 | 100* | $76.07 | $7,607 |
| 9/15/04 | 300* | $76.04 | $22,812 |
| 9/15/04 | 100* | $76.06 | $7,606 |
| 9/15/04 | 100* | $75.89 | $7,589 |
| 9/15/04 | 100* | $76.05 | $7,605 |
| 9/15/04 | 100* | $76.02 | $7,602 |
| 9/15/04 | 100* | $76.10 | $7,610 |
| 9/15/04 | 100* | $75.92 | $7,592 |
| 9/15/04 | 100* | $75.98 | $7,598 |
| 9/15/04 | 200* | $75.99 | $15,198 |
| 9/16/04 | 200* | $76.64 | $15,328 |
| 9/16/04 | 300* | $76.60 | $22,980 |
| 9/16/04 | 100* | $76.62 | $7,662 |
| 9/16/04 | 100* | $76.70 | $7,670 |
| 9/16/04 | 200* | $76.49 | $15,298 |
| 9/16/04 | 200* | $76.47 | $15,294 |
| 9/16/04 | 100* | $76.45 | $7,645 |
| 9/16/04 | 100* | $76.48 | $7,648 |
| 9/16/04 | 100* | $76.44 | $7,644 |
| 9/16/04 | 200* | $76.46 | $15,292 |
| 9/16/04 | 100* | $76.41 | $7,641 |
| 9/16/04 | 500* | $76.59 | $38,295 |
| 9/16/04 | 500* | $76.56 | $38,280 |
| 9/16/04 | 100* | $76.55 | $7,655 |
| 9/16/04 | 100* | $76.52 | $7,652 |
| 9/16/04 | 400* | $76.50 | $30,600 |
| 9/16/04 | 100* | $76.54 | $7,654 |
| 9/16/04 | 100* | $76.29 | $7,629 |

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 9/29/04 | 100* | $66.67 | $6,667 |
| 9/29/04 | 100* | $66.66 | $6,666 |
| 9/29/04 | 300* | $66.40 | $19,920 |
| 9/29/04 | 200* | $66.44 | $13,288 |
| 9/29/04 | 100* | $66.41 | $6,641 |
| 9/29/04 | 300* | $66.50 | $19,950 |
| 9/29/04 | 200* | $66.55 | $13,310 |
| 9/29/04 | 200* | $66.58 | $13,316 |
| 9/29/04 | 100* | $66.59 | $6,659 |
| 9/29/04 | 100* | $66.26 | $6,626 |
| 9/29/04 | 100* | $66.30 | $6,630 |
| 9/29/04 | 200* | $66.45 | $13,290 |
| 9/29/04 | 200* | $66.31 | $13,262 |
| 9/29/04 | 100* | $66.33 | $6,633 |
| 9/29/04 | 200* | $66.37 | $13,274 |
| 9/29/04 | 300* | $66.34 | $19,902 |
| 9/29/04 | 100* | $66.32 | $6,632 |
| 9/29/04 | 100* | $66.35 | $6,635 |
| 9/29/04 | 300* | $66.36 | $19,908 |
| 9/29/04 | 100* | $66.38 | $6,638 |
| 9/29/04 | 100* | $66.96 | $6,696 |
| 9/30/04 | 3,500* | $63.29 | $221,515 |
| 10/07/04 | 100* | $68.77 | $6,877 |
| 10/07/04 | 100* | $67.75 | $6,775 |
| 10/07/04 | 200* | $68.41 | $13,682 |
| 10/07/04 | 100* | $68.40 | $6,840 |
| 10/07/04 | 100* | $68.50 | $6,850 |
| 10/07/04 | 100* | $68.55 | $6,855 |
| 10/07/04 | 100* | $68.25 | $6,825 |
| 10/07/04 | 100* | $68.39 | $6,839 |
| 10/07/04 | 100* | $68.82 | $6,882 |
| 10/07/04 | 200* | $69.00 | $13,800 |
| 10/07/04 | 200* | $68.90 | $13,780 |
| 10/07/04 | 100* | $68.95 | $6,895 |
| 10/07/04 | 100* | $68.15 | $6,815 |
| 10/07/04 | 100* | $68.11 | $6,811 |
| 10/07/04 | 100* | $67.93 | $6,793 |
| | | | |
| **Totals:** | **188,767** | | **$13,700,609.78** |

*Sales made pursuant to a written stock-trading plan.

206.    Defendant Spencer gained proceeds of over $2.6 million from her sales of Fannie

Mae common stock during the Class Period, as follows:

### LEANNE G. SPENCER
### SALES OF FANNIE MAE COMMON STOCK

| Transaction Date | Shares Sold | Sale Price | Gross Sales Proceeds |
|---|---|---|---|
| 5/17/02 | 3,200 | $80.12 | $256,384.00 |
| 5/17/02 | 6,800 | $80.06 | $544,408.00 |
| 5/20/02 | 206 | $80.06 | $ 16,492.36 |
| 1/8/03 | 429 | $68.685 | $ 29,465.86 |
| 1/21/03 | 1,044 | $69.43 | $ 72,484.92 |
| 4/23/03 | 8,900 | $73.26 | $652,014.00 |
| 4/23/03 | 500 | $73.38 | $ 36,690.00 |
| 5/19/03 | 206 | $73.905 | $ 15,224.43 |
| 1/5/04 | 1,452 | $74.495 | $108,166.74 |
| 1/23/04 | 1,230 | $78.315 | $ 96,327.45 |
| 1/27/04 | 3,000 | $79.00 | $237,000.00 |
| 2/19/04 | 6,200 | $79.66 | $493,892.00 |
| 2/19/04 | 600 | $79.73 | $ 47,838.00 |
| 5/18/04 | 194 | $68.60 | $ 13,308.40 |
|  |  |  |  |
| Totals: | 33,961 | | $2,619,696.16 |

207.    Notably, many of these sales occurred right after the Fannie Mae Defendants

announced another quarter of "record" earnings and "double-digit earnings per share."   For

example, the Company publicly announced its fourth quarter and 2002 year-end results on

January 15, 2003.  In January 2003, shortly after this earnings release, Defendant Raines sold

39,532 shares for proceeds of $2.7 million; Defendant Howard sold 5,489 shares for proceeds of

$381,033; and Defendant Spencer sold 4,230 shares for proceeds of $730,892.

208.    Regulators also questioned the timing of Howard's 2004 trades.[14]  According to

the September 7, 2004 GSE Report, Howard sold nearly $5 million of Fannie Mae's stock by

exercising and selling 70,000 options in 2004.  In the GSE Report on October 4, 2004, a section

titled "Will insider sales of Fannie Mae stock withstand scrutiny?" stated that just days before

the 2004 OFHEO Report was disclosed, Howard "locked in more than $400,000 of his gains in automatic sales."  In a *Wall Street Journal* article, Kevin Schwenger, insider-transaction analyst for Thomson Financial Inc., commented that Howard sold between 84,000-92,800 options in 2004.[15]  In response, a Fannie Mae spokesperson stated it was a "coincidence" that Howard initiated the transactions after government regulators began their probe but before the release of the 2004 OFHEO Report.[16]

209.    Throughout the Class Period, the Fannie Mae Defendants knowingly or recklessly made materially false and misleading statements concerning, among other things, the Company's earnings, financial results, compliance with GAAP, risk management policies and internal controls.  The Fannie Mae Defendants' misrepresentations and material omissions caused the price of the Company's securities to become and remain artificially inflated throughout the Class Period, causing harm and damages to Lead Plaintiffs and the other Class members.

## VIII.   FANNIE MAE DEFENDANTS' FALSE AND MISLEADEADING STATEMENTS DURING THE CLASS PERIOD

### A.    Statements Concerning Fiscal Year 2001

210.    The Class Period begins on April 17, 2001.  On that day, Fannie Mae issued a press release in which it announced its financial results for the first quarter ending March 31, 2001, under the headline: "Fannie Mae Reports Record First Quarter 2001 Financial Results; Operating Net Income of $1.238 Billion Up 16.6 Percent Over First Quarter 2000; Operating

---

[14] GSE Report October 4, 2004, at p. 33-34.

[15] According to the article, the options were slated to expire in November 2004.

[16] Kathleen Day, *Finance Chief Wields Broad Influence; Howard Has Not Been Timid in Exercising Clout at Fannie Mae, Regulator Says*, The Washington Post, Sept. 24, 2004, at E4.

Earnings Per Diluted Common Share of $1.20 Up 17.6 Percent," which stated, in pertinent part, as follows:

> Fannie Mae (FNM/NYSE), the nation's largest source of financing for home mortgages, today reported operating net income for the first quarter of 2001 of $1.238 billion, a 16.6 percent increase compared with the first quarter of 2000. Operating earnings per diluted common share (Operating EPS) of $1.20 were 17.6 percent above the same period in 2000.

|  | First Quarter | | |
|---|---|---|---|
|  | **2001** | **2000** | **Change** |
| **Operating Net Income (in billions)** | **$1.238** | **$1.062** | **16.6%** |
| **Operating EPS (in dollars)** | **$1.20** | **$1.02** | **17.6%** |

> Operating net income and earnings per share exclude the one-time cumulative change in accounting principle and the quarter-to-quarter variability in the market value of purchased options which Financial Accounting Standard 133 (FAS 133) now requires to be included in the income statement. Net income and earnings per diluted common share (EPS) for the first quarter of 2001 including these FAS 133 items were $1.293 billion and $1.25, respectively.

> **Franklin D. Raines, Fannie Mae's Chairman and Chief Executive Officer, said, "At a time when many companies are reporting disappointing results, Fannie Mae continues to meet or exceed performance expectations."** . . . (Emphasis added.)

> . . . Raines added that Fannie Mae's revenues grew by over 20 percent compared with the first quarter of 2000, nearly double the growth rate of the company's operating costs over the same period.

> * * *

> **Portfolio Investment Business Results**

> Fannie Mae's portfolio investment business manages the interest rate risk of the company's mortgage portfolio and other investments. The results of this business are largely reflected in net interest income, which in the first quarter of 2001 totaled $1,707 million. Prior to the adoption of FAS 133, net interest income included the amortization expense of purchased options, which was $64.1 million in the first quarter of 2001. This cost now appears in the new "purchased options expense" line item, together with the changes to the market value of these options.

> Under FAS 133 adjusted net interest income, which is net interest income less purchased options amortization expense, becomes the more meaningful measure of portfolio revenue and is comparable with prior periods. Fannie Mae's adjusted net interest income of $1,643 million in the first quarter of 2001 was 20.6 percent

above the first quarter of 2000. This increase was driven by an 18.5 percent rise in the average net investment balance and a one basis point increase in the net interest margin.

. . . The company's average net interest margin was 103 basis points in the first quarter of 2001, up one basis point from the 102 basis point average in the first quarter of 2000.

\* \* \*

**Capital**

Fannie Mae's core capital was $21.5 billion at March 31, 2001 compared with $18.6 billion at March 31, 2000. During the first quarter of 2001 Fannie Mae repurchased 1.0 million shares of common stock. Fannie Mae had 1,000.3 million shares of common stock outstanding as of March 31, 2001 compared with 1,007.4 million shares as of March 31, 2000.

\* \* \*

**Implementation of FAS 133**

Fannie Mae adopted FAS 133, Accounting for Derivative Instruments and Hedging Activities, on January 1, 2001. FAS 133 requires that Fannie Mae mark to market only its purchased options and none of its option-based debt or the mortgage investments it hedges with purchased options. At adoption, the mark-to-market of the time value of the purchased options that the company uses as a substitute for callable debt resulted in a cumulative gain of $258.3 million, or $167.9 million after tax. The change in the market value of Fannie Mae's purchased options during the first quarter of 2001 was a loss of $237.6 million. This amount includes $64.1 million in option cost amortization that formerly was included in net interest income.

FAS 133 also requires that the company record certain derivatives, primarily interest rate swaps it uses as substitutes for non-callable debt, on the balance sheet at their fair values, with an offsetting entry recorded in a separate component of stockholders' equity called other comprehensive income. At implementation on January 1, 2001, Fannie Mae recorded a $3.9 billion reduction in the other comprehensive income component of stockholders' equity. This amount was a reduction of $5.7 billion, or 0.9 percent of the net mortgage balance, at March 31, 2001. Other comprehensive income is not a component of core capital. At March 31, 2001 Fannie Mae's core capital was $21.5 billion.

211.    In a written statement submitted to the Senate Subcommittee on Housing and Transportation, Senate Committee on Banking, and Urban Affairs on May 8, 2001, Defendant Raines stated:

Last October we announced a set of path breaking voluntary initiatives to further strengthen our safety and soundness. Our liquidity management, market

discipline, **and disclosure practices are now at the vanguard of such practices globally**, and we and Freddie Mac are the only U.S. corporations to commit to creating a deep and liquid market for our subordinated debt. (Emphasis added.)

* * *

**Safety and Soundness**

Because Fannie Mae and Freddie Mac play a critical role in providing consumers access to the long-term, fixed-rate financing they prefer, it is essential that the two companies remain at the forefront of global safety and soundness practices.

In 2000, we recognized that there were additional measures we could put in place that would assure policymakers that our safety and soundness protections are at the forefront of evolving world practices. To formulate these measures we turned to the experts: the reports and studies of the Basel Committee on Banking Supervision, OFHEO, the Federal Reserve, and other policymakers and market participants who analyze risk in the financial markets.

After a comprehensive review of these recommendations, Fannie Mae and Freddie Mac, in conjunction with policymakers, crafted a set of initiatives designed to place the two companies at the leading edge of safety and soundness practices. These commitments were announced with Congressman Richard Baker, Congressman Paul Kanjorski, and other Members of the House of Representatives last October. Fannie Mae committed to issue subordinated debt, obtain an annual credit rating, enhance our liquidity planning, disclose more information about interest rate risk and credit risk sensitivity, and implement and disclose the results of an interim risk-based capital standard. Together, these initiatives will give investors and policymakers more information about Fannie Mae's risk exposure and confidence that Fannie Mae can manage that exposure than they can get from any other financial institution. I am happy to announce that Fannie Mae has implemented all six of these commitments.

**These six new voluntary measures, combined with the regulatory mechanisms Congress enacted in 1992, place Fannie Mae at the vanguard of risk management and disclosure practices worldwide, with cutting-edge regulatory discipline bolstered by cutting-edge market discipline.** (Emphasis added.)

This statement was posted on Fannie Mae's website for investors to review.

212. In remarks delivered to the Sanford Bernstein Strategic Investors Conference on June 7, 2001, Defendant Raines disclosed his intimate knowledge of the hedge transactions engaged in by Fannie Mae, Fannie Mae's related disclosure policies and Fannie Mae's obsessive focus on earnings per share growth, when stating:

As mortgages become more complex, we've had to become increasingly sophisticated in the way we design and execute our hedges in order to maintain the right balance between our assets and liabilities -- the right duration gap -- even as interest rates move and try to upset the balance.

As most portfolio managers know, you don't run a perfectly matched book -- if you did, there would be no money in it. What we try to do is keep the cash flow -- or duration match -- fairly close, between plus or minus six months. As interest rates move, the duration gap also moves. We move it back in line through our mix of funding and the options we purchase.

As you can see, that's what happened in late 1998 and early 1999 as interest rates kept rising. We were able to rebalance our portfolio and bring the duration gap back into our comfort zone.

* * *

**Our single, obsessive focus on risk management -- both in our portfolio business and our credit guaranty business -- explains why Fannie Mae has done so well, 14 years straight, through many different risk environments.** (Emphasis added.)

* * *

Last year, these questions were raised about Fannie Mae. I believe we resolved them. We resolved them by adopting a series of voluntary initiatives that matched our government regulation with some market-focused discipline and supplemental capital.

Now, with our risk-based standard, our risk disclosures, our regular issues of subordinated debt, our external ratings and other measures, Fannie Mae is now regarded as a new global model for financial institution safety and soundness. We've taken a legitimate policy issue off the table for us in a legitimate way.

* * *

Fannie Mae is one of only five companies in America with record, double-digit operating earnings growth for the last 14 consecutive years, 53 consecutive quarters, greatly exceeding the growth rate of the S&P 500 during this period. We've also made great progress against my EPS challenge. In 1999, we re-committed that Fannie Mae would deliver earnings growth of over 10 percent per year. We set an expectation to continue our earnings growth rate of the previous five years of 13.6 percent per year. And our goal was to double earnings over a five-year period, or a 14.9 percent growth per year. We're off to a rousing start. We posted 15.2 percent growth in 1999, 15.3 percent growth in 2000, and 17.6 percent growth in the first quarter of this year. Our relative P/E is also doing better. Back in 1987, we had almost a 60 percent discount. We've been making progress bringing that in line with our value. We slowed down a little in 1999 because of the technology rally and the political noise, but we're now down to about 30 percent discount. Obviously, we think there should be no discount, since our earnings are anything but volatile, and our performance is significantly better than the S&P average. Our view is, with our steady earnings record, our stock can bring value to every portfolio, even the most aggressive.