**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **In re Federal National Mortgage Association Securities, Derivative and ERISA Litigation** | **MDL NO. 1668** |
| **In re Fannie Mae Securities Litigation** | **Consolidated Civil Action No.: 1:04-CV-01639**<br><br>**Judge Richard J. Leon** |

# LEANNE G. SPENCER'S MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20006
Tel. (202) 263-3000
Fax (202) 263-3300

*Counsel for Defendant*
*Leanne G. Spencer*

January 23, 2007

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

FACTUAL BACKGROUND ........ 1

I. PRE-REPUDIATION EVENTS ........ 2

II. POST-REPUDIATION EVENTS ........ 4

ARGUMENT ........ 7

I. LEAD PLAINTIFFS' PROPOSED CLASS CANNOT BE CERTIFIED UNDER RULE 23 BECAUSE COMMON QUESTIONS DO NOT PREDOMINATE ........ 7

A. Post-Repudiation Investors Are Not Entitled To The Fraud On The Market Presumption ........ 7

B. All Post-Repudiation Purchasers Are Not Similarly Situated ........ 10

C. Other Issues Precluding Certification Of Lead Plaintiffs' Proposed Class ........ 12

II. THE COURT SHOULD REFUSE TO CERTIFY A CLASS WITH RESPECT TO THE CONTROL PERSON CLAIMS ........ 12

CONCLUSION ........ 13

# TABLE OF AUTHORITIES

**CASES**

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)........ 8, 11

*Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020 (2d Cir. 1993)........ 12

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 226 (2005) ........ 13

*East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395 (1977) ........ 11

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999)........ 14

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997)........ 8

*In re Cable & Wireless, PLC, Sec. Litig.*, 217 F.R.D. 372 (E.D. Va. 2003)........ 12

*In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130 (D.N.J. 1984)........ 9

*In re Initial Public Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006)........ 11

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994)........ 7

*Kriendler v. Chem. Waste Mgmt, Inc.*, 877 F. Supp. 1140 (N.D. Ill. 1995) ........ 9

*Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) ........ 8, 9

*Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005) ........ 9

*Walsh v. Ford Motor Co.*, 807 F.2d 1000 (D.C. Cir. 1986)........ 10

*Weiner v. Quaker Oats Co.*, 129 F.3d 310 (3d Cir. 1997)........ 9

**STATUTES**

12 U.S.C. § 4517(d) ........ 5

12 U.S.C. § 481........ 5

Securities Exchange Act Section 10(b), 15 U.S.C. §78j(b)........ 12

Securities Exchange Act Section 20(a), 15 U.S.C. § 78t(a) ........ 12

**RULES**

Fed. R. Civ. P. 23........ *passim*

Defendant Leanne G. Spencer ("Spencer") respectfully submits this memorandum in opposition to Lead Plaintiffs' Motion for Class Certification.[1] Spencer joins and adopts Fannie Mae's argument that Lead Plaintiffs' proposed class cannot be certified because, among other things, it includes investors who purchased Fannie Mae stock *after* the Company publicly and emphatically repudiated its prior financial statements on December 22, 2004. Such investors cannot be presumed to have relied on the integrity of those financial statements, and therefore individualized questions of reliance will overwhelm the common issues, precluding class certification. Accordingly, Lead Plaintiffs' motion should be denied.

## FACTUAL BACKGROUND

From the standpoint of Fannie Mae's investors, this story begins with the emergence of an accounting scandal at Freddie Mac in 2003. Shortly thereafter, the Office of Federal Housing Enterprise Oversight ("OFHEO"), which had failed to detect Freddie Mac's alleged fraud, announced that it would conduct a Special Examination of Fannie Mae's accounting practices. *See* Second Amended Consolidated Class Action Complaint ("Complaint") ¶ 36.

In September 2004, OFHEO publicly alleged that Fannie Mae had engaged in intentional and pervasive misapplications of generally accepted accounting principles ("GAAP"). *See id.* ¶ 40. The fall-out from OFHEO's report was fast and severe. By the end of December 2004, Fannie Mae had initiated a comprehensive internal investigation of its accounting policies and internal controls, appealed OFHEO's allegations to the SEC, announced that the SEC agreed with OFHEO's conclusions, forced out its top management, discharged its auditor, repudiated its

---

[1] The Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification ("Pl. Mem.") is Docket No. 166. Fannie Mae's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("FM Mem.") is Docket No. 322.

prior published financial statements and estimated that restated results would wipe out approximately $9 billion in earnings. The Company's stock price reacted accordingly. Then, throughout 2005, there were numerous disclosures – many by OFHEO – of additional alleged accounting errors, most of which turned out to be false or exaggerated, and various other deliberate actions by OFHEO, or by Fannie Mae in acquiescence to OFHEO, that adversely impacted the Company's stock price.

The various investigations and reviews came to a head in 2006. In February, Fannie Mae released a report of the internal investigation commissioned by its Board of Directors, which accused management of wrongdoing but absolved the Board. In May, OFHEO released its final report, which came to starkly different conclusions about the Board's role in the events at Fannie Mae. Finally, in December, Fannie Mae issued restated financial results, which eliminated far less earnings than had been originally forecast and disclosed that many of the accounting errors purportedly discovered in 2005 were not, in fact, errors.

We describe these factual developments in detail below because they are important to understanding why investors who purchased Fannie Mae stock before and after the Company's December 2004 repudiation are differently situated, and therefore why Lead Plaintiffs' Motion for Class Certification should be denied.

## I. PRE-REPUDIATION EVENTS

On September 22, 2004, OFHEO publicly released an Interim Report alleging that Fannie Mae had intentionally misapplied accounting standards and that it had inadequate internal controls. OFHEO asserted that "the matters detailed in this report are serious and *raise doubts concerning the validity of previously reported financial results*, the adequacy of regulatory

capital, the quality of management supervision, and the overall safety and soundness of the Enterprise." Complaint ¶ 36 (emphasis added).

The market was immediately aware of the charges. Within days, Fannie Mae's stock price fell by over 13% and numerous investors filed securities fraud lawsuits. *See id.* ¶¶ 37, 45. A week later, it was reported that the Department of Justice had initiated a criminal investigation and Fannie Mae announced that it had acquiesced to OFHEO's demands that it take numerous corrective actions, including hiring independent counsel and accountants to review accounting policies and other corporate policies to ensure they complied with applicable laws and regulations. *See id.* ¶¶ 47-48.

Although Fannie Mae disputed OFHEO's allegations, it agreed to have its accounting practices reviewed by the SEC to determine whether they complied with GAAP, and to abide by the SEC's determination. *See id.* ¶ 54. In November 2004, Fannie Mae announced that if it were required to restate its financial results, it would eliminate an estimated $9 billion of earnings. *See id.* ¶ 51.

In December 2004, the SEC concluded that Fannie Mae's accounting practices did not comply with GAAP. On December 22, 2004, Fannie Mae announced that it would restate its prior financial statements accordingly, explicitly warning investors not to rely on those financial results:

> Fannie Mae's previously filed interim and audited financial statements and the independent auditors' reports thereon for the periods from *January 2001 through the second quarter of 2004 should no longer be relied upon because such financial statements were prepared applying accounting practices that did not comply with generally accepted accounting principles*.

*Id.* ¶ 61 (emphasis in original). The day after this announcement, Fannie Mae's stock price decreased by 9.3%. *See id.* ¶ 62.

Within days, Fannie Mae announced that its Chief Executive Officer and Chief Financial Officer would leave the Company and that it had discharged its long-time external auditor. *See id.* ¶¶ 59, 63.[2] On its way out the door, the auditor "notified the Company that there existed strong indicators of material weaknesses in internal control over financial reporting." *Id.* ¶ 64. OFHEO also determined that Fannie Mae was undercapitalized by $3 billion, which forced the Company to take "prompt and extreme" corrective measures, including cutting the dividend on its common stock by 50%. *See id.* ¶ 60. All of this information was immediately disclosed to the public. *See id.* ¶¶ 59-64.

## II. POST-REPUDIATION EVENTS

Throughout 2005, there was a series of disclosures adverse to Fannie Mae that caused further declines in its stock price. Lead Plaintiffs seek to expand the class period to encompass these events in an effort to recover additional "losses." However, these losses were not caused by the allegations that Fannie Mae's prior accounting results were misstated – those allegations were fully known to the market when Fannie Mae repudiated its prior financials in December 2004. Instead, the post-repudiation losses were caused by a combination of what are best described as "political" factors.

The root of these political factors was OFHEO's quest to burnish its reputation by appearing tough on Fannie Mae. A report issued by the Inspector General of OFHEO's parent agency, the Department of Housing and Urban Development (the "IG Report"),[3] reveals the

---

[2] A month later, on January 17, 2005, it was announced that Spencer would resign her executive positions with Fannie Mae. *See* Complaint ¶ 21(d).

[3] A copy of the IG Report is attached as Exhibit 3 to Defendant Franklin D. Raines Memorandum of Law in Opposition to Lead Plaintiffs' Motion for Class Certification (Docket No. 337, Jan. 23, 2007) ("Raines Mem.").

origin and form of this campaign. OFHEO, generally perceived as a weak regulator, suffered "humiliation" as a result of its failures in the Freddie Mac affair and faced clear indications that Congress was considering replacing OFHEO with a new regulator. *See* IG Report at 8-9. Accordingly, OFHEO determined to adopt a more "adversarial" relationship with Fannie Mae and was "prompt to use public release of information as a tool to advance its enforcement agenda." *Id.* Stephen Blumenthal, the agency's then-Deputy Director, described the new approach as being "the cop on the beat. You whack them in the head with a nightstick." *Id.*

Blumenthal admitted that the agency sought to "negatively impact the stock of Fannie Mae . . . as a means for making the regulated entity, in Blumenthal's word, 'submit to the will' of the regulator." *Id.* at 11. An OFHEO examiner stated that Blumenthal gave a presentation in which he "put together movements in stock price at the [E]nterprises and tie[d] them to precipitous drops in stock price," resulting in a "policy thereafter pursued by OFHEO" in which the agency "exploit[ed] its ability to make public certain events or views to get the Enterprises to do what the Director and the Deputy thought that they ought to be doing." *Id.* at 9 (alterations omitted). The witness added that "there was a continuing effort underway at OFHEO to get Fannie Mae to have to restate its financials . . . . My opinion is that there's a very strong intent to embarrass Fannie Mae and this is one of the primary ways to do it." *Id.* (internal quotation marks omitted). After one instance in which OFHEO's public statements had hurt Fannie Mae's stock price, Blumenthal was reported as "almost gleeful that it was going down." *Id.*[4]

---

[4] When it was pointed out to Blumenthal that the agency's practice – purposely releasing information to drive down Fannie Mae's stock price and thereby exerting its will on the Company – might have caused hundreds of millions of dollars in shareholder losses, he responded that "investor protection is not part of our mandate." IG Report at 11. OFHEO's leaks, however, were inappropriate and inconsistent with its role as a regulator. *See* 12 U.S.C. § 4517(d) (providing that, in conducting Special Examinations, OFHEO examiners are "subject to the same disclosures, prohibitions, obligations, and penalties as are

Throughout 2005, there was a series of news articles "revealing" additional purported accounting errors at Fannie Mae, usually citing anonymous sources. For instance, a September 28, 2005 newspaper article, citing "people close to" the investigations, asserted that Fannie Mae had hidden losses with finite insurance policies, overvalued assets, underreported credit losses and misused tax credits. *See* Dawn Kopecki, Fannie Accounting Probes Turn Up New, Pervasive Problems, Sources Say, *Dow Jones Newswires* (Sept. 28, 2005) (copy attached as Exhibit 7 to Raines Mem.). It turned out that the allegations were without merit, as these issues did not require adjustments in Fannie Mae's restated financial results. *See* Declaration of Frederick C. Dunbar (Docket No. 322-5, Jan. 8, 2007) ("Dunbar Decl.") ¶¶ 48-51.

After Fannie Mae repudiated its prior financial statements in their entirety, the news reports provided a steady drumbeat of negative news about Fannie Mae, leaving investors to reasonably wonder whether the Company would ever reverse its negative momentum. This fear and uncertainty was exacerbated by several measures agreed to by or imposed on Fannie Mae that further depressed the stock price, including dividend cuts, reductions in the size of the Company's mortgage portfolio (which directly limited its prospects for revenue growth), and rumored adverse congressional and/or regulatory actions. *See id.* ¶¶ 37-42. Together, these political factors likely accounted for the decreases in Fannie Mae's stock price after December 2004. In the face of these political factors and the absence of the fraud on the market presumption, it is clear that all investors who purchased Fannie Mae stock after December 2004 are differently situated.

---

(… cont'd)

applicable to examiners employed by the Federal Reserve banks"); 12 U.S.C. § 481 (barring such examiners from publishing reports of examinations unless certain requirements are met).

# ARGUMENT

## I. LEAD PLAINTIFFS' PROPOSED CLASS CANNOT BE CERTIFIED UNDER RULE 23 BECAUSE COMMON QUESTIONS DO NOT PREDOMINATE

Pursuant to Rule 23(b)(3), Lead Plaintiffs seek to certify a class consisting of investors who purchased Fannie Mae stock between April 17, 2001 and September 27, 2005. *See* Pl. Mem. at 1. Such a class cannot be certified because the questions common to class members will not predominate over questions affecting individual members of the class. Because the "fraud on the market" presumption of reliance will not be available to post-repudiation purchasers, these investors will have to prove their actual and reasonable reliance on a material misrepresentation made by particular defendants. Moreover, post-repudiation purchasers will have to establish the extent to which the "political" factors affected their investment decisions. Finally, the class is overbroad because it includes options traders and because it includes investors who had sold all of their Fannie Mae stock prior to the first disclosure of accounting problems in September 2004. For all of these reasons, Lead Plaintiffs' proposed class should not be certified.

### A. Post-Repudiation Investors Are Not Entitled To The Fraud On The Market Presumption

To state a claim for securities fraud, investors must establish (among other things) that their purchases were made in reasonable reliance on false or misleading statements of material fact made by a defendant. *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). As in most securities cases, Lead Plaintiffs seek to avoid individualized questions of reliance by invoking the "fraud on the market" theory. This theory applies to securities traded in an "efficient market," which means that all material information is immediately absorbed by the market, with the stock price adjusting accordingly. *See In re Burlington Coat Factory Sec.*

*Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997). There is no dispute that the market for Fannie Mae stock is efficient. *See* Complaint ¶ 449. In such a market, investors are "presumed to have relied on the integrity of the shares' price," and thus to have relied on any fraudulent statements affecting that price. *Kowal*, 16 F.3d at 1276 n.1.

However, this presumption of reliance is rebuttable. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 179 (3d Cir. 2000). "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). For instance, a defendant may rebut the presumption of reliance by showing that "the market was aware that the misrepresentations were false." *Semerenko*, 223 F.3d at 179 n.7.

There is no allegation that Spencer made any public representations after Fannie Mae's December 22, 2004 repudiation of the prior published financial statements. Thus, to establish a securities fraud claim against Spencer, post-repudiation investors must establish that they reasonably relied on Fannie Mae's prior financial statements – notwithstanding the facts detailed above, most notably that OFHEO had accused the Company of intentional and pervasive accounting violations, that the SEC had agreed, and that Fannie Mae itself had warned investors (i) that the prior financial statements "*should no longer be relied upon* because such financial statements were prepared applying accounting practices that did not comply with" GAAP; (ii) that restated financial results were expected to eliminate over $9 billion in previously recorded earnings; (iii) that internal controls were weak; and (iv) that a comprehensive internal investigation was underway in which additional accounting problems could be identified.

As explained more fully in Fannie Mae's brief, *see* FM Mem. at 10-17, such reasonable reliance cannot be *presumed*. *See Semerenko*, 223 F.3d at 181 ("In light of the curative nature of the warning statement, and given the instantaneous decline in the market price of both companies' common stock, we conclude that the announcement immediately rendered the prior misrepresentations concerning Cendant's financial condition thereafter immaterial as a matter of law.").[5] Therefore, post-repudiation investors must prove their reasonable reliance on an individual basis. Such claims are not susceptible to class determination because common questions will not predominate. *See Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) ("[A] district court must perform sufficient analysis to determine that class members' fraud claims are not predicated on proving individual reliance. If the circumstances surrounding each plaintiff's alleged reliance on fraudulent representations differ, then reliance is an issue that will have to be proven by each plaintiff, and the proposed class fails Rule 23(b)(3)'s predominance requirement.").

Finally, it is worth noting that the so-called "new accounting issues" that Lead Plaintiffs claim were discovered throughout 2005 do not change the analysis. *See* Complaint ¶¶ 70-76. These accounting issues were in reality only additional reasons to disregard the previously-issued financial statements.[6] After all, it is the published financial statements on which investors

---

[5] *See also Weiner v. Quaker Oats Co.*, 129 F.3d 310, 321 (3d Cir. 1997) (holding that a public statement curing the misleading effect of a prior misrepresentation rendered the prior misrepresentation immaterial); *Kriendler v. Chem. Waste Mgmt, Inc.*, 877 F. Supp. 1140, 1147, 1160 (N.D. Ill. 1995) (holding, on a class certification motion, that purchasers could not claim damages based on a company's valuation of certain assets after the defendant announced that it would review those valuations); *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 144 (D.N.J. 1984) (holding that an announcement that an auditor had concluded that information in financial statements was materially misstated ended any reasonable reliance on those statements), *rev'd on other grounds by In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir. 1988).

[6] As detailed in Mr. Raines's brief, many of the accounting errors "revealed" in news articles throughout 2005 were false, exaggerated and motivated by OFHEO's agenda. *See* Raines Mem. at 6-8.

allegedly relied. Once those financial statements were repudiated in their entirety by Fannie Mae, it does not matter how long it took for all the details about the alleged problems therein to trickle out. All that matters is the point at which it is no longer possible to presume an investor's reasonable reliance on the prior financial statements. That point was reached when Fannie Mae took the actions described above in December 2004.

**B. All Post-Repudiation Purchasers Are Not Similarly Situated**

Further complicating matters, all post-repudiation purchasers are not similarly situated and are therefore not certifiable as a class. *See Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017-18 (D.C. Cir. 1986) (reversing a grant of class certification in a case involving automobile transmissions because, among other things, there were multiple types of transmission systems and plaintiffs had not shown that the differences were "minor and immaterial"). All such investors would have to prove their reliance on misrepresentations by a defendant, which would inevitably raise a host of individualized issues. *See Basic*, 485 U.S. at 242 ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones."). Consequently, Rule 23(a) cannot be satisfied because "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). Given the current state of the record, the Court cannot solve the problem simply by certifying sub-classes of pre- and post-repudiation investors.

Without the benefit of the fraud on the market presumption of reliance, each post-repudiation investor would have to establish which statements, by which defendants, he or she relied upon. *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 42-43 (2d Cir. 2006)

(reversing a grant of class certification where the plaintiffs could not establish the applicability of the fraud on the market presumption; "Plaintiffs recognize that they must establish that they relied on the misrepresentations that they have alleged, and they also recognize that establishing reliance individually by members of the class would defeat the requirement of Rule 23 that common questions of law or fact predominate over questions affecting only individual members."). Each would have to establish that such reliance was reasonable, given the investor's level of sophistication and the availability of relevant information, among other factors. *See Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993). Even after determining which combination of statements an individual investor relied upon, the Court would still be required to determine whether those statements, viewed in context, were material, whether the investor was aware of the "political" factors influencing the stock price – especially OFHEO's vendetta against Fannie Mae – and whether any such political factors (and not the alleged accounting errors) caused the investor's losses.

Further, as explained by Fannie Mae, Lead Plaintiffs cannot adequately represent the interests of post-repudiation purchasers for two reasons. First, Lead Plaintiffs sold more Fannie Mae stock than they purchased during the post-repudiation period. *See* FM Mem. at 33. Courts have rejected such investors' attempts to represent a class of purchasers. *See In re Cable & Wireless, PLC, Sec. Litig.*, 217 F.R.D. 372, 378 (E.D. Va. 2003). Second, Lead Plaintiffs' claims would raise individualized issues because their stock analysts testified that they actually anticipated that additional accounting issues would surface during the post-repudiation investigations, further undermining any claim that Lead Plaintiffs relied on the repudiated financial statements when making subsequent investments. *See* FM Mem. at 31-32; Dunbar Decl. ¶ 33.

At the very least, the Court should await the development of further information in discovery and, in particular, further explication of the true cause of various movements in Fannie Mae's stock price, before ruling on class certification. Finally, the Court should not countenance Lead Plaintiffs' transparent attempt to inflate their damages by ending the class period on a date with no independent significance other than the fact that the stock price bottomed out the next day. *See* FM Mem. at 34-39.

### C. Other Issues Precluding Certification Of Lead Plaintiffs' Proposed Class

Spencer further adopts additional arguments advanced by Fannie Mae for not certifying the proposed class. First, investors who sold all of their Fannie Mae stock before the first indication of accounting problems in September 2004 cannot state a claim under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), because *undisclosed* accounting errors could not have caused the stock price to fall. Therefore, these investors did not suffer a loss caused by the alleged accounting errors. *See* FM Mem. at 39-42.

Second, traders in Fannie Mae options (rather than common stock) present unique issues because they do not rely on the integrity of the stock price – they bet against it, gambling that the stock price does not reflect the Company's true value at the time of the investment. Thus, such investors are not entitled to a presumption that they relied on the integrity of the stock price, and therefore cannot be part of a class with investors who assumed that the stock price accurately reflected the Company's financial status. *See id.* at 42-43.

## II. THE COURT SHOULD REFUSE TO CERTIFY A CLASS WITH RESPECT TO THE CONTROL PERSON CLAIMS

Finally, the Court should refuse to certify a class of post-repudiation purchasers for purposes of Lead Plaintiffs' purported "control person" claims under Section 20(a) of the Exchange Act. A Section 20(a) claim seeks to hold the defendant responsible for the fraudulent

conduct of another – in this case, the corporation itself. Control person claims require a predicate finding of Section 10(b) securities fraud by the controlled person. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 207 (1st Cir. 1999). Thus, to the extent that the securities fraud claims cannot be resolved on a class-wide basis, neither can the Section 20(a) control person claims.

**CONCLUSION**

For the foregoing reasons, Leanne G. Spencer respectfully requests that Lead Plaintiffs' Motion for Class Certification be denied.

Dated: January 23, 2007

Respectfully submitted,

By: /s/ David S. Krakoff

David S. Krakoff (D.C. Bar No. 229641)
Mark W. Ryan (D.C. Bar No. 359098)
Christopher F. Regan (D.C. Bar No. 433972)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C. 20006
Tel. (202) 263-3000
Fax (202) 263-3300

*Counsel for Defendant Leanne G. Spencer*

**CERTIFICATE OF SERVICE**

I certify that on January 23, 2007, I caused the foregoing Defendant Leanne G. Spencer's Memorandum of Law in Opposition to Lead Plaintiffs' Motion for Class Certification to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF.

/s/ Christopher F. Regan
Christopher F. Regan