**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

MAY 8 - 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| In re Federal National Mortgage ) | |
| Association Securities, Derivative, ) MDL No. 1668 | |
| and "ERISA" Litigation ) | |
| ) | |
| In re Fannie Mae Securities )Consolidated Civ. Action No.  04-1639 (RJL) | |
| Litigation ) | |

**MEMORANDUM OPINION**
(May __8__, 2007) [#289]

Plaintiffs in this putative class action securities fraud suit seek to recover against

defendant Goldman, Sachs & Co. ("Goldman Sachs") for alleged violations of Section 10(b)

of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange

Commission ("SEC") Rule 10b-5(b) as set forth in their Second Amended Consolidated

Class Action Complaint ("Amended Complaint").  Before the Court is Goldman Sachs'

motion to dismiss these claims.  Based upon a review of the briefs and oral argument, the

Court GRANTS defendant's motion.

**BACKGROUND**

The Federal National Mortgage Association ("Fannie Mae") was established in 1938

as a United States government owned entity to, *inter alia*, make mortgages more accessible

for low and middle income Americans.  In 1968, Congress amended Fannie Mae's charter

to make it a shareholder-owned company. Fannie Mae is one of two (the other being Freddie

Mac) federally-chartered government sponsored enterprises that serve the public policy of

expanding home ownership, in part, by supplying capital and liquidity in the secondary mortgage market for residential mortgages.

Plaintiffs have brought this putative class action securities fraud suit on behalf of investors who purchased Fannie Mae securities during the period from April 17, 2001 through September 27, 2005 (the "class period"). In addition to Fannie Mae, plaintiffs have named as defendants three of its former senior executives; the national accounting firm KPMG (Fannie Mae's outside auditor during the class period); and the investment bank Goldman Sachs, who designed and implemented two Real Estate Mortgage Investment Conduit ("REMIC") transactions in December 2001 and March 2002.

In their Amended Complaint, plaintiffs allege that Fannie Mae repeatedly violated Generally Accepted Accounting Principles ("GAAP"), issued false financial statements, and made other actionable public disclosures during the putative class period, and thereby "engaged in one of the largest financial frauds in U.S. corporate history." (Am. Compl. ¶ 4.) Indeed, the Amended Complaint alleges that certain public statements by Fannie Mae between the first quarter of 2001 and the second quarter of 2004 were materially false as a result of numerous GAAP violations. (*See id.* ¶¶ 210-315.) Moreover, plaintiffs challenge various statements made by Fannie Mae about its compliance with GAAP, the quality of its internal controls and its corporate culture throughout the class period. (*See, e.g., id.* ¶¶ 225, 256, 300, 315.) In addition, plaintiffs allege liability on the part of KPMG because of a series of certified audit report statements concerning Fannie Mae's 2001, 2002 and 2003

fiscal years indicating that KPMG had conducted its audits of Fannie Mae's financial statements in accordance with GAAP, and concluding that its financial statements fairly presented Fannie Mae's financial condition in all material respects and in accordance with GAAP. (*See id.* ¶¶ 8, 316-407.)

With respect to Goldman Sachs, plaintiffs' allegations are contained in their August 14, 2006 Amended Complaint that, for the first time, named Goldman Sachs as a defendant. These allegations, in essence, are limited to Goldman Sachs' involvement in two REMIC transactions with Fannie Mae. As defined by plaintiffs, a REMIC "is a vehicle for issuing multi-class mortgage-backed securities that allows the issuer [Fannie Mae] to treat the transaction as a sale of assets for tax and accounting purposes." (*Id.* ¶ 411) The two REMIC transactions at issue closed, respectively, in December 2001 ($20 billion principal amount) and March 2002 ($10 billion principal amount). (*See id.* ¶¶ 9, 408.)

On November 13, 2006, Goldman Sachs moved to dismiss plaintiffs' claims pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 *et seq.* ("PSLRA"). As to Rule 12(b)(6), Goldman Sachs principally argues that plaintiffs fail to state a claim because their allegations, as presently articulated, are tantamount to aiding and abetting someone else's primary violation of Section 10(b) and Rule 10b-5 (*i.e.* Fannie Mae), and, thus, are barred as a private right of action by the Supreme Court's holding in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994). In that regard, they contend that plaintiffs have

3

failed to plead sufficient conduct by Goldman Sachs to state a claim for primary liability under any subpart of Section 10(b) or Rule 10b-5.   As to Rule 9(b), Goldman Sachs maintains that the Amended Complaint fails to plead with sufficient particularity facts giving rise to a strong inference of scienter to "deceive, manipulate or defraud" Fannie Mae's investors as required under both that rule and the PSLRA.   While either of these deficiencies alone would be enough to dismiss plaintiffs' claims against Goldman Sachs, the Court finds, for the following reasons, that plaintiffs' Amended Complaint must be DISMISSED for failure to state a claim under Section 10(b) and Rule 10b-5.[1]

---

[1]   Even if plaintiffs' Amended Complaint could somehow pass muster under Rule 12(b)(6), this Court would still conclude that plaintiffs' Amended Complaint fails to withstand scrutiny under Rule 9(b).   As stated previously, that rule requires plaintiffs to plead with particularity facts giving rise to a "strong inference" that Goldman Sachs acted with scienter, (*i.e.* the intent to defraud Fannie Mae investors when it was working with Fannie Mae on the two REMIC transactions).   15 U.S.C. § 78u-4(b)(2); 15 U.S.C. § 78u-4(b)(3)(A).   Under Section 10(b) and Rule 10b-5, the required state of mind" is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).   A majority of federal courts of appeals have held that, in order to satisfy the PSLRA's pleading requirements, a plaintiff must plead facts giving rise to a strong inference of knowing misconduct or severe recklessness. *Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir. 2001); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 411-12 (5th Cir. 2001); *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261-63 (10th Cir. 2001); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 550-52 (6th Cir. 2001); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285-86 (11th Cir. 1999).   However, even when considering plaintiffs' allegations under the more liberal pleading standard of "motive and opportunity" to commit securities fraud, *see Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999), this Court still finds that plaintiffs' allegations, even when viewed together, are insufficient to support a "strong inference" of fraudulent intent because they are wholly conclusory and not based on sufficient underlying allegations of fact as to Goldman Sachs' conduct. *See In re U.S. Office Products Sec. Litig.*, 326 F. Supp. 2d 68, 77 (D.D.C. 2004) (finding that a complaint that "couples a factual statement with a conclusory allegation of fraudulent intent is insufficient to support the inference that the defendants acted recklessly or with fraudulent intent").

# ANALYSIS

## A. *Pleading Standard Under the PSLRA*

A motion to dismiss will not be granted unless it "appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In considering a motion to dismiss for failure

to state a claim upon which relief can be granted, this Court must view the factual allegations

in the light most favorable to the plaintiff.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117

---

Plaintiffs argue that they have satisfied the scienter pleading standard by alleging that "Goldman 'was the source of the idea to use, what appeared to the public as just another REMIC deal, to manipulate Fannie Mae's earnings'"; Goldman Sachs' proposal "'described that the purpose of the [REMIC] transactions was to 'manage the recognition of income' for GAAP purposes and achieve the desired accounting objective of shifting earnings into later periods'"; and "Goldman 'discovered' and 'tried to manipulate' the REMICs' GAAP accounting mismatches to allow [Fannie Mae] to smooth earnings volatility." (Pls.' Opp. at 33 (quoting Am. Compl. ¶¶ 415, 416, 418).)  However, because plaintiffs' do not allege that Goldman Sachs knew that Fannie Mae's accounting for the REMICs would violate GAAP, these allegations cannot support a strong inference that Goldman Sachs knowingly or recklessly engaged in a fraud upon Fannie Mae investors.  Similarly, plaintiffs' allegations that "Goldman willingly participated in a cover-up to deceive investors with respect to the true nature of these REMICs," (Pls.' Opp. at 33.), does not support the requirement of a strong inference of fraud.  Plaintiffs rely solely upon an internal Fannie Mae e-mail stating that Fannie Mac would direct any market inquiries it received about Fannie Mae's December 2001 REMIC to Goldman Sachs, (Am. Compl. ¶¶ 424-425), but do not allege that Goldman Sachs ever received any such inquiry or made any statement in response.

Finally, although plaintiffs allege that Goldman had a "motive to 'make Fannie Mae happy, as Fannie Mae was one of Goldman Sachs' largest trading clients . . . [and] acted as lead manager, co-manager, and underwriter of numerous securities offerings for Fannie Mae, through which Goldman received millions of dollars in fees'" (Pls.' Opp. at 34 (quoting Am. Compl. ¶¶ 438-39)), plaintiffs "readily concede that 'profit maximization' cannot stand alone to establish scienter," (Pls.' Opp. at 34).  *See, e.g., In re Interbank FundingCorp. Sec. Litig.*, 329 F. Supp. 2d 84, 90 (D.D.C. 2004), *rev'd on other grounds, sub nom. Belizan v. Hershon*, 434 F.3d 579 (D.C. Cir. 2006); *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 20 (D.D.C. 2000).  Accordingly, as plaintiffs' allegations of knowledge and recklessness are wholly conclusory and their allegations of motive are insufficient as a matter of law, this Court finds that plaintiffs have not adequately pled the required strong inference of scienter under any potentially applicable standard.

F.3d 621, 625 (D.C. Cir. 1997). However, even if the Court accepts as true all of the factual

allegations set forth in the complaint, *Doe v. U.S. DOJ*, 753 F.2d 1092, 1102 (D.C. Cir.

1985), and construes the complaint liberally in favor of the plaintiff, *Schuler v. United States*,

617 F.2d 605, 608 (D.C. Cir. 1979), it "need not accept inferences drawn by the plaintiff[]

if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI*

*Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Plaintiffs seek to recover against Goldman Sachs under Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC")

Rule 10b-5(b) promulgated thereunder. Section 10(b) of the Exchange Act states in relevant

part:

> It shall be unlawful for any person, directly or indirectly . . . (b) To use
> or employ, in connection with the purchase or sale of any security
> registered on a national securities exchange or any security not so
> registered, any manipulative or deceptive device or contrivance in
> contravention of such rules and regulations as the Commission may
> proscribe as necessary or appropriate in the public interest or for the
> protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 implements this statute, stating:

> It shall be unlawful for any person, directly or indirectly, by the use of
> any means or instrumentality of interstate commerce, or of the mails or
> of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state
> a material fact necessary in order to make the statements made, in the
> light of the circumstances under which they were made, not misleading,
> or

(c) To engage in any act, practice or course of business which operated
or would operate as a fraud or deceit upon any person, in connection
with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Complaints brought under Section 10(b) and Rule 10b-5 are

governed by special heightened pleading standards that were included by Congress in the

PSLRA. These pleading standards are unique to securities fraud litigation and were adopted

in an attempt to curb abuses of these laws. *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735,

741 (8th Cir. 2002). The first of these two standards requires the plaintiff's complaint to

specify each misleading statement or omission and specify why the statement or omission

was misleading. 15 U.S.C. § 78u-4(b)(1). If the allegation "is made on information and

belief, the complaint shall state with particularity all facts on which that belief is formed."

*Id.* Similarly, Rule 9(b) of the Federal Rules of Civil Procedure has long required that "in

all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be

stated with particularity." The text of the PSLRA was designed "to embody in the Act itself

at least the standards of Rule 9(b)." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st

Cir. 1999).

Second, Congress stated in the PSLRA that a plaintiff's complaint must "state with

particularity facts giving rise to a *strong* inference that the defendant acted with the required

state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added); *Fla. State Bd. of Admin. v. Green

Tree Fin. Corp.*, 270 F.3d 645, 654 (8th Cir. 2001). Indeed, in the securities fraud context,

this Court must "disregard 'catch-all' or 'blanket' assertions that do not live up to the

particularity requirements of the [PSLRA]." *Green Tree*, 270 F.3d at 660. "[U]nder the

Reform Act, a securities fraud case cannot survive unless its allegations collectively add up

to a strong inference of the required state of mind." *Green Tree*, 270 F.3d at 660. "Congress

has effectively mandated a special standard for measuring whether allegations of scienter

survive a motion to dismiss.  While under Rule 12(b)(6) all inferences must be drawn in

plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable . . .

Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and

'strong' inferences." *Id.* (quoting *Greebel*, 194 F.3d at 195-96).

## B. Claims Against Goldman Sachs

Plaintiffs' securities fraud allegations are based on Goldman Sachs' involvement in

two REMIC transactions.  Plaintiffs contend, in essence, that Goldman Sachs participated

in a four and a half year securities fraud "scheme" because it:  (1) proposed the two REMIC

transactions; (2) suggested that they could help Fannie Mae manage its income recognition

for GAAP purposes; and (3) performed unspecified functions as "underwriter/dealer" when

the REMIC interests were offered to prospective purchasers of those interests. (Am. Compl.

¶¶ 9, 25, 408, 416.)  Plaintiffs allege that the two REMIC transactions were unorthodox,

"because of their . . . unusual size and because, unlike other Fannie Mae REMICs, Fannie

Mae 'purchased' and retained 90 percent ownership of the underlying mortgages in these two

deals." (Am. Compl. ¶ 412.)  Indeed, plaintiffs assert that the result of these transactions was

"to shift $107 million of Fannie Mae's earnings into future years," and that this income

shifting to later periods was the "sole purpose" of the transactions.  (Am. Compl. ¶ 409.)[2]
In that regard, plaintiffs contend that Goldman Sachs was willing to engage in securities
fraud because it "had [the] motive to make Fannie Mae happy, as Fannie Mae was one of
Goldman Sachs' largest trading clients," from which Goldman Sachs received "millions of
dollars in fees" before and since the putative class period in "numerous securities offerings
for Fannie Mae" (*id.* ¶ 438), and because Goldman Sachs earned a "standard" fee of
$625,000 on the December 2001 REMIC transaction (*id.* ¶ 439).

Curiously, plaintiffs have alleged that Fannie Mae and KPMG, *not* Goldman Sachs,
"did not make appropriate disclosures about these transactions in Fannie Mae's financial
statements and other public statements," (*id.* ¶ 9), and that "the transactions were not

---

[2]  According to plaintiffs, Goldman Sachs allegedly described the purpose of the
transactions as "to 'manage the recognition of income' for GAAP purposes and achieve the
desired accounting objective of shifting earnings to later periods." (*Id.* ¶ 416.)  To support that
characterization, plaintiffs quote a slide from the Goldman Sachs presentation, as follows:

> Replacing a MBS pass-through portfolio with a sequentially tranched
> basket of CMO [i.e., REMIC] classes representing the same cash flows
> allows FNMA to better manage the recognition of income for GAAP
> purposes.  By replacing a single asset yield with multiple asset yields,
> FNMA can substantially reduce the GAAP accounting mismatch between
> asset yields and the term structure of its financing costs.  The current steep
> yield curve environment exaggerates the mismatch between the
> recognition of interest income and interest expense and makes the
> transaction more compelling than in a flat yield curve environment. . .
>
> A simple sequential pay vanilla structure ensures that shorter lower
> yielding classes pay off prior to longer higher yielding classes, which is
> critical to achieving the desired accounting objective.  The use of a long
> sequential Z could even further enhance the desired accounting objective.

(*Id.* ¶ 416 (emphasis added in Amended Compl.).)

9

accounted for properly, in part because of internal control deficiencies at Fannie Mae, including Fannie Mae's lack of systems to account for the transactions properly" (*id.* ¶ 409).

## C. Failure to State a Section 10(b) and Rule 10b-5 Claim Against Goldman Sachs

Goldman Sachs contends that plaintiffs' "scheme allegations," at best, amount to aiding and abetting liability under Section 10(b) and Rule 10b-5, and are therefore barred by the Supreme Court's decision in *Central Bank*, in which the Supreme Court held that there is no private cause of action for aiding and abetting someone else's primary violation of these laws. 511 U.S. 164, 191 (1994). Accordingly, Goldman Sachs argues that the claims against it must be dismissed because plaintiffs have failed to allege that Goldman Sachs' conduct *itself* either deceived Fannie Mae shareholders or manipulated the price of Fannie Mae stock. I agree.

In *Central Bank*, the Supreme Court held that "there is no private aiding and abetting liability under § 10(b)" of the Exchange Act. *Id.* at 191. In that case, the Supreme Court examined the text of the Exchange Act and concluded that Congress did not intend to impose secondary liability under Section 10(b). *Id.* at 184. The Supreme Court explained: "[Section 10(b)] prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act . . . . The proscription does not include giving aid to a person who commits a manipulative or deceptive act. We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute."

*Id.* at 177-78 (citations omitted).   Therefore, a defendant may have liability to private

plaintiffs under Section 10(b) only for a *primary* violation of the statute.  Thus, for Goldman

Sachs to incur liability, plaintiffs must sufficiently plead "*all* of the requirements for primary

liability under Rule 10b-5."   *Central Bank*, 511 U.S. at 191 (emphasis in original).

Accordingly, to state a claim against Goldman Sachs, plaintiffs had to satisfactorily plead

each of the elements of a primary violation of Section 10(b) and Rule 10b-5, which are:  (1)

the making of a material misrepresentation, or the use of a manipulative or deceptive device;

(2) with scienter (*i.e.*, a wrongful state of mind); (3) in connection with the purchase or sale

of a security; (4) reliance by plaintiffs; (5) economic loss; and (6) loss causation (proximate

cause).  *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Plaintiffs

did not do so here.

   In this case, plaintiffs have failed to plead that Goldman Sachs engaged in the type

of "manipulative or deceptive" conduct that the Supreme Court in *Central Bank*

concluded was necessary for liability under Section 10(b).  First, a device or contrivance

is not "deceptive," within the meaning of Section 10(b), absent some misstatement or a

failure to disclose by one who has a *duty* to disclose.  *See Regents of the Univ. of Cal. v.*

*Credit Suisse First Boston, Inc.*, 2007 WL 816518, No. 06-20856, at *10 (5th Cir. Mar.

19, 2007), *petition for cert. filed*, No. 06-1341 (U.S. Mar. 5, 2007); *In re Charter*

*Commc'ns, Inc. Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006), *cert. granted*, 2007 WL

879583, 75 U.S.L.W. 3034 (U.S. Mar. 26, 2007) (No. 06-43) (citing *Santa Fe Indus., Inc.*

11

*v. Green*, 430 U.S. 462, 474-75 (1977)).[3]  Second, the term "manipulative" in Section 10(b) has the limited meaning applied by the Supreme Court in *Santa Fe*, 430 U.S. at 476-77, that is not applicable here.[4]

Given these definitions, a defendant "who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under section 10(b) or any subpart of Rule 10b-5." *Regents of the Univ. of Cal.*, 2007 WL 816518, at *10 (quoting *In re Charter*, 443 F.3d at 992); *see also Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006) ("*Homestore*"), *petition for cert. filed*, 75 U.S.L.W. 3236 (U.S. Oct. 19, 2006) (No. 06-560) ("It is not enough that a transaction in which a defendant was involved had a deceptive purpose and effect; the defendant's own conduct contributing to the transaction or overall scheme must have had a deceptive purpose and effect.").

---

[3]  The Ninth Circuit has adopted a more liberal standard with respect to the scope of primary liability for secondary actors, under which primary liability attaches to anyone who engages in a "transaction [that] has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud." *Homestore*, 452 F.3d at 1050. This Court finds that the more restrictive interpretation of "deceptive acts" adopted by the Fifth and Eighth Circuits in *In re Charter* and *Regents of the University of California* is in a better keeping with the Supreme Court's ruling in *Central Bank*.

[4]  This narrow universe of practices consists of "wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity," *Santa Fe* 430 U.S. at 476; insider trading, *United States v. O'Hagan*, 521 U.S. 642, 650-53 (1997); and misappropriation of securities, *SEC v. Zandford*, 535 U.S. 813, 819-21 (2002).  *See Regents of the Univ. of Cal.*, 2007 WL 816518, at * 10.

Here, plaintiffs merely allege that Goldman Sachs is liable to Fannie Mae's investors on the basis that it engaged in two business transactions (the REMICs) for which *Fannie Mae* purportedly improperly accounted.  Plaintiffs do not allege that Goldman Sachs made any statement, omission or action at issue or that plaintiffs relied on any statement, omission or action made by Goldman Sachs.  Rather, the Amended Complaint proffers only an internal Fannie Mae email that suggested that Fannie Mae would refer to Goldman Sachs any market inquiries it received about the December 2001 REMIC, (Am. Compl. ¶¶ 424, 425); yet, plaintiffs offer no indication that Goldman made any statement in respect to such inquires.

Moreover, plaintiffs do not claim that Goldman Sachs was responsible for, or was involved in:  (1) the preparation of Fannie Mae's allegedly false or misleading financial statements; (2) Fannie Mae's allegedly improper internal accounting practices; or (3) the allegedly false or misleading public statements made by Fannie Mae and its former executives.  Indeed, plaintiffs do not assert that any of the allegedly misleading statements presented in the Amended Complaint were made, seen, or reviewed by Goldman Sachs in advance.  And, absent a legal duty owed to Fannie Mae investors, Goldman Sachs cannot be held liable under Section 10(b) for any purported omissions in Fannie Mae's financial statements.  *See Chiarella v. United States*, 445 U.S. 222, 235 (1980) (there can be no liability for fraud under Section 10(b) absent a duty to speak).  In that regard, the Fifth Circuit recently reached that very conclusion under similar circumstances in the *Enron*

13

case when it concluded that no such duty is owed by a secondary actor in this type of

situation. *See Regents of the Univ. of Cal.*, 2007 WL 816518.  I agree.

In *Regents of the University of California*, the Fifth Circuit held that banks that had

been alleged to "enter[] into partnerships and transactions that allowed . . . Enron to

misstate its financial position," 2007 WL 816518, at *1, "did not owe plaintiffs any duty

to disclose the nature of the alleged transactions," *id.* at *8, and, thus, even if Enron did

commit fraud "by misstating its accounts," the "banks only aided and abetted that fraud

by engaging in transactions to make it more plausible; they owed no duty to Enron's

shareholders," *id.* at *9.  Here, plaintiffs' claims similarly fail to demonstrate any duty

owed by Goldman Sachs to plaintiffs, or that Goldman Sachs itself participated in any

misstatement of financial statements by Fannie Mae.[5]  Accordingly, because these are

---

[5] Plaintiffs have alternatively argued that Goldman Sachs' conduct amounts to a "scheme to defraud," which is actionable under Section 10(b) and Rule 10b-5 of the securities laws.  I disagree.  After *Central Bank*, a secondary actor involved in a "scheme" to violate the securities law must still commit a manipulative or deceptive act in furtherance of that scheme.  *Homestore*, 452 F.3d at 1048-50 (holding that third party vendors and other business partners were not liable under Section 10(b) where plaintiffs failed to allege that they relied on any statements made by those defendants or on the purported "scheme" in which the defendants were alleged to have participated); *see also Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 842 (2d Cir. 1998) (extending *Central Bank*'s reasoning to claims that group of defendants conspired to violate securities laws); *In re Charter*, 433 F.3d at 992; *Dutton v. D&K Healthcare Res.*, No. 04-147, 2006 WL 1778863, at *7-8 (E.D. Mo. June 23, 2006); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 505 (S.D.N.Y. 2005).

Moreover, because the REMIC transactions created in this case were not themselves unlawful, or inherently deceptive, plaintiffs cannot rely upon those cases where a business partner's scheme liability was the product of a "sham," "shell," or "fiction[al]" transaction.  (*See* plaintiffs' argument at Pls.' Opp. at 12-17 (citing *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, Nos. MDL-1446, Civ. A. 01-3624, 2006 U.S. Dist. LEXIS 88121, at *18 (S.D. Tex. Dec. 4, 2006) ("*Enron IV*"); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005); *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161 (D. Mass. 2003)).)  The Amended Complaint

insufficient allegations, if true, to constitute primary liability under Section 10(b) as defined by the Supreme Court in *Central Bank*, plaintiffs' Amended Complaint fails to state a claim against Goldman Sachs for securities fraud.

## CONCLUSION

Thus, for the foregoing reasons, this Court GRANTS Goldman Sachs' Motion to Dismiss plaintiffs' claims against it.   An appropriate Order consistent with this ruling accompanies this Memorandum Opinion.

RICHARD J. LEON
**United States District Judge**

---

itself demonstrates that the two REMIC transactions at issue resulted in actual sales of billions of dollars to third party investors, backed by billions of dollars of mortgage securities. (Am. Compl. ¶¶ 408, 411.)

In a recent decision in Texas, a district court rejected an assertion of "scheme" liability even where the third party "designed" the transaction at issue and even though plaintiffs in that case asserted that the transactions were "innately deceptive." *In re Enron Corporation Securities, Derivative & ERISA Litigation*, Nos. MDL-1446, Civ. A. 01-3624, at 18 (S.D. Tex. Feb. 7, 2007).  In that case, the court held that the transactions at issue were "not shams and did not depend upon any fictions because, according to the complaint, they were functioning entities with substance that purchased assets and issued notes . . . ." *Id.* at 18.  Similarly, plaintiffs here have provided no "factual specificity" to support an assertion that the transactions were innately deceptive or shams or that Goldman Sachs helped Fannie Mae "cover up" any alleged accounting and disclosure violations by Fannie Mae.  Thus, plaintiffs' failure to "allege specific details" that show that the REMICs created by Goldman Sachs were inherently deceptive and that Goldman Sachs used and employed them to deceive investors, are fatal to their "scheme" allegations.  *See Enron IV*, 2006 U.S. Dist. LEXIS 88121, at *16.  Accordingly, in the absence of the type of specific allegations mandated by the Supreme Court in *Central Bank*, this Court will not expand the scope of securities liability to permit claims of this type under the umbrella of a "scheme liability" theory.