**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE FANNIE MAE SECURITIES LITIGATION | No. 1:04-cv-01639 (RJL) |
| FRANKLIN MANAGED TRUST *et al*., <br><br> *Plaintiffs*, <br> v. <br><br> FEDERAL NATIONAL MORTGAGE ASSOCIATION *et al*., <br><br> *Defendants*. | No. 1:06-cv-00139 (RJL) |

**KPMG LLP'S OPPOSITION TO FANNIE MAE'S MOTION TO COMPEL
PRODUCTION OF DOCUMENTS RELATED TO THE PUBLIC COMPANY
ACCOUNTING OVERSIGHT BOARD**

This motion is squarely controlled by the principle, well recognized by this Court, that

where "the statute's language is plain, the sole function of the courts . . . is to enforce it

according to its terms." *In re Fed. Nat'l Mortgage Ass'n Sec., Derivative, & "ERISA" Litig*.,

503 F. Supp. 2d 25, 32 (D.D.C. 2007) (quoting *Hartford Underwriters Ins. Co. v. Union Planters

Bank, N.A*., 530 U.S. 1, 6 (2000)).  Fannie Mae seeks an order compelling KPMG to produce

transcripts and correspondence from confidential investigative proceedings, and non-public

reports of inspections, conducted by the Public Company Accounting Oversight Board

("PCAOB" or "the Board")—the entity established by Congress to regulate auditors of public

companies.  The Sarbanes-Oxley Act, which created the PCAOB, expressly declares that "all

documents and information prepared or received by or specifically for the Board" in connection

with inspections or investigations "shall be confidential and privileged" and "shall not be subject

to civil discovery" in "any proceeding in any Federal or State court or administrative agency."

15 U.S.C. § 7215(b)(5)(A) ("Section 105(b)(5)(A)").  This statutory command is clear, and it

conclusively demonstrates that the "documents and information" Fannie Mae seeks are not

subject to civil discovery.

Nothing Fannie Mae offers can rebut the plain language of the statute.  In particular, it

can identify no reason this Court should find that the statute vests a privilege only in certain

agencies rather than in the confidential materials themselves.  Moreover, the policies that

motivated the establishment of the PCAOB and the enactment of new confidentiality

requirements support that plain meaning.  Congress deliberately enacted broad confidentiality

provisions to encourage an ongoing and "constructive dialogue" between the Board and the

accounting firms it regulates.[1]  The strained interpretation proposed by Fannie Mae would allow

it (and any other plaintiff) to pry into that dialogue, creating the very situation that Congress

sought to avoid.  Fannie Mae's motion to compel should be denied.

## STATEMENT

The PCAOB's investigations and inspections are governed by the Sarbanes-Oxley Act, a

statute enacted in 2002 in response to revelations of significant securities law violations at

Enron, Worldcom, and other large publicly traded companies.  Among the steps Congress took

to improve future audits of such companies was the creation of a new auditing oversight body—

the Public Company Accounting Oversight Board—which the Act vested with substantial new

authority to inspect and investigate accounting firms.

---

[1]  PCAOB Release 104-2006-077, at 2 (Mar. 21, 2006), http://www.pcaobus.org/inspections/
2006-03-21_release_104-2006-077.pdf.

Sarbanes-Oxley authorizes the Board to undertake "inspections" and "investigations." For the former, the PCAOB must conduct a "continuing program of inspections to assess the degree of compliance of each registered public accounting firm." 15 U.S.C. § 7214(a) ("Section 104"). These inspections are conducted annually for firms such as KPMG that have more than 100 issuer-clients. Section 104(b)(1)(A). The Board reviews selected audit engagements and evaluates the accounting firm's overall quality control system. Section 104(d). Accounting firms must give the inspectors access to "any record in the possession, custody, or control" of the firm. PCAOB Rule 4006(a). The Board sends the firm a draft report of the findings from the inspection and gives the firm an opportunity to respond, Rule 4007, after which the PCAOB issues a confidential final report. Rule 4008. This final report is shared only with the accounting firm, the SEC, and equivalent state regulators. Section 104(g)(1). The firm is given twelve months to remedy any problems identified in the final report. Section 104(g)(2). At the end of that period, the Board makes public a version of the report that omits both confidential client information and references to any problems that the auditor remedied to the satisfaction of the Board. *Id*.

Sarbanes-Oxley also empowers the PCAOB to investigate and, upon appropriate findings, sanction accounting firms. The Board may initiate an investigation "when it appears that an act or practice, or omission to act, by a[n auditor] may violate" Sarbanes-Oxley, PCAOB Rules, securities laws and regulations, or professional standards. PCAOB Rules 5100 & 5101.

When Congress established the PCAOB, it was well aware of the shortcomings of the Board's predecessor, the Public Oversight Board (the "POB"). The POB was viewed as ineffective, largely because its ability to inspect and investigate firms was hampered by their unwillingness to provide materials in the absence of a guarantee of privilege and confidentiality.

Congress heard testimony from, among others, the Chairman of the POB's Panel on Audit

Effectiveness, a body established at the SEC's request to conduct a comprehensive review and

evaluation of the way independent audits are conducted.  He testified that the oversight efforts of

the PCAOB's predecessor were "hampered by distrust and by concerns that the materials

developed were not protected."[2]  He added:  "Providing confidentiality will expedite and vastly

improve the review, investigatory, and disciplinary processes." *Id.*  A member of the POB itself

echoed those concerns, testifying that a new privilege was needed "to keep the information

gathered out of the hands of the litigating lawyers." *Id*. at 377 (Statement of John H. Biggs,

Chairman, President, and CEO, Teachers' Insurance and Annuity Association).  A former SEC

Chairman also explained the importance of keeping the new regulator's work "privileged from

outsiders."[3]

To address these concerns, and to avoid the mistakes of the past, Congress enacted a

robust confidentiality provision.  Section 105(b)(5)(A) of the Sarbanes-Oxley Act reads, in full:

> (A)  Confidentiality—
>
> Except as provided in subparagraph (B), all documents and information prepared
> or received by or specifically for the Board, and deliberations of the Board and its
> employees and agents, in connection with an inspection under section [104] or
> with an investigation under this section, shall be confidential and privileged as an
> evidentiary matter (and shall not be subject to civil discovery or other legal
> process) in any proceeding in any Federal or State court or administrative agency,

---

[2] *Accounting Reform and Investor Protection: Hearing on S. 2763 Before the S. Comm. on Banking, Housing, and Urban Affairs*, 107th Cong. 724 (2002) (Statement of Shaun F. O'Malley, Chairman, 2000 Public Oversight Board Panel on Audit Effectiveness).

[3] *Id*. at 22 (Statement of David S. Ruder, Chairman, SEC); *see also id*. at 532 (Statement of Joel Seligman, Dean and Ethan A.H. Shepley University Professor, Washington University School of Law) (explaining that there should be "a privilege from discovery of investigative files to facilitate auditing discipline during the pendency of other Government or private litigation").

> and shall be exempt from disclosure, in the hands of an agency or establishment of the Federal Government, under the Freedom of Information Act (5 U.S.C. 552a), or otherwise, unless and until presented in connection with a public proceeding or released in accordance with subsection (c) of this section.

By this provision's express terms, *all* documents and information prepared or received by the Board in connection with its investigations or inspections "shall be confidential and privileged as an evidentiary matter (and shall not be subject to civil discovery or other legal process) in any proceeding in any Federal or State court or administrative agency." *Id.*

Sarbanes-Oxley also contains an expansive confidentiality provision for the non-public portions of PCAOB inspection reports:

> [A written report shall be] made available in appropriate detail to the public (subject to [Section 105(b)(5)(A)], and to the protection of such confidential and proprietary information as the Board may determine to be appropriate, or as may be required by law), except that no portions of the inspection report that deal with criticisms of or potential defects in the quality control systems of the firm under inspection shall be made public if those criticisms or defects are addressed by the firm, to the satisfaction of the Board, not later than 12 months after the date of the inspection report.

15 U.S.C. § 7214(g) (emphasis added) ("Section 104(g)").

The legislative history for these two provisions amply demonstrates that Congress saw confidentiality as an essential part of its effort to improve the oversight of auditors. The Senate Banking Committee explained the purpose of a broad statutory privilege:

> Committee witnesses also emphasized that information gathered by Board investigators should be "privileged from outsiders" during the investigative process. Under the bill, any information gathered in the course of an investigation is to be confidential and privileged for all purposes (including civil discovery), unless and until particular information is presented in connection with a public proceeding.[4]

---

[4] S. Rep. No. 107-205, at 10 (2002).

The PCAOB itself has explained that Congress's broad confidentiality provision for inspections "reflects a legislative policy choice favoring the correction of quality control problems over the exposure of them."[5]  According to the PCAOB, the assurance of confidentiality and the corresponding cooperative approach has "enhanced" the "effectiveness and efficiency" of its efforts to improve auditing practices by "encourag[ing] constructive engagement, rather than . . . put[ting] firms in a position where they will perceive that their self-interest is better served by an adversarial and confrontational posture." *Id.* at 8.

As the Chairman of the PCAOB, Mark W. Olson, announced just four months ago, under the new "supervisory model" for overseeing auditors, "firms are making a number of efforts to remediate [audit] deficiencies."[6]  Significantly, "[t]his is true for larger and smaller firms and is an indication that the PCAOB inspection program is making a positive impact." *Id.*  Particularly encouraging are the important ways in which the new model adopted by Congress, and implemented by the Board, have generated year-over-year improvements in the quality of audits:

> Additional evidence of progress came from inspection procedures that we employed in recent years.  In these procedures, inspectors selected certain audits that they had previously inspected where they had found significant deficiencies, and then reviewed the more recent audits – of the same issuers by the same auditing firms – in order to see whether the auditors continued to commit the same errors.  In the majority of these specific audits, PCAOB inspectors observed improvements in the auditing procedures where inspectors had previously identified deficiencies.  It is significant to note that this occurred both when the auditing firm had agreed with our prior observations, and when the firm had expressed disagreement with the existence of a deficiency.

---

[5]  PCAOB Release 104-2006-077, at 2.

[6]  Mark W. Olson, Chairman of PCAOB, The PCAOB Supervisory Approach and Current Market Challenges, Before the AICPA National Conference on SEC and PCAOB Developments (Dec. 8, 2008), http://www.pcaobus.org/News_and_Events/ Events/2008/Speech/12-08_Olson.aspx.

*Id.* Moreover, with this new model the Board "not only seeks to identify audit deficiencies but

also to find 'core' problems and emerging risks that may have a more systemic effect on a firm's

performance." *Id.* In short, the confidentiality provisions have proven their worth by enabling

the PCAOB to implement an approach of frank and constructive dialogue to improve auditor

oversight.

Based on the express civil discovery bar that Congress created for PCAOB matters,

KPMG asserted privilege over transcripts, correspondence, and other materials covered by these

two statutory provisions.[7] Lead Plaintiffs and the Individual Defendants have respected the

obvious scope of this privilege and have not challenged its applicability. Indeed, since the

inception of the PCAOB, there are no reported decisions in which a party has even tried to obtain

this type of information in civil discovery.

## ARGUMENT

**I.      The Sarbanes-Oxley Statutory Privilege Bars Discovery Of
         Documents Prepared Or Received By The PCAOB In Connection
         With An Investigation Or Inspection.**

There is no dispute that the plain language of the statute protects the materials Fannie

Mae requests here. PCAOB transcripts indisputably constitute "information . . . received by" the

Board, and the transcripts themselves are "documents . . . prepared or received by or specifically

for the Board." Section 105(b)(5)(A). Likewise, correspondence between KPMG and the Board

---

[7] KPMG created a separate privilege log for PCAOB investigation materials after searching for responsive documents. Each of the documents on that log was prepared or received by the Board in connection with the Board's investigation of the Fannie Mae audit. As Fannie Mae notes, FM Br. at 2, n.1, KPMG did not search for or log documents related to PCAOB inspections, because every audit the PCAOB reviewed during its inspections was of a client other than Fannie Mae. *See* Argument II, *infra*.

constitutes documents and information prepared or received by the Board, and the inspection

reports that Fannie Mae seeks were prepared by the Board.  Under a plain reading of the statute,

these materials are "prepared for or received specifically by the Board" and are therefore

"confidential" and immune from "civil discovery."  Here, "the statute's language is plain," and

"the sole function of the courts is to enforce it according to its terms."  *In re Fed. Nat'l Mortgage*

*Ass'n Sec., Derivative, & "ERISA" Litig.*, 503 F. Supp. 2d 25, 32 (D.D.C. 2007).

Fannie Mae puts forward a number of arguments aimed at proving that the statute does

not actually mean what it says.  None of these arguments has any support, and none is plausible.

No court has ordered the production of PCAOB materials.  Fannie Mae offers this Court no

reason to be the first.[8]

First, Fannie Mae purports to find it "inexplicabl[e]" that transcripts of testimony before

the PCAOB would receive more protection than transcripts of testimony before the SEC.  FM

Br. at 3.  The explanation, however, is right before Fannie Mae's eyes.  PCAOB testimony and

other documents and information are protected by an express statutory provision in the Sarbanes-

Oxley Act.  There is no similar confidentiality provision in the statutes governing the SEC's

procedures.  The express privileges contained in the Sarbanes-Oxley Act reflect a conscious

---

[8] The lack of precedent for Fannie Mae's demand is plainly a product of the clarity of the
statutory text.  Congress also chose a familiar method for encouraging persons and entities to
engage in useful self-evaluative processes that would not be possible without protection of
private parties from discovery in civil litigation.  *See, e.g., In re K*, 561 A.2d 1063, 1067
(N.H. 1989) (Souter, J.) (state statute protecting discovery of records generated by a hospital
evaluation committee was needed to overcome "the natural reluctance of hospital employees
and staff members to engage in such evaluation after the fact, by furnishing information and
voicing critical judgments, if in so doing they would also be compiling a fund of material
discoverable by adverse parties in any subsequent litigation against the hospital"); *Santa
Rosa Mem'l Hosp. v. Superior Court*, 174 Cal. App. 3d 711, 719 (Cal. Ct. App. 1985) (a
similar California law "express[es] a legislative judgment that the public interest in medical
staff candor extends beyond damage immunity and requires a degree of confidentiality").

effort by Congress to *change* the existing model governing the regulation of auditors, in part by providing confidentiality protections not found in existing laws (such as those governing the production of SEC materials).  If Fannie Mae can conceive of "no principled reason" to treat PCAOB materials differently from SEC materials, "[t]hat is an argument better made to Congress." *In re Fed. Nat'l Mortgage Ass'n Sec., Derivative, & "ERISA" Litig*., 503 F. Supp. 2d at 32.

Second, Fannie Mae asserts that if the privilege statute "truly applied to documents provided to a regulated party, one would expect the statute to refer to material 'received from' the PCAOB."  FM Br. at 4.  But what Fannie Mae would "expect to see" does not control here; the statutory text does.  And the statutory text protects "documents and information prepared . . . by or specifically for the Board."  There is no room for dispute that PCAOB transcripts (like many other documents) that are "received from" the Board are also "prepared by or specifically for" the Board.[9]  In short, the statute contains no reference to documents "received from" the Board because no such verbiage is necessary.

Third, Fannie Mae argues that PCAOB Rule 5108 shows that documents and information are privileged only when "in the hands of the Board" and "not when in the hands of an auditor that has been the subject of an investigation or inspection."  FM Br. at 6.  The rule states that testimony, documents and other information prepared or received by or specifically for the Board in connection with informal inquiries and formal investigations "shall be confidential in the

---

[9]  This is confirmed by the PCAOB's reading of Section 105(b)(5)(A), in which it states that a "written accounting board demand for documents"—which an auditor receives from the Board—is "encompassed by the language of Section 105(b)(5)(A) and would therefore be confidential."  PCAOB Release No. 2003-015, at A2-38 (Sept. 29, 2003), http://www.pcaobus.org/Rules/Docket_005/Release2003-015.pdf.

hands of the Board." Rule 5108, by its very terms then, is only meant to address how the

privilege will be applied by the Board for materials in its possession; it does not purport to

eliminate the privilege for materials in the possession of audit firms.

Fannie Mae's way around this problem is to cite a proposed change to Rule 5108 that was

*not* adopted. Fannie Mae notes that the Board received comments during the Rule 5108

rulemaking process suggesting that the rule address the confidentiality of documents in the hand

of audit firms. Fannie Mae declares that the Board "pointedly *declined*" and "refused" to adopt

that position, instead "reject[ing]" the requested change. *Id.* at 5 (emphasis in original). Fannie

Mae goes on to say that "if the PCAOB had been concerned about discovery of documents in the

possession of the audit firms, it no doubt would have seized the opportunity to modify the rule

exactly as requested." *Id.*

Fannie Mae's suggested approach to the interpretation of statutes and rules has been

unpersuasive in the past.[10] It is particularly unpersuasive in this setting, where a statutory

enactment would be interpreted by relying on unadopted comments from a regulatory

rulemaking. In any event, Fannie Mae omits to mention that the PCAOB expressly cautioned

against drawing the inference Fannie Mae now asks the Court to accept. In adopting Rule 5108,

the PCAOB explained: "By using the phrase 'in the Board's hands,' we do not mean to express

---

[10] *See, e.g., Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (holding it "particularly dangerous" to rest an interpretation of a statute on "a proposal that does not become law"; such "inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change") (internal quotation marks omitted); *United States v. Genao*, 831 F. Supp. 246, 251 (S.D.N.Y. 1993) ("[T]he failure of the Sentencing Commission to amend the Guidelines as proposed is not indicative of any intent or consideration on its part.").

a view on whether the Act reaches further than that."[11]  If that were not sufficiently explicit, the

Board went on to explain exactly why it was unnecessary for Rule 5108 to address the scope of

the privilege in litigation settings:  "[T]he rule omits the Act's reference to an evidentiary

privilege because . . . the statute does not require an implementing rule."  *Id.*  Fannie Mae's

recitation of the procedural history behind this Rule pointedly omits these statements, statements

that directly refute Fannie Mae's contention.

　　　Finally, Fannie Mae looks for help in a different subparagraph of the statute.  Section

105(b)(5)(B) provides:  "Without the loss of its status as confidential and privileged in the hands

of the Board, all information referred to in subparagraph (A) may - (i) be made available to the

Commission; and (ii) in the discretion of the Board, when determined by the Board to be

necessary to accomplish the purposes of this Act or to protect investors, be made available to"

other state or federal regulatory authorities including the United States Attorney General and

state attorneys general.  Fannie Mae concludes that subparagraph (B) is a limitation on the

protections of subparagraph (A), arguing that because Congress "did *not* include audit firms" in

subparagraph (B)'s list of entities, the Board may not share information with those firms without

erasing the protections of subparagraph (A).  FM Br. at 6.  Fannie Mae therefore argues that "the

information described is 'confidential and privileged' only when it is 'in the hands of the Board'

– not in the hands of an auditor that has been the subject of an investigation or inspection."  *Id.*

　　　In essence, Fannie Mae reads the statute only to exempt the Board from the discovery

process:  the Board does not have to "hand over" the materials in response to a subpoena, but the

accounting firms do.  But that is not the way Congress wrote the statute.  Section 105(b)(5)(A)

---

[11]  PCAOB Release No. 2003-015, at A2-39 (Sept. 29, 2003), http://www.pcaobus.org/Rules/
Docket_005/Release2003-015.pdf

states that "all documents and information" shall be confidential. It is "documents and

information" that are "privileged as an evidentiary matter." It is "documents and information"

that "shall not be subject to civil discovery or other legal process." The language used to

establish this litigation privilege is broad, unambiguous, and unqualified. It does not limit its

protections to materials in the hands of certain entities. In particular, it does not carve out an

exclusion from the privilege for materials in the hands of the witness or an auditor—such as

KPMG—who is the subject of an investigation or inspection. If all that Congress intended to do

was protect the Board and certain other regulators from responding to certain kinds of document

requests, it could have said so. But it did not.[12]

Fannie Mae simply misreads both subparagraphs of Section 105(b)(5). Section

105(b)(5)(A) *requires* the Board to keep confidential the documents and information that Fannie

Mae seeks unless and until they are presented or released as described in the statute. The fact

that Congress did not give the Board an unfettered power to disclose materials in its discretion

underscores the importance of this confidentiality. Without the authority extended by Section

105(b)(5)(B), the confidentiality obligation would prevent the PCAOB from sharing such

materials with even the SEC or the Department of Justice. Congress therefore gave the Board

the power to share information with identified sister agencies, and to do so without impairing the

---

[12] Nor does an interpretation that protects only certain "hands" from the discovery process
comport with the legislative history of the statute. As the Senate Report explained, "any
information" gathered for the Board is "confidential and privileged for all purposes." S. Rep.
No. 107-205, at 10 (2002). Again, Congress was concerned with more than just protecting
the Board from having to respond to subpoenas. In the words of the regulator, Congress
wanted to create a new model that would "favor[] the correction of quality control problems
over the exposure of them." PCAOB Release 104-2006-077, at 2.

privilege protecting this information.  Subparagraph (B) did not limit the scope of the privilege;

it expanded that scope.

Indeed, the Board has explained that, read "literally," Section 105(b)(5)(A) would

"prohibit the staff not only from showing exhibits to witnesses, but even from transmitting to a

firm a written accounting board demand for documents, since the demand would be a document

encompassed by the language of Section 105(b)(5)(A) and would therefore be confidential."

PCAOB Release No. 2003-015, at A2-38.  The Board, not surprisingly, rejected that view.

Instead, the PCAOB correctly reasoned that "the Act authorizes the Board and its staff to

disclose documents and information (even if otherwise covered by Section 105(b)(5)(A)) as

reasonably necessary to execute the Board's authority and responsibility to conduct fair

investigations."  *Id.*

Simply put, the PCAOB was created to regulate auditors.  Congress did not need to

include them on "the list" of persons with whom the PCAOB may communicate freely while

conducting its confidential investigations.

Without support for its arguments in the text, the legislative history, the PCAOB's rules

and statements, or plain logic, Fannie Mae merely worries about the consequences of Congress's

decision.  If the PCAOB transcripts are privileged, it suggests, KPMG witnesses "could

contradict their sworn testimony to the PCAOB without fear of adverse consequences in this

litigation."  FM Br. at 3.  As Fannie Mae admits, however, the SEC and OFHEO also conducted

their own investigations, and Fannie Mae has transcripts of that sworn testimony.  Those

transcripts comprise 28 days and over 4,600 pages of testimony.  Fannie Mae does not need the

PCAOB transcripts to prepare its case.  Even ignoring the availability of the SEC and OFHEO

transcripts, enforcing the privilege does not give KPMG witnesses license to "contradict their

sworn testimony to the PCAOB," because, as Fannie Mae itself points out, the Board is authorized to provide transcripts of that testimony to the SEC (among other regulators).  Fannie Mae's worries provide no basis to breach an express, statutory privilege.

The plain text of the statute, its legislative history, and its underlying policy considerations all point in the same direction:  the documents that Fannie Mae seeks from Board inspections and investigations may not be produced in civil discovery.

## II.    Draft And Unredacted Inspection Reports Are Also Protected From Discovery.

The Inspection Report Documents sought by Fannie Mae are privileged and protected from civil discovery demands for the same reasons PCAOB transcripts are protected.[13]  Section 105(b)(5)(A), by its plain terms, bars civil discovery of all documents and information created "in connection with an inspection under section [104]."  Moreover, the Sarbanes-Oxley Act contains a separate provision, Section 104, which confirms that the non-public portions of inspection reports are "subject to" Section 105(b)(5)(A).  Section 104 also states that "no portions of the inspection report that deal with criticisms of . . . the firm under inspection shall be made public[.]"[14]  Section 104(g)(2).  Fannie Mae does not mention this separate provision in its

---

[13]  Fannie Mae uses the term "Inspection Report Documents" to refer to the complete versions of inspection reports (*i.e.* those including portions not released to the public) that the PCAOB prepared for the audit years 2004 and earlier, as well as related documents such as KPMG's internal discussions of the PCAOB's findings concerning KPMG audits—discussions that would reveal information previously prepared by the Board, information previously received by the Board, and deliberations of the Board.

[14]  This prohibition is limited when those criticisms or defects are not "addressed by the firm, to the satisfaction of the Board, not later than 12 months after the date of the inspection report." The limitation is not relevant here, and Fannie Mae does not argue otherwise.

papers, much less explain how it could obtain the non-public portions of the inspection reports explicitly protected by Section 104(g).

The inspection report materials are not discoverable for a second and independent reason: they do not concern any audit of Fannie Mae. Instead, the reports that Fannie Mae demands concern the audits of the financial statements of other companies. Fannie Mae offers no legitimate reason why discovery in this matter should be broadened to include other audits of other companies. Its proffered rationale—that some of the accounting rules mentioned in the reports are the same as some of the accounting rules that applied to the Fannie Mae audit, FM Br. at 9—demonstrates the type of "fishing expedition" on which Fannie Mae seeks to embark. Just how wide Fannie Mae casts its net is shown by its insistence that such generalized issues as "sufficient evidential matter" and "internal controls" are reason enough to let it open those companies' audits to discovery in this case. *Id*. at 10. This Court has previously warned that Fannie Mae's malpractice case should not be the tail wagging the dog. This time Fannie Mae wants that tail to wag a different dog—a whole range of KPMG audit work for clients unrelated to Fannie Mae.

In short, the Inspection Report Documents are protected under Section 105(b)(5)(A) as information and documents prepared by the Board. They are protected under Section 105(b)(5)(A) as reporting the deliberations of the Board and its staff. They are protected under Section 104(g)(2) to the extent they contain "confidential and proprietary information," including that of audit clients, that the Board has determined should not be disclosed. They are precisely the information about which Section 104(g) mandates that "no portions . . . shall be made public." And they are not reports on any audit of Fannie Mae. Fannie Mae's insistence on being the first plaintiff in the country to receive these materials is pure overreaching.

15

## CONCLUSION

The Sarbanes-Oxley Act is susceptible to only one interpretation: documents prepared in connection with a Board inspection or investigation "shall not be subject to civil discovery." This unambiguous text is complemented by legislative history evincing the intent of Congress to protect the confidentiality of the PCAOB's investigation and inspection documents in order to ensure full and uninhibited cooperation between auditors and the Board. The non-public portions of inspection reports are also expressly protected from disclosure, and they concern other audits conducted by other KPMG personnel for other clients. For these reasons, Fannie Mae's motion should be denied.


DATED: April 3, 2009

                                    Respectfully submitted,

                                     /s/ Andrew S. Tulumello
                                    F. Joseph Warin (D.C. Bar No. 235978)
                                    Scott A. Fink (*pro hac vice*)
                                    John Sturc (D.C. Bar No. 914028)
                                    Michael F. Flanagan (D.C. Bar No. 435942)
                                    Andrew S. Tulumello (D.C. Bar No. 468351)
                                    David Debold (D.C. Bar No. 484791)
                                    GIBSON, DUNN & CRUTCHER LLP
                                    1050 Connecticut Avenue, N.W.
                                    Washington, D.C.  20036

## CERTIFICATE OF SERVICE

I hereby certify that I caused copies of the foregoing to be transmitted via electronic mail to the following counsel:

James R. Cummins
Melanie S. Corwin
Jean Marie Geoppinger
Waite, Schneider, Bayless & Chesley Co., L.P.A.
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, OH 45202
*Counsel for Lead Plaintiffs*

Frank J. Johnson
Johnson Bottini, LLP
655 W. Broadway, Suite 1400
San Diego, CA 92101
*Counsel for Plaintiff Sassan Shahrokhinia*

Jeffrey W. Kilduff
Michael J. Walsh, Jr.
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
*Counsel for Defendants Fannie Mae, Thomas P. Gerrity, Taylor C. Segue, III, William R. Harvey, Joe Pickett, Kenneth M. Duberstein, Manuel Justiz, H. Patrick Swygert, and Leslie Rahl*

Kevin M. Downey
Alex G. Romain
Joseph M. Terry, Jr.
John E. Clabby
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5091
*Counsel for Defendant Franklin D. Raines*

Daniel S. Sommers
Cohen, Milstein, Hausfeld & Toll P.L.L.C
West Tower, Suite 500
1100 New York Ave., N.W.
Washington, D.C. 20005
*Counsel for Plaintiffs Vincent Vinci*; *State Teachers Retirement System of Ohio*; *Anne E. Flynn; Robert L. Garber*

Robert W. Liles
Liles Parker, PLLC
4400 MacArthur Blvd., N.W.
Suite 203
Washington, DC 20007
*Counsel for Plaintiff Sassan Shahrokhinia*

Steven M. Salky
Eric R. Delinsky
Ellen D. Marcus
Caroline E. Reid
Zuckerman Spaeder LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036-2638
*Counsel for Defendant Timothy J. Howard*

David S. Krakoff
Christopher F. Regan
Adam B. Miller
Heather H. Martin
Mayer Brown LLP
1909 K Street, N.W.
Washington, D.C. 20006-1101
*Counsel for Defendant Leanne G. Spencer*

17

William H. Jeffress
Julia E. Guttman
Nicholas A. Brady
Baker Botts LLP
The Warner
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2400
*Counsel for Defendant Jamie S. Gorelick*

Rhonda D. Orin
Anderson Kill & Olick, P.C.
2100 M Street, N.W. Suite 650
Washington, D.C. 20037
*Counsel for Defendant Leslie Rahl*

John H. Doyle, III
Reed Smith LLP
599 Lexington Ave.
New York, NY 10022-7650
*Counsel for Defendant Leslie Rahl*

James D. Wareham
Paul, Hastings, Janofsky & Walker LLP
875 15th Street, N.W., Suite 12
Washington, D.C. 20005
*Counsel for Defendant Daniel H. Mudd*

Shannon Ratliff
Ratliff Law Firm, PLLC
600 Congress Avenue
Suite 3100
Austin, TX 78701
*Counsel for Manuel Justiz*

Barbara Van Gelder
Morgan, Lewis & Bockius LLP
111 Pennsylvania Ave., NW
Washington, DC 20004
*Counsel for Defendants Anne M. Mulcahy
and Frederic V. Malek*

Cristen Sikes Rose
Edward S. Scheideman III
John J. Clarke, Jr.
DLA Piper US LLP
1200 19th Street, N.W.
Washington, D.C. 20036
*Counsel for Defendants Stephen B. Ashley,
Donald B. Marron, and Ann Korologos*

David I. Ackerman
James Hamilton
Bingham McCutchen LLP
2020 K Street, N.W.
Washington, D.C. 20006
*Counsel for Defendant Joe Pickett*

18

Seth Aronson
O'Melveny & Myers LLP
400 South Hope Street, 15th Floor
Los Angeles, Ca. 90071
*Counsel for Defendant Fannie Mae,*
*Thomas P. Gerrity, Taylor C. Segue, III,*
*William R. Harvey, Joe Pickett, Kenneth M.*
*Duberstein, Manuel Justiz, H. Patrick*
*Swygert, and Leslie Rahl*

William K. Dodds
Neil A. Steiner
Dechert LLP
30 Rockefeller Plaza
New York, NY 10112
*Counsel for Defendant Thomas P. Gerrity*

Ian H. Gershengorn
Jerome L. Epstein
Jenner & Block
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412

*Counsel for Fannie Mae*

J. C. O'Malley
Michael J. Avenatti
Eagan O'Malley & Avenatti, LLP
450 Newport Center Drive, 2nd Floor
Newport Beach, CA 92660
*Counsel for Fannie Mae*

/s/ _____
David Debold