# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation | MDL No. 1668 |
| In re Fannie Mae Securities Litigation | Consolidated Civil Action No.  04-1639 (RJL) |

## MEMORANDUM OPINION
(September 20, 2012) [# 940]

This is a class action securities fraud suit against Federal National Mortgage

Association ("Fannie Mae"), its former accountant KPMG, LLP, and three of Fannie

Mae's former senior executives (collectively, "defendants"), brought by a class of parties

represented by lead plaintiffs Ohio Public Employees Retirement System ("OPERS") and

State Teachers Retirement System of Ohio ("STRS") (collectively, "plaintiffs").  Before

the Court are eight separate summary judgment motions.[1]  This opinion addresses only

---

[1]      Plaintiffs filed two summary judgment motions: one against Fannie Mae, Lead
Plaintiffs' Motion for Partial Summary Judgment on Count I Against Defendant Federal
National Mortgage Association [Dkt. # 916] ("Pls.' Mot. Fannie Mae"), and another
against KPMG, Lead Plaintiffs' Motion for Partial Summary Judgment on Count III
Against Defendant KPMG LLP [Dkt. # 936] ("Pls.' Mot. KPMG").
        In turn, the defendants filed six separate summary judgment motions.  Of those, all
of the defendants joined in filing two of the motions, which focus, respectively, on the
loss causation element of the securities fraud claims and on plaintiffs' claims related to
Statements of Financial Accounting Standards ("FAS") 133.  Defs.' Joint Mot. for
Summ. J. for Failure to Prove Loss Causation [Dkt. # 939] ("Defs.' Mot. Loss
Causation"); Defs.' Joint Mot. for Partial Summ. J. Based on FAS 133 Accounting Issues
[Dkt. # 941] ("Defs.' Mot. FAS 133").  Finally, the individual defendants and KPMG
have each separately moved for summary judgment.  KPMG LLP's Mot. for Summ. J.
[Dkt. # 937] ("KPMG's Mot."); Def. J. Timothy Howard's Mot. for Summ. J. [Dkt. #

one of those motions: defendant Franklin D. Raines's Motion for Summary Judgment. I will address the remaining individual defendants' motions forthwith, [2] and the companies' and plaintiffs' motions thereafter. Upon consideration of the pleadings, oral argument, and the entire record herein, defendant Raines's Motion for Summary Judgment is GRANTED.

## BACKGROUND[3]

### I.    Factual Background

Fannie Mae, along with its cousin Freddie Mac, operates in the secondary mortgage market as a federally-chartered government-sponsored enterprise, buying home mortgages from banks and issuing debt and mortgage-backed securities. Formerly a private shareholder-owned company, Fannie Mae has been in a conservatorship under the Federal Housing Finance Agency ("FHFA") since September 6, 2008. During the time period relevant to this litigation (April 17, 2001 through December 22, 2004), however, Fannie Mae's stock was traded on the New York Stock Exchange, and it was regulated

---

938] ("Howard's Mot."); Def. Franklin D. Raines's Mot. for Summ. J. [Dkt. # 940] ("Raines's Mot."); Def. Leanne G. Spencer's Mot. for Summ. J. [Dkt. # 942] ("Spencer's Mot.").

[2]    The other individual defendants in this matter are J. Timothy Howard and Leanne Spencer. Defendant Timothy Howard was the Executive Vice President and Chief Financial Officer at Fannie Mae from 1990 until December 2004. Def. Fannie Mae's Statement of Genuine Issues of Material Fact ¶ 7 [Dkt. # 973-1] ("Fannie Mae's S-GIMF"). Defendant Leanne Spencer was Vice President and Controller of Fannie Mae during the class period. *Id.* ¶ 8.

[3]    For additional background information concerning this litigation, see the Court's Memorandum Opinions in *In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d 25, 29-30 (D.D.C. 2007), and *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32, 34-36 (D.D.C. 2008).

by the Office of Federal Housing Enterprise Oversight ("OFHEO").[4] OFHEO's

oversight responsibilities generally involved ensuring that Fannie Mae had adequate

capital, a sound corporate structure, and financial stability. This, of course, was no small

task: Fannie Mae was, and still is, one of the largest financial institutions in the country

and had a balance sheet of mortgage loans and mortgage-backed securities worth

hundreds of billions of dollars. Defs.' Reply Regarding their Statements of Undisputed

Material Fact in Supp. of the Joint Mot. for Partial Summ. J. Based on FAS 133

Accounting Issues ¶ 1 [Dkt. # 1024-4] ("Defs.' Reply SUMF FAS 133"). From January

1999 until December 2004, Raines was Fannie Mae's Chairman of the Board and Chief

Executive Officer. Fannie Mae's SGIMF ¶ 4.[5]

The narrative of plaintiffs' securities fraud claims against Raines, not surprisingly,

flows directly from an OFHEO investigation of Fannie Mae. In June 2003, following the

disclosure of certain accounting issues at Freddie Mac, OFHEO began examining Fannie

Mae's accounting policies and internal controls. On September 22, 2004, Fannie Mae

released a public statement, indicating that OFHEO had delivered the findings of that

investigation to Fannie Mae's board of directors. Fannie Mae's SGIMF ¶ 13; Fannie

Mae Form 8-K (Sept. 22, 2004), Decl. of W.B. Markovits in Supp. Of Lead Pls.' Mot. for

---

[4]   Amidst the financial crisis of 2008, Congress established FHFA to replace
OFHEO as Fannie Mae and Freddie Mac's independent regulator, and granted FHFA
additional powers over those held by OFHEO, including the ability to place the mortgage
giants in conservatorship or receivership under FHFA's control. Housing and Economic
Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654.

[5]   Raines was previously Fannie Mae's Vice Chairman from 1991 to 1996. *Id.* After
serving as the Director of the Office of Management and Budget in the Clinton
Administration from 1996 to 1998, he returned to Fannie Mae. *Id.*

Partial Summ. J. on Count I Against Def. Fannie Mae [Dkt. #920] ("Markovits-Fannie Mae Decl."), Ex. 5 [Dkt. # 920-6].[6] The company added that the Securities and Exchange Commission ("SEC") also had begun an inquiry and that Fannie Mae's board had retained former Senator Warren B. Rudman ("Senator Rudman") and his law firm, Paul, Weiss, Rifkind, Wharton & Garrison LLP, to conduct an independent investigation of what happened.  Fannie Mae's SGIMF ¶ 13.  Later that day, OFHEO publicly released its interim report entitled "Report of Findings to Date, Special Examination Fannie Mae" (the "OFHEO Interim Report").  *Id.* ¶ 14; *see also* OFHEO Interim Report, Decl. of Adam B. Miller in Supp. of Def. Leanne G. Spencer's Mot. for Summ. J., Ex. 148 [Dkt. # 942-3] ("Miller Decl., Ex. 148").  According to the Interim Report, Fannie Mae had misapplied certain Generally Accepted Accounting Principles ("GAAP"), specifically two key standards known as FAS 91 and FAS 133, which relate to the company's amortization of price changes on securities and loans and to its use of hedge accounting. Miller Decl., Ex. 148 at *i – vii.*[7]  OFHEO also raised concerns over the company's internal controls and audit reviews.  Fannie Mae's SGIMF ¶ 15.

---

[6]     According to the public statement, OFHEO summarized its findings to the Board by stating that "Fannie Mae (1) applied accounting methods and practices that do not comply with GAAP in accounting for the enterprise's derivatives transactions and hedging activities, (2) employed an improper 'cookie jar' reserve in accounting for amortization of deferred price adjustments under GAAP, (3) tolerated related internal control deficiencies, (4) in at least one instance deferred expenses apparently to achieve bonus compensation targets, and (5) maintained a corporate culture that emphasized stable earnings at the expense of accurate financial disclosures." Fannie Mae Form 8-K (Sept. 22, 2004), Markovits-Fannie Mae Decl., Ex. 5 at 7.

[7]     Generally Accepted Accounting Principles are defined by the Financial Accounting Standards Board, a private organization designated for this task by the SEC

Apparently surprised by these findings, Fannie Mae requested that the SEC's Office of the Chief Accountant review the company's accounting with respect to FAS 91 and FAS 133. *Id.* ¶ 24. Several months later, on December 15, 2004, the SEC's Chief Accountant, Donald Nicolaisen, issued a press release, stating that the SEC's accounting staff had determined that Fannie Mae's accounting did *not* comply in material respects with FAS 91 and FAS 133, and that he had advised the company to restate its financial statements after eliminating the use of hedge accounting and reevaluating its amortization of premiums and discounts. *Id.* ¶ 22 (quoting Markovits-Fannie Mae Decl., Ex. 16 [Dkt. # 922-8]). Shortly thereafter, on December 21, 2004, Raines announced his retirement from Fannie Mae. *Id.* ¶ 26. The next day, in a Form 8-K, Fannie Mae declared its intention to restate its 2001 to mid-2004 financial results to comply with the SEC's Office of Chief Accountant's review and recommendations concerning its FAS 91 and FAS 133 accounting. Fannie Mae Form 8-K (Dec. 22, 2004), Markovits-Fannie Mae Decl., Ex. 18 [Dkt. # 922-10].

---

and the private sector. Defs.' Reply SUMF FAS 133 ¶ 13. FAS 91 and FAS 133 are two of the many GAAP standards defined by this organization.

Briefly, FAS 91, or "Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases," instructs companies on how to account for premiums and discounts on securities and loans—in Fannie Mae's case, mortgages. Pls.' Responses to Fannie Mae's Statements of Additional Material Facts [Dkt. # 990-1] ("Pls. Responses to Fannie Mae's SAUMF") ¶¶ 24, 30 (Ex. 30, FAS 91, ¶¶ 4, 15, 18). And FAS 133, or "Accounting for Derivative Instruments and Hedging Activities," addresses a company's hedge accounting, or its recording of the value of derivative transactions in its earnings. *See* OFHEO Interim Report at *iv*. Fannie Mae used derivatives transactions, particularly interest-rate swaps, to hedge (protect) against interest rate changes in its issued debt and the mortgage loans it owned. *See* Defs.' Reply SUMF FAS 133 ¶¶ 1-12.

Over a year later, on February 23, 2006, Fannie Mae released the report of Senator

Rudman and his team at Paul Weiss, "A Report to the Special Review Committee of the

Board of Directors of Fannie Mae" (the "Rudman Report"), which reached similar

findings as OFHEO's Interim Report.[8]  Fannie Mae's SGIMF ¶¶ 31-32.  OFHEO

released its final report on May 23, 2006.  Report of the Special Examination of Fannie

Mae, May 2006, Decl. of W.B. Markovits in Supp. of Lead Pls.' Mems. of Points and

Authorities in Opp'n to Def. J. Timothy Howard's and Def. Leanne G. Spencer's Mots.

for Summ. J. [Dkt. # 969-2] ("Markovits-Howard/Spencer Decl."), Ex. 12 ("OFHEO

Final Report").[9]  Based on its findings, OFHEO brought administrative charges against

Raines, Howard, and Spencer, alleging that they "knowingly and/or recklessly engaged in

misconduct and safety and soundness violations that caused substantial and/or material

harm and loss to [Fannie Mae]".  December 18, 2006 OFHEO News Release, Decl. of

W.B. Markovits in Supp. of Pls.' Mem. in Opp'n to Franklin D. Raines's Mot. for Summ.

J. [Dkt. # 967-2] ("Markovits-Raines Decl."), Ex. 34 at 2; *see also* OFHEO's Notice of

Charges, Notice No. 2006-1, Markovits-Raines Decl., Ex. 34.[10]

---

[8]     Curiously, the defendants refer to the Rudman Report as the Paul Weiss Report.
*See, e.g.*, Raines's Mot. 2.  Go figure!

[9]     The SEC also filed a civil complaint against Fannie Mae on that date, alleging that
Fannie Mae violated Section 10(b) of the Exchange Act and Rule 10b-5.  Compl., *SEC v.
Fannie Mae*, No. 1:06-cv-00959 (D.D.C. May 23, 2006).  OFHEO filed a similar
enforcement action.  That day, Fannie Mae agreed to settle those cases and pay a $400
million civil penalty.  Fannie Mae Form 8-K (May 30, 2006), Markovits-Fannie Mae
Decl., Ex. 25 [Dkt. # 924-3].

[10]    OFHEO alleged the individuals committed violations including "[i]nappropriate
earnings management and manipulation; [d]eliberately misleading financial reporting and
disclosures; [f]ailure to establish a sound internal controls process . . .; [m]isleading and

Finally, on December 6, 2006, Fannie Mae filed with the SEC its prior financial results in a Form 10-K (the "Restatement"). *Id.* ¶ 65. The Restatement resulted in a "total reduction in retained earnings of $6.3 billion through June 30, 2004." Restatement 2; *see also* Fannie Mae's SGIMF ¶ 68.

## II. This Litigation

After OFHEO issued its Interim Report in September 2004, several Fannie Mae shareholders filed class action suits alleging that the company and its executives had violated the federal securities laws and committed securities fraud. The first of these actions was filed on September 23, 2004. After the other separately-filed cases were eventually consolidated into this multi-district litigation action, I appointed OPERS and STRS as lead plaintiffs on January 13, 2005.[11] In January 2008, this Court certified a class generally composed of approximately one million investors in Fannie Mae stock from April 17, 2001 through December 22, 2004 (the "class period"). Order, Jan. 7, 2008 [Dkt. # 572]; Mem. Op., Jan. 7, 2008 [Dkt. # 571]. Thereafter, the parties engaged in an extensive discovery period until May 26, 2011. The volume of information exchanged in

---

deficient reporting from the important Internal Audit function; and [p]ermitting known deficient systems to continue to operate while recognizing that such systems facilitated the ongoing manipulations sought by the individuals charged." December 18, 2006 OFHEO News Release, Markovits-Raines Decl., Ex. 34 at 2. Raines later settled these charges in April of 2008. April 18, 2008 OFHEO News Release, Markovits-Raines Decl., Ex. 58.

[11]    On March 4, 2005, plaintiffs filed a Consolidated Class Action Complaint for Violations of Federal Securities Laws [Dkt. # 64] on behalf of purchasers of Fannie Mae common stock during the period from April 17, 2001, through September 21, 2004. On August 14, 2006, plaintiffs filed a Second Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws [Dkt # 204] ("SAC").

discovery was enormous; together, the parties produced nearly 67 million pages of documents, deposed 123 fact witnesses, and engaged 35 expert witnesses. *See* Pls.' Mem. in Supp. of Pls.' Mot. Fannie Mae at 4-5 [Dkt. # 918] (Pls.' Mem. Fannie Mae"). Unfortunately, however, the discovery process was unnecessarily prolonged by OFHEO's repeated and stubborn assertion of privileges that had to be litigated up to the Court of Appeals. *See* Order, Jan. 22, 2008 [Dkt. # 580], *aff'd*, 552 F.3d 814 (D.C. Cir. 2009).

In the end, plaintiffs allege that Fannie Mae and the individual defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2011), by intentionally manipulating earnings and violating GAAP, causing losses to investors.[12]  As to Raines specifically, plaintiffs contend that he knowingly made false statements, in his statements in the company's periodic financial reporting and in other public statements, about the soundness of Fannie Mae's accounting and internal controls.  Pls.' Mem. of P. & A. in Opp'n to Def. Franklin D. Raines's Mot. for Summ. J. at 1-2 [Dkt. # 967] ("Pls.' Opp'n Raines").  Plaintiffs also contend that Raines misled investors about his approval and participation in earnings management strategies designed to meet quarterly earnings-per-share targets to maximize bonuses, about Fannie Mae's hedge accounting policy that implemented FAS 133, and about the company's internal controls. *Id.*

---

[12]   Plaintiffs also claim that the individual defendants violated § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (2006).

On August 22, 2011, Raines moved for summary judgment on all claims against

him, arguing that plaintiffs have failed to prove that he acted with the necessary scienter

under the securities laws. Raines's Mot. at 1.[13]  On June 5-7 and June 13, 2012, I heard

oral argument on the pending summary judgment motions, including Raines's motion.[14]

Because I agree with the defendant that plaintiffs have failed to put forth sufficient

evidence of scienter, Raines is entitled to summary judgment.

### STANDARD OF REVIEW

Summary judgment is appropriate when the movant demonstrates that no genuine

issue of material fact is in dispute and that the moving party is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a).  The moving party bears the burden, and the court

will draw "all justifiable inferences" in favor of the non-moving party.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986).  Nevertheless, the non-moving party

"may not rest upon the mere allegations or denials of his pleading, but . . . must set forth

specific facts showing that there is a genuine issue for trial."  *Id.* at 248 (internal

quotation marks and citation omitted).  "Thus, if the evidence presented by the opposing

party is 'merely colorable' or 'not significantly probative,' summary judgment may be

granted."  *Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (quoting *Anderson*, 477

---

[13]     Raines also joined the defendants' motion for summary judgment based on loss
causation, Defs.' Mot. Loss Causation, and the defendants' motion for partial summary
judgment with regard to claims arising from FAS 133 accounting issues, Defs.' Mot. FAS
133. Raines's Mot. at 1-2. This opinion addresses only Raines's scienter arguments.

[14]     This Court heard oral argument specifically on Raines's motion on June 6, 2012
and June 13, 2012. Tr. of Mots. Hr'g, June 6, 2012 [Dkt. # 1051]; Tr. of Mots. Hr'g,
June 13, 2012 [Dkt. # 1050].

U.S. at 249-50).  Factual assertions in the moving party's affidavits may be accepted as

true unless the opposing party submits its own affidavits, declarations, or other

documentary evidence to the contrary.  *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

## DISCUSSION

The elements of a securities fraud claim and the requirements of a summary

judgment motion remain constant, regardless of the enormity and novelty of the facts in

question.  Securities fraud claims under Rule 10b-5 or Section 10(b) of the Securities

Exchange Act of 1934 require proof of the following elements: "(1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between

the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon

the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge*

*Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).  Raines's summary

judgment motion, however, focuses on only one of these elements: scienter.  To establish

scienter in a securities fraud case, a plaintiff must prove that the defendant acted "with an

intent to deceive—not merely innocently or negligently." *Merck & Co. v. Reynolds*, 130

S. Ct. 1784, 1796 (2010).  Thus, plaintiffs must put forth proof of intentional wrongdoing

or extreme recklessness. *Liberty Prop. Trust v. Republic Props. Corp.*, 577 F.3d 335, 342

(D.C. Cir. 2009).  Our Circuit has defined extreme recklessness as an "extreme departure

from the standards of ordinary care, . . . which presents *a danger of misleading buyers or*

*sellers that is either known to the defendant or is so obvious that the actor must have*

*been aware of it*." *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008)

(internal citations and quotation marks omitted).  For extreme recklessness, the danger of

deception must be such that the "actor was aware of it and consciously disregarded it."
*Id.* Plaintiffs claim that Raines knowingly misled Fannie Mae's investors about the
company's accounting and internal controls and recklessly disregarded a deficient
corporate governance structure.  Pls.' Opp'n Raines at 5.

Unfortunately for plaintiffs, they have not established a genuine issue of material
fact as to Raines's alleged scienter.  There is not only no direct evidence that Raines
intended to deceive Fannie Mae's investors, there is no evidence that he even knew his
statements were false.  Indeed, plaintiffs conceded these very points at oral argument.
Tr. of Mots. Hr'g 30:9-31:12 (June 6, 2012).

And while proof of scienter may sometimes be inferred from circumstantial
evidence, *see In re Baan*, 103 F. Supp. 2d 1, 20 (D.D.C. 2000), this is not the case here.
In essence, plaintiffs have stitched together a patchwork quilt of evidence that they allege
presents a disputed issue of material fact as to Raines's scienter.  I disagree.  Plaintiffs'
cited evidence simply does not rise to an inference of scienter.  Although scienter is
generally a question of fact for a jury, *see, e.g.*, *SEC v. Pace*, 173 F. Supp. 2d 30, 33
(D.D.C. 2001) ("In the ordinary securities fraud case, scienter is a genuine issue of
material fact."); *see also Wechsler v. Steinberg*, 733 F.2d 1054, 1058-59 (2d Cir. 1984)
("Issues of motive and intent are usually inappropriate for disposition on summary
judgment."), plaintiffs' theories on Raines's scienter are insufficient to withstand his
summary judgment motion, *see Anderson*, 477 U.S. at 256-57 (recognizing that resolving
defendant's "state of mind" may be appropriate on summary judgment and that plaintiff
may not defeat "a defendant's properly supported motion for summary judgment . . .

without offering any concrete evidence from which a reasonable juror could return a

verdict in his favor"); *see also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425

(9th Cir. 1994) (finding defendants had "conclusively rebutted" plaintiffs' "speculative

inferences" of fraud).

To the contrary, Raines has identified significant, undisputed[15] evidence that is

utterly inconsistent with the requisite scienter for securities fraud.  For example, no

witness testified that anyone had advised Raines that Fannie Mae's financial statements

were not GAAP compliant or that Raines knew that the statements were materially

inaccurate.  Further, no witness testified that Raines ever told him to violate GAAP, Def.

Franklin D. Raines's Reply to Lead Pls.' Responses to Def. Raines's Statement of

Undisputed Material Facts and Statement of Additional Undisputed Material Facts in

Supp. of Def. Franklin D. Raines's Mot. for Summ. J. ¶ 152 [Dkt. #979] ("Raines Reply

SUMF and SAUMF"), and many testified as to Raines's expressed desires to have the

company's accounting fully comply with GAAP, *id.* ¶¶ 152-62.  Moreover, Raines has

identified substantial evidence indicating that he believed Fannie Mae's accounting was

GAAP compliant.  For instance, Raines sought input from the SEC's chief accountant to

confirm that Fannie Mae's accounting was appropriate.  *Id.* ¶¶ 203-05.  Raines identified

similar evidence (or rather the conspicuous absence) of Raines's awareness of internal

_____

[15]      Plaintiffs claim to "dispute" certain of this evidence but do not actually present
admissible evidence to create a dispute.  Instead, they point to other "evidence" irrelevant
to the fact at hand, *see, e.g.*, Lead Pls.' Statement of Genuine Issues of Material Fact
Precluding Summ. J. for Def. Franklin Raines ¶¶ 152-53 [Dkt. # 967-1] ("Pls.' S-GIMF-
Raines"), objecting to testimony as self-serving, *see, e.g.*, *id.* ¶ 158, and making
conclusory statements about the capabilities of Fannie Mae's staff, *see, e.g.*, *id.* ¶ 185.

controls weaknesses.  To wit, no witness testified that anyone informed Raines that
Fannie Mae had material weaknesses in its internal controls, and Raines received
assurances (before the OFHEO Interim Report), from internal and external auditing
professionals, to the contrary.  *See* Raines's Reply SUMF ¶¶ 37, 47, 48.  Of course, such
evidence is generally insufficient to grant summary judgment, especially if a plaintiff
identifies admissible evidence supporting a reasonable inference of scienter.  But where,
as here, that is not the case, such substantial evidence negates any possible inference of
scienter.  In sum, plaintiffs' evidence shows, *at best*, that Raines acted negligently in his
role as the company's chief executive and negligently in his representations about the
company's accounting and earnings management practices.

  Plaintiffs claims to the contrary that Raines either knowingly made false
statements concerning Fannie Mae's earnings management, accounting, internal controls,
or recklessly relied on a flawed corporate structure, are, for the following reasons,
inadequate to establish the scienter required for securities fraud.

## I. Earnings Management

  The heart of plaintiffs' case against Raines is that he was aware of, or complicit in,
an earnings management scheme to increase executive bonuses.  *See* Tr. of Mots. Hr'g
31:19-43:21 (June 6, 2012).  Plaintiffs contend that Raines, therefore, misled investors
about whether Fannie Mae used "loss smoothing and earnings management tools to shift
earnings" between reporting periods.  Pls.' Opp'n Raines at 13-14.  Plaintiffs, however,
offer no evidence from which a reasonable juror could conclude that any of his

statements concerning earnings management were made with an intent to deceive, or
were otherwise made without any reasonable basis. *See SEC v. Steadman*, 967 F.2d 636,
641-42 (D.C. Cir. 1992).

Moreover, plaintiffs fail to show that certain financial transactions were improper
at all, or that Raines was even involved or knowledgeable about them.  For instance,
plaintiffs claim that Raines was "consulted with respect to senior management's efforts to
shift earnings" between periods to meet earnings targets and maximize bonuses.  Pls.'
Opp'n Raines at 7.  In particular, plaintiffs point to Fannie Mae's insurance transactions,
debt buy-backs, and charitable donations as alleged examples of earnings manipulation.
*See* Pls.' Opp'n Raines at 7-13 (citing November 4, 2001 Memorandum from Spencer to
Raines, Markovits-Raines Decl., Ex. 2 at 1 ("[W]e still have some placeholder debt
repurchase combined with a special contribution for the foundation."), 9-11 (citing use of
insurance instruments), 11-13 (discussing debt buy-backs)); *see also* Pls.' Supp'l Mem.
of P. & A. in Opp'n to Franklin D. Raines's Mot. for Summ. J. at 3-4, 6-8 [Dkt. # 1037]
("Pls.' Supp'l Mem. Raines").[16]  But plaintiffs' cited evidence, at most, indicates that

---

[16]     Plaintiffs cite to a memorandum addressed to Raines from Leanne Spencer and the
presentation referenced by that memorandum as evidence that Raines was informed "that
senior management was deliberately manipulating the earnings per share they reported to
the investing public during the class period by, among other things, moving earnings
from one reporting period into future reporting periods." Pls.' Opp'n Raines at 7-9
(citing Markovits-Raines Decl., Exs. 1, 2).  On its face, however, the only "earnings
management" or "smoothing ideas" referenced in Spencer's memorandum are her noting
that the current analysis shows the company's reaching a target earnings mark by using
"some placeholder debt repurchase combined with a special contribution for the [Fannie
Mae] foundation."  Markovits-Raines Decl., Ex. 2 at 1.  Spencer states: "You should
view these as pro-forma."  *Id.*  No improper purpose could be inferred from such
evidence.

Raines was aware of certain transactions that affected earnings; plaintiffs fail to provide any evidence from which a reasonable jury could infer that Raines believed any of these transactions were improper or sought to conceal them from the public.  Indeed, plaintiffs' own expert recognized that earnings management does not necessarily show an improper purpose. *See* Expert Report of Sharon Sabba Fierstein, Sept. 14, 2010, at 5-5 ("Fierstein Report"), Decl. of Eun Young Choi in Supp. of Def. Franklin D. Raines's Mot. for Summ. J. [Dkt. # 979] ("Choi Decl."), Ex. 191 at 5-5 ("Certain transactions may be executed to manage earnings (i.e., change the pattern of earnings) without violating GAAP.  At Fannie Mae, an example of this was its debt buyback program.").[17]
Similarly, plaintiffs fail to offer any expert evidence linking any accounting for these transactions to executive compensation.[18]  Moreover, the record shows that Fannie Mae disclosed its debt buy-backs in their public filings.  Raines Reply SUMF and SAUMF ¶ 246 [Dkt. #979] (citing Fannie Mae's filings).

[17]    For example, plaintiffs claim that Fannie Mae used mortgage insurance transactions to manipulate earnings and then claim that "[a]s early as 2001, Raines was personally involved in discussions related to using insurance transactions to shift earnings into future reporting periods." *See* Pls.' Opp'n Raines at 9-11 (citing Markovits-Raines Decl. ¶ 10, Ex. 3).  Plaintiffs focus on one 2001-2002 transaction, referred to as the "Radian Transaction," that Fannie Mae later admitted in its 2006 Restatement had violated GAAP. *See id.*  But plaintiffs do not identify any specific evidence that Raines was personally aware of this transaction, or any evidence that any employee ever had any improper purpose or intent to manipulate earnings with such transactions, from Raines or otherwise. *Cf.* Raines's Reply-SUMF ¶¶ 239-44 (citing testimony of Fannie Mae employees, including the Executive Vice President and Chief Credit Officer who believed this transaction was entered into because "it would be beneficial to Fannie Mae and its shareholders" rather than "to manipulate Fannie Mae's earnings").

[18]    Raines notes that plaintiffs' executive compensation expert "apparently withdrew voluntarily after receiving the expert reports submitted on behalf of Mr. Raines."  Mem. in Supp. of Franklin D. Raines's Mot. for Summ. J. at 5 [Dkt. #940-1] ("Raines Mem.").

Additionally, plaintiffs fail to offer sufficient evidence to conclude that Raines's statements that they specifically identify as misrepresentations are even false. Instead, plaintiffs merely carve up Raines's statements to fit their story. For instance, plaintiffs quote Raines as stating that "Fannie Mae had 'done none of those[, a]bsolutely none'" in response to a question about smoothing techniques and earnings management. *See* Pls.' Opp'n Raines at 13; *but see* Kudlow and Cramer Tr., July 24, 2003, Decl. of W.B. Markovits in Supp. of Lead. Pls.' Mem. in Opp'n to Defs.' Joint Mot. for Partial Summ. J. Based on FAS 133 Accounting Issues ("Markovits-FAS 133 Decl.") [Dkt. # 968-2], Ex. 28 (text from cited document reads: "We looked at each and every one of the things included in that report that Freddie Mac did, and we've done none of those. Absolutely none."). But plaintiffs' excerpt amazingly ignores the context of Raines's statement, which when viewed in its entirety paints a very different picture.[19]

Plaintiffs also point to a July 30, 2003 conference call with financial analysts and journalists, during which Raines was asked whether "Fannie Mae used any accounting practices, or any accounting driven transactions, that have either distorted your financial presentations or that might appear questionable if known to the public?" Pls.' Opp'n Raines at 13 (citing July 30, 2003 Transcript of "A Conversation with Franklin D. Raines," 12-13); *see also* Pls.' Supp'l Mem. Raines at 4-5, 10-11. Plaintiffs claim that

---

[19]   Plaintiffs eventually cited the entirety of this exchange in their supplemental memorandum. *See* Pls.' Supp'l Mem. Raines at 4, 9-10. By doing so, plaintiffs provide the necessary context—demonstrating that Raines's statement was *not* as broad as they claimed it to be. Plaintiffs' belated attempt to characterize the full citation as "at best a half truth" and employ a metaphor and a proverb to suggest that Raines must have been lying. *Id.* at 9-10. But metaphors and proverbs cannot demonstrate scienter. Plaintiffs fail to present the key evidence: evidence that Raines *knew* what he was saying was false.

Raines's response that Fannie Mae "[had] not undertaken any transactions to distort our true financial condition" was false because Raines was "aware of multiple instances in which senior management undertook transactions to move earnings into future reporting periods." Pls.' Opp'n Raines at 13. But following Freddie Mac's accounting issues, Fannie Mae's Controller's Department evaluated Fannie Mae's accounting at Raines's request and then reported to Raines and the company's audit committee that Fannie Mae did not have the same issues as Freddie Mac and that its accounting was GAAP compliant. Statement of Undisputed Material Facts in Supp. of Def. Franklin D. Raines's Mot. for Summ. J. ¶¶ 146-51 ("Raines SUMF") [Dkt. #940-2].[20] There is certainly no evidence here from which a reasonable juror could infer that Raines thought that Fannie Mae made "transactions to distort [their] true financial condition." Pls.' Opp'n Raines at 13.

Finally, plaintiffs also argue that Raines's October 6, 2004 testimony before Congress was misleading concerning a 1998-1999 transaction involving Fannie Mae's deferral of $199 million in expenses, which Raines approved. Pls.' Opp'n Raines at 16-18; *see also* Pls.' Supp'l Mem. Raines at 2-3. Specifically, Raines testified that "we have learned of no facts and no other materials that support the allegation that the decision about the amount to book was related to bonuses . . . ." Pls.' Opp'n Raines at 17 (citing Transcript of October 6, 2004 Raines Testimony Before Congress, Markovits-FAS 133

---

[20]     Even plaintiffs' FAS 133 expert acknowledged that Raines's public statements concerning Fannie Mae's accounting as compared to Freddie Mac's were "probably true." Dep. of John E. Barron, Decl. of Joseph M. Terry in Supp. of Def. Franklin D. Raines's Mot. for Summ. J. [Dkt. # 940-3] ("Terry Decl."), Ex. 186 at 613:4-614:5.

Decl., Ex. 13 at 75).  But plaintiffs do not cite to any evidence that Raines thought that

this statement was false.  *See* Pls.' Opp'n Raines at 16-17.  Instead, they assert that this

"testimony was false and misleading" and claim that Raines knew that Fannie Mae

"would not have reached its earnings target if the $199 million expense, which was the

subject of an audit difference, had been booked in 1998."  Pls.' Opp'n Raines at 17-18.

At bottom, plaintiffs make much ado about earnings management, but plaintiffs

present no evidence that Raines was ever aware that these transactions may have violated

GAAP or, more importantly, were being used for an improper purpose.[21]

## II.     Fannie Mae's FAS 133 and FAS 91 Accounting

Plaintiffs also claim that Raines misled investors as to Fannie Mae's FAS 133

hedge accounting policy and its FAS 91 accounting policy.  *See* Pls.' Opp'n Raines at 14-

18.  However, plaintiffs have not identified *any* evidence that Raines knew or, indeed,

had any reason to know, that Fannie Mae's accounting violated GAAP.  Further,

plaintiffs have not identified *any* evidence that Raines intentionally misled investors

through his statements concerning the implementation and operation of these accounting

policies.[22]

---

[21]     At oral argument, plaintiffs recognized that earnings management by itself was not
*per se* fraudulent and that only "abusive earnings management" could support fraud.  Tr.
of Mots. Hr'g at 13:4-9 (June 13, 2012).

[22]     *Cf. Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations of GAAP
violations or accounting irregularities, standing alone, are insufficient to state a securities
fraud claim.  Only where such allegations are coupled with evidence of corresponding
fraudulent intent might they be sufficient.") (internal citations and quotation marks
omitted).

With respect to FAS 133, plaintiffs claim that Raines misled investors because Fannie Mae had misapplied FAS 133 to improperly minimize earnings volatility. *Id.* at 14-16. Plaintiffs point to two statements Raines made in July of 2003. First, plaintiffs claim that Raines somehow misled investors by stating that Fannie Mae had "spent millions of dollars for new computer systems, hired new people, and when we implemented the [FAS 133] standard, we didn't try to defeat the effect of the volatility that it brought in by doing fancy trades, we simply reported that volatility." Pls.' Opp'n Raines at 14 (citing Kudlow and Cramer Tr., July 24, 2003, Markovits-Raines Decl., Ex. 26).[23] Second, plaintiffs cite as misleading Raines's statement that Fannie Mae made "no effort to try to smooth FAS 133 earnings, or to in any way distort what the actual impact of FAS 133 was on Fannie Mae." Pls.' Opp'n Raines at 15 (citing July 30, 2003 Transcript, Markovits-FAS 133 Decl., Ex. 40 at 9). Plaintiffs claim that Raines had recently been informed at a meeting with Jonathan Boyles, Fannie Mae's point person on FAS 133 accounting, that "management had designed and implemented the Company's FAS 133 policy in a way that would 'minimize earnings volatility.'" Pls.' Opp'n Raines at 14-15; *see also* Raines SUMF ¶ 6. But plaintiffs conflate Fannie Mae's goal of minimizing earnings volatility through derivative transactions with the company's implementation of FAS 133. The cited evidence does not show that Boyles informed Raines that Fannie Mae had used its FAS 133 accounting to smooth earnings. *See* Raines Reply SUMF and SAUMF ¶¶ 224-27. Instead, Boyles's sworn testimony reflects that

---

[23]    Plaintiffs also claim this is misleading because Fannie Mae was trying to "leverage off existing [computer] systems." Pls.' Opp'n Raines at 15. But Raines's statement is not even inconsistent with this goal, much less false.

any sort of earnings-minimization goal was connected to *which* derivative types Fannie

Mae purchased and not *how* it accounted for those derivatives under its accounting

policies. *See* Boyles Dep. 537:1-540:18; *see also* Raines Dep. 464:22-466:7 (discussing

minimizing earnings volatility as part of "hedging strategies"). Thus, if any reasonable

inference can be drawn from this evidence, it is that Raines himself was concerned with

Fannie Mae's hedging strategies from only a business perspective and "didn't seem to

care about [reducing volatility]." *See* Boyles Dep. 538:20-540:18; *see also* Raines Dep.

464:22-466:7.[24]

Similarly, plaintiffs fail to provide any evidence that Raines knew that Fannie

Mae's FAS 91 accounting violated GAAP. Plaintiffs claim that Raines's October 6, 2004

testimony before Congress was misleading with regard to FAS 91. Pls.' Opp'n Raines at

18. But the plaintiffs do not provide any evidence to dispute that Fannie Mae's internal

accounting professionals, executives, and outside auditors advised Raines, time and

again, that they had evaluated the FAS 91 policy and determined that it was GAAP

compliant. Raines SUMF ¶¶ 32-34, 36-37, 90, 142-43. Instead, plaintiffs rely on a 2002

memorandum from an accountant in Fannie Mae's Controller's Office that plaintiffs

---

[24]     Plaintiffs also rely on an internal KPMG e-mail between two of KPMG's lead
Fannie Mae auditors, in which one of the auditors stated "there are probably things that
they do that are not in strict compliance with GAAP and we need to make sure that Tim
[Howard] and Frank [Raines] understand those items and that there is a mechanism in
place that measures how material the departure from GAAP is." *See* Pls.' Opp'n Raines
at 15 (citing Markovits-Raines Decl., Ex. 29). However, not only do plaintiffs fail to
provide any evidence that either of these auditors ever informed Raines of these issues,
but the auditors also affirmatively acknowledged that KPMG repeatedly informed Raines
and Fannie Mae that their accounting *was* GAAP compliant in all material respects. *See*
Raines Reply SUMF and SAUMF ¶¶ 220-22 (citing testimony).

claim was sent to Raines.  Pls.' Opp'n Raines at 18 (citing September 23, 2002

Memorandum from Finance Division Manager, Markovits-Raines Decl., Ex. 20) (the

"2002 Barnes Memorandum").[25]  Plaintiffs, however, fail to offer *any* evidence that

Raines ever received this memo in 2002 and ignore the fact that when Raines finally

learned of Barnes's allegations in 2003, he initiated an investigation which concluded

that the allegations were without merit.  Raines SUMF ¶¶ 194-95.

In short, where a chief executive, like Raines, relies in good faith on the

professional judgment of the company's internal and external accounting and auditing

personnel, and the plaintiffs have not put forth any evidence that he was notified or

should have known that Fannie Mae's accounting policies violated GAAP, summary

judgment is warranted.  *See In re REMEC Inc. Sec. Litig.,* 702 F. Supp. 2d 1202, 1236-51

(S.D. Cal. 2010).[26]

---

[25]     This anonymous memorandum, later identified as drafted by Roger Barnes,
includes "Amortization of Purchase Discount/Premium and other deferrals" among a list
of "critical areas . . . where questionable decisions have been made" and states that these
concerns "possibly affect[] the integrity of the current financial statements."  2002 Barnes
Memorandum.  Plaintiffs claim that Raines's statement in his October 6, 2004 testimony
before Congress that "our accounting staff has repeatedly determined that our policies
and practices with regard to FAS 91 . . . are reasonable and in accord with GAAP" was
"clearly misleading in light of the information Roger Barnes sent Raines."  Pls.' Opp'n
Raines at 18 (citing Transcript of October 6, 2004 Testimony, Markovits-FAS 133 Decl.,
Ex. 13 at 75).  There is simply no reasonable inference to be drawn from this
memorandum, however, that Fannie Mae's accounting was not GAAP compliant or,
more specifically, that Fannie Mae's accounting staff had actually determined that their
FAS 91 accounting was unreasonable or a violation of GAAP.

[26]     Plaintiffs' claims against Raines concerning FAS 133 and FAS 91 are surprisingly
meager given that their overall case is largely dependent on the fact of Fannie Mae's
restatement of earnings to correct for accounting flaws identified by OFHEO and the
SEC in the company's implementation of these policies.  *See* Pls.' Mem. Fannie Mae at
13, 17 (noting FAS 133 restatement resulted in cumulative reduction in $12.9 billion pre-

### III.    Fannie Mae's Internal Controls and Corporate Governance Structure

Plaintiffs also claim that Raines misrepresented Fannie Mae's internal controls to investors. Pls.' Opp'n Raines at 19-21. Curiously, they do so without disputing the fact that numerous Fannie Mae officers evaluated the company's internal controls and certified to Raines that Fannie Mae's periodic reporting contained no material misstatements or omissions. *See* Raines Reply SUMF and SAUMF ¶¶ 60-90 (including plaintiffs' responses). Instead, plaintiffs contend that these individuals and groups did not properly carry out their tasks, *see* Raines Reply SUMF and SAUMF ¶ 61, relying on the "admissions" in Fannie Mae's Restatement and the conclusions of the Rudman Report as a synopsis of the evidence, *see* Pls.' Opp'n Raines at 20 nn.81 & 83 (citing Restatement and Rudman Report). Putting aside the serious issue as to the admissibility of these alleged "admissions," such evidence does not show that Raines intended to deceive investors by relying on the reports and certifications he received as the company's chief executive. *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007) (recognizing rule that there is no "fraud by hindsight").

Indeed, the only actual evidence the plaintiffs can muster of Raines's knowledge about internal-controls issues is an August 2003 letter to Raines from Fannie Mae's Chief

---

tax income), 20 (noting FAS 91 accounting restatement resulted in cumulative reduction of $1.1 billion pre-tax income). Indeed, plaintiffs do not focus their claims on any specific involvement by Raines in the development or implementation of these policies, *see, e.g.*, Raines Reply SUMF and SAUMF ¶¶ 6-25, preferring instead to rely on the amount of earnings restated to show evidence of scienter, *see* Pls.' Opp'n Raines at 30-31 (arguing "sheer scope and magnitude of the fraud" establish scienter).

Internal Auditor (the "Rajappa Letter")[27] and the 2002 Barnes Memorandum, Pls.' Opp'n

Raines at 18-19, and those fail to establish the point for which they are offered.  Instead,

plaintiffs mischaracterize the Rajappa Letter, no plausible reading of which could be that

Fannie Mae had "substantial internal control weaknesses." *See* August 19, 2003 Letter

from Rajappa to Raines, Markovits-Raines Decl. ¶ 38, Ex. 21 ("I have never seen or been

part of any discussion where anything was ever discussed that could be considered to be

'not kosher'. . . .  The above is certainly not to be critical of anyone, or to imply

somebody is doing something bad . . . .").  Moreover, it is undisputed that Raines

responded to this letter by *increasing* resources in the Controller's office.  Raines Reply

SUMF and SAUMF ¶ 249.  And as to the Barnes Memorandum, Raines rightly points out

that plaintiffs have not submitted any evidence that Raines actually received that

document.  *See* Reply Mem. in Supp. of Franklin D. Raines's Mot. for Summ. J. at 16

[Dkt. # 986] ("Raines Reply"); *see also* Pls.' Opp'n Raines at 18-19.  But even if he had,

in the final analysis neither of these documents shows that Raines had the necessary

scienter to defraud *when* he made his certifications to investors concerning the company's

---

[27]    Sam Rajappa, Fannie Mae's Internal Auditor, sent a letter to Raines in August of
2003 in which he offered "constructive" thoughts and criticisms about the company.
Letter to the Chairman, Markovits-Raines Decl., Ex. 21.  Rajappa indicated some
concerns about Fannie Mae and stated that "there's a *lot of stress*, in some areas,
especially in controllers, and portfolio management." *Id.* at 1.  Rajappa stated that he
sent this letter to Raines in part because "Raines had maintained an atmosphere where he
said if you guys have anything on your mind, let me know . . . and I just took this
opportunity to tell him what I thought about all aspects of the company . . . and there
were some stress levels around the company in this time frame . . . ." Dep. of Sampath
Rajappa, Choi Decl., Ex. 225 at 122:12-123:10.

internal controls. *See* Pls.' Opp'n Raines at 20 (citing March 15, 2004 Certification of Raines, Markovits-Raines Decl., Ex. 39).

To the contrary, any possible evidence of scienter is negated by the substantial evidence that Raines acted in good faith. Indeed, plaintiffs do not even attempt to dispute the fact that Fannie Mae's executives repeatedly reassured Raines before his certifications that everything was in order at Fannie Mae. *See* Raines Reply SUMF and SAUMF ¶¶ 82-87. In fact, no such concern was ever even mentioned at the company's disclosure meetings, held before releasing the company's financial reports, with numerous Fannie Mae executives and outside auditors, including Rajappa himself. *See id.*

Further, there is no basis for plaintiffs to contend that Raines was reckless in relying on this reporting and certification process. *See* Pls.' Opp'n Raines at 21-25. Plaintiffs purport to reference four examples of corporate government deficiencies that precluded Raines from reasonably relying on Fannie Mae's internal structure because of his knowledge of those deficiencies. *Id.* (claiming Raines was aware of the following deficiencies: (1) inadequate staffing of accounting and financial reporting departments, (2) deficient critical risk oversight function, (3) inadequate financial accounting systems' information technology applications and infrastructure, and (4) defective disclosure and certification process). However, plaintiffs do not offer any expert testimony on the standard of professional conduct related to Fannie Mae's corporate governance structure. *See id.*; *see also SEC v. Guenthner*, 395 F. Supp. 2d 835, 847 (D. Neb. 2005) (noting need for expert testimony to determine whether "defendants' actions as professional and

certified accountants in preparing [company's] financial reports complied with GAAP"

because it involved "technical, and specialized knowledge.").[28]  In short, plaintiffs have

provided no admissible evidence to support a reasonable inference that Raines was aware

of, or consciously disregarded, information presenting a danger of misleading investors.

*See Dolphin & Bradbury*, 512 F.3d at 639.

At best, plaintiffs offer after-the-fact admissions by Fannie Mae about its internal

controls, *see, e.g.*, Pls.' Opp'n Raines at 24 (citing Fannie Mae's Earnings Restatement),

and an after-the-fact conclusion about Fannie Mae's certification process by Senator

Rudman in his testimony before Congress, *see id.* (citing Rudman Testimony).  In no way

were these documents admissions or findings of scienter, much less specifically for

Raines, and, standing alone, they do not provide any evidence of Raines's scienter at the

time he allegedly made misrepresentations.  In addition, the communications from Barnes

and Rajappa, when examined in the light most favorable to plaintiffs, simply do not

support an inference of Raines's scienter.  Pls.' Opp'n Raines at 19-20.

Finally, plaintiffs mischaracterize the deposition testimony of defendants' experts

as "admissions" of corporate governance deficiencies.  *See, e.g.*, Pls.' Opp'n Raines at

21-22 (characterizing Professor Gilson's answers to plaintiffs' counsel's hypotheticals as

admissions), 24 (claiming Professor Haft's deposition testimony); *see also* Def. Franklin

---

[28]     Indeed, plaintiffs previously designated Harvey Pitt, a former SEC Chairman, as
an expert for the standard of care for corporate governance. Mem. and Order, Mar. 8,
2011, at 1 [Dkt. # 899]. However, when Pitt realized that plaintiffs had not provided him
with all the information necessary for him to prepare for his deposition, he refused to
continue his deposition, and this Court had no choice but to strike his expert report. *Id.* at
3-4.

D. Raines's Responses to Lead Pls.' Statement of Genuine Issues of Material Fact Precluding Summ. J. ¶ 96 [Dkt. # 979] ("Raines Reply Pls.' SGIMF") (citing Haft's testimony that plaintiffs' references to his corporate disclosure treatise "were not the prevailing customs and practices and standards in the field during Raines's tenure"). Enough!  To say the least, plaintiffs would have a difficult time supporting a negligence claim on such evidence, much less a theory of extreme recklessness.

## IV.    Motive and Opportunity

Plaintiffs also have failed to establish Raines's scienter through a motive and opportunity theory.  Notably, Raines *increased* his stock holdings during the class period and did not sell any of his shares of Fannie Mae stock or exercise his stock options. Raines SUMF ¶¶ 213-14, 216.  To say the least, such actions are inconsistent with a fraudulent intent. *See In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003) ("The net acquisition of shares cuts against the notion that defendants sought to unload their holdings of KeySpan stock before their likely diminution in value following the disclosure of negative insider information.").  Plaintiffs nevertheless argue that "a jury could reasonably conclude that a corporate officer complicit in such earnings management would not unload company stock, so long as its inflated price held steady." Pls.' Opp'n Raines at 27.  This argument is, at best, specious; as previously discussed, plaintiffs have not advanced any evidence that Raines was "complicit" in any illicit earnings management.  Moreover, to find evidence of scienter in a corporate executive's goals of maintaining a high stock price, increasing earnings, and maximizing compensation, without personally benefiting from fraud, would effectively eviscerate the

scienter requirement. *See Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (noting that scienter requires more than "motives possessed by virtually all corporate insiders" such as maintaining credit rating, sustaining profitability, and maintaining stock price to increase executive compensation).

Apparently recognizing this flaw, plaintiffs now claim that Raines created an earnings-based compensation structure that incentivized fraud and earned him millions of dollars in bonuses. Pls.' Opp'n Raines at 25-26. What plaintiffs fail to mention, however, is that Fannie Mae's board of directors developed its executive compensation plan, including the earnings-per-share metric, *before* Raines became CEO. Raines Reply SUMF and SAUMF ¶¶ 252-54.[29] Thus, even if Raines had single-handedly masterminded this compensation plan, plaintiffs point to no evidence that Raines knowingly violated any securities laws in compensating himself or others.

## V.   Reports and Findings of Regulators and Outside Counsel

Throughout their opposition brief, plaintiffs lean heavily on the post-hoc reports and litigation documents, which were uniformly prepared after the relevant events in this case, and some of which were explicitly prepared in preparation for litigation, as "evidence" of Raines's scienter. *See, e.g.*, Pls.' Opp'n Raines at 9, 12, 29 (citing OFHEO Final Report), *id.* at 11, 14, 20, 21, 28, 30 (citing Fannie Mae's Restatement), *id.* at 14, 17 (citing OFHEO Interim Report), *id.* at 10, 12, 17, 18, 20 (citing Rudman Report), *id.* at 17, 29 (citing SEC's complaint against Fannie Mae), *id.* at 29-30 (citing OFHEO's Notice

---

[29]    Fannie Mae's Congressionally-drafted charter also dictates a significant portion of executive compensation is to be based on corporate performance. *See* Fannie Mae Charter Act, Choi Decl., Ex. 227 at 27.

of Charges against Raines).  Putting aside the obvious and substantial admissibility

questions concerning these documents,[30] plaintiffs face a much larger challenge in relying

on these documents: they do *not* contain any evidence of Raines's scienter.  *See* Pls.'

Opp'n Raines at 30 (referencing Fannie Mae's Restatement, the Rudman Report, and

OFHEO's Notice of Charges against Raines and stating that a "jury could reasonably

count this as further evidence of Raines's scienter.").  With the exception of the

administrative charges, these documents uniformly reached no conclusions as to Raines's

state of mind, and, in many cases, referred only indefinitely to "[s]enior management" or

"senior executives."  *See, e.g.*, Pls.' Opp'n Raines at 29 (citing OFHEO Final Report).

Here, the key inquiry as to scienter is whether Raines knew, or consciously disregarded,

the potential falseness of his statements.  The after-the-fact and non-specific conclusions

of regulators and investigators fail to shed *any* light on this inquiry.[31]

    In addition, plaintiffs' sweeping claim that "both of Fannie Mae's regulators

charged Raines with intentional and reckless misconduct" is, at best, disingenuous.  Pls.'

Opp'n Raines at 28-30.  First, as Raines correctly notes, the SEC filed charges *only*

---

[30]     The conclusions and opinions in these documents are clearly hearsay.  Plaintiffs
contend that the OFHEO reports are admissible under Fed. R. Evid. 803(8) as public
records.  Pls.' Opp'n Spencer at 5 n. 16; Pls.' Opp'n Howard at 5 n.7.  But the OFHEO
reports were part of an effort to prepare administrative charges against the individual
defendants and raise substantial questions of trustworthiness.  *See* Fed. R. Civ. P. 803(8).
The Rudman Report certainly does not fall within the 803(8) exception, which is limited
to records or statements "of a public office."  *Id.*  Moreover, the prejudicial effect of these
documents substantially outweighs their probative value—these documents, after all,
were undoubtedly fashioned with multiple considerations in mind.

[31]     In addition, the Rudman Report expressly stated that "we did not find that [Raines]
knew the Company's accounting departed from GAAP in significant ways." Executive
Summary, Rudman Report, Terry Decl., Ex. 190 at 5.

against Fannie Mae, not Raines. Raines's Reply 21. Second, plaintiffs neither did, nor could, explain how OFHEO's charges against Raines, which were settled with a *denial* of liability, can be considered evidence of scienter. Such advocacy is—to say the least— disappointing!

## VI.     Magnitude of the Fraud

Finally, plaintiffs attempt to shore up their case against Raines by pointing to the "sheer scope and magnitude of the fraud on Raines's watch." Pls.' Opp'n Raines at 30-31. But as they say down in Louisiana: you can't sandbag a levee with a gaping hole!  At the motion-to-dismiss stage, I warned plaintiffs' counsel that a fraud's magnitude *alone* was insufficient to establish an inference of scienter. *See In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d 25, 41-42 (D.D.C. 2007). That principle is stronger now at the summary-judgment stage, and the time for simply presenting allegations that give rise to a strong inference of scienter has long since passed. Without any actual evidence supporting a conclusion of Raines's scienter, the magnitude of Fannie Mae's earnings restatement alone is insufficient to preclude summary judgment.[32]

---

[?]     Even plaintiffs recognize this deficiency. *See* Pls.' Opp'n at 31 n.131("Plaintiffs e not suggesting that the magnitude of the fraud alone is sufficient to establish scienter . .").
Moreover, Plaintiffs do not dispute that the factor responsible for the largest ount of Fannie Mae's earnings restatement was its FAS 133 policy. *See* Lead Pls.' n. of P & A in Opp'n to Defs.' Mot. FAS 133 at 30-31 [Dkt. # 968]. Because that ge in Fannie Mae's hedge accounting so significantly affected Fannie Mae's ted earnings, this case is simply distinct from cases involving fake transactions, n liabilities, or the distortion of the economics of a business. *See* Defs.' Reply FAS 133 ¶ 76 (discussing disclosure of FAS 133 accounting to public and ts' ability to calculate earnings impact).

## CONCLUSION

Sustaining claims for securities fraud requires a showing of scienter—either an intent to deceive or an extreme departure from the standard of ordinary care—for each individual or entity claimed to have committed such fraud. Put simply, the securities fraud laws are not a means for shareholders to recover for all losses, no matter how sizable or sudden. Upon review of all plaintiffs' evidence, this Court concludes that plaintiffs have failed to put forth sufficient evidence from which a reasonable jury could find that Raines had such an intent. A failure to understand, or even negligent behavior, is not the equivalent of the necessary intent to deceive or conscious disregard of obvious risks. Therefore, Raines is entitled to summary judgment on all claims against him.[33]

For all of the foregoing reasons, the Court GRANTS defendant Franklin D. Raines's Motion for Summary Judgment. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[33] Because I conclude that there is no evidence that Raines "culpably participated" in any underlying securities law violation, Raines is also entitled to summary judgment on plaintiffs' claims against him under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *See In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d 25, 42–47 (D.D.C. 2007) (dismissing Section 20(a) claim due to plaintiffs' failure to plead culpable conduct as to defendants); *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000) ("To make out a prima facie case under § 20(a) . . . a plaintiff must show . . . that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." (citation and internal quotation marks omitted)). As discussed above, plaintiffs have not put forth any admissible evidence that Raines acted without good faith or induced any securities fraud.