# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation** | **MDL No. 1668** |
| **In re Fannie Mae Securities Litigation** | **Consolidated Civil Action No.  04-1639 (RJL)** |

## MEMORANDUM OPINION
(October 16, 2012) [#938]

This is a class action securities fraud suit against Federal National Mortgage

Association ("Fannie Mae"), its former accountant, KPMG, LLP, and three of Fannie

Mae's former senior executives (collectively, "defendants"), brought by a class of parties

represented by lead plaintiffs Ohio Public Employees Retirement System ("OPERS") and

State Teachers Retirement System of Ohio ("STRS") (collectively, "plaintiffs").  The

parties filed eight separate summary judgment motions in this case.[1]  On September 20,

---

[1]      Plaintiffs filed two summary judgment motions: one against Fannie Mae, Lead Plaintiffs' Motion for Partial Summary Judgment on Count I Against Defendant Federal National Mortgage Association [Dkt. # 916] ("Pls.' Mot. Fannie Mae"), and another against KPMG, Lead Plaintiffs' Motion for Partial Summary Judgment on Count III Against Defendant KPMG LLP [Dkt. # 936] ("Pls.' Mot. KPMG").

In turn, the defendants filed six separate summary judgment motions.  Of those, all of the defendants joined in filing two of the motions, which focus, respectively, on the loss causation element of the securities fraud claims and on plaintiffs' claims related to Statements of Financial Accounting Standards ("FAS") 133.  Defs.' Joint Mot. for Summ. J. for Failure to Prove Loss Causation [Dkt. # 939] ("Defs.' Mot. Loss Causation"); Defs.' Joint Mot. for Partial Summ. J. Based on FAS 133 Accounting Issues [Dkt. # 941] ("Defs.' Mot. FAS 133").  Finally, the individual defendants and KPMG have each separately moved for summary judgment.  KPMG LLP's Mot. for Summ. J. [Dkt. # 937] ("KPMG's Mot."); Def. J. Timothy Howard's Mot. for Summ. J. [Dkt. #

the Court granted defendant Franklin D. Raines's Motion for Summary Judgment.  Mem.

Op., Sept. 20, 2012 [Dkt. # 1053]; Order, Sept. 20, 2012 [Dkt. # 1054].  This opinion

addresses defendant J. Timothy Howard's Motion for Summary Judgment.[2]  I will

address defendant Leanne G. Spencer's motion forthwith, and the defendants' joint

motions, KPMG's motion, and the plaintiffs' motions thereafter.  Upon consideration of

the pleadings, oral argument, and the entire record herein, defendant Howard's Motion

for Summary Judgment is GRANTED.

## BACKGROUND[3]

### I.      Factual Background

Fannie Mae, along with its cousin Freddie Mac, operates in the secondary

mortgage market as a federally-chartered government-sponsored enterprise, buying home

mortgages from banks and issuing debt and mortgage-backed securities.  Formerly a

private shareholder-owned company, Fannie Mae has been in a conservatorship under the

Federal Housing Finance Agency ("FHFA") since September 6, 2008.  However, during

---

938] ("Howard's Mot."); Def. Franklin D. Raines's Mot. for Summ. J. [Dkt. # 940]
("Raines's Mot."); Def. Leanne G. Spencer's Mot. for Summ. J. [Dkt. # 942] ("Spencer's
Mot.").

[2]      The other defendants in this case are Fannie Mae, Franklin D. Raines, Leanne
Spencer, and KPMG.  Raines was Fannie Mae's Chairman of the Board and Chief
Executive Officer from January 1999 until December 2004, and Spencer was Vice
President and Controller of Fannie Mae during the class period.  Def. Fannie Mae's
Statement of Genuine Issues of Material Fact ¶¶ 4, 8 [Dkt. # 973-1] ("Fannie Mae's
SGIMF").  For approximately 35 years prior to December 2004, KPMG served as Fannie
Mae's outside auditor.  *Id.* ¶ 11.

[3]      For additional background information concerning this litigation, see the Court's
Memorandum Opinions in *In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d 25, 29-30
(D.D.C. 2007), and *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32, 34-36 (D.D.C. 2008).

this litigation's class period, beginning April 17, 2001 and ending December 22, 2004,

Fannie Mae's stock was traded on the New York Stock Exchange, and it was regulated

by the Office of Federal Housing Enterprise Oversight ("OFHEO").[4]  OFHEO's

oversight responsibilities generally involved ensuring that Fannie Mae had adequate

capital, a sound corporate structure, and financial stability.  This, of course, was no small

task: Fannie Mae was, and still is, one of the largest financial institutions in the country

and had a balance sheet of mortgage loans and mortgage-backed securities worth

hundreds of billions of dollars.  Defs.' Reply Regarding their Statements of Undisputed

Material Fact in Supp. of Their Joint Mot. for Partial Summ. J. Based on FAS 133

Accounting Issues ¶ 1 [Dkt. # 1024-4] ("Defs.' Reply SUMF FAS 133").  During the

class period, Howard served as Fannie Mae's Chief Financial Officer and Vice Chairman.

Def. J. Timothy Howard's Reply to Pls.' Statement of Genuine Issues of Material Fact ¶

1 [Dkt. # 995-1] ("Howard's Reply to Pls.' SGIMF").

The narrative of plaintiffs' securities fraud claims against Howard, not

surprisingly, flows directly from an OFHEO investigation of Fannie Mae.  In June 2003,

following the disclosure of certain accounting issues at Freddie Mac, OFHEO began

examining Fannie Mae's accounting policies and internal controls.  On September 22,

2004, Fannie Mae released a public statement, indicating that OFHEO had delivered the

findings of that investigation to Fannie Mae's board of directors.  Fannie Mae's SGIMF ¶

---

[4]     Amidst the financial crisis of 2008, Congress established FHFA to replace
OFHEO as Fannie Mae and Freddie Mac's independent regulator, and granted FHFA
additional powers over those held by OFHEO, including the ability to place the mortgage
giants in conservatorship or receivership under FHFA's control.  Housing and Economic
Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654.

13; Fannie Mae Form 8-K (Sept. 22, 2004), Decl. of W.B. Markovits in Supp. of Lead

Pls.' Mot. for Partial Summ. J. on Count I Against Def. Fannie Mae [Dkt. #920]

("Markovits-Fannie Mae Decl."), Ex. 5 [Dkt. # 920-6].[5]  The statement also noted that

the Securities and Exchange Commission ("SEC") also had begun an inquiry and that

Fannie Mae's board had retained former Senator Warren B. Rudman ("Senator Rudman")

and his law firm, Paul, Weiss, Rifkind, Wharton & Garrison LLP, to conduct an

independent investigation of what happened.  Fannie Mae's SGIMF ¶ 13.  Later that day,

OFHEO publicly released its interim report entitled "Report of Findings to Date, Special

Examination Fannie Mae" (the "OFHEO Interim Report").  *Id.* ¶ 14; *see also* OFHEO

Interim Report, Decl. of Adam B. Miller in Supp. of Def. Leanne G. Spencer's Mot. for

Summ. J., [Dkt. # 942-3] ("Miller Decl."), Ex. 148.  According to the Interim Report,

Fannie Mae had misapplied certain Generally Accepted Accounting Principles

("GAAP"), specifically two key standards known as FAS 91 and FAS 133, which relate

to the company's amortization of price changes on securities and loans and to its use of

hedge accounting.  Miller Decl., Ex. 148 at *i – vii*.[6]  OFHEO also raised concerns over the

---

[5]      According to the public statement, OFHEO summarized its findings to the Board
by stating that "Fannie Mae (1) applied accounting methods and practices that do not
comply with GAAP in accounting for the enterprise's derivatives transactions and
hedging activities, (2) employed an improper 'cookie jar' reserve in accounting for
amortization of deferred price adjustments under GAAP, (3) tolerated related internal
control deficiencies, (4) in at least one instance deferred expenses apparently to achieve
bonus compensation targets, and (5) maintained a corporate culture that emphasized
stable earnings at the expense of accurate financial disclosures."  Fannie Mae Form 8-K
(Sept. 22, 2004), Markovits-Fannie Mae Decl., Ex. 5 at 7.

[6]      Generally Accepted Accounting Principles are defined by the Financial
Accounting Standards Board, a private organization designated for this task by the SEC

company's internal controls and audit reviews.  Fannie Mae's SGIMF ¶ 15.

Apparently surprised by these findings, Fannie Mae requested that the SEC's

Office of the Chief Accountant review the company's accounting with respect to FAS 91

and FAS 133.  *Id.* ¶ 24.  Several months later, on December 15, 2004, the SEC's Chief

Accountant, Donald Nicolaisen, issued a press release, stating that the SEC's accounting

staff had determined that Fannie Mae's accounting did *not* comply in material respects

with FAS 91 and FAS 133, and that he had advised the company to restate its financial

statements after eliminating the use of hedge accounting and reevaluating its amortization

of premiums and discounts.  *Id.* ¶ 22 (quoting Markovits-Fannie Mae Decl., Ex. 16 [Dkt.

# 922-8]).  Shortly thereafter, on December 21, 2004, Howard resigned from his positions

as CFO and Vice Chairman of the Board of Directors.  Fannie Mae's SGIMF ¶ 26.  The

next day, in a Form 8-K, Fannie Mae declared its intention to restate its 2001 to mid-2004

financial results to comply with the SEC's Office of Chief Accountant's

recommendations concerning its FAS 91 and FAS 133 accounting.  Fannie Mae Form 8-

K (Dec. 22, 2004), Markovits-Fannie Mae Decl., Ex. 18 [Dkt. # 922-10].  On December

---

and the private sector. Defs.' Reply SUMF FAS 133 ¶ 13. FAS 91 and FAS 133 are two
of the many GAAP standards defined by this organization.
    Briefly, FAS 91, or "Accounting for Nonrefundable Fees and Costs Associated
with Originating or Acquiring Loans and Initial Direct Costs of Leases," instructs
companies on how to account for premiums and discounts on securities and loans—in
Fannie Mae's case, mortgages. Pls.' Responses to Fannie Mae's Statements of
Additional Material Facts [Dkt. # 990-1] ("Pls. Responses to Fannie Mae's SAUMF") ¶¶
24, 30 (Ex. 30, FAS 91, ¶¶ 4, 15, 18). And, FAS 133, or "Accounting for Derivative
Instruments and Hedging Activities," addresses a company's hedge accounting, or its
recording of the value of derivative transactions in its earnings. *See* OFHEO Interim
Report at *iv.* Fannie Mae used derivatives transactions, particularly interest-rate swaps,
to hedge (protect) against interest rate changes in its issued debt and the mortgage loans it
owned. *See* Defs.' Reply SUMF FAS 133 ¶¶ 1-12.

30, 2004, Howard resigned entirely from Fannie Mae's board of directors. Fannie Mae's SGIMF ¶ 7.

Over a year later, on February 23, 2006, Fannie Mae released the report of Senator Rudman and his team at Paul Weiss, "A Report to the Special Review Committee of the Board of Directors of Fannie Mae" (the "Rudman Report"), which reached similar findings as the OFHEO Interim Report.[7] *Id.* ¶¶ 31-32. OFHEO released its final report on May 23, 2006. Report of the Special Examination of Fannie Mae, May 2006, Decl. of W.B. Markovits in Supp. of Lead Pls.' Mems. of P. & A. in Opp'n to Def. J. Timothy Howard's and Def. Leanne G. Spencer's Mots. for Summ. J. [Dkt. # 969-2] ("Markovits-Howard/Spencer Decl."), Ex. 12 ("OFHEO Final Report").[8] Based on its findings, OFHEO brought administrative charges against Raines, Howard, and Spencer, alleging that they "knowingly and/or recklessly engaged in misconduct and safety and soundness violations that caused substantial and/or material harm and loss to [Fannie Mae]." December 18, 2006 OFHEO News Release, Decl. of W.B. Markovits in Supp. of Pls.' Mem. in Opp'n to Franklin D. Raines's Mot. for Summ. J. [Dkt. # 967-2] ("Markovits-

---

[7]     Curiously, the defendants refer to the Rudman Report as the Paul Weiss Report. *See, e.g.*, Supplemental Mem. in Supp. of Def. J. Timothy Howard's Mot. for Summ. J. at 12 [Dkt. # 1045] ("Howard's Supp'l Mem."). Go figure!

[8]     The SEC also filed a civil complaint against Fannie Mae on that date, alleging that Fannie Mae violated Section 10(b) of the Exchange Act and SEC Rule 10b-5. Compl., *SEC v. Fannie Mae*, No. 1:06-cv-00959 (D.D.C. May 23, 2006). OFHEO filed a similar enforcement action. That day, Fannie Mae agreed to settle those cases and pay a $400 million civil penalty. Fannie Mae Form 8-K (May 30, 2006), Markovits-Fannie Mae Decl., Ex. 25 [Dkt. # 924-3].

Raines Decl."), Ex. 34 at 2; *see also* OFHEO's Notice of Charges, Notice No. 2006-1, Markovits-Raines Decl., Ex. 34.[9]

Finally, on December 6, 2006, Fannie Mae filed with the SEC its Restatement of its prior financial results in a Form 10-K (the "Restatement"). Fannie Mae's SGIMF ¶ 65. The Restatement resulted in a "total reduction in retained earnings of $6.3 billion through June 30, 2004." Restatement at 2; *see also* Fannie Mae's SGIMF ¶ 68.

## II.   This Litigation

After OFHEO issued its Interim Report in September 2004, several Fannie Mae shareholders filed class action suits alleging that the company and its executives had violated the federal securities laws and committed securities fraud. Compl. [Dkt. #1]. The first of these actions was filed on September 24, 2004. *Id.* After the other separately-filed cases were eventually consolidated into this multi-district litigation action, I appointed OPERS and STRS as lead plaintiffs on January 13, 2005. Mem. Op. and Order, Jan. 13, 2005 [Dkt. # 52].[10]   In January 2008, this Court certified a class

---

[9]      OFHEO alleged the individuals committed violations including "[i]nappropriate earnings management and manipulation; [d]eliberately misleading financial reporting and disclosures; [f]ailure to establish a sound internal controls process . . . ; [m]isleading and deficient reporting from the important Internal Audit function; and [p]ermitting known deficient systems to continue to operate while recognizing that such systems facilitated the ongoing manipulations sought by the individuals charged." December 18, 2006 OFHEO News Release, Markovits-Raines Decl., Ex. 34 at 2. Howard, Raines, and Spencer later settled these charges in April of 2008. April 18, 2008 OFHEO News Release, Markovits-Raines Decl., Ex. 58.

[10]      On March 4, 2005, plaintiffs filed a Consolidated Class Action Complaint for Violations of Federal Securities Laws [Dkt. # 64] on behalf of purchasers of Fannie Mae common stock during the period from April 17, 2001, through September 21, 2004. On August 14, 2006, plaintiffs filed a Second Amended Consolidated Class Action *Complaint for Violations of Federal Securities Laws* [Dkt. # 204] ("SAC").

generally composed of approximately one million investors in Fannie Mae stock during

the class period. Order, Jan. 7, 2008 [Dkt. # 572]; Mem. Op., Jan. 7, 2008 [Dkt. # 571].

Thereafter, the parties engaged in an extensive discovery period until May 26, 2011. The

volume of information exchanged in discovery was enormous; together, the parties

produced nearly 67 million pages of documents, deposed 123 fact witnesses, and engaged

35 expert witnesses. *See* Pls.' Mem. in Supp. of Pls.' Mot. Fannie Mae at 4-5 [Dkt. #

918] (Pls.' Mem. Fannie Mae"). Unfortunately, however, the discovery process was

unnecessarily prolonged by OFHEO's repeated and inappropriate assertion of privileges

that had to be litigated up to the Court of Appeals. *See* Order, Jan. 22, 2008 [Dkt. # 580],

*aff'd*, 552 F.3d 814 (D.C. Cir. 2009).

In the end, plaintiffs allege that Fannie Mae and the individual defendants violated

§ 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17

C.F.R. § 240.10b-5 (2011), by intentionally manipulating earnings and violating GAAP,

causing losses to investors.[11] As to Howard specifically, plaintiffs contend that he

knowingly made false statements about the soundness of Fannie Mae's accounting, risk

management, and internal controls. Lead Pls.' Mem. of P. & A. in Opp'n to Def. J.

Timothy Howard's Mot. for Summ. J. at 1 [Dkt. # 969] ("Pls.' Opp'n Howard").

Plaintiffs also contend that Howard misled investors about his participation in earnings

management strategies designed to meet quarterly earnings-per-share targets to maximize

bonuses, in violation of GAAP and various accounting standards. *Id.*

---

[11]    Plaintiffs also claim that the individual defendants violated § 20(a) of the
Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (2006).

On August 22, 2011, Howard moved for summary judgment on all claims against him, arguing that plaintiffs have failed to prove that he acted with the necessary scienter under the securities laws.  Mem. in Supp. of Def. J. Timothy Howard's Mot. for Summ. J. at 1 [Dkt. # 938-1] ("Howard's Mem.").[12]  On June 5-7 and June 13, 2012, I heard oral argument on the pending summary judgment motions, including Howard's motion.[13] Because I agree with the defendant that plaintiffs have failed to put forth sufficient evidence of scienter, Howard is entitled to summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate when the movant demonstrates that no genuine issue of material fact is in dispute and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the burden, and the court will draw "all justifiable inferences" in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986).  Nevertheless, the non-moving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 248 (internal quotation marks and citation omitted).  "Thus, if the evidence presented by the opposing party is 'merely colorable' or 'not significantly probative,' summary judgment may be granted."  *Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (quoting *Anderson*, 477

---

[12]     Howard also joined the defendants' motion for summary judgment based on loss causation, Defs.' Mot. Loss Causation, and the defendants' motion for partial summary judgment with regard to claims arising from FAS 133 accounting issues, Defs.' Mot. FAS 133.  This opinion addresses only Howard's scienter arguments.

[13]     This Court heard oral argument specifically on Howard's motion on June 13, 2012.  Tr. of Mots. Hr'g, June 13, 2012 [Dkt. # 1050] ("Tr.").

U.S. at 249-50); *see also Montgomery v. Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008) ("The possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment."). Factual assertions in the moving party's affidavits may be accepted as true unless the opposing party submits its own affidavits, declarations, or documentary evidence to the contrary. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

## DISCUSSION

The elements of a securities fraud claim and the requirements of a summary judgment motion remain constant, regardless of the enormity and novelty of the facts in question. Securities fraud claims under Section 10(b) and Rule 10b-5 require proof of the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Howard's summary judgment motion, however, focuses on only one of these elements: scienter. To establish scienter in a securities fraud case, a plaintiff must prove that the defendant acted "with an intent to deceive—not merely innocently or negligently." *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1796 (2010). Thus, plaintiffs must put forth proof of intentional wrongdoing or extreme recklessness. *Liberty Prop. Trust v. Republic Props. Corp.*, 577 F.3d 335, 342 (D.C. Cir. 2009). Our Circuit has defined extreme recklessness as an "extreme departure from the standards of ordinary care, . . . which presents *a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.*" *Dolphin &*

*Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008) (internal citations and quotation marks omitted). For extreme recklessness, the danger of deception must be such that the "actor was aware of it and consciously disregarded it." *Id.*

Unfortunately, for plaintiffs, they have not established a genuine issue of material fact as to Howard's alleged scienter. There is no direct evidence that Howard intended to deceive Fannie Mae's investors. Indeed, plaintiffs conceded this very point at oral argument. Tr. at 62:4-14. And while proof of scienter may sometimes be inferred from circumstantial evidence, *see In re Baan*, 103 F. Supp. 2d 1, 20 (D.D.C. 2000), this is not the case here. In essence, plaintiffs, as they did with Raines, have stitched together a patchwork quilt of evidence that they allege presents a disputed issue of material fact as to Howard's scienter. I disagree. Plaintiffs' cited evidence simply does not rise to an inference of scienter. Although scienter is generally a question of fact for a jury, *see, e.g.*, *SEC v. Pace*, 173 F. Supp. 2d 30, 33 (D.D.C. 2001) ("In the ordinary securities fraud case, scienter is a genuine issue of material fact."); *see also Wechsler v. Steinberg*, 733 F.2d 1054, 1058-59 (2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for disposition on summary judgment."), summary judgment is appropriate if plaintiffs present no concrete evidence of scienter, *see Anderson*, 477 U.S. at 256-57 (recognizing that resolving defendant's "state of mind" may be appropriate on summary judgment and that plaintiff may not defeat "a defendant's properly supported motion for summary judgment . . . without offering any concrete evidence from which a reasonable juror could return a verdict in his favor"); *see also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407,

1425 (9th Cir. 1994) (finding defendants had "conclusively rebutted" plaintiffs'

"speculative inferences" of fraud).

Plaintiffs' theories on Howard's scienter are insufficient to withstand his summary

judgment motion, particularly in light of the overwhelming evidence of Howard's good

faith.  No witnesses testified that Howard knew that Fannie Mae's financial statements

were materially inaccurate or not GAAP compliant.  Further, no witnesses testified that

Howard sought to misrepresent Fannie Mae's earnings or mislead investors.  Throughout

the class period, Howard relied on internal and external accounting experts to ensure that

the company's financial statements complied with GAAP, and these experts universally

assured Howard that Fannie Mae's financial statements were accurate in all material

respects.[14]  *See* Howard's Reply to Pls.' SGIMF ¶ 26; Lead Pls.' Supp'l Mem. of P. & A.

in Supp. of Lead Pls.' Mem. in Opp'n to Def. J. Timothy Howard's Mot. for Summ. J. at

14 [Dkt. # 1042] ("Pls.' Supp'l Mem. Howard"); Tr. at 48-51; Howard's Mem. at 10-15.

---

[14]   Plaintiffs contend that Howard's reliance on KPMG, Spencer, and Spencer's
subordinates was not reasonable, credible, or in good faith because he knew that Spencer
and her subordinates were intentionally hiding information from KPMG. Pls.' Opp'n
Howard at 34; *see also* Lead Pls.' Statement of Genuine Issues of Material Fact
Precluding Summ. J. for Def. J. Timothy Howard ¶¶ 66-70 [Dkt. # 969-1] ("Pls.' SGIMF
Howard"). In support, plaintiffs rely upon only one class-period document: an email
from Spencer to Howard observing that KPMG was not aware that Fannie Mae and
Freddie Mac employed different accounting methods. Email from Spencer to Howard re:
"KPMG and Freddie," January 28, 2002, Markovits-Howard/Spencer Decl., Ex. 23. This
email says absolutely nothing about intentionally "hiding . . . IO/PO GAAP violations
from KPMG," as plaintiffs misleadingly suggest. Pls.' SGIMF Howard ¶ 67. Plaintiffs
also cite two documents predating the class period, which plaintiffs again
mischaracterize. *See* Reply Mem. in Supp. of Def. J. Timothy Howard's Mot. for Summ.
J. at 17-18 [Dkt. # 995] ("Howard's Reply"). These documents are certainly not
evidence that Howard knew that anyone at Fannie Mae was concealing accounting
violations from KPMG.

And Howard himself testified that he believed that Fannie Mae was in compliance with GAAP and had accurate financial statements. *See* Howard's Mem. at 18-19. Of course, such evidence of good faith is generally insufficient to grant summary judgment, especially if a plaintiff identifies admissible evidence supporting a reasonable inference of scienter. But where, as here, that is not the case, such substantial evidence of good faith negates any possible inference of scienter.

Moreover, the parties' dispute as to whether Howard possessed the requisite education, experience, and accounting acumen to personally understand the nuances of Fannie Mae's accounting policies does not reveal any evidence of scienter. Howard's Mem. at 2-4; Pls.' Opp'n Howard at 6-10. The Court has no doubt that, as plaintiffs state, Howard "gained an in-depth understanding of Fannie Mae's accounting policies and the accounting standards applicable to the company during his 22-year tenure there." Pls. Opp'n Howard at 7. Nor does the Court doubt that Howard was deeply involved in developing Fannie Mae's accounting policies. *See* Pls.' Opp'n Howard at 8-10; Pls.' SGIMF Howard ¶¶ 19-20. But Howard's familiarity with accounting policies cannot imply scienter of accounting fraud if no evidence of such fraud was ever brought to Howard's attention. As such, plaintiffs do not put forth *any* evidence, direct or circumstantial, that Howard was told during the class period that Fannie Mae violated GAAP or committed fraud.

In sum, plaintiffs offer no evidence from which a reasonable juror could conclude that any of Howard's statements concerning Fannie Mae's accounting practices or

internal controls were made with an intent to deceive, or were otherwise made without any reasonable basis.

## I.      Internal Controls Weaknesses

When asked during oral argument to present the three best examples of evidence of Howard's scienter, plaintiffs began with what they characterized as "one of the best examples": a 2004 email describing a conversation with Sampath Rajappa, Fannie Mae's Senior Vice President for Operations Risk and head of the Office of Auditing. Tr. at 62:4-24; *see also* Pls.' Opp'n Howard at 12, 30. In the email, Howard tells Spencer that he "made it 'blisteringly clear' to [Rajappa] that on any future calls he gets from the Chairman of our Audit Committee on accounting-related issues he must run the question or issue by you before he or anyone else gets back to [the Audit Committee Chairman]." Pls.' Opp'n Howard at 30. According to plaintiffs, this email demonstrates that "Howard was trying to keep the internal audit from acting independently," Tr. at 65:24-25, and "demand[ing] control over all information given by the internal auditor to the Audit Committee," Pls.' Opp'n Howard at 30. But plaintiffs point to absolutely no evidence that supports their nefarious interpretation of this email. And conversely, defendants present evidence that Howard did not intend to—and never did—censor Rajappa's communications with the Audit Committee Chairman.[15] Thus, even if plaintiffs'

---

[15]      *See* Dep. of Sampath Rajappa, Decl. of Eric Delinsky in Supp. of Def. J. Timothy Howard's Reply in Supp. of his Mot. for Summ. J. [Dkt. # 995-2] ("Delinsky Decl."), Ex. 79 at 132-33 (conversation referenced in email involved Howard asking Rajappa to "make sure [he] gets all the relevant latest data from accounting . . . so that it will give a full picture to [the Audit Committee Chairman]"); *id.* at 394 (Rajappa agreeing that he was *not* "required *to go through* anyone else" to talk to the Audit Committee Chairman);

interpretation of the email was credible, the email is devoid of any connection to accounting misbehavior or harm to investors. This is simply not evidence of scienter of securities fraud.

Plaintiffs then attempt to muster other evidence that Howard "was aware of . . . material internal control weaknesses." Pls.' Opp'n Howard at 31. This evidence consists of descriptions of Fannie Mae's organizational structure that allegedly created "clear conflicts of interests." *Id.* Yet again, plaintiffs provide no evidence that Howard *knew* that Fannie Mae's organizational structure possessed conflicts or weaknesses.[16] Ignoring what Howard did or did not know, plaintiffs state that "Howard had no reasonable basis for believing that [Rajappa] was competent" because he was not a

---

Dep. of Timothy Howard, Delinsky Decl., Ex. 75 at 79 (purpose of the conversation with Rajappa was to "reinforce to him the importance of getting your facts in order before you do your analysis and report it to the chairman of the audit committee . . . ."); *id.* at 73 (Howard did not "take any steps to inhibit Mr. Rajappa's communication to the audit committee chair . . . "); *id.* at 74-75 (use of phrase "blisteringly clear" was an inside joke between Howard and Spencer); Dep. of Thomas Gerrity (Audit Committee Chairman), Delinsky Decl., Ex. 80 at 318-23 (testifying that communications with Rajappa appeared to be candid, forthright, and uncensored both before and after the 2004 email).

[16]     To further their argument, plaintiffs point to two memoranda from Rajappa to Howard and Spencer. In the first memorandum from October 2003, Rajappa describes Fannie Mae's Internal Audit department as "bleeding from inside and outside recruitment," which was "seriously undermining" the ability of internal audit to complete financial certifications and Sarbanes Oxley 302 certifications. Pls.' SGIMF Howard ¶ 130 (citing Email from Rajappa to Howard dated October 24, 2003, Markovits-Howard/Spencer Decl., Ex. 57). In the second memorandum from June 18, 2004, Rajappa highlights "high attrition rates in the audit department . . . which results in fewer experienced auditors, challenges in cross training staff, and difficulties in transition responsibilities to existing staff." Pls.' SGIMF Howard ¶ 132 (citing Memorandum from Rajappa to Howard dated June 18, 2004, Markovits-Howard/Spencer Decl., Ex. 59). Plaintiffs cite no evidence, however, that Howard read these memoranda or that Howard would have interpreted such comments as signs of weaknesses in internal controls.

Certified Public Accountant and had no prior auditing experience.  Again, plaintiffs cite

no evidence that Howard knew that such qualities were critical to Rajappa's competency

or that the lack of such qualities created an internal control weakness.  To prove scienter,

plaintiffs cannot merely present evidence of alleged weaknesses without also presenting

evidence that Howard knew, or should have known, about these weaknesses.

## II.    FAS 91

Next, plaintiffs detail the events leading up to a 1998 audit difference related to

FAS 91 and the deferral of $199 million in expenses to future periods.  Pls.' Opp'n

Howard at 17, 21-25.  Plaintiffs argue that, prior to the 1998 audit difference, Fannie

Mae's Financial Standards Group chief Jonathan Boyles "specifically informed Howard

that Fannie Mae was violating FAS 91 during this period," Pls.' Opp'n Howard at 22, and

"Boyles fully explained to Howard . . . how Fannie Mae was violating [GAAP]

requirements . . . " with respect to IO and PO securities, *id*. at 17.  To support these

accusations, plaintiffs cite two unpersuasive documents.  The first appears to be a 1995

memo from Boyles to "Distribution," Markovits-Howard/Spencer Decl., Ex. 43, but

plaintiffs provide no evidence that Howard ever received this memo.  The second is

entitled "IO/REMIC Package Briefing for Tim Howard" and, despite plaintiffs'

allegation, contains no references to GAAP violations or Howard's knowledge of

purported violations.  Markovits-Howard/Spencer Decl., Ex. 22.[17]  Plaintiffs even go one

step further, citing this document as support for the assertion that "Howard allowed

---

[17]    Nor does the document indicate that Boyles authored it, despite plaintiffs'
unsupported statement to that effect.  *Id.*; *see also* Pls.' SGIMF Howard ¶ 74.

[GAAP violations with respect to IO/PO accounting] because of the 'operational difficulties' involved in complying." Pls.' Opp'n Howard at 36 (citing Pls.' SGIMF Howard ¶¶ 73-76). In fact, the document appears to be a briefing designed *for* Howard and contains no information about what Howard did or why. *See* Markovits-Howard/Spencer Decl., Ex. 22 at 3. Neither of plaintiffs' documents demonstrates that Howard knew anything about alleged GAAP or FAS 91 violations, despite plaintiffs' deceptive suggestions to the contrary.[18]

As further evidence related to FAS 91, plaintiffs cite another document predating the class period: a September 23, 1999 memorandum to Howard from Janet Pennewell, Fannie Mae's Vice President for Financial Reporting and Planning. Pls.' Supp'l Mem. Howard at 4; Tr. at 74:15-75:15; Pls.' SGIMF Howard ¶¶ 17, 113; Markovits-Howard/Spencer Decl., Ex. 51. The memorandum discusses a recommended amortization policy. Markovits-Howard/Spencer Decl., Ex. 51. Plaintiffs allege that this memorandum "warned Howard that FAS 91 required Fannie Mae to record catch-up to adjust prior period amortization in the current period, and that percentage thresholds do not conform to GAAP." Pls.' Supp'l Mem. Howard at 4. What the memo actually states, however, is:

---

[18] Plaintiffs also seize upon the language in this document that suggests that Fannie Mae attempted to "keep [its] analysis confidential" from KPMG and did not bring "these issues to [KPMG's] attention." *Id.* Again, plaintiffs provide no evidence that Howard saw this document. Even if he had seen this document, Howard testified that, upon learning that "KPMG had not been apprised" of Fannie Mae's IO REMIC package accounting policy, he asked Fannie Mae's Controller to "share [that policy] with KPMG." Delinsky Decl., Ex. 75 at 271-72.

> Our intention is to [change amortization speeds] in a manner which accurately reflects our financial results . . . . Accounting policy requires us to record any catch-up to adjust prior period amortization in the current period.   However, we believe that it may be appropriate to adjust the catch-up over time if the amount is not material.

Markovits-Howard/Spencer Decl., Ex. 51 at 1, 3.  Thus, while the memorandum addresses what "[a]ccounting policy requires," it does not go on to conclude that Fannie Mae's current or proposed policy violates GAAP.  Instead, the memorandum states that "we believe that it may be appropriate"—not inappropriate or contrary to GAAP—to adjust immaterial catch-up over time.  Even if the memorandum implied concerns about the company's amortization policy, plaintiffs present no evidence that Howard ever read the memorandum.[19]  To the contrary, defendants present evidence suggesting that the memorandum was a draft[20] and that Howard did not recall reading the memorandum.[21]  And evidence indicates that Fannie Mae never even used the amortization option discussed in the memorandum.  Howard's Supp'l Mem. at 8-9 (citing Delinsky Decl., Ex. 62 ¶ 23; Miller Decl., Ex. 183 at 244).  Simply put, plaintiffs cannot claim evidence of Howard's scienter lies in a document that does not identify a GAAP violation, that Howard may have never read, and that discusses a practice that was never implemented.

---

[19]     Indeed, plaintiffs admit that they failed to confront Howard with this very memorandum.  Tr. at 80:4-10.

[20]     *See* Howard's Supp'l Mem. at 7 (citing Pennewell deposition, Supplemental Decl. of Adam B. Miller in Supp. of Def. Leanne G. Spencer's Mot. for Summ. J. [Dkt. # 996-3], Ex. 224 at 101).

[21]     *See* Howard's Supp'l Mem. at 7-8 (citing OFHEO Sworn Interview with Howard, Markovits-Howard/Spencer Decl., Ex. 65 at 181, 184).

More importantly, plaintiffs fail to demonstrate that this pre-class-period evidence would be admissible as evidence of "what the defendant knew during the class period." Pls.' Supp'l Mem. Howard at 2 (citations omitted).  Since plaintiffs fail to demonstrate that Howard knew of any GAAP or FAS violations before the class period, plaintiffs' evidence cannot be probative of Howard's scienter during the class period itself.[22]

### III.    FAS 133 and Alleged Earnings Manipulation

Plaintiffs did not address FAS 133 in their portions of oral argument or supplemental briefing related to Howard.  However, in their original summary judgment motion, plaintiffs did cite two pieces of evidence that they alleged demonstrates Howard's knowledge of FAS 133 violations.  First, plaintiffs pointed to an email from Boyles in which plaintiffs say that Boyles "specifically told Howard that Fannie Mae's policy was 'aggressive' and 'not one we would want to flash in front of the [Financial Accounting Standards Bureau] for comment or the treatment could get worse.'"  Pls.' Opp'n Howard at 20 (emphasis omitted); *see* Markovits-Howard/Spencer Decl., Ex. 66 at 1-2.  Plaintiffs, however, conveniently omit the middle of the sentence: "*we have KPMG's approval.*"  *See* Markovits-Howard/Spencer Decl., Ex. 66 at 1.  With this phrase included, this sentence no longer implies that the accounting policy was somehow improper.  To the contrary, the sentence stands as evidence supporting the defendant's assertion that Howard was told that Fannie Mae's accounting policies were acceptable.

---

[22]    *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d. Cir. 2000) ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled with evidence of corresponding fraudulent intent, might they be sufficient.") (internal citations and quotation marks omitted).

Plaintiffs also omit Howard's response to this email, in which Howard rejects "attempting to work behind the scenes" in favor of "mak[ing] our argument forcibly to FASB." Delinsky Decl., Ex. 64 at 1. In no way does this email demonstrate that Howard knew about improper accounting practices or supported keeping any accounting practices a secret.[23]

Second, plaintiffs cite a July 2000 email from Mehmood Nathani from Fannie Mae's Treasurer's Office, stating that Howard "can no longer feel even somewhat assured that the analysts and external folks will not misinterpret FAS 133's impact when we go live. Therefore, reduction of earnings volatility is still our numero uno objective." Pls.' Opp'n Howard at 20; *see* Markovits-Howard/Spencer Decl., Ex. 67. Based upon this quotation alone, plaintiffs conclude that "Howard's standing instruction was that minimizing earnings volatility trumped compliance with FAS 133." Pls.' Opp'n Howard at 20. Please! Plaintiffs once again misconstrue the evidence. This "numero uno objective" quotation is not only *not* attributed to Howard, the email contains *no* instruction from Howard to disregard FAS 133.[24]

## IV.    Earnings Management

Plaintiffs next allege that "Howard directed Fannie Mae's pervasive and improper earnings management over the entire class period." Pls.' Opp'n Howard at 14. In

---

[23]    In fact, both Boyles' email and Howard's reply were sent to eleven other recipients. *See* Markovits-Howard/Spencer Decl., Ex. 66; Delinsky Decl., Ex. 64.

[24]    To the contrary, the defendant presents deposition testimony in which Nathani states that he believed Howard wanted FAS 133 implemented faithfully. *See* Howard's Reply at 10 (citing Decl. of Miles Clark in Supp. of Def. J. Timothy Howard's Mot. for Summ. J. [Dkt. # 938-3] ("Miles Decl."), Ex. 55 at 323).

support, plaintiffs point to Fannie Mae's IO/PO accounting, debt repurchases, and on-top adjustments, which they conclude represent "instances where Howard was specifically informed of and tolerated . . . GAAP violations . . . ." Pls.' Opp'n Howard at 17-19. At most, plaintiffs' evidence indicates that Howard was involved with certain transactions that affected earnings. Plaintiffs fail to point to any evidence from which a reasonable jury could infer that Howard believed any of these transactions were improper or sought to conceal them from the public. Indeed, plaintiffs' own expert recognized that earnings management does not necessarily show an improper purpose. *See* Fierstein Report at 5-5, September 14, 2010, Delinsky Decl., Ex. 69 ("Certain transactions may be executed to manage earnings (i.e., change the pattern of earnings) without violating GAAP. At Fannie Mae, an example of this was its debt buyback program."). With respect to debt buy-backs, the record shows that Fannie Mae disclosed the buy-backs in their public filings. Delinsky Decl., Ex. 71 (2001, 2002, and 2003 disclosures). As to the on-top adjustments, plaintiffs only evidence is an email describing an on-top adjustment "[b]ased on discussions with" Howard. Pls.' Opp'n Howard at 19 (citing Markovits-Howard/Spencer Decl., Ex. 41). The email, however, contains no reference to GAAP violations, Howard's knowledge of GAAP violations, or Howard's knowledge of the on-top adjustment.[25]

Plaintiffs also present evidence of alleged "warn[ings]" Howard received about earnings manipulation. Pls.' Supp'l Mem. Howard at 4. For example, plaintiffs state that

---

[25]    For a discussion of the only piece of contemporaneous evidence plaintiffs cite in support of their IO/PO earnings management allegations, see the discussion of the 1998 IO/REMIC package briefing *supra* at 16-17.

KPMG "specifically warned Howard on three separate occasions that earnings manipulations to meet specific goals were impermissible . . . ." *Id.* The three occasions they cite, however, consist of general communications from the SEC about "earnings management"—not linked to any Fannie Mae practice or any GAAP violation. Pls.' SGIMF Howard ¶¶ 60-62. Further, all three of these alleged warnings *predate* the class period and do not provide insight into Howard's class-period scienter. *Id.*

### V.   Alleged Efforts to Hide Information from KPMG and SEC

Plaintiffs claim that "Howard was informed on several occasions that senior management was hiding certain GAAP violations and other important information from KPMG, but did nothing." Pls.' Opp'n Howard at 15. In addition to citing the IO/REMIC package briefing discussed above,[26] plaintiffs cite another pre-class-period document: a summary of a 1998 meeting that Howard attended. *Id.* at 16 (citing Markovits-Howard/Spencer Decl., Ex. 24). The summary mentions the proposed implementation of an "internal (not public to KPMG) policy," leading plaintiffs to conclude that "Spencer told Howard she was hiding Fannie Mae's FAS 91 violations from KPMG . . . ." *Id.* But plaintiffs identify no evidence that Spencer wrote this summary or that Howard read it. Nor do plaintiffs identify evidence that Howard was told that the proposed policy violated FAS 91. In short, this summary says nothing about Howard's state of mind, despite plaintiffs' contrary assertion.

Nor does plaintiffs' class-period evidence indicate that Howard knew that Fannie Mae was hiding information from KPMG. Plaintiff's single piece of class-period

---

[26]     *See supra* at 16-17.

evidence is a 2002 email from Spencer to Howard and Boyles. *See* Pls.' Opp'n Howard at 16; Markovits-Howard/Spencer Decl., Ex. 23. In this email, Spencer remarked that "[t]here is at least one thing that we know of where we have a favorable accounting treatment and that is on the IO's we have on our books. Freddie [Mac] is doing IO accounting and we are not. KPMG hasn't figured that out . . . ." Markovits-Howard/Spencer Decl., Ex. 23. This comment does not suggest that Fannie Mae was concealing improper accounting practices from KPMG. Rather, Spencer simply observed that KPMG was not aware that Fannie Mae's accounting practices differed from those of Freddie Mac. No mention is made of either company's accounting practices violating GAAP or being otherwise improper. Even if plaintiffs pointed to evidence that Howard read this email, this email could not have tipped off Howard to the presence of accounting fraud.

Plaintiffs also fail to show that Howard was aware of any attempts to conceal information from the SEC. In this regard, plaintiffs present merely a memorandum from Jonathan Boyles, in which he states that "the process we have in place is not exactly what we showed the SEC though it gets close." Pls.' Opp'n Howard at 16 (citing Markovits-Howard/Spencer Decl., Ex. 26 at 2). Putting aside the questionable value of this statement, the memorandum's distribution list does not even include Howard. Without evidence that Howard read the memorandum, plaintiffs cannot credibly argue that this memorandum is evidence that Howard intended to deceive anyone. *See Novak*, 216 F.3d at 309 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled

with evidence of corresponding fraudulent intent, might they be sufficient.") (internal citations and quotation marks omitted).

## VI.   Howard's Financial Motivation

Plaintiffs again fail to establish Howard's scienter by observing that "Howard had substantial financial motivation to improperly manipulate [earnings per share]." Pls.' Opp'n Howard at 12.  Plaintiffs claim that Howard designed a compensation program that rewarded Howard and other Fannie Mae employees when Fannie Mae met targeted earnings per share. *Id.* at 12-13.  What plaintiffs fail to mention, however, is that Fannie Mae's board of directors developed its executive compensation plan, including the earnings-per-share metric, *before* Howard became CFO.  Def. Franklin D. Raines's Reply to Lead Pls.' Responses to Def. Raines's Statement of Undisputed Material Facts and Statement of Additional Undisputed Material Facts in Supp. of Def. Franklin D. Raines's Mot. for Summ. J. ¶ 252-54 [Dkt. #979] ("Raines Reply SUMF and SAUMF").[27] Moreover, this compensation program, standing alone, cannot constitute evidence of scienter. *See Novak*, 216 F.3d at 307 (noting that scienter requires a showing of more than "motives possessed by virtually all corporate insiders" such as maintaining credit rating, sustaining profitability, and maintaining stock price to increase executive compensation).

---

[27]      Fannie Mae's Congressionally drafted charter also dictates a significant portion of executive compensation is to be based on corporate performance. *See* Fannie Mae Charter Act, Decl. of Eun Young Choi in Supp. of Def. Franklin D. Raines's Mot. for Summ. J. [Dkt. # 979] ("Choi Decl."), Ex. 227 at 27.

Notably, Howard *increased* his ownership of Fannie Mae stock and vested stock options by more than 20 percent during the class period.  Howard's Reply to Pls.' SGIMF ¶¶ 136-38.  Such behavior is, to say the least, inconsistent with a fraudulent intent.  *See In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383-84 (E.D.N.Y. 2003) ("The net acquisition of shares cuts against the notion that defendants sought to unload their holdings of KeySpan stock before their likely diminution in value following the disclosure of negative insider information.").

## VII.   Reports and Findings of Regulators and Outside Counsel

Throughout their opposition brief, plaintiffs lean heavily on the post-hoc reports and litigation documents, which were uniformly prepared after the relevant events in this case, and some of which were explicitly prepared in preparation for litigation, as "evidence" of Howard's scienter.  *See, e.g.*, Pls.' Opp'n Howard at 16 (citing OFHEO Report); *id.* at 9, 17, 21, 28, 29, 30, 39 (citing Fannie Mae's Restatement); *id.* at 21, 23 (citing Rudman Report); *id.* at 9, 31 (citing SEC complaint against Fannie Mae); *id.* at 32 (citing OFHEO's Notice of Charges and Issuance of Consent Orders).  Putting aside the obvious and substantial admissibility questions concerning these documents,[28] plaintiffs

---

[28]    The conclusions and opinions in these documents are clearly hearsay.  Plaintiffs contend that the OFHEO and Rudman reports are admissible under Fed. R. Evid. 803(8) as public records.  Pls.' Opp'n Howard at 5 n.7.  But, the OFHEO reports were part of an effort to prepare administrative charges against the individual defendants and raise substantial questions of trustworthiness.  *See* Fed. R. Evid. 803(8).  The Rudman Report certainly does not fall within the 803(8) exception, which is limited to records or statements "of a public office." *Id.*
        Moreover, the prejudicial effect of these documents substantially outweighs their probative value; these documents, after all, were undoubtedly fashioned with multiple considerations in mind.  Plaintiffs argue that inadmissible evidence can be used to defeat

face a much larger challenge in relying on these documents: they do *not* contain any

evidence of Howard's scienter. *See* Pls.' SGIMF Howard ¶ 125 (citing OFHEO report as

"evidence of Howard's knowing and intentional violations of FAS 91). With the

exception of the administrative charges, these documents uniformly reached no

conclusions as to Howard's state of mind, and, in many cases, referred only indefinitely

to "senior management" or "executives." *See, e.g.*, Markovits-Howard/Spencer Decl.,

Ex. 12 (summarizing OFHEO report findings); Pls.' Opp'n Howard at 16 ("OFHEO

stated that, 'Fannie Mae senior management systematically withheld information about

the Enterprise's operations and financial condition from . . . OFHEO . . . .'"). Here, by

comparison, the key inquiry as to scienter is whether Howard knew, or consciously

disregarded, the potential falseness of his statements. As such, the after-the-fact and

non-specific conclusions of regulators and investigators, contained in this myriad of

reports, fail to shed *any* light on this inquiry.[29]

## VIII. Magnitude of the Fraud

Finally, plaintiffs attempt to shore up their case against Howard by pointing to the

"sheer scope and magnitude of the fraud." Pls.' Opp'n Howard at 38. But as

Shakespeare might have noted: a giant body doth not portend an evil mind. Indeed, at the

---

summary judgment "so long as it is capable of being converted into admissible
evidence," but plaintiffs do not demonstrate that the reports contain "underlying
admissible evidence" that could be used at trial. Pls.' Opp'n Howard at 5 n.7.

[29]     Plaintiffs also note that, "[i]n December 2006, OFHEO brought charges against
Raines, Howard, and Spencer for intentional and knowing misconduct." Pls.' Opp'n
Howard at 32. Yet plaintiffs fail to explain how these charges, which were settled with a
denial of liability, can be considered *evidence* of scienter.

motion-to-dismiss stage, I warned plaintiffs' counsel that a fraud's magnitude *alone* was insufficient to establish an inference of scienter. *See In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d at 41. That principle is stronger now at the summary-judgment stage, and the time for simply presenting allegations that give rise to a strong inference of scienter has long since passed. Without any actual evidence supporting a conclusion of Howard's scienter, the magnitude of Fannie Mae's earnings restatement alone is insufficient to preclude summary judgment.[30]

## CONCLUSION

Sustaining claims for securities fraud requires a showing of scienter—either an intent to deceive or an extreme departure from the standard of ordinary care—for each individual or entity claimed to have committed such fraud. Put simply, the securities fraud laws are not a means for shareholders to recover for all losses, no matter how sizable or sudden. Upon review of all plaintiffs' evidence, this Court concludes that plaintiffs have failed to put forth sufficient evidence from which a reasonable jury could find that Howard had such an intent. A failure to understand, or even negligent behavior,

---

[30]     Moreover, plaintiffs do not dispute that the factor responsible for the largest amount of Fannie Mae's earnings restatement was its FAS 133 application. *See* Lead Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot. FAS 133 at 30-31 [Dkt. # 968]. Because that change in Fannie Mae's hedge accounting so significantly affected Fannie Mae's reported earnings, this case is simply distinct from cases involving fake transactions, hidden liabilities, or the distortion of the economics of Fannie Mae's business. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 496 (S.D.N.Y. 2004). *See also* Defs.' Reply SUMF FAS 133 ¶ 76 (discussing disclosure of FAS 133 accounting to public and analysts' ability to calculate earnings impact).

is not the equivalent of the necessary intent to deceive or conscious disregard of obvious

risks.  Therefore, Howard is entitled to summary judgment on all claims against him.[31]

    For all of the foregoing reasons, the Court GRANTS defendant J. Timothy

Howard's Motion for Summary Judgment.  An Order consistent with this decision

accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[31]    Because I conclude that there is no evidence that Howard "culpably participated" in any underlying securities law violation, Howard is also entitled to summary judgment on plaintiffs' claims against him under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  *See In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d at 42–46 (dismissing § 20(a) claim due to failure of plaintiffs to plead culpable conduct as to defendants); *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000) ("To make out a prima facie case under § 20(a) . . . a plaintiff must show . . . that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." (internal quotation marks omitted)).  As discussed above, plaintiffs have not put forth any admissible evidence that Howard acted without good faith or induced any securities fraud.