# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FILED

NOV ? 9 2012

Clerk, U.S. Dist. and Bankr.
Courts for the District of Columbia

| | |
|---|---|
| **In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation** | **MDL No. 1668** |
| **In re Fannie Mae Securities Litigation** | **Consolidated Civil Action No. 04-1639 (RJL)** |

## MEMORANDUM OPINION
(November 20, 2012) [# 942]

This is a class action securities fraud suit against Federal National Mortgage

Association ("Fannie Mae"), its former accountant, KPMG, LLP, and three of Fannie

Mae's former senior executives (collectively, "defendants"), brought by a class of parties

represented by lead plaintiffs Ohio Public Employees Retirement System ("OPERS") and

State Teachers Retirement System of Ohio ("STRS") (collectively, "plaintiffs"). The

parties filed eight separate summary judgment motions in this case.[1]  Recently, I granted

---

[1]     Plaintiffs filed two summary judgment motions: one against Fannie Mae, Lead Plaintiffs' Motion for Partial Summary Judgment on Count I Against Defendant Federal National Mortgage Association [Dkt. # 916] ("Pls.' Mot. Fannie Mae"), and another against KPMG, Lead Plaintiffs' Motion for Partial Summary Judgment on Count III Against Defendant KPMG LLP [Dkt. # 936] ("Pls.' Mot. KPMG").

In turn, the defendants filed six separate summary judgment motions. Of those, all of the defendants joined in filing two of the motions, which focus, respectively, on the loss causation element of the securities fraud claims and on plaintiffs' claims related to Statements of Financial Accounting Standards ("FAS") 133. Defs.' Joint Mot. for Summ. J. for Failure to Prove Loss Causation [Dkt. # 939] ("Defs.' Mot. Loss Causation"); Defs.' Joint Mot. for Partial Summ. J. Based on FAS 133 Accounting Issues [Dkt. # 941] ("Defs.' Mot. FAS 133"). Finally, the individual defendants and KPMG each separately moved for summary judgment. KPMG LLP's Mot. for Summ. J. [Dkt. # 937] ("KPMG's Mot."); Def. J. Timothy Howard's Mot. for Summ. J. [Dkt. # 938]

defendant Franklin D. Raines's and J. Timothy Howard's Motions for Summary

Judgment.[2] *See* Mem. Op., Oct. 16, 2012 [Dkt. # 1056]; Order, Oct. 16, 2012 [Dkt. #

1057]; Mem. Op., Sept. 20, 2012 [Dkt. # 1053]; Order, Sept. 20, 2012 [Dkt. # 1054].

This opinion addresses defendant Leanne G. Spencer's Motion for Summary Judgment.[3]

I will address the defendants' joint motions, KPMG's motion, and the plaintiffs' motions

at a later time. Upon consideration of the pleadings, oral argument, and the entire record

herein, defendant Spencer's Motion for Summary Judgment is GRANTED.

## BACKGROUND[4]

### I.    Factual Background

Fannie Mae, along with its cousin Freddie Mac, operates in the secondary

mortgage market as a federally-chartered government-sponsored enterprise, buying home

mortgages from banks and issuing debt and mortgage-backed securities. Formerly a

private shareholder-owned company, Fannie Mae has been in a conservatorship under the

---

("Howard's Mot."); Def. Franklin D. Raines's Mot. for Summ. J. [Dkt. # 940] ("Raines's Mot."); Def. Leanne G. Spencer's Mot. for Summ. J. [Dkt. # 942] ("Spencer's Mot.").

[2]    Raines was Fannie Mae's Chairman of the Board and Chief Executive Officer from January 1999 until December 2004. Def. Fannie Mae's Statement of Genuine Issues of Material Fact ¶¶ 4, 8 [Dkt. # 973-1] ("Fannie Mae's SGIMF"). Howard served as Fannie Mae's Chief Financial Officer and Vice Chairman. Def. J. Timothy Howard's Reply to Pls.' Statement of Genuine Issues of Material Fact ¶ 1 [Dkt. # 995-1] ("Howard's Reply to Pls.' SGIMF").

[3]    The remaining defendants in this case are Fannie Mae and KPMG. For approximately 35 years prior to December 2004, KPMG served as Fannie Mae's outside auditor. Fannie Mae's SGIMF ¶ 11.

[4]    For additional background information concerning this litigation, see the Court's Memorandum Opinions in *In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d 25, 29-30 (D.D.C. 2007), and *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32, 34-36 (D.D.C. 2008).

Federal Housing Finance Agency ("FHFA") since September 6, 2008. However, during

this litigation's class period, beginning April 17, 2001 and ending December 22, 2004,

Fannie Mae's stock was traded on the New York Stock Exchange, and it was regulated

by the Office of Federal Housing Enterprise Oversight ("OFHEO").[5] OFHEO's

oversight responsibilities generally involved ensuring that Fannie Mae had adequate

capital, a sound corporate structure, and financial stability. This, of course, was no small

task: Fannie Mae was, and still is, one of the largest financial institutions in the country

and had a balance sheet of mortgage loans and mortgage-backed securities worth

hundreds of billions of dollars. Defs.' Reply Regarding their Statements of Undisputed

Material Fact in Supp. of Their Joint Mot. for Partial Summ. J. Based on FAS 133

Accounting Issues ¶ 1 [Dkt. # 1024-4] ("Defs.' Reply SUMF FAS 133"). Beginning in

January 1999 and continuing through the class period, Spencer served as Senior Vice

President and Controller of Fannie Mae. Fannie Mae's SGIMF ¶ 8; Lead Pls.' Mem. of

P. & A. in Opp'n to Def. Leanne G. Spencer's Mot. for Summ. J. at 7 [Dkt. # 970] ("Pls.'

Opp'n Spencer").

The narrative of plaintiffs' securities fraud claims against Spencer, not

surprisingly, flows directly from an OFHEO investigation of Fannie Mae. In June 2003,

following the disclosure of certain accounting issues at Freddie Mac, OFHEO began

examining Fannie Mae's accounting policies and internal controls. On September 22,

---

[5]     Amidst the financial crisis of 2008, Congress established FHFA to replace
OFHEO as Fannie Mae and Freddie Mac's independent regulator and granted FHFA
additional powers over those held by OFHEO, including the ability to place the mortgage
giants in conservatorship or receivership under FHFA's control. Housing and Economic
Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654.

2004, Fannie Mae released a public statement, indicating that OFHEO had delivered the findings of that investigation to Fannie Mae's board of directors. Fannie Mae's SGIMF ¶ 13; Fannie Mae Form 8-K (Sept. 22, 2004), Decl. of W.B. Markovits in Supp. of Lead Pls.' Mot. for Partial Summ. J. on Count I Against Def. Fannie Mae [Dkt. # 920] ("Markovits-Fannie Mae Decl."), Ex. 5 [Dkt. # 920-6].[6] The company added that the Securities and Exchange Commission ("SEC") also had begun an inquiry and that Fannie Mae's board had retained former Senator Warren B. Rudman ("Senator Rudman") and his law firm, Paul, Weiss, Rifkind, Wharton & Garrison LLP, to conduct an independent investigation of what happened. Fannie Mae's SGIMF ¶ 13. Later that day, OFHEO publicly released its interim report entitled "Report of Findings to Date, Special Examination Fannie Mae" (the "OFHEO Interim Report"). *Id.* ¶ 14; *see also* OFHEO Interim Report, Decl. of Adam B. Miller in Supp. of Def. Leanne G. Spencer's Mot. for Summ. J. [Dkt. # 942-3] ("Miller Decl."), Ex. 148. According to the Interim Report, Fannie Mae had misapplied certain Generally Accepted Accounting Principles ("GAAP"), specifically two key standards known as FAS 91 and FAS 133, which relate to the company's amortization of price changes on securities and loans and to its use of

---

[6]     According to the public statement, OFHEO summarized its findings to the Board by stating that "Fannie Mae (1) applied accounting methods and practices that do not comply with GAAP in accounting for the enterprise's derivatives transactions and hedging activities, (2) employed an improper 'cookie jar' reserve in accounting for amortization of deferred price adjustments under GAAP, (3) tolerated related internal control deficiencies, (4) in at least one instance deferred expenses apparently to achieve bonus compensation targets, and (5) maintained a corporate culture that emphasized stable earnings at the expense of accurate financial disclosures." Fannie Mae Form 8-K (Sept. 22, 2004), Markovits-Fannie Mae Decl., Ex. 5 at 7.

hedge accounting.  Miller Decl., Ex. 148 at *i – vii.*[7]  OFHEO also raised concerns over the

company's internal controls and audit reviews.  Fannie Mae's SGIMF ¶ 15.

Apparently surprised by these findings, Fannie Mae requested that the SEC's

Office of the Chief Accountant review the company's accounting with respect to FAS 91

and FAS 133.  *Id.* ¶ 24.  Several months later, on December 15, 2004, the SEC's Chief

Accountant, Donald Nicolaisen, issued a press release, stating that the SEC's accounting

staff had determined that Fannie Mae's accounting did *not* comply in material respects

with FAS 91 and FAS 133, and that he had advised the company to restate its financial

statements after eliminating the use of hedge accounting and reevaluating its amortization

of premiums and discounts.  *Id.* ¶ 22 (quoting Markovits-Fannie Mae Decl., Ex. 16 [Dkt.

# 922-8]).  In its December 22, 2004 Form 8-K, Fannie Mae declared its intention to

restate its 2001 to mid-2004 financial results to comply with the SEC's Office of Chief

Accountant's review and recommendations concerning its FAS 91 and FAS 133

accounting.  Fannie Mae Form 8-K (Dec. 22, 2004), Markovits-Fannie Mae Decl., Ex. 18

---

[7]      Generally Accepted Accounting Principles are defined by the Financial
Accounting Standards Board, a private organization designated for this task by the SEC
and the private sector. Defs.' Reply SUMF FAS 133 ¶ 13. FAS 91 and FAS 133 are two
of the many GAAP standards defined by this organization.
       Briefly, FAS 91, or "Accounting for Nonrefundable Fees and Costs Associated
with Originating or Acquiring Loans and Initial Direct Costs of Leases," instructs
companies on how to account for premiums and discounts on securities and loans—in
Fannie Mae's case, mortgages. Pls.' Responses to Fannie Mae's Statement of Additional
Undisputed Material Facts [Dkt. # 990-1] ("Pls.' Responses to Fannie Mae's SAUMF")
¶¶ 24, 30 (Ex. 30, FAS 91, ¶¶ 4, 15, 18). And, FAS 133, or "Accounting for Derivative
Instruments and Hedging Activities," addresses a company's hedge accounting, or its
recording of the value of derivative transactions in its earnings. *See* OFHEO Interim
Report at *iv.* Fannie Mae used derivatives transactions, particularly interest-rate swaps,
to hedge (protect) against interest rate changes in its issued debt and the mortgage loans it
owned. *See* Defs.' Reply SUMF FAS 133 ¶¶ 1-12.

[Dkt. # 922-10].  Less than a month later, on January 17, 2005, Spencer stepped down from her position as Controller.  Fannie Mae's SGIMF ¶ 8.

On February 23, 2006, Fannie Mae released the report of Senator Rudman and his team at Paul Weiss, "A Report to the Special Review Committee of the Board of Directors of Fannie Mae" (the "Rudman Report"), which reached similar findings as the OFHEO Interim Report.[8]  *Id.* ¶¶ 31-32.  OFHEO released its final report on May 23, 2006.  Report of the Special Examination of Fannie Mae, May 2006, Decl. of W.B. Markovits in Supp. of Lead Pls.' Mems. of P. & A. in Opp'n to Def. J. Timothy Howard's and Def. Leanne G. Spencer's Mots. for Summ. J. [Dkt. # 969-2] ("Markovits-Howard/Spencer Decl."), Ex. 12 ("OFHEO Final Report").[9]  Based on its findings, OFHEO brought administrative charges against Raines, Howard, and Spencer, alleging that they "knowingly and/or recklessly engaged in misconduct and safety and soundness violations that caused substantial and/or material harm and loss to [Fannie Mae]."  December 18, 2006 OFHEO News Release, Decl. of W.B. Markovits in Supp. of Pls.' Mem. in Opp'n to Franklin D. Raines's Mot. for Summ. J. [Dkt. # 967-2] ("Markovits-

---

[8]     Curiously, the defendants refer to the Rudman Report as the Paul Weiss Report. *See, e.g.*, Reply Mem. in Supp. of Def. Leanne G. Spencer's Mot. for Summ. J. at 4, 12, 15, 18 [Dkt. # 996] ("Spencer's Reply Mem.").  Go figure!

[9]     The SEC also filed a civil complaint against Fannie Mae on that date, alleging that Fannie Mae violated Section 10(b) of the Exchange Act and SEC Rule 10b-5. Compl., *SEC v. Fannie Mae*, No. 1:06-cv-00959 (D.D.C. May 23, 2006).  OFHEO filed a similar enforcement action.  That day, Fannie Mae agreed to settle those cases and pay a $400 million civil penalty.  Fannie Mae Form 8-K (May 30, 2006), Markovits-Fannie Mae Decl., Ex. 25 [Dkt. # 924-3].

Raines Decl."), Ex. 34 at 2; *see also* OFHEO's Notice of Charges, Notice No. 2006-1, Markovits-Raines Decl., Ex. 34.[10]

Finally, on December 6, 2006, Fannie Mae filed with the SEC its Restatement of its prior financial results in a Form 10-K (the "Restatement"). Fannie Mae's SGIMF ¶ 65. The Restatement resulted in a "total reduction in retained earnings of $6.3 billion through June 30, 2004." Fannie Mae's SGIMF ¶ 68 (citing Restatement).

## II.    This Litigation

After OFHEO issued its Interim Report, several Fannie Mae shareholders filed class action suits alleging that the company and its executives had violated the federal securities laws and committed securities fraud. Compl. [Dkt. #1]. The first of these actions was filed on September 23, 2004. *Id.* After the other separately-filed cases were eventually consolidated into this multi-district litigation action, I appointed OPERS and STRS as lead plaintiffs on January 13, 2005. Mem. Op. and Order, Jan. 13, 2005 [Dkt. # 52].[11]   In January 2008, this Court certified a class generally composed of approximately

---

[10]    OFHEO alleged the individuals committed violations including "[i]nappropriate earnings management and manipulation; [d]eliberately misleading financial reporting and disclosures; [f]ailure to establish a sound internal controls process . . . ; [m]isleading and deficient reporting from the important Internal Audit function; and [p]ermitting known deficient systems to continue to operate while recognizing that such systems facilitated the ongoing manipulations sought by the individuals charged." December 18, 2006 OFHEO News Release, Markovits-Raines Decl., Ex. 34 at 2. Howard, Raines, and Spencer settled these charges in April 2008. April 18, 2008 OFHEO News Release, Markovits-Raines Decl., Ex. 35.

[11]    On March 4, 2005, plaintiffs filed a Consolidated Class Action Complaint for Violations of Federal Securities Laws [Dkt. # 64] on behalf of purchasers of Fannie Mae common stock during the period from April 17, 2001, through September 21, 2004. On August 14, 2006, plaintiffs filed a Second Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws [Dkt. # 204].

one million investors in Fannie Mae stock during the class period. Order, Jan. 7, 2008 [Dkt. # 572]; Mem. Op., Jan. 7, 2008 [Dkt. # 571]. Thereafter, the parties engaged in extensive discovery until May 26, 2011. The volume of information exchanged in discovery was enormous; together, the parties produced nearly 67 million pages of documents, deposed 123 fact witnesses, and engaged 35 expert witnesses. *See* Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. Fannie Mae at 4-5 [Dkt. # 918] (Pls.' Mem. Fannie Mae"). Unfortunately, however, the discovery process was unnecessarily prolonged by OFHEO's repeated and inappropriate assertion of privileges that had to be litigated up to the Court of Appeals. *See* Order, Jan. 22, 2008 [Dkt. # 580], *aff'd*, 552 F.3d 814 (D.C. Cir. 2009).

In the end, plaintiffs allege that Fannie Mae and the individual defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2011), by intentionally manipulating earnings and violating GAAP, causing losses to investors.[12]  As to Spencer specifically, plaintiffs contend that she knowingly made false statements about the soundness of Fannie Mae's accounting, risk management, and internal controls. Pls.' Opp'n Spencer at 1. Plaintiffs also contend that Spencer misled investors about her participation in earnings management strategies designed to meet quarterly earnings-per-share targets to maximize bonuses, in violation of GAAP and various accounting standards. *Id.*

---

[12]     Plaintiffs also claim that the individual defendants violated § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (2006).

On August 22, 2011, Spencer moved for summary judgment on all claims against her, arguing that plaintiffs have failed to prove that she acted with the necessary scienter under the securities laws.  Mem. in Supp. of Def. Leanne G. Spencer's Mot. for Summ. J. at 1 [Dkt. 942-1] ("Spencer's Mem.").[13]  On June 5-7 and June 13, 2012, I heard oral argument on the pending summary judgment motions, including Spencer's motion.[14] Because I agree with the defendant that plaintiffs have failed to put forth sufficient evidence of scienter, Spencer is entitled to summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate when the movant demonstrates that no genuine issue of material fact is in dispute and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the burden, and the court will draw "all justifiable inferences" in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986).  Nevertheless, the non-moving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 248 (internal quotation marks and citation omitted).  "Thus, if the evidence presented by the opposing party is 'merely colorable' or 'not significantly probative,' summary judgment may be granted."  *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002) (quoting *Anderson*, 477

---

[13]   Spencer also joined the defendants' motion for summary judgment based on loss causation, Defs.' Mot. Loss Causation, and the defendants' motion for partial summary judgment with regard to claims arising from FAS 133 accounting issues, Defs.' Mot. FAS 133.  This opinion addresses only Spencer's scienter arguments.

[14]   This Court heard oral argument specifically on Spencer's motion on June 13, 2012.  Tr. of Mots. Hr'g, June 13, 2012, at 96-165 [Dkt. # 1050] ("Tr.").

U.S. at 249-50); *see also Montgomery v. Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008) ("The possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment."). Factual assertions in the moving party's affidavits may be accepted as true unless the opposing party submits its own affidavits, declarations, or documentary evidence to the contrary. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

## DISCUSSION

The elements of a securities fraud claim and the requirements of a summary judgment motion remain constant, regardless of the enormity and novelty of the facts in question. Securities fraud claims under Section 10(b) and Rule 10b-5 require proof of the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Plaintiffs' claims regarding Spencer, however, can be foreclosed by addressing only one of these elements: scienter.[15] To establish scienter in a securities fraud case, a plaintiff must prove that a defendant acted "with an intent to deceive—not

---

[15]    Because I conclude that there is no evidence that Spencer "culpably participated" in any underlying securities law violation, she also is entitled to summary judgment on plaintiffs' claims against her under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *See In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d 25, 42–47 (D.D.C. 2007) (dismissing Section 20(a) claim due to plaintiffs' failure to plead culpable conduct as to defendants); *see also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000) ("To make out a prima facie case under § 20(a) . . . a plaintiff must show . . . that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." (citation and internal quotation marks omitted)). As discussed hereafter, plaintiffs have not put forth any admissible evidence that Spencer acted without good faith or possessed scienter of securities fraud.

merely innocently or negligently." *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1796
(2010). Thus, plaintiffs must put forth proof of intentional wrongdoing or extreme
recklessness. *Liberty Prop. Trust v. Republic Props. Corp.*, 577 F.3d 335, 342 (D.C. Cir.
2009). Our Circuit has defined extreme recklessness as an "extreme departure from the
standards of ordinary care . . . which presents *a danger of misleading buyers or sellers
that is either known to the defendant or is so obvious that the actor must have been aware
of it.*" *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008) (internal
citations and quotation marks omitted). For extreme recklessness, the danger of
deception must be such that the "actor was aware of it and consciously disregarded it."
*Id.*

Unfortunately, for plaintiffs, they have not established a genuine issue of material
fact, either direct or circumstantial, as to Spencer's alleged scienter. In essence,
plaintiffs, as they did with Raines and Howard, have stitched together a patchwork quilt
of evidence that they allege demonstrates Spencer's intent to deceive Fannie Mae's
investors. I disagree. Plaintiffs' cited evidence simply does not rise to an inference of
scienter. Although scienter is generally a question of fact for a jury, *see, e.g., SEC v.
Pace*, 173 F. Supp. 2d 30, 33 (D.D.C. 2001) ("In the ordinary securities fraud case,
scienter is a genuine issue of material fact."); *see also Wechsler v. Steinberg*, 733 F.2d
1054, 1058-59 (2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for
disposition on summary judgment."), summary judgment is appropriate if plaintiffs
present no concrete evidence of scienter. *See Anderson*, 477 U.S. at 256-57 (recognizing
that resolving defendant's "state of mind" may be appropriate on summary judgment and

that plaintiff may not defeat "a defendant's properly supported motion for summary

judgment . . . without offering any concrete evidence from which a reasonable juror could

return a verdict in his favor"); *see also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407,

1425 (9th Cir. 1994) (finding defendants had "conclusively rebutted" plaintiffs'

"speculative inferences" of fraud).

Plaintiffs' theories on Spencer's scienter are insufficient to withstand her summary

judgment motion, particularly in light of the overwhelming evidence of Spencer's good

faith. *See* Def. Leanne G. Spencer's Reply Statement of Undisputed Material Facts in

Supp. of Her Mot. for Summ. J. ¶¶ 26-64 [Dkt. # 981] ("Spencer's Reply SUMF"). No

witnesses testified that Spencer knew that Fannie Mae's financial statements were

materially inaccurate or not GAAP compliant. Def. Leanne G. Spencer's Statement of

Undisputed Material Facts in Supp. of Her Mot. for Summ. J. ¶ 8 [Dkt. # 942-2]

("Spencer's SUMF"). Further, no witnesses testified that Spencer sought to misrepresent

Fannie Mae's earnings or mislead investors. *See id.* ¶¶ 6-8. Throughout the class period,

Spencer relied on internal and external accounting experts to ensure that the company's

financial statements complied with GAAP, and these experts universally assured Spencer

that Fannie Mae's financial statements were accurate in all material respects. *Id.* ¶ 12.

And Spencer herself testified that she believed that Fannie Mae was in compliance with

GAAP in all material respects.[16] *Id.* ¶ 10. Of course, such evidence of good faith is

---

[16]    Plaintiffs dispute each of these statements of fact simply by citing 90 paragraphs
of their statements of fact and the entirety of the Rudman and OFHEO reports. *See* Part
II: Response to Spencer's Statement ¶¶ 6-12, Lead Pls.' Statement of Genuine Issues of
Material Fact Precluding Summ. J. for Def. Leanne G. Spencer [Dkt. # 970-1] ("Pls.'

generally insufficient to grant summary judgment, especially if a plaintiff identifies admissible evidence supporting a reasonable inference of scienter. But where, as here, that is not the case, such substantial evidence of good faith negates any possible inference of scienter. *See Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004); *In re Digi Int'l Sec. Litig.*, 14 F. App'x 714, 717 (8th Cir. 2001).

Moreover, the parties' dispute as to whether Spencer possessed the requisite education, expertise, and managerial responsibility to personally understand the nuances of Fannie Mae's accounting policies does not reveal any evidence of scienter. Spencer's Mem. at 4-5; Pls.' Opp'n Spencer at 7-8. The Court has no doubt that, as plaintiffs state, Spencer "had [an] in-depth understanding and knowledge of Fannie Mae's accounting policies and the accounting standards applicable to the company . . . ." Pls.' Opp'n Spencer at 7. But Spencer's familiarity with accounting policies and standards cannot imply scienter of accounting fraud if no evidence of such fraud was ever brought to Spencer's attention. As such, plaintiffs do not put forth *any* evidence that Spencer was told during the class period that Fannie Mae committed fraud or material violations of GAAP.

In sum, plaintiffs offer no evidence from which a reasonable juror could conclude that any of Spencer's statements concerning Fannie Mae's accounting practices or

---

SGIMF Spencer"). Even if the Rudman and OFHEO reports were admissible, plaintiffs cannot expect the Court to rummage through these voluminous documents to find their alleged factual disputes. *See Glass v. Lahood*, 786 F. Supp. 2d 189, 199 (D.D.C. 2011); *see also* Fed. R. Civ. P. 56(c)(1) (a party supporting or opposing a summary judgment motion must cite "*particular parts* of materials in the record"). More importantly, the Court has not found *any* facts creating a genuine dispute as to Spencer's good faith in plaintiffs' briefs, statements of facts, or exhibits.

internal controls were made with an intent to deceive or were otherwise made without any reasonable basis.

## I.    Earnings Management and Accounting Standards

The heart of plaintiffs' case against Spencer is that she engaged in improper earnings management to increase executive bonuses, in violation of various accounting standards. *See* Pls.' Opp'n Spencer at 1, 12-25. At most, plaintiffs' evidence indicates that Spencer was involved with certain transactions that affected earnings.[17] Plaintiffs fail to point to *any* evidence from which a reasonable jury could infer that Spencer believed any of these transactions were improper or sought to conceal them from the public. Indeed, plaintiffs' own expert recognized that earnings management does not necessarily show an improper purpose. *See* Fierstein Report, Sept. 14, 2010, Delinsky Decl., Ex. 69 at 5-5 ("Certain transactions may be executed to manage earnings (i.e., change the pattern of earnings) without violating GAAP."); Fierstein Rebuttal Report, Miller Decl., Ex. 230 at 4 ("earnings management activities that involve discretionary choices by management" are distinguishable from other, impermissible forms of earnings management).

As an example of improper earnings management, plaintiffs cite Spencer's participation in certain debt repurchases. *See* Pls.' Opp'n Spencer at 16-18. According to plaintiffs, "[d]ebt repurchases is [a] clear example where Spencer improperly managed earnings and specifically misled investors." *Id.* at 16. But plaintiffs cite to no evidence

---

[17]    *See, e.g.*, Plaintiffs' citation to a November 4, 2001 memorandum from Spencer to Raines, in which Spencer discusses "managing" and "smoothing" earnings. Pls.' Opp'n Spencer at 12-13 (citing Markovits-Howard/Spencer Decl., Ex. 69).

that these debt repurchases violated GAAP or that Spencer believed that the debt

repurchases violated GAAP.  In fact, plaintiffs' expert used Fannie Mae's debt

repurchases as an example of an earnings management strategy that did *not* violate

GAAP.  *See* Fierstein Report, Sept. 14, 2010, Delinsky Decl., Ex. 69 at 5-5.  Moreover,

Fannie Mae disclosed debt repurchases in their public filings.  Delinsky Decl., Ex. 71

(2001, 2002, and 2003 disclosures).

Plaintiffs again fail to muster sufficient evidence of scienter when they discuss on-

top adjustments.  In a vain attempt to demonstrate Spencer's knowledge, plaintiffs cite an

email from accounting manager Roger Barnes that was not sent to Spencer and does not

even mention her name.  *See* Pls.' Opp'n Spencer at 18 (citing Markovits-

Howard/Spencer Decl., Ex. 36).  Plaintiffs' other "evidence" is two emails: the first

conveys a purported instruction from Spencer to "book the whole 19 million in

[O]ctober," Pls.' Opp'n Spencer at 18, and the second reports that Spencer and others

"will be making a decision on how much to post [as an on-top adjustment] and whether to

post after reviewing operating results for 11/2002," *id.* at 19.  Neither email suggests that

Spencer believed that the on-top adjustments were improper.  However, even if such

behavior were improper, evidence of improper behavior *alone* does not demonstrate

scienter.  *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d. Cir. 2000) ("[A]llegations of

GAAP violations or accounting irregularities, standing alone, are insufficient to state a

securities fraud claim.  Only where such allegations are coupled with evidence of

corresponding fraudulent intent, might they be sufficient.") (internal citations and

quotation marks omitted).

As to catch-up adjustments, plaintiffs misconstrue their evidence.  Plaintiffs rely on a document that predates the class period by several years, alleging that the document represents "Spencer's strategy notes of [a risk review] meeting" and "clearly show[s] that she intentionally manipulated earnings, ignored GAAP violations, and hid material information from KPMG."  Pls.' Opp'n Spencer at 20-21 (citing Markovits-Howard/Spencer Decl., Ex. 24).   But as plaintiffs admitted in oral argument, Spencer did not even know who wrote the document, Tr. at 134:22-23, much less recognize it as her "strategy notes."  More importantly, the document says nothing about violating accounting standards or Spencer's state of mind during the class period.  Later in their brief, plaintiffs describe how certain catch-up adjustments purportedly violated Fannie Mae's amortization policy, but they cite no evidence that Spencer knew about, authorized, or planned these catch-up adjustments.  Pls.' Opp'n Spencer at 25, 32.

With respect to hedging transactions, plaintiffs allege that Boyles alerted Spencer to improper accounting practices.  *See* Lead Pls.' Supp'l Mem. of P. & A. in Opp'n to Spencer Mot. at 8-9 [Dkt. # 1038] ("Pls.' Supp'l Mem. Spencer"); *see also* Pls.' SGIMF Spencer ¶ 109 (citing Markovits-Howard/Spencer Decl., Ex. 66 at 1-2).  Plaintiffs highlight a 2001 email from Boyles in which Boyles allegedly "warned" Spencer that its "accounting treatment for certain hedging transactions was so 'aggressive' [and] 'not one we would want to flash in front of the FASB [Financial Accounting Standards Bureau] for comment or the treatment could get worse . . . .'"  Pls.' Supp'l Mem. Spencer at 8-9.  Plaintiffs, however, conveniently omit the middle of the sentence: "*we have KPMG's approval.*"  Markovits-Howard/Spencer Decl., Ex. 66 at 1.  With this phrase included,

this sentence no longer implies that the accounting policy was somehow improper. To the contrary, the sentence stands as evidence supporting the defendant's assertion that Spencer was told that Fannie Mae's accounting policies were acceptable. Plaintiffs also omit Howard's response to this email, sent to Spencer and Boyles, in which Howard rejects "attempting to work behind the scenes" in favor of "mak[ing] our argument forcibly to FASB." Delinsky Decl., Ex. 64 at 1. In no way does this email demonstrate that Spencer knew about improper accounting practices or made any effort to hide improper accounting practices.[18]

Plaintiffs also focus on the development—prior to the class period—of Fannie Mae's amortization policy. Plaintiffs cite a 1999 memo, in which Spencer and Janet Pennewell, Fannie Mae's Vice President for Financial Reporting and Planning, "recommend[ed] a policy for managing the amortization of purchase discount/premium and buyup/buydown fees," with the goal of "accurately reflect[ing] our financial results . . . ." Pls.' Opp'n Spencer at 22-23 (citing Markovits-Howard/Spencer Decl., Ex. 50). Plaintiffs also cite a 2000 email from Howard to Pennewell and Spencer describing how a proposed amortization policy would give them "a fair amount of leeway." *Id.* at 23 (citing Markovits-Howard/Spencer Decl., Ex. 6). Plaintiffs allege that these recommended policies violated FAS 91, but they cite no support for this allegation. *Id.* at 22-23. Finally, plaintiffs also allege that Pennewell "testified that both she and Spencer were concerned that certain elements of . . . the amortization policy were inconsistent

---

[18]     In fact, both Boyles' email and Howard's reply were sent to eleven other recipients. *See* Markovits-Howard/Spencer Decl., Ex. 66; Delinsky Decl., Ex. 64.

with FAS 91 and . . . shared those concerns with Howard." *Id.* at 24. How misleading! What plaintiffs characterize as Pennewell's "testi[mony]" is, in fact, an interview memorandum prepared in connection with the Rudman Report by a Paul Weiss attorney three weeks after the interview. And while the memorandum states that Spencer may have communicated her "discomfort" with Howard's policy to Howard, it does *not* state that this discomfort was based on a contemporaneous belief that the policy violated FAS 91. *See* Markovits-Howard/Spencer Decl., Ex. 54 at 26-27. Moreover, according to the memorandum, Fannie Mae never put the policy at issue into practice. *Id.* at 27.

Plaintiffs continually rely upon evidence predating the class period, but do not demonstrate how that evidence sheds light on Spencer's class-period scienter. In addition to highlighting the pre-class-period evidence discussed above, plaintiffs highlight a 1999 email from Fannie Mae's Financial Standards Group chief Jonathan Boyles to Spencer, in which they allege that "Spencer told Boyles to keep Fannie Mae's non-compliant IO/PO accounting close to the vest." Def. Leanne G. Spencer's Response to Lead Pls.' Statement of Genuine Issues of Material Fact ¶ 46 [Dkt. # 996-2] ("Spencer's Reply to Pls.' SGIMF"); *see also* Pls.' Opp'n Spencer at 15. Plaintiffs must somehow expect this Court to take their nefarious interpretation of this email on faith, since they neglected to ask Spencer or Boyles about this email in their depositions. Spencer's Reply to Pls.' SGIMF ¶ 46. However, even if plaintiffs' interpretation of this email were correct, they do not describe how this behavior in 1999 is relevant to Spencer's scienter during the class period. Plaintiffs also point to two "manipulations" that Spencer purportedly undertook to manage earnings prior to the class period. Pls.' Opp'n Spencer at 21-22.

Not only do plaintiffs fail to identify how this evidence is relevant to Spencer's class-period scienter, but they also fail to identify any evidence that Spencer believed these "manipulations" violated GAAP.  In short, plaintiffs point to a lot of things that Spencer said or did—but nothing that proves that she *knew* what she was saying or doing was wrong.

## II.     Alleged Efforts to Hide Information from KPMG and Regulators

Plaintiffs claim that "Spencer participated in intentionally hiding GAAP violations and material information from KPMG, the SEC, and OFHEO."  Pls.' Opp'n Spencer at 13.  To allege that Spencer concealed information from KPMG, plaintiffs cite four documents that predate both the class period and Spencer's promotion to Controller.  Pls.' SGIMF Spencer ¶¶ 36, 38-39, 74.  For one of the documents, plaintiffs point to no evidence that Spencer even read it, *id.* ¶ 36, and for another document, plaintiffs allege that Spencer wrote it, but fail to cite any evidence of her authorship, *id.* ¶ 74.  The only evidence plaintiffs provide on this subject that is within the class period is a 2002 email from Spencer to Howard, in which Spencer notes that "[t]here is at least one thing that we know of where we have a favorable accounting treatment and that is on the IO's we have on our books.  Freddie [Mac] is doing IO accounting and we are not.  KPMG hasn't figured that out . . . ."  *Id.* ¶ 37 (citing Markovits-Howard/Spencer Decl., Ex. 23).  This email says absolutely nothing about intentionally "hiding . . . IO/PO GAAP violations from KPMG," as plaintiffs misleadingly suggest.  Pls.' SGIMF Spencer ¶ 37; *see also* Supp'l Mem. in Supp. of Def. Leanne G. Spencer's Mot. for Summ. J. at 4 [Dkt. # 1034] ("Spencer's Supp'l Mem.").  And in fact, plaintiffs admitted during oral argument that

they neglected to confront Spencer with this document during her deposition. Tr. at 130:2-15. In short, plaintiffs do not put forth any evidence that Spencer intentionally or knowingly concealed material information from KPMG.

In addition to alleging that Spencer hid information from KPMG, plaintiffs allege that Spencer ignored KPMG's multiple warnings that Fannie Mae was violating GAAP. Pls' Opp'n Spencer at 29. As a result, plaintiffs argue that Spencer's reliance on KPMG was not in good faith.[19] *Id.* Three of the "warn[ings]" plaintiffs cite, however, consist of general communications from the SEC about "earnings management"—not linked to any Fannie Mae practice or any GAAP violation. *Id.* (citing Pls.' SGIMF Spencer ¶¶ 30-32). Further, all three of these alleged warnings *predate* the class period and do not provide insight into Spencer's class-period scienter. *Id.* More discouragingly, plaintiffs inaccurately allege that Spencer received one such warning at a meeting that evidence indicates she did *not* attend. Pls.' SGIMF Spencer ¶ 30 (citing Markovits-Howard/Spencer Decl., Ex. 16 to show that "KPMG specifically advised Howard and Spencer . . . ."); Markovits-Howard/Spencer Decl., Ex. 16 (summarizing a meeting with Howard, not Spencer).

---

[19]    Plaintiffs also allege that Spencer failed to satisfy her duty to familiarize herself with Fannie Mae's core operations and financial reporting because she engaged in "blind reliance on others" to determine that Fannie Mae's financial reporting was accurate. Pls.' Opp'n Spencer at 28. But beyond this assertion, plaintiffs cite *no* evidence that Spencer failed to familiarize herself with Fannie Mae's core operations and financial reporting. Spencer's reliance on others is not "blind" simply because plaintiffs say it is so—and the Court has not seen any evidence that leads it to believe such reliance was blind or otherwise improper.

As another example of a supposed "warn[ing]" from KPMG, plaintiffs point to an email between two KPMG employees describing a conversation with Spencer, in which employee Harry Argires said, "I told her that there are probably things that they do that are not in strict compliance with GAAP and we need to make sure that Tim and Frank understand those items and that there is a mechanism in place that measures how material the departure from GAAP is." *See* Pls.' Opp'n Spencer at 29 (citing Markovits-Howard/Spencer Decl., Ex. 68 at 1). Yet again, plaintiffs admit that they failed to confront Spencer with this email during her deposition. Tr. at 153:5. As a result, plaintiffs lack any evidence about whether Spencer recalled such a conversation, and if so, how she responded to it. Further, the email, as such, does not say that Argires told Spencer that Fannie Mae engaged in a material GAAP violation. *See* Spencer's Reply to Pls.' SGIMF ¶ 113 (citing Argires deposition as evidence that Argires was referring only to immaterial items). And with respect to each year of the class period, KPMG did not identify any material weaknesses in Fannie Mae's internal accounting controls. Spencer's Reply SUMF ¶¶ 128, 138. For all of these reasons, I cannot conclude that a jury could find this document to be evidence of Spencer's scienter of GAAP violations.

Next, in an effort to allege that Spencer hid information from the SEC, plaintiffs present a memorandum from Jonathan Boyles, in which he states that "the process we have in place is not exactly what we showed the SEC though it gets very close." Pls.' Opp'n Spencer at 15 (citing Markovits-Howard/Spencer Decl., Ex. 26 at 2); *see also* Tr. at 124:16-128:4. While Spencer was on the memorandum's distribution list, Markovits-Howard/Spencer Decl., Ex. 26 at 3, plaintiffs once again never asked Spencer if she read

this memorandum. Tr. at 124:18-24. But even if she had, when read in the light most favorable to plaintiffs—that Boyles had not described the process with full accuracy to the SEC—the memorandum goes on to state thereafter that Fannie Mae informed the SEC that it had been accounting for the transaction "incorrectly" and aimed to ensure "that the entries are booked as described to the SEC." Markovits-Howard/Spencer Decl., Ex. 26 at 2; *see also* Spencer's Supp'l Mem. at 2-3. Such conduct does not evince an intent to deceive either shareholders or the SEC; rather, this represents a good-faith effort to achieve accurate accounting and comply with the SEC's expectations.

Regarding efforts to conceal information from OFHEO, plaintiffs cite only one source: the OFHEO report.[20] Pls.' Opp'n Spencer at 14-15. Contrary to plaintiffs' assertion, the cited portion of the report does not say that "Spencer . . . misled Fannie Mae's regulators." *Id.* at 14. It says that "*senior management* systematically withheld information" from OFHEO. *Id.* (emphasis added). However, suggesting that OFHEO's non-specific and after-the-fact conclusions were related to Spencer is elevating wishful thinking into advocacy.

### III.   Internal Controls Weaknesses

As they did with defendants Raines and Howard, plaintiffs allege that Spencer misrepresented Fannie Mae's inadequate internal controls to investors. Pls.' Opp'n Spencer at 25-28. Plaintiffs cite the Restatement, OFHEO, and Rudman reports as evidence that Fannie Mae had or "admitted" to having various internal controls

---

[20]   *See* the discussion of the admissibility of the OFHEO report and similar sources *infra* at 27-28.

deficiencies during the class period. *Id.* at 26-28. But these reports, even if actually admissible,[21] could not serve as *post hoc* evidence of Spencer's scienter. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007) (recognizing rule that there is no "fraud by hindsight").

Indeed, during oral argument, plaintiffs pointed to a 2001 memorandum from Pennewell to Spencer that allegedly showed Spencer's knowledge of internal controls weaknesses. Tr. at 144:1-152:8 (discussing Markovits-Howard/Spencer Decl., Ex. 93). In this memorandum, Pennewell tells Spencer that an internal review identified "serious control issues" in the securities accounting area. Markovits-Howard/Spencer Decl., Ex. 93 at 3. Plaintiffs insisted that *no* evidence in the record suggests that Spencer or Fannie Mae took appropriate action to fix these issues. Tr. at 151:20, 154:19-21; *see also* Pls.' Supp'l Mem. Spencer at 3-4. However, plaintiffs barely acknowledged Spencer's lengthy cover letter to this memorandum, Tr. at 148:22-25, in which she stated that she did not intend to allow these issues to continue and that Fannie Mae was in the process of addressing these issues. Markovits-Howard/Spencer Decl., Ex. 93 at 1-2. Plaintiffs also failed to account for—or conveniently ignored—the follow-up memorandum one year later, which stated that "the Securities Accounting group . . . made significant progress in strengthening internal controls." Second Supp'l Decl. of Adam B. Miller in Supp. of Def. Leanne G. Spencer's Mot. for Summ. J., Ex. 237 at 1 [Dkt. # 1034-1] ("Miller Second Supp'l Decl."). Indeed, Sampath Rajappa, Senior Vice President for Operations

---

[21]    *See* the discussion of the admissibility of the Restatement and similar sources *infra* at 27-28.

Risk and head of Fannie Mae's Office of Auditing, specifically credited Spencer for the progress described in this follow-up memorandum.  Miller Second Supp'l Decl., Ex. 238 at 8 ("Frank [Raines], a lot of good work has been done since last audit; significant progress by Leanne.").  And throughout the class period, KPMG certified that Fannie Mae's internal controls were effective.  Spencer's Reply SUMF ¶ 170.  To characterize Spencer's conduct as disregarding clear evidence of internal controls weaknesses is disingenuous, at best.  In short, this is evidence of good faith, not evidence of securities fraud.

Plaintiffs also allege that Spencer "had no reasonable basis for believing that [Rajappa] was competent" or "independent" because he was not a certified public accountant, did not have prior auditing experience, and reported on a "dotted line" basis to Howard.  Pls.' Opp'n Spencer at 26.  But once again plaintiffs provide no evidence that Spencer *knew* these facts about Rajappa or *believed* these facts to be problematic.[22] To prove scienter, plaintiffs cannot merely present evidence of alleged weaknesses without also presenting evidence that Spencer knew or should have known about these weaknesses.

---

[22]    To allege that "Rajappa had informed Spencer about the personnel deficiencies in the [auditing] department," Pls.' Opp'n Spencer at 26, plaintiffs point to three memoranda from Rajappa.  Pls.' SGIMF Spencer ¶¶ 101-103.  Two of the three memoranda were not even sent to Spencer.  *Id.* at ¶¶ 101-102.  To the extent Spencer was aware of the contents of the memoranda, plaintiffs cite no evidence that Spencer would have interpreted such comments as signs of weaknesses in internal controls.  Indeed, when Rajappa was asked in his deposition about the Office of Auditing's staffing and budget, he agreed that the staffing and budget were adequate for the office to perform its job.  *See* Dep. of Sampath Rajappa ("Rajappa Dep."), Miller Decl., Ex. 207 at 225-26.

Additionally, plaintiffs claim that "Howard and Spencer demanded control over **all** information given by [Rajappa] to the Audit Committee." Pls.' Opp'n Spencer at 27. In support thereof, they point to a 2004 email, in which Howard told Spencer that he "made it 'blisteringly clear' to [Rajappa] that on any future calls he gets from the Chairman of our Audit Committee on accounting-related issues he must run the question or issue by you before he or anyone else gets back to [the Audit Committee Chairman]." *Id.* According to plaintiffs, this email demonstrates that "Howard [was] telling [Spencer to not] let Rajappa go to the audit committee with any accounting related issues." Tr. at 156:6-8. But plaintiffs point to absolutely no evidence that supports this allegation. And conversely, other evidence suggests that Spencer and Howard did not intend to—and never did—censor Rajappa's communications with the Audit Committee Chairman.[23] Thus, even if plaintiffs' interpretation of the email was reasonable, the email is devoid of any connection to accounting misbehavior or harm to investors. Once again, this is not evidence of scienter of securities fraud.

---

[23]   *See* Rajappa Dep., Miller Decl., Ex. 207 at 132-33 (conversation referenced in email involved Howard asking Rajappa to "make sure [he] get[s] all the relevant latest data from . . . accounting . . . so that it will give a full picture to [the Audit Committee Chairman]"); *id.* at 394 (Rajappa agreeing that he was not "required to go through anyone else" to talk to the Audit Committee Chairman); Dep. of Timothy Howard, Decl. of Eric Delinsky in Supp. of Def. J. Timothy Howard's Reply in Supp. of his Mot. for Summ. J. [Dkt. # 995-2] ("Delinsky Decl."), Ex. 75 at 79 (purpose of the conversation with Rajappa was to "reinforce to him the importance of getting your facts in order before you do your analysis and report it to the chairman of the audit committee . . . ."); *id.* at 73 (Howard did not "take any steps to inhibit Mr. Rajappa's communication" to the audit committee chair . . . "); *id.* at 74-75 (use of phrase "blisteringly clear" was an inside joke between Howard and Spencer); Dep. of Thomas Gerrity (Audit Committee Chairman), Delinsky Decl., Ex. 80 at 318-23 (testifying that communications with Rajappa appeared to be candid, forthright, and uncensored both before and after the 2004 email).

IV.    **Spencer's Financial Motivation**

Plaintiffs again fail to establish Spencer's scienter by observing that Spencer "had

substantial financial motivation to improperly manipulate [earnings per share]," Pls.'

Opp'n Spencer at 8, and "reaped huge financial rewards from the fraud," *id.* at 33.

Plaintiffs claim that Spencer designed a compensation program that rewarded Spencer

and other Fannie Mae employees when Fannie Mae met targeted earnings per share. *Id.*

at 9-11.  What plaintiffs fail to mention, however, is that Fannie Mae's board of directors

developed its executive compensation plan, including the earnings-per-share metric,

*before* Spencer became Senior Vice President and Controller.  Def. Franklin D. Raines's

Reply to Lead Pls.' Responses to Def. Raines's Statement of Undisputed Material Facts

and Statement of Additional Undisputed Material Facts in Supp. of Def. Franklin D.

Raines's Mot. for Summ. J. ¶¶ 252-54 [Dkt. # 979] ("Raines Reply SUMF and

SAUMF").[24]  And evidence suggests that Fannie Mae's earnings-per-share performance

was not the dominant incentive underlying Spencer's compensation.  Spencer's Reply to

Pls.' SGIMF ¶ 8 (citing Miller Decl., Ex. 170 at 35).  Moreover, this compensation

program, standing alone, cannot constitute evidence of scienter.  *See Novak v. Kasaks*,

216 F.3d 300, 307 (2d. Cir. 2000) (noting that scienter requires a showing of more than

"motives possessed by virtually all corporate insiders" such as maintaining credit rating,

sustaining profitability, and maintaining stock price to increase executive compensation).

---

[24]    Fannie Mae's Congressionally-drafted charter also dictates a significant portion of executive compensation is to be based on corporate performance. *See* Fannie Mae Charter Act, Decl. of Eun Young Choi in Supp. of Def. Franklin D. Raines's Mot. for Summ. J. [Dkt. # 979] ("Choi Decl."), Ex. 227 at 27.

Notably, Spencer substantially *increased* her ownership of Fannie Mae stock and

vested stock options throughout the class period.  Spencer's Reply Mem. at 12; *see also*

Spencer's Reply SUMF ¶¶ 74-76.  Such behavior is, to say the least, inconsistent with a

fraudulent intent.  *See In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383-84

(E.D.N.Y. 2003) ("The net acquisition of shares cuts against the notion that defendants

sought to unload their holdings of KeySpan stock before their likely diminution in value

following the disclosure of negative insider information.").

### V.      Reports and Findings of Regulators and Outside Counsel

Throughout their opposition brief, plaintiffs lean heavily on the post-hoc reports

and litigation documents, which were uniformly prepared after the relevant events in this

case, and some of which were explicitly prepared in preparation for litigation, as

"evidence" or "admissions" of Spencer's scienter.  *See, e.g*, Pls.' Opp'n Spencer at 2 n.3,

3 n.4, 5 n.16, 15 n.50 (citing OFHEO reports or press releases); *id.* at 4 n.10, 20 n.70, 25

n.95, 26 n.97, 27 n.101, 33 n.128 (citing Fannie Mae's Restatement); *id.* at 2 n.1, 5 n.16,

17 n.59, 20 nn.70 & 75, 25 n.95, 27 n.101 (citing Rudman Report); *id.* at 3 n.7, 24 n.91

(citing SEC complaint against Fannie Mae); Pls.' Supp'l Mem. Spencer at 6 n.12 (citing

Fannie Mae's Restatement).  Putting aside the obvious and substantial admissibility

questions concerning these documents,[25] plaintiffs face a much larger challenge in relying

---

[25]      The conclusions and opinions in these documents are clearly hearsay and thus
cannot be considered as evidence of Spencer's scienter. *See Wilkerson v. Wackenhut
Protective Servs., Inc.*, 813 F. Supp. 2d 61, 67 n.9 (D.D.C. 2011) (inadmissible evidence
"cannot be considered at summary judgment").
         Plaintiffs contend that the OFHEO and Rudman reports are admissible under Fed.
R. Evid. 803(8) as public records. Pls.' Opp'n Spencer at 5 n.16. But, the OFHEO

on these documents: they do *not* contain any evidence of Spencer's scienter. *See, e.g.,* Part II: Response to Spencer's Statement ¶¶ 6-12, Pls.' SGIMF Spencer (citing Rudman and OFHEO reports as "evidence . . . that Spencer knowingly and intentionally engaged in pervasive improper earnings management and GAAP violations . . . ."). With the exception of the administrative charges, these documents uniformly reached *no* conclusions as to Spencer's state of mind. Here, by comparison, the key inquiry as to scienter is whether Spencer knew, or consciously disregarded, the potential falseness of her statements. As such, the after-the-fact and non-specific conclusions of regulators and investigators, contained in this myriad of reports, fail to shed *any* light on this inquiry.[26]

## VI.   Magnitude of the Fraud

Finally, plaintiffs attempt to shore up their case against Spencer by pointing to the "sheer scope and magnitude of the fraud." Pls.' Opp'n Spencer at 32. But as Shakespeare might have said, a giant body doth not portend an evil mind. Indeed, at the motion-to-dismiss stage, I warned plaintiffs' counsel that a fraud's magnitude *alone* was

---

reports were part of an effort to prepare administrative charges against the individual defendants and raise substantial questions of trustworthiness. *See* Fed. R. Evid. 803(8). The Rudman Report certainly does not fall within the 803(8) exception, which is limited to records or statements "of a public office." *Id.*

Moreover, the prejudicial effect of these documents substantially outweighs their probative value; these documents, after all, were undoubtedly fashioned with multiple considerations in mind. Plaintiffs argue that inadmissible evidence can be used to defeat summary judgment "so long as it is capable of being converted into admissible evidence," Pls.' Opp'n Spencer at 5 n.16, but plaintiffs do not demonstrate that the reports contain "underlying admissible evidence" that could be used at trial.

[26]   Plaintiffs also note that "OFHEO . . . brought charges against Raines, Howard, and Spencer for intentional and knowing misconduct and reckless[] misconduct." Pls.' Opp'n Spencer at 2. Yet plaintiffs fail to explain how these charges, which were settled with a denial of liability, can be considered *evidence* of scienter.

insufficient to establish an inference of scienter. *See In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d at 41. That principle is stronger now at the summary-judgment stage, and the time for simply presenting allegations that give rise to a strong inference of scienter has long since passed. Without any actual evidence supporting a conclusion of Spencer's scienter, the magnitude of Fannie Mae's earnings restatement alone is insufficient to preclude summary judgment.[27]

## CONCLUSION

Sustaining claims for securities fraud requires a showing of scienter—either an intent to deceive or an extreme departure from the standard of ordinary care—for each individual or entity claimed to have committed such fraud. Put simply, the securities fraud laws are not a means for shareholders to recover for all losses, no matter how sizable or sudden. Upon review of plaintiffs' evidence, this Court concludes that plaintiffs have failed to put forth sufficient evidence from which a reasonable jury could find that Spencer had such an intent. A failure to understand, or even negligent behavior, is not the equivalent of the necessary intent to deceive or conscious disregard of obvious risks. Therefore, Spencer is entitled to summary judgment on all claims against her.

---

[27]    Moreover, plaintiffs do not dispute that the factor responsible for the largest amount of Fannie Mae's earnings restatement was its FAS 133 application. *See* Lead Pls.' Mem. of P. & A. in Opp'n to Defs.' Mot. FAS 133 at 30-31 [Dkt. # 968]. Because that change in Fannie Mae's hedge accounting so significantly affected Fannie Mae's reported earnings, this case is simply distinct from cases involving fake transactions, hidden liabilities, or the distortion of the economics of Fannie Mae's business. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 496 (S.D.N.Y. 2004). *See also* Defs.' Reply SUMF FAS 133 ¶ 76 (discussing disclosure of FAS 133 accounting to public and analysts' ability to calculate earnings impact).

For all of the foregoing reasons, the Court GRANTS defendant Leanne G.

Spencer's Motion for Summary Judgment.  An Order consistent with this decision

accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge