# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FILED**

**DEC 0 6 2013**

Clerk, U.S. District and
Bankruptcy Courts

| | |
|---|---|
| In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation | MDL No. 1668 |
| In re Fannie Mae Securities Litigation | Consolidated Civil Action No. 04-1639 (RJL) |

## MEMORANDUM OPINION
December **5**, 2013 [## 1092, 1093]

This is a class action securities fraud suit against Federal National Mortgage

Association ("Fannie Mae") and its former accountant, KPMG, LLP,[1] brought by a class

of parties represented by lead plaintiffs the Ohio Public Employees Retirement System

("OPERS") and the State Teachers Retirement System of Ohio ("STRS") (collectively,

"Lead Plaintiffs"). After nearly a decade of litigation—including more than five years of

extensive discovery, multiple rounds of briefing on dispositive motions, several appeals

to our Circuit Court, a constitutional challenge to a regulation in a related proceeding,[2]

and more than two years of mediation—the parties now seek final approval of a

---

[1] Three of Fannie Mae's former senior executives—Franklin D. Raines (Fannie Mae's Chief Executive Officer and Chairman of the Board), J. Timothy Howard (Fannie Mae's Chief Financial Officer and Vice Chairman), and Leanne G. Spencer (Fannie Mae's Controller and Senior Vice President)—were defendants in this suit until this Court granted their summary judgment motions and dismissed them from the case during the past year. *See In re Fannie Mae Sec. Litig.*, 892 F. Supp. 2d 59 (D.D.C. 2012) (Franklin D. Raines); *In re Fannie Mae Sec. Litig.*, 898 F. Supp. 2d 176 (D.D.C. 2012) (J. Timothy Howard); *In re Fannie Mae Sec. Litig.*, 905 F. Supp. 2d 63 (D.D.C. 2012) (Leanne G. Spencer).

[2] *Ohio Pub. Emps. Ret. Sys. v. FHFA*, Civil Case No. 11-01543 (D.D.C.).

stipulated settlement agreement that would resolve this action as to the Settlement Class[3] and constitute the largest securities class action settlement in the history of our Circuit (since the Private Securities Litigation Reform Act ("PSLRA") went into effect in 1996). On October 31, 2013, the Court held a fairness hearing related to the settlement, as required by Federal Rule of Civil Procedure 23(e) ("Fairness Hearing"). The arguments and representations made on the record during the Fairness Hearing are hereby expressly incorporated and made part of this Memorandum Opinion. Upon consideration of the parties' pleadings, the arguments and representations made at the Fairness Hearing, the relevant statutes and case law, and the entire record herein, the Court GRANTS Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation and Memorandum of Law in Support ("Pls.' Mot. Final Approval") [Dkt. # 1092], and hereby approves the $153 million settlement and the Plan of Allocation. The Court also GRANTS Lead Counsel's[4] Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and Memorandum of Law in Support ("Mot. Attorneys' Fees") [Dkt. # 1093], and hereby awards plaintiffs' counsel attorneys' fees equal to 22% of the Settlement Fund (including interest and after other expenses have been deducted) and $15,294,860.78 in reimbursement of litigation expenses.

---

[3] Unless otherwise indicated herein, capitalized terms shall have those meanings contained in the Stipulation of Settlement of Securities Action [Dkt. # 1089-2].

[4] Lead Counsel is the law firm Markovits, Stock & DeMarco, LLC. The Court initially appointed the law firm Waite, Schneider, Bayless & Chesley Co., LPA as lead counsel in 2005, *see In re Fannie Mae Sec. Litig.*, 355 F. Supp. 2d 261, 265 (D.D.C. 2005), but subsequently approved the substitution of Markovits, Stock & DeMarco, LLC for that firm as lead counsel, *see* Minute Order, Sept. 20, 2012.

# BACKGROUND[5]

In September 2004, several Fannie Mae shareholders filed class action suits

alleging that the company and its executives had violated the federal securities laws and

committed securities fraud. Compl. [Dkt. # 1]. After other separately-filed cases were

consolidated into this multi-district litigation action, I appointed OPERS and STRS as

Lead Plaintiffs on January 13, 2005. *In re Fannie Mae Sec. Litig.*, 355 F. Supp. 2d 261,

263-64 (D.D.C. 2005).[6] Plaintiffs alleged that Fannie Mae, its auditor KPMG, and three

of Fannie Mae's former senior executives violated § 10(b) of the Securities Exchange Act

of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, by intentionally

manipulating earnings and violating Generally Accepted Accounting Principles

("GAAP"), causing losses to investors.[7] Specifically, plaintiffs alleged that the

defendants publicly issued materially false and misleading financial reports and other

statements that artificially inflated the price of Fannie Mae's securities. *See* Stipulation

of Settlement of Securities Action ("Stipulation") [Dkt. # 1089-2] at 2.

On January 7, 2008, this Court certified a class composed of approximately one

---

[5] For a detailed history of this litigation and additional background information, see the Court's Memorandum Opinions in *In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d 25, 29-30 (D.D.C. 2007), and *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32, 34-36 (D.D.C. 2008), as well as the Joint Declaration of W.B. Markovits and Joseph T. Deters in Support of (A) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation, and (B) Lead Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses [Dkt. # 1092-1] ¶¶ 4-82.

[6] In March 2005, plaintiffs filed a Consolidated Class Action Complaint for Violations of Federal Securities Laws [Dkt. # 64]; I denied Fannie Mae's motion to dismiss [Dkt. # 77] in February 2006. *See* Order, Feb. 10, 2006 [Dkt. # 115]. In August 2006, plaintiffs filed a Second Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws [Dkt. # 204]; I denied KPMG's motion to dismiss [Dkt. # 240] in January 2007. *See* Minute Order, Jan. 24, 2007.

[7] Plaintiffs also alleged that the individual defendants violated § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) (2006).

million purchasers of Fannie Mae common stock and call options, and sellers of Fannie Mae put options, during the period from April 17, 2001 through December 22, 2004 (the "Class Period"). *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32 (D.D.C. 2008). On that date, the Court also designated Lead Plaintiffs as class representatives, and appointed lead class counsel. *Id.* Thereafter, the parties engaged in extensive discovery, with fact discovery concluding on April 29, 2010, and expert discovery concluding on May 26, 2011. And discovery was indeed extensive: together, the parties produced nearly 67 million pages of documents, deposed 123 fact witnesses, and engaged 35 expert witnesses. *See* Joint Declaration of W.B. Markovits and Joseph T. Deters in Support of (A) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation, and (B) Lead Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Markovits & Deters Joint Decl.") [Dkt. # 1092-1] ¶¶ 26, 37-49.[8]

Meanwhile, in September 2008, while discovery was ongoing, the Federal Housing Finance Agency ("FHFA") placed Fannie Mae into conservatorship, essentially converting plaintiffs' case from one against a private company into a case against the U.S. government. *See id.* ¶¶ 50-51. Then, in July 2009, FHFA proposed a rule that (1) subordinated securities litigation claims to the lowest level of the statutory priority for unsecured claims in receivership, and (2) prohibited a regulated entity in conservatorship,

---

[8] The discovery process was prolonged by the Office of Federal Housing Enterprise Oversight's ("OFHEO") assertion of privileges, which was litigated up to our Circuit Court. *See* Order, Jan. 22, 2008 [Dkt. # 580], *aff'd*, 552 F.3d 814 (D.C. Cir. 2009). (Amidst the financial crisis of 2008, Congress established FHFA to replace OFHEO as Fannie Mae's independent regulator.)

such as Fannie Mae, from paying securities litigation claims or making capital distributions (redefined to include securities litigation claims) without the FHFA Director's approval. *See Conservatorship and Receivership*, 75 Fed. Reg. 39,462 (proposed July 9, 2010); Markovits & Deters Joint Decl. ¶ 52. Concerned that the rule might effectively block any recovery for their securities fraud claims, plaintiffs filed a separate action in this Court challenging the final rule, *Conservatorship and Receivership*, 76 Fed. Reg. 35,724 (June 20, 2011), on constitutional and other grounds. *See* Compl., Aug. 26, 2011, *Ohio Pub. Emps. Ret. Sys. v. FHFA*, Civil Case No. 11-01543 [Dkt. # 1].[9] Cross motions for summary judgment in that related case are currently pending before this Court.

Notwithstanding the parallel proceeding regarding the FHFA rule, the parties filed eight summary judgment motions in this litigation in August 2011—two by Lead Plaintiffs, and six by the defendants. Markovits & Deters Joint Decl. ¶ 64-75. After hearing oral argument on the motions over four days in June 2012, this Court granted the summary judgment motions of the three individual defendants and dismissed them from the case. *See In re Fannie Mae Sec. Litig.*, 892 F. Supp. 2d 59 (D.D.C. 2012) (Franklin D. Raines); *In re Fannie Mae Sec. Litig.*, 898 F. Supp. 2d 176 (D.D.C. 2012) (J. Timothy Howard); *In re Fannie Mae Sec. Litig.*, 905 F. Supp. 2d 63 (D.D.C. 2012) (Leanne G. Spencer). With the remaining five summary judgment motions still pending, the parties

---

[9] In October 2011, in support of FHFA's motion to stay this class action litigation [Dkt. # 944], the Acting Director of FHFA submitted a declaration invoking the new rule and stating that he would not approve payment of any of plaintiffs' claims under his discretionary authority. *See* Decl. of Edward J. DeMarco [Dkt. # 944-14] ¶¶ 4, 6. I denied FHFA's motion for a stay in November 2011. *See* Minute Order, Nov. 14, 2011; *see also* Markovits & Deters Joint Decl. ¶¶ 57-59.

agreed to enter formal mediation in 2011 and appointed Morgan, Lewis & Bockius LLP partner Fred Fielding as their mediator. Markovits & Deters Joint Decl. ¶ 76. After more than two years of mediation, the parties reached an agreement in principle on March 20, 2013. *Id.* ¶ 80. The parties then finalized the terms of the $153 million agreement, and on May 7, 2013, Lead Plaintiffs filed an Unopposed Motion for Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, Setting Date for Hearing on Final Approval of Settlement, and Staying Non-Settlement Related Proceedings and Memorandum in Support [Dkt. ## 1089, 1089-1], along with a Stipulation of Settlement of Securities Action [Dkt. # 1089-2].

On June 7, 2013, this Court issued an Order (1) granting preliminary approval of the settlement; (2) approving the form and manner of notice to the Class; (3) setting a date for the Fairness Hearing and a procedure for Class Members to make objections to the settlement; (4) setting a deadline for plaintiffs' counsel to submit a motion for attorneys' fees and expenses; and (5) staying all non-settlement related proceedings. *See* Preliminary Approval Order, June 7, 2013 [Dkt. # 1090]. Thereafter, the Claims Administrator mailed notices to more than 1.1 million potential class members and nominees. Markovits & Deters Joint Decl. ¶ 87. Pursuant to Federal Rule of Civil Procedure 23(e), the Court held a Fairness Hearing on October 31, 2013 to consider whether the settlement is fair, reasonable, and adequate, and to hear any objections.

## ANALYSIS

A certified class action may not be settled without the Court's approval. Fed. R. Civ. P. 23(e). "Before giving its approval, the Court must direct the provision of

adequate notice to all members of the class, conduct a 'fairness hearing,' and find, after notice and a hearing, that the 'settlement is fair, adequate and reasonable and is not the product of collusion between the parties.'" *In re Black Farmers Discrim. Litig.*, 856 F. Supp. 2d 1, 26 (D.D.C. 2011) (internal citations omitted). For the reasons explained below, the Court finds the $153 million settlement, as well as the Plan of Allocation for distributing those funds to the Class Members, to be fair, reasonable, and adequate. The Court also approves Lead Counsel's request for attorneys' fees and reimbursement of expenses.

## I.    Notice

As a preliminary matter, the Court finds that notice was adequate. Under Rule 23, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Lead Counsel retained The Garden City Group, Inc. ("GCG"), a firm specializing in class action settlements and claims processing, to act as both Notice Administrator and Claims Administrator. Decl. of Jose C. Fraga ("Fraga Decl.") [Dkt. # 1092-25] ¶ 2. Following this Court's preliminary approval of the settlement in June 2013, GCG mailed 1,149,771 copies of the Notice and Proof of Claim form to potential class members or their nominees. *See* Supplemental Declaration of Jose C. Fraga ("Fraga Suppl. Decl.") [Dkt. # 1107-3] ¶ 2. GCG also published notice in the Wall Street Journal and PR Newswire, as well as set up a dedicated website, email address, and telephone helpline. *See* Markovits & Deters Joint Decl. ¶¶ 88-90; Fraga Decl. ¶¶ 10-14.

The Notice advised Class Members of the essential terms of the Settlement

Agreement, the Plan of Allocation, how to make a claim, how to object to the settlement,

and the date, time, and location of the Fairness Hearing. *See* Markovits & Deters Joint

Decl. ¶ 84; *see also* Fraga Decl. Ex. A (Notice; Proof of Claim form). It also informed

potential Class Members of Lead Counsel's intention to apply to the Court for an award

of attorneys' fees of no more than 22% of the Settlement Fund (after deducting costs and

expenses, and adding interest), and reimbursement of expenses of no more than $17

million (plus the costs of settlement administration, plus interest). *See* Fraga Decl. Ex. A

¶ 5 (Notice; Proof of Claim form). Having examined the Notice and Proof of Claim

form, I find that notice was adequate.[10]

## II.    The Settlement

Final approval of a proposed class action settlement agreement lies within this

Court's discretion. *Vista Healthplan v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349,

357 (D.D.C. 2007). "In considering whether to approve a proposed class action

settlement, the Court must strike a balance between a rubber stamp approval and 'the

detailed and thorough investigation that it would undertake if it were actually trying the

case.'" *Id.* (quoting *United States v. District of Columbia*, 933 F. Supp. 42, 47 (D.D.C.

1996)). The Court's role is to act as a fiduciary for class members and determine whether

the proposed settlement is "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2);

---

[10] The Court received one objection to the adequacy of the Notice, from purported class member Rinis Travel Service, Inc. Profit Sharing Trust U.A. 6-1-1989 ("Rinis"). Since Rinis is not, in fact, a class member and thus lacks standing to object, *see* Lead Pls.' Mot. Strike Objection of Rinis Travel Service, Inc. Profit Sharing Trust U.A. 6-1-1989 and Mem. Supp. ("Pls.' Mot. Strike Rinis Objection") [Dkt. # 1111] at 2-3, I need not formally overrule this purported objection.

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975) ("the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members"). Nonetheless, "there is a long-standing judicial attitude favoring class action settlements," *Vista Healthplan*, 246 F.R.D. at 357, and "the discretion of the Court to reject a settlement is restrained by the 'principle of preference' that encourages settlements," *In re Black Farmers Discrim. Litig.*, 856 F. Supp. 2d at 30. *See also Osher v. SCA Realty I, Inc.*, 945 F. Supp. 298, 304 (D.D.C. 1996) ("It is well-established that courts assume a limited role when reviewing a proposed class action settlement. They should not substitute their judgment for that of counsel who negotiated the settlement. Rather, courts . . . strongly encourage settlements [and] [i]n the context of class actions, settlement is particularly appropriate given the litigation expenses and judicial resources required in many such suits." (internal citations omitted)).

There is no single test in our Circuit for evaluating a proposed class action settlement under Rule 23(e). *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 194 (D.D.C. 2011). The Court must consider the particular facts and circumstances of the case, but generally courts in our Circuit have considered the following factors in making this determination: "(a) whether the settlement is the result of arms-length negotiations; (b) the terms of the settlement in relation to the strength of [plaintiffs'] case; (c) the stage of the litigation proceedings at the time of settlement; (d) the reaction of the class; and (e) the opinion of experienced counsel." *Id.*; *see also Vista Healthplan*, 246 F.R.D. at 360; *In re Lorazepam & Clorazepate Antitrust Litig.*, No. MDL 1290, 2003 WL 22037741, *2 (D.D.C. June 16, 2003) (citing numerous cases). Having carefully considered these

factors and all of the characteristics of this case, I easily find this settlement to be fair, adequate, and reasonable.

## A. Arm's-Length Negotiations

A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 104 (D.D.C. 2004) (quoting Manual for Complex Litigation (Third), § 30.42 (1995)). Lead Counsel has described the negotiations process and submits that the settlement reached "is the product of extensive and vigorous arm's-length bargaining, undertaken in good faith with full knowledge of the case and its attendant risks." Pls.' Mot. Final Approval at 7-8; *see also* Markovits & Deters Joint Decl. ¶¶ 76-80, 91. I agree.

In 2011, nearly seven years into this litigation and after five years of fact and expert discovery, the parties agreed to formal mediation and engaged the services of Fred Fielding, a highly experienced mediator whose distinguished career includes service as White House Counsel to two U.S. Presidents. Over the span of two years, the parties conducted eleven joint negotiation sessions in addition to numerous other meetings and telephone conferences between the mediator and the individual parties. *See* Pls.' Mot. Final Approval at 7-8; Markovits & Deters Joint Decl. ¶¶ 76-80; Letter from F. Fielding (Oct. 21, 2013). Accordingly, the settlement was reached only after the parties had conducted years of discovery and legal analysis and two years of mediated negotiations. Moreover, Mr. Fielding submitted a letter to the Court attesting that, "in [his] professional opinion, the negotiations leading to this proposed settlement were very

concentrated and conducted at arms' length," and "[a]ll of the Parties' counsel were not only professionals, but also clearly possessed the sufficient discovery and research materials to make informed decisions." Letter from F. Fielding (Oct. 21, 2013). Accordingly, I have no trouble concluding that this settlement is the product of arm's-length negotiations, and there is no evidence of unfairness or collusion. This factor therefore weighs in favor of approval.

## B. Terms of the Settlement in Relation to the Strength of Plaintiffs' Case

Next, the Court compares the terms of the settlement with the likely recovery plaintiffs would attain if the case proceeded to trial, an exercise which necessarily involves evaluating the strengths and weaknesses of plaintiffs' case. Our Circuit Court has stated that "[t]he court's primary task [when considering a settlement under Rule 23(e)] is to evaluate the terms of the settlement in relation to the strength of the plaintiffs' case." *Thomas v. Albright*, 139 F.3d 227, 231 (D.C. Cir. 1998). Accordingly, some courts in our Circuit have deemed this the most important factor. *See In re Black Farmers Discrim. Litig.*, 856 F. Supp. 2d at 26 ("By far the most important factor is a comparison of the terms of the compromise or settlement with the likely recovery that plaintiffs would realize if the case went to trial"); *Blackman v. District of Columbia*, 454 F. Supp. 2d 1, 8 (D.D.C. 2006). In this particular case, I find this factor is indeed the most important. In view of the size of the recovery in relation to the facts and circumstances of this complex case—including the current posture of the litigation and the relative strength of plaintiffs' legal claims—the Court finds that the settlement is a very positive outcome for plaintiffs and thus weighs in favor of approval.

As an initial matter, the $153 million settlement amount[11] in this case is the largest securities class action settlement in our Circuit since the PSLRA went into effect in 1996. Markovits & Deters Joint Decl. ¶ 101, Ex. 3 (Institutional Shareholder Services Inc., Securities Class Action Services, Top 100 Settlements Semi-Annual Report (Jan. 18, 2013)). This remarkable statistic in itself tends to indicate the favorability of this recovery for plaintiffs. Moreover, plaintiffs' recovery in relation to potential damages is reasonable. Lead Plaintiffs calculate that the $153 million settlement amounts to 4-8% of the "best case scenario" potential recovery (of $2-4 billion) had they prevailed at trial, as estimated by their damages expert, *see* Markovits & Deters Joint Decl. ¶ 127, a percentage which compares favorably with other cases approving securities class action settlements. *See In re Baan Co. Sec. Litig.*, 288 F. Supp. 2d 14, 17 (D.D.C. 2003) (noting the median settlement "in similar [securities fraud] class actions brought under the PSLRA" is 3.6% of estimated damages); *In re Newbridge Networks Sec. Litig.*, No. 94-1678, 1998 WL 765724, at *2, (D.D.C. Oct. 23, 1998) (finding "an agreement that secures roughly six to twelve percent of a *potential* trial recovery, while preventing further expenditures and delays and eliminating the risk that no recovery at all will be won, seems to be within the targeted range of reasonableness"); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting study showing that securities

---

[11] Lead Plaintiffs' damages expert has estimated that "approximately 767 million shares of Fannie Mae common stock were purchased during the Class Period and held through a corrective disclosure and therefore were damaged," and as a result "estimates that, if valid claims for all damaged shares are submitted, the average recovery per damaged share of Fannie Mae common stock will be approximately $0.20 per share before deduction of attorneys' fees, costs and expenses awarded by the Court and the costs of providing notice and administering the Settlement." Fraga Decl. Ex. A, ¶ 3 (Notice; Proof of Claim form). A Class Member's actual recovery, however, will depend on many factors, including how many claims are ultimately filed. *Id.*

class action settlements since 1995 (when the PSLRA was enacted) have recovered between 5.5% and 6.2% of class members' estimated losses).

But while comparisons to other cases offer helpful reference points, the touchstone of the inquiry under this factor must be an evaluation of the terms of the settlement in relation to the strength of the plaintiffs' claims in *this* particular case. And in view of the uncertainties and very significant risks to plaintiffs' case posed by defendants' legal defenses and the FHFA rule, and the concomitant risk of securing no recovery at all for the class members, I find that this factor weighs heavily in favor of approving the settlement.

Losing at trial is always a risk, of course, but as Lead Counsel concedes, there were unique complexities and challenges for plaintiffs in this case that would have made proceeding to trial costly, and prevailing once there highly uncertain. In particular, Lead Counsel considered:

> . . . (b) the difficulties and risks involved in proving the operative allegations—especially given the fact that the Court has already granted summary judgment motions filed by the three individual defendants on the basis that Lead Plaintiffs had offered no evidence to create a genuine issue of material fact that any of the individual defendants acted with the requisite level of scienter; (c) the legal uncertainties associated with proving corporate scienter absent any showing of individual defendant scienter; (d) the difficulties and risks of demonstrating corporate scienter with respect to Fannie Mae's implementation of FAS 133; (e) the difficulties and risks of demonstrating auditor scienter (a heightened standard) with respect to KPMG's participation in Fannie Mae's development and implementation of FAS 133; (f) the difficulties and risks of proving that the alleged fraud caused the Class's losses; (g) the probability that Lead Plaintiffs would be barred from introducing into evidence the findings and/or conclusions of the Rudman Report, the OFHEO Report, the 2006 OFHEO Report, and the Restatement, among other things; (h) the potential for adverse opinions on the outstanding

13

summary judgment motions; (i) the attendant risks of litigation, especially in a complex action such as this, including the ability to maintain class status through to judgment; (j) the uncertainty in Lead Plaintiffs' theory of damages, even assuming that Lead Plaintiffs could establish liability as to the remaining Defendants; (k) the delays and uncertainties inherent in such litigation, including appeals; (l) the risk that Fannie Mae would be placed into receivership or liquidated entirely; and (m) the risk that the FHFA Rule would be upheld, denying the Class any damages to which it would otherwise be entitled.

Pls.' Mot. Final Approval at 3-4. Lead Counsel also noted the "distinct risk that the Court might find no scienter respecting defendant Fannie Mae under the 'corporate scienter' theory" because I had already granted summary judgment motions by the three individual defendants and dismissed them from the case in 2012. *Id.* at 4 n.4. Moreover, even if plaintiffs had succeeded at trial—which likely would have involved a costly "battle of the experts"—an appeal likely would have followed, further delaying any recovery for the class members. *See Vista Healthplan*, 246 F.R.D. at 362 (noting a likely appeal of any successful trial verdict for plaintiffs would have delayed final resolution of the case, whereas settlement provided for relatively prompt recovery).

In short, plaintiffs faced significant challenges in first surviving summary judgment and then proving liability and damages at trial. But compounding these typical litigation risks was the atypical circumstance of potentially winning at trial and *still* not securing any recovery as a result of the FHFA rule. For were that rule to be upheld (either by this Court, or by our Circuit Court on an appeal), the FHFA Director would be able to use his discretionary authority to prohibit Fannie Mae from paying any securities fraud claims in conservatorship, including those of plaintiffs if they succeeded at trial. I find that this unusual circumstance tilts this factor further in support of approval here. *Cf.*

*Trombley*, 826 F. Supp. 2d at 195-196, 199 (finding this factor weighed in favor of settlement approval, in part because "the legal landscape for [bank overdraft fee litigation] remains challenging and riddled with uncertainty" where a federal law preemption issue had not yet been decided by any federal appeals court).

In light of the significant litigation risks plaintiffs faced in establishing liability and damages at trial, the risk of no recovery notwithstanding success at trial, and the benefit to Class Members of securing recovery now, I find that the terms of the settlement in relation to the strength of plaintiffs' case support approval.

## C. Stage of the Litigation at the Time of Settlement

Based on the history of this case, the Court also has little trouble finding that the status of this litigation at the time of settlement favors approval. This factor guides courts to assess "whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success and range of recovery." *Vista Healthplan*, 246 F.R.D. at 362 (quoting *In re Lorazepam*, 2003 WL 22037741, at *4). Here, after nearly nine years of litigation—including extensive fact and expert discovery, motions practice, several appeals to our Circuit Court, and two years of mediation—there is no question that counsel for both sides had ample information and sufficient understanding of the strengths and weaknesses of their respective positions to assess the merits of this settlement. Thus, the settlement certainly "do[es] not come too early to be suspicious." *In re Vitamins*, 305 F. Supp. 2d at 105. Nor does it come "too late to be a waste of resources," *id.*, because significant outstanding issues loomed in the path even before reaching trial, including the five

pending summary judgment motions and plaintiffs' challenge to the FHFA rule.

Accordingly, I find that this factor also weighs in favor of approving the settlement.

### D. Reaction of the Class

The Class Members' reaction to the settlement has been positive and also supports approval. The Claims Administrator, GCG, mailed 1,149,771 copies of the Notice and Proof of Claim form to potential class members or their nominees following this Court's preliminary approval of the settlement in June 2013. *See* Fraga Suppl. Decl. ¶ 2. Prior to the October 31, 2013 Fairness Hearing, the Claims Administrator received 24,158 Proof of Claim forms from potential class members (as of October 10, 2013), as well as nearly 4,000 calls to its dedicated telephone helpline and more than 200 emails to its settlement-specific email address. *Id.* ¶¶ 16, 9, 8. These contacts with potential class members have indicated that the settlement has been "favorably received." Pls.' Mot. Final Approval at 9; *see also* Fairness Hr'g Tr. 30, Oct. 31, 2013 (plaintiffs' counsel W.B. Markovits stating there have been "over 4,000 calls, about 3,700 I believe website visits and e-mails" and noting "[w]e fielded hundreds of calls ourselves, and I might note that all of these calls from what I hear from the Garden City Group, and from what I know of the calls to us have been supportive of the settlement"). In fact, only four objections (or purported objections) were submitted, which is remarkable for a class as large as this one. *See Bynum v. District of Columbia*, 412 F. Supp. 2d. 73, 77 (D.D.C. 2006) ("The low number of opt outs and objectors (or purported objectors) supports the conclusion that the terms of the settlement were viewed favorably by the overwhelming majority of class members."). Moreover, of those four submissions, only one objected to the substance of

the settlement itself,[12] and it is a meritless objection by a purported class member who, as it turns out, lacks standing.[13]

### E. Opinion of Experienced Counsel

Finally, the Court considers the opinion of counsel that this settlement is reasonable and should be approved. The opinion of experienced counsel "'should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement.'" *Vista Healthplan*, 246 F.R.D. at 363 (quoting *In re Lorazepam*, 2003 WL 22037741, at *6). Class counsel obviously believes that the settlement is fair,

---

[12] Three objections (or purported objections) concerned other aspects of the settlement. Class members Jeff Pechan and Cafco-Gold Equity Fund, L.P objected to the Plan of Allocation. *See infra* Part III. Purported class member Rinis objected to the adequacy of the notice and the requested attorneys' fees. *See supra* note 10; *infra* note 19. And purported class member Jeffrey M. Jacobson submitted a letter to the Court objecting that the requirements to submit a claim under the Proof of Claim form are too onerous because class members must submit records going back several years in order to prove their membership. (Mr. Jacobson's letter did not comply with the procedures for filing objections set forth in the Notice, *see* Fraga Decl. Ex. A, ¶¶ 72-73 (Notice; Proof of Claim form), and in any event I find his objection meritless.)

[13] Ms. Khadija Duma filed a Motion to Intervene [Dkt. # 1114] the day before the Fairness Hearing, asserting that she is a class member and should have received notice of the settlement, but did not. Ms. Duma then appeared in person at the Fairness Hearing, stated she was a former Fannie Mae employee, and, upon questioning by this Court, raised concerns about the merits of settlement itself. *See* Fairness Hr'g Tr. 17-26, 24-25 (Ms. Duma stating "I know they manipulated the balances on the books. I know they manipulated the way that the products were . . . I know a lot about that so how do you decide what the stock was really worth when the accounting was so far off base . . . [?]" and "how do you get to a value that's fair?"). At the Court's direction, Lead Counsel contacted Ms. Duma after the hearing and investigated her claim of being a class member. Lead Counsel has since concluded that Ms. Duma is not a class member according to their records, that she has failed to produce any records sufficient to prove her class membership, as required by the Notice, and that therefore she lacks standing to object. *See* Letter from W.B. Markovits (Nov. 12, 2013) ("Fannie Mae records show that any shares purchased by Ms. Duma through Fannie Mae's Employee Stock Purchase Plan were liquidated as part of a cashless exercise when they were awarded [and therefore she could not have suffered damages necessary to render her a Class Member] because she could not have held purchased stock until the date of a corrective disclosure made by defendants. . . . Moreover, to the extent Ms. Duma owned shares in the Employee Stock Ownership Plan, the plan would receive the notice and have the claim, not her."). Though the Court need not formally overrule Ms. Duma's objection given her lack of standing, I note that I have already found that notice was adequate, and her vague allegations regarding the veracity of certain filings by certain defendants, and her questioning of the facts underlying this litigation, *see* Fairness Hr'g Tr. 20, 22, do not give me pause after the parties engaged in such extensive discovery.

adequate and reasonable, *see generally* Pls.' Mot. Final Approval, and among those multiple plaintiffs' firms there is a large amount of experience in complex securities and class action litigation, *id.* at 10; Markovits & Deters Joint Decl. Ex. 1a – 1w (counsel biographies). Moreover, the settlement was reached after two years of arm's-length negotiations with defendants' counsel, who have a wealth of experience in their own right, which further indicates the reasonableness of the settlement. But there are two additional circumstances in this case that point to the reasonableness of the settlement: the Ohio Attorney General supported the settlement agreement, and the boards of Lead Plaintiffs OPERS and STRS, both sophisticated institutional investors, approved the settlement. Pls.' Mot. Final Approval at 10, 10 n.7; *see In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 0165, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("under the PSLRA, a settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness'" (citation omitted)). Accordingly, this factor also militates in favor of approval of the settlement.

Thus, after due consideration of the terms of the Settlement Agreement, all papers filed in connection therewith, the oral presentations of counsel at the Fairness Hearing, and the factors discussed above, I find that the settlement is in the best interests of the class and is fair, reasonable, and adequate under Federal Rule of Civil Procedure 23(e).

### III.   The Plan of Allocation

Having found the settlement to be fair, reasonable, and adequate, the Court next turns to Lead Counsel's proposed Plan of Allocation ("POA") for distributing the

monetary recovery to class members. "As with settlement agreements, courts consider whether distribution plans are fair, reasonable, and adequate." *In re Lorazepam*, 2003 WL 22037741, at *7 (citing *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 381 (D.D.C. 2002)); *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000).

Under the proposed POA in this case, settlement funds will be distributed according to the relative amount of damage suffered by each class member. *See* Fraga Decl. Ex. A, ¶¶ 41-45 (Notice; Proof of Claim form). Based on relevant case law regarding loss causation and market analyses by Lead Plaintiffs' damages experts, the POA is designed to distribute the settlement funds to class members who suffered economic losses resulting from defendants' alleged violations of securities laws, rather than from market or other factors. *See* Markovits & Deters Joint Decl. ¶ 108. To do this,

> . . . Lead Plaintiffs' damage expert calculated the amount of estimated artificial inflation in the per share closing prices of Fannie Mae common stock and call options throughout the Class Period, as well as the artificial deflation in Fannie Mae put options, that allegedly was proximately caused by Defendants' alleged misrepresentations and material omissions. The damage expert's analysis entailed studying the price declines in Fannie Mae common stock in reaction to certain public announcements regarding Fannie Mae in which alleged misrepresentations and material omissions were alleged to have been revealed to the market (*i.e.*, "corrective disclosures"), adjusted to eliminate the effects attributable to general market and/or industry conditions. In this respect, artificial inflation tables were created and presented as part of the Settlement Notice for every trading day of the Class Period for both Fannie Mae common stock and call options, as well as an artificial deflation table for Fannie Mae put options. These tables will be utilized in calculating each claimant's Net Inflation Losses and/or Gains, and ultimately a claimant's overall Recognized Claim.

*Id.* ¶ 109. Based on the computations of class members' Recognized Claims, the

settlement funds will be proportionately allocated. *Id.* ¶ 110; *see also* Fraga Decl. Ex. A, ¶ 41 (Notice; Proof of Claim form).

The sole valid[14] Class Member objection filed with the Court takes issue with the POA. Objectors Jeff Pechan and Cafco-Gold Equity Fund, L.P. (collectively, "Pechan and Cafco") contend, based on the analysis of their expert, Greggory A. Brauer, that the POA "unfairly and improperly rewards option investors at the expense of stock purchasers." Class Members Jeff Pechan and Cafco-Gold Equity Fund, L.P.'s Objection to the Plan of Allocation and Mem. Supp. ("Pechan & Cafco Objection") [Dkt. # 1099] at 1. Specifically, Pechan and Cafco dispute how the POA calculates options values: they argue that the POA overvalues the call options and undervalues the put options, which, in a *pro rata* allocation, will have the effect of decreasing the amount of settlement funds that common stock holder class members receive. *See* Pechan & Cafco Objection at 3. To be clear, the objectors do not quarrel with the POA's employment of the commonly-used Black-Scholes methodology for valuing options. Instead, they focus their criticism on the input used for one of the six variables in that pricing model—the measure of volatility. *Id.* at 4-5. They claim that the POA's use of implied volatility was error, and that plaintiffs' experts should have used historical volatility instead. *Id.*

To address this objection, the Court need not wade into the depths of options valuation or join in the skirmish between the parties' experts.[15] After all, a plan of

---

[14] *See supra* notes 12-13.

[15] Lead Plaintiffs, marshaling their own experts to respond to the objection, argue that Pechan's and Cafco's expert's analysis is "rife with error" and assert that, "even if the historical volatility calculation suggested in the objection were used, the effect would be both the opposite of that asserted [by the

allocation "need not be perfect." *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D.
151, 163 (S.D.N.Y. 2011). Rather, it suffices if the plan has "a reasonable, rational basis,
particularly if recommended by experienced and competent class counsel." *Id.* (citation
omitted); *see also In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497
(S.D.N.Y. 2009); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL 3:07-1827, 2011
WL 7575004, at *4 (N.D. Cal. Dec. 27, 2011) (overruling objection to plan of allocation
where class counsel "provided a rational basis for the proposed plan of allocation").

Here, I am persuaded that the POA has a reasonable, rational basis because the use
of implied volatility rather than historical volatility to value options is a commonly
accepted method for calculating options damages in securities cases. *See* Lead Pls.'
Response to Objection and Suppl. Mem. in Further Supp. of Pls.' Mot. Final Approval
("Pls.' Response to Objection") [Dkt. # 1107] at 7. In fact, while Lead Plaintiffs cite a
litany of cases in which implied volatility was used to value options for securities
settlements, *see* Declaration of Kenneth N. Kotz and Frank C. Torchio [Dkt. # 1107-2] ¶
5, at 3 n.6 (collecting cases), the objectors do *not* cite a single case, or any other
authority, in their Objection to support the opinion of their expert that historical volatility
is a more appropriate measure, *see* Pls.' Response to Objection at 7; Fairness Hr'g Tr. 12.
Moreover, the one case the objectors brought to the Court's attention at the Fairness
Hearing—an unpublished Delaware Court of Chancery opinion in which the court elected
to use historical volatility—actually *confirms* the reasonableness of the POA here. In that

---

objectors] and *de minimis*—effecting a change in allocation of far less than 1% of total estimated
damages." Lead Pls.' Response to Objection and Suppl. Mem. in Further Supp. of Pls.' Mot. Final
Approval [Dkt. # 1107] at 1, 2.

case, *Lillis v. AT&T Corp.*, the court expressly noted that "implied volatility is the generally preferred method of valuing options" and "implied volatility is the more pure economic means to calculate volatility." *Lillis v. AT&T Corp.*, No. 717-N, 2007 WL 2110587, at *21 (Del. Ch. July 20, 2007). That court went on to use historical rather than implied volatility in that particular case (which is not a securities fraud case) due to unique circumstances that are not present in this case.[16]

Finally, the Court notes that the POA here is based on the work of several qualified experts, including Professor Gregg A. Jarrell, the former chief economist of the SEC, whose work was repeatedly tested by defendants' experts during the course of this litigation without their use of implied volatility ever being questioned. *See* Fairness Hr'g Tr. 12-13. In sum, plans of allocation, like this one, "that apportion[] funds according to the relative amount of damages suffered by class members have repeatedly been deemed fair and reasonable," *In re Vitamins*, 2000 WL 1737867, at *6, and I find that Pechan's and Cafco's largely unsupported critique of one variable underlying the *pro rata* distribution calculations here provides no basis to question the reasonableness of this POA. Accordingly, I overrule the Pechan & Cafco Objection and approve of the POA.

## IV.    Attorneys' Fees and Expenses

Finally, the Court turns to the attorneys' fees and expense reimbursement

---

[16] The Delaware court concluded that, "[w]hile implied volatility is the generally preferred method of valuing options, here historical volatility is the more appropriate measure of volatility for calculating damages" because (1) implied volatility reflected the market's short-term view of the company, which was problematic for valuing employee stock options at issue in the case because they were of a longer duration, and (2) implied volatility underpriced the value of plaintiffs' options in the case because it accounted for take-out risk priced into publicly traded options resulting from merger speculation. *See Lillis*, 2007 WL 2110587, at *21-22.

requested by Lead Counsel. In accordance with Fed. R. Civ. P. 23(h)(1), Lead Counsel gave notice to the Class Members that they would apply to the Court for attorneys' fees of no more than 22% of the Settlement Fund (after deducting costs and expenses, and adding interest), and expenses of no more than $17 million (plus the costs of settlement administration, plus interest). *See* Fraga Decl. Ex. A ¶ 5 (Notice; Proof of Claim form).[17] Consistent with that Notice, and pursuant to this Court's June 7, 2013 Preliminary Approval Order, Lead Counsel submitted its application on August 16, 2013, requesting attorneys' fees in the amount of 22% of the settlement amount and expense reimbursement of $15,296,349.17 (subsequently revised down to $15,294,860.78). *See* Mot. Attorneys' Fees; Pls.' Response to Objection at 6 n.10 (revising expense calculation). Lead Counsel estimates that the requested 22% fee amounts to $29,152,612.27 (without interest). *See* Mot. Attorneys' Fees at 8. The defendants take no position regarding Lead Plaintiffs' application. *See* Stipulation at 20.[18]

---

[17] Pursuant to the retention agreement between Lead Counsel and the Ohio Attorney General, Lead Counsel may apply and seek an award of attorneys' fees and costs in connection with this matter, and that agreement set a base minimum fee of 7.5%-8.5% of the total recovery amount, after costs and expenses. Lead Counsel has explained that they are now seeking fees above that base minimum "[b]ased on a number of factors not specifically set forth in the retention agreement—including the unusual length of this litigation (more than eight years), its difficulty, the extraordinary amount of time expended by the Plaintiffs' Counsel (the fees sought are far less than the lodestar, which is the amount of time expended multiplied by the hourly rates), and a comparison with fee awards in comparable cases." *See* Fraga Decl. Ex. A ¶ 5 (Notice; Proof of Claim form).

[18] Following any award of attorneys' fees by this Court, "Lead Counsel shall allocate the attorneys' fees among the Plaintiffs' Counsel authorized to assist in the prosecution of the Consolidated Action in a manner in which they in good faith believe reflects the contributions of such counsel to the prosecution and settlement of the Consolidated Action." *See* Stipulation at 20-21. Prior to the Fairness Hearing, two plaintiffs' firms—Statman, Harris & Eyrich, LLC and Bernstein Liebhard LLP—submitted supplemental briefs [Dkt. ## 1091, 1096] asserting that they are owed specific amounts from any attorneys' fee award pursuant to letter agreements with former lead counsel Waite, Schneider, Bayless & Chesley Co., LPA. Subsequently, however, both firms agreed with current Lead Counsel that any dispute over fee allocation is premature and agreed to defer the issue until after the settlement has been approved. *See* Pls.' Response to Objection at 2; Fairness Hr'g Tr. 31-34.

## A. Attorneys' Fees

In a class action suit, "the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Courts have a duty to ensure that claims for attorneys' fees are reasonable." *In re Black Farmers Discrim. Litig.*, --- F. Supp. 2d ---, 2013 WL 3480346, at *4 (D.D.C. 2013) (quoting *Trombley*, 826 F. Supp. 2d at 204 (internal quotations omitted); *see also Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993). And for federal securities class actions, the PSLRA reiterates this mandate. *See* 15 U.S.C. § 78u-4(a)(6) ("Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable* percentage of the amount of any damages and prejudgment interest actually paid to the class." (emphasis added)).

In a common fund case, such as this one, our Circuit has joined other circuits in concluding that "a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award." *See Swedish Hosp. Corp.*, 1 F.3d at 1271. While our Circuit "has not yet developed a formal list of factors to be considered in evaluating fee requests under the percentage-of-recovery method," *In re Lorazepam*, 2003 WL 22037741, at *8, courts in this District have often considered the following seven factors: "(1) the size of the fund created and the number of persons benefited, (2) the presence or absence of substantial objections by class members to the settlement terms or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of litigation, (5) the risk of nonpayment, (6) the time devoted to the case by plaintiffs' counsel, and (7) awards in similar cases." *In re Black Farmers*

*Discrim. Litig.*, 2013 WL 3480346, at *5 (quoting *Trombley*, 826 F. Supp. 2d at 204); *see also In re Lorazepam*, 2003 WL 22037741, at *8.

In applying these factors here, I find that the most significant are the complexity and duration of the litigation, the amount of time devoted by plaintiffs' counsel, the risk of nonpayment, and the skill and performance of the attorneys. In order to first place plaintiff's request in context, however, the Court will begin with awards in similar cases in order to benchmark the 22% fee requested.

Both nationally and in our Circuit, "a majority of common fund class action fee awards fall between twenty and thirty percent." *In re Black Farmers Discrim. Litig.*, 2013 WL 3480346, at *14 (citations omitted) (collecting cases); *Swedish Hosp. Corp.*, 1 F.3d at 1272; *see also* 4 William B. Rubenstein, Alba Conte & Herbert B. Newberg, Newberg On Class Actions § 14:6 (4th ed. 2002) ("In the normal range of common fund recoveries in securities and antitrust suits, common fee awards fall in the 20 to 33 per cent range."). Lead Counsel have identified a number of cases in our Circuit in which courts adhered to this range, and they contend that, if anything, their 22% fee request is at "the low end of the spectrum" for common fund cases. *See* Mot. Attorneys' Fees at 5-6. Further, according to law professor Brian Fitzpatrick, who submitted a declaration in support of Lead Counsel's fee request and who conducted an empirical study of federal class action settlements and attorneys' fee awards for the two-year period 2006-2007, "nearly two-thirds of awards using the percentage-of-the-fund method fell between 25% and 35%," and he "found the mean award to be 25.4% and the median 25%." Declaration of Brian T. Fitzpatrick ("Fitzpatrick Decl.") [Dkt. # 1092-28] ¶ 11 (citing

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 833-34, 838 (2010) ("Fitzpatrick Empirical Study")). Accordingly, the requested award falls well within the range of reasonableness established by other cases.

The Court is nonetheless mindful of the size of the settlement fund in this case because "[l]arger common funds are typically associated with smaller percentage awards . . . because even a small percentage of a very large fund yields 'a very large fee award.'" *In re Black Farmers Discrim. Litig.*, 856 F. Supp. 2d at 39 (quoting *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (2d Cir. 2005)). Indeed, "[w]here the common fund is worth many millions or even billions of dollars—in so-called 'megafund' cases—an appropriate fee may be considerably less than twenty percent of the fund." *Id.*; *see also In re Lorazepam*, 2003 WL 22037741, at *7. According to Mr. Fitzpatrick's own study of 2006-2007 cases, in settlements involving common funds of $100 million to $250 million, the mean award was 17.9% and the median was 16.9%. Fitzpatrick Decl. ¶ 13 (citing Fitzpatrick Empirical Study at 839). In comparing plaintiffs' fee request here to other cases, however, it may be appropriate to view it as lower than 22% because that percentage applies to the fund *after* expenses have been deducted. By contrast, all of the fee percentages in Mr. Fitzpatrick's study of 2006-2007 settlements were calculated *before* expenses were deducted from the settlement. *See* Fitzpatrick Decl. ¶ 11. When calculated in that manner, Lead Counsel are requesting only 19% in fees here, *id.*, which is "only slightly above the mean" for settlements of comparable size, *id.* ¶ 13. The Court is satisfied, therefore, that the 22% fee request is reasonable at even the preliminary stage

of comparing it to awards in other cases.

The flaw with comparisons to fees in other cases, of course, is that they inevitably tend to focus on averages and medians and ranges. This case, however, was anything but average. First, there is no question that this litigation was lengthy, highly complex, and vigorously contested. As discussed in greater detail in Part II above, this case lasted nearly a decade, involved extensive discovery and motions practice, necessitated numerous experts on both sides, and concerned numerous challenging, and at times *sui generis*, legal issues. Plaintiffs' counsel wrestled with highly complex accounting issues and Fannie Mae's placement into conservatorship, as well as initiated a parallel proceeding challenging an FHFA rule that compounded their risks by potentially cutting off any recovery even in the event they succeeded at trial—all while facing off against skilled defense lawyers. In the Court's view, this case was extraordinary in many respects and merits a substantial fee award. *See* Fairness Hr'g Tr. 34 (the Court stating "This was indeed one of the most hard fought, hotly contested and I might add fairly fought pieces of major litigation certainly that I have seen; and I don't think it would be an exaggeration to say that's ever been litigated in this courthouse. Certainly in the 12 years I have been here, I can't think of a major piece of litigation of this magnitude where the stakes were as high . . .").

Second, the time devoted by plaintiffs' counsel and their high risk of nonpayment—both of which stemmed from the complexity and duration of the case— also militate in favor of a substantial award here. Over nine years of litigation, plaintiffs' counsel billed nearly 300,000 uncompensated hours and incurred more than $15 million

in litigation expenses, all of which were at risk in the event of an unsuccessful result. *See* Mot. Attorneys' Fees at 16. And again, as discussed in Part II above, plaintiffs faced significant challenges in defeating defendants' pending summary judgment motions, establishing liability and damages at trial, and, even if successful there, securing any recovery in the face of the FHFA rule. In the Court's view, the amount of work plaintiffs' counsel performed in litigating this case was staggering, the hours billed were proportionate to the legal complexity of the case, and the risk of nonpayment for those hours and expenses incurred was very high.

Third, the skill and performance of the attorneys also justifies approval of a substantial fee in this case. Plaintiffs' counsel included firms and attorneys with a great deal of experience in complex class action and securities litigation. *See* Mot. Attorneys' Fees at 11; Markovits & Deters Joint Decl. Ex. 1a – 1w (counsel biographies). But the best testament to their effectiveness was their ability to successfully resolve this exceedingly complex case and secure the largest securities class action settlement in our Circuit (since the PSLRA went into effect) while battling opposing counsel at the very top of the defense bar. In the Court's view, and as I stated on the record at the Fairness Hearing, the lawyering in this case has been, by any standard, exceptional. *See* Fairness Hr'g Tr. 35 (the Court noting the "really outstanding lawyering on both sides of the aisle" and that "the quality of lawyering . . . has been extraordinary and frankly I think a credit to the profession").

Finally, the Court notes that there were no class member objections to the fee

request,[19] and a "lodestar cross-check" confirms the reasonableness of the fee request here.[20] In sum, the facts and circumstances of this case warrant a substantial fee award, and, in any event, Lead Counsel's request falls comfortably within the range that has been established in other cases both in and outside our Circuit. Accordingly, I have concluded that class counsel is entitled to an attorneys' fee award of 22% of the Settlement Fund (after deducting costs and expenses, and adding interest).

## B. Expenses

"In addition to being entitled to reasonable attorneys' fees, class counsel in common fund cases are also entitled to reasonable litigation expenses from that fund." *In re Lorazepam*, 2003 WL 22037741, at *10 (quotations and citations omitted). Here, Lead Counsel seek reimbursement for $15,294,860.78 in expenses incurred during the litigation. *See* Mot. Attorneys' Fees; Pls.' Response to Objection at 6 n.10 (revising expense calculation). This amount is comprised of expenses incurred by twenty-four

---

[19] The Court received one objection to the attorneys' fees request, from purported class member Rinis. Since Rinis is not, in fact, a class member and thus lacks standing to object, *see* Pls.' Mot. Strike Rinis Objection at 2-3, I need not formally overrule this purported objection.

[20] The "lodestar" is calculated by multiplying the hours reasonably expended in the litigation by a reasonable hourly fee. "Some circuits that employ the percentage of the fund method to calculate attorneys' fees in common fund class actions have suggested that district courts cross-check the percentage award at which they arrive against the results of the lodestar award method, to determine whether the percentage award roughly reflects the time and expertise the attorneys invested in the case." *In re Black Farmers Discrim. Litig.*, 2013 WL 3480346, at *17 (quotations and citations omitted). While our Circuit does not require such a lodestar cross-check, *id.*, performing one in this case confirms the reasonableness of a 22% award. Here, plaintiffs' counsel's lodestar (calculated using historical rates) is $94,132,246.27. *See* Declaration of W.B. Markovits [Dkt. # 1107-1] Ex. 10 (Fannie Mae Lead Plaintiffs' Counsel Cumulative Time and Lodestar Report; Cost and Expense Report). Comparing the requested fee of 22% (approximately $29 million) to this lodestar produces a multiplier of only 0.31. *See* Mot. Attorneys' Fees at 8. By contrast, "multiples ranging up to 'four are frequently awarded in common fund cases when the lodestar method is applied.'" *In re Lorazepam*, 2003 WL 22037741, at *9 (quoting *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 341 (3d Cir.1998)); *see also* 4 Newberg On Class Actions § 14:7 (4th ed. 2002) ("Generally, multipliers from 1-3 are the norm").

different law firms that represented plaintiffs in this wide-ranging litigation. *See* Declaration of W.B. Markovits ("Markovits Decl.") [Dkt. # 1107-1] Ex. 10 (Fannie Mae Lead Plaintiffs' Counsel Cumulative Time and Lodestar Report; Cost and Expense Report).

The most significant expense category relates to plaintiffs' experts and consultants. Of the total reimbursement sought, $10,027,188.94, or nearly 66%, is for expert and consultant fees and expenses. *See* Markovits Decl. Ex. 10 (Fannie Mae Lead Plaintiffs' Counsel Cumulative Time and Lodestar Report; Cost and Expense Report); Decl. of Waite, Schneider, Bayless & Chesley Co., LPA [Dkt. # 1092-4] Ex. B (Fannie Mae Class Action Litigation – Litigation Fund Expense Report). While large, the Court finds this expense appropriate in the context of a case, such as this one, of extraordinary complexity and duration, where experts were necessary to assist counsel in addressing highly complex securities and accounting issues, testing the opposing parties' numerous experts, challenging a federal regulation (the FHFA rule) in a parallel legal proceeding, and preparing the Plan of Allocation. *See* Mot. Attorneys' Fees at 20.

In addition, the long duration and magnitude of the case inevitably led to significant expenditures in categories like document production and management ($3,183,695.82, or 20.8%) and travel ($972,395.92, or 6.4%), all of which were accumulating over nine years. In view of Lead Counsel's representations about the steps they have taken to reduce, standardize, and audit costs across all plaintiffs' counsel firms, *see* Mot. Attorneys' Fees at 19-22, as well as the inherent incentive in contingency-fee litigation to minimize expenses due to the risk of failing to secure any recovery, the Court

is quite satisfied that these expenses are reasonable.

Moreover, the Court notes that plaintiffs' counsel secured a bargain in at least one expense category: mediation fees. Indeed, I have noted in a very different class action case that a large mediation fee "might be appropriate . . . in a highly complex case between two (or at least one) highly financed corporations, where there is a very large common fund for the settlement." *Hubbard v. Donahoe*, --- F. Supp. 2d ---, 2013 WL 3943495, at *9 (D.D.C. 2013). This is just such a case! And yet the parties managed to secure the services of a highly esteemed lawyer and mediator, Fred Fielding, whose services proved successful in resolving this hard-fought litigation, for just $71,776.86. *See* Markovits & Deters Joint Decl. ¶¶ 76, 155. Considering the length and complexity of the litigation, the size of the settlement fund, and the magnitude of the other litigation expenses incurred, it is hard not to see this particular expense as a bargain for plaintiffs.

As such, the Court is easily satisfied that class counsel reasonably expended the costs claimed in the course of their work on behalf of the class members, and no class member has objected to the award of expenses. Accordingly, the Court will award the requested $15,294,860.78 in expenses to class counsel.

## CONCLUSION

For all of the foregoing reasons, the Court grants final approval of the class action settlement under Federal Rule of Civil Procedure 23(e), approves the Plan of Allocation, and grants Lead Counsel's request for attorneys' fees and reimbursement of expenses. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge